**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

| | |
|---|---|
| DALE HARTKEMEYER (AKA SEIGEN)  ) | |
| ) | |
| Plaintiff,      ) | |
| ) | |
| v.         ) | Case No. _____ |
| ) | |
| WILLIAM P. BARR, in his official   ) | |
| capacity as the Attorney General of the  ) | |
| United States; MICHAEL CARVAJAL, in  ) | |
| his official capacity as the Director of the  ) | |
| Federal Bureau of Prisons; and T.J.   ) | |
| WATSON, in his official capacity as   ) | |
| Complex Warden for Terre Haute Federal  ) | |
| Correctional Complex,   ) | |
| ) | |
| Defendants.   ) | |

**<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

## INTRODUCTION

1.        In the midst of a global pandemic, with escalating cases arising around the country, the United States Government plans to carry out back-to-back executions at United States Penitentiary, Terre Haute ("USP Terre Haute")[1]—a prison with a documented COVID-19 outbreak.  After nearly two decades without carrying out any executions, the Government now seeks to rush forward with three executions in the month of July, each likely to spread new infections to participants and witnesses, prison staff, prisoners, and the community where the prison is located, as well as to the communities across the country from which participants and witnesses will travel for the executions.  The State of Missouri is the only jurisdiction in the United States that has carried out an execution since the President declared COVID-19 a national emergency on March 13, 2020.[2]  The Missouri prison where that execution occurred on May 19, 2020, saw an outbreak of 21 COVID-19 infections in the weeks after the execution.[3]  The Federal Government's extensive and large-scale plans for the executions amplify the risk posed by the executions.  Each execution will require the travel, movement, and congregation of hundreds of individuals, including the families of the victims and the death row prisoners, scores of correctional officers, members of local and national media, as well as large numbers of witnesses and legal counsel from around the country.

2.        This reckless plan should be troubling for anyone involved. For the Venerable Seigen Hartkemeyer (aka Dale Hartkemeyer), a Buddhist priest and spiritual advisor of eleven years to death row prisoner Wesley Purkey, it presents an untenable conflict—Rev. Hartkemeyer

---

[1] Together with Federal Correctional Institution, Terre Haute ("FCI Terre Haute"), USP Terre Haute forms the Federal Correctional Complex, Terre Haute ("FCC Terre Haute").
[2] *COVID-19 Emergency Declaration*, FEMA (Mar. 13, 2020), https://www.fema.gov/news-release/2020/03/13/covid-19-emergency-declaration.
[3] Bobby Radford, *COVID-19 Outbreak Confirmed at Prison in Bonne Terre*, Daily Journal Online (June 19, 2020), https://dailyjournalonline.com/news/local/govt-and-politics/covid-19-outbreak-confirmed-at-prison-in-bonne-terre/article_c7222072-e242-513d-871a-c63a9c30cfbc.html.

must decide whether to risk his own life in order to exercise his religious obligation to be present for Mr. Purkey's execution.  Rev. Hartkemeyer is 68 years old.  As a result of his age alone, he is especially vulnerable to COVID-19.  Even more troubling, Rev. Hartkemeyer had severe and recurring cases of bronchitis in 2019, and has a history of pleurisy, an illness that causes severe lung infection and impedes his ability to breathe.  As a result of his medical vulnerabilities, Rev. Hartkemeyer faces a grave risk of serious illness and death should he contract the virus.  The Government violates Rev. Hartkemeyer's right to the free exercise of religion by using its discretionary power to schedule Mr. Purkey's execution in a time and place where it cannot guarantee the safety of those individuals entitled to attend the execution, like Rev. Hartkemeyer. This Court should intervene and grant emergency injunctive relief, requiring the Government to postpone Mr. Purkey's execution until it can be carried out without burdening Rev. Hartkemeyer's rights.

## PARTIES

3.      Plaintiff Hartkemeyer is a Buddhist priest who serves as spiritual advisor to death row prisoner Wesley Purkey.  Plaintiff Hartkemeyer is a United States Citizen and resides in Bloomington, Indiana.

4.      Defendant William P. Barr is the Attorney General of the United States. He scheduled Mr. Purkey's execution for July 15, 2020 and has responsibility over carrying out death sentences against federal prisoners.  Defendant Barr maintains an office in Washington, D.C. and is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

5.      Defendant Michael Carvajal is the Acting Director of the Federal Bureau of Prisons ("BOP").  He is responsible for the supervision and operation of all federal prisons, including USP Terre Haute, where Mr. Purkey is scheduled to be executed on July 15, 2020.  Defendant Carvajal

maintains an office in Washington, D.C. and is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

6.      Defendant T.J. Watson is the Complex Warden for the Federal Correctional Complex, Terre Haute ("FCC Terre Haute").  Defendant Watson maintains an office in Terre Haute, Indiana and is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 (federal question jurisdiction).  Plaintiff Hartkemeyer seeks injunctive and declaratory relief under 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

8.      Venue lies in the Southern District of Indiana, the judicial district in which Plaintiff resides, and where the federal prison, FCC Terre Haute is located.  Venue is also appropriate under 28 U.S.C. § 1391, as venue is proper in any district in which a defendant resides.

## STATEMENT OF FACTS

### COVID-19 is a Dangerous and Potentially Fatal Disease, Particularly for the Elderly and Those with Certain Underlying Health Conditions

9.      COVID-19 is a highly contagious and deadly respiratory disease caused by a novel coronavirus (SARS-CoV-2).  The death rate of COVID-19 is estimated to be several times higher

than that of the common flu that kills thousands a year.[4]  The World Health Organization estimates that one in five people who contract the disease requires hospitalization.[5]

10.     COVID-19 is particularly dangerous to people who are 50 years of age and older.[6] The risk of hospitalization due to COVID-19 increases significantly beginning at age 50. According to the Centers for Disease Control and Prevention ("CDC"), 84.6 per 100,000 patients aged 40-49 years are hospitalized due to COVID-19. That rate increases to 136.1 per 100,000 for patients aged 50-64 years; to 198.7 per 100,000 for patients aged 65-74 years; and to 329.3 per 100,000 for patients aged 75-84 years.[7]

11.     The risk of death from COVID-19 also increases with age, rising significantly after age 50.  Patients aged 40-49 account for 2.9 percent of all COVID-19 deaths.  Patients aged 50-64 account for 15 percent of COVID-19 deaths; patients aged 65-74 account for 20.6 percent of deaths; and patients aged 75-84 account for 26.1 percent of deaths.[8]

---

[4] The University of Tennessee Health Science Center estimates the fatality rate may be as high as 3.4 percent and notes that the novel coronavirus and COVID-19 are "100s of times worse than influenza."  *Expert Responses*, University of Tennessee Health Science Center, https://uthsc.edu/coronavirus/expert-responses.php (last visited June 30, 2020).  As of June 30, 2020, there were 10,434,835 confirmed cases globally, with 509,779 deaths and 5,322,785 recoveries.  *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University*, Johns Hopkins University School of Medicine, https://cutt.ly/StEyn2U; *see also Coronavirus disease 2019 (COVID-19)*, UpToDate, https://cutt.ly/GtJYSkj (as of May 15, 2020, estimated overall fatality rate of 2.3 percent globally).
[5] *Q&A on Coronaviruses (COVID-19)*, *"Should I Worry About COVID-19?*," World Health Organization, https://cutt.ly/YtEyrxl (last visited May 19, 2020).
[6] Shikha Garg et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 – COVID-NET, 14 States, March 1-30, 2020*, 69 MMWR 458, 458 (2019), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6915e3-H.pdf (during first month of U.S. surveillance, 74.5 percent of hospitalized COVID-19 patients were aged 50 years or older).
[7] Centers for Disease Control and Prevention, Older Adults (updated June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.
[8] Centers for Disease Control and Prevention, *Demographic Trends of COVID-19 cases and deaths in the US reported to CDC* (updated June 29, 2020), https://www.cdc.gov/covid-data-tracker/index.html#demographics.

12.     The CDC has also identified people with particular medical conditions, including serious heart conditions or chronic lung diseases, as being especially vulnerable to severe illness or death from COVID-19.[9]

13.     Rev. Hartkemeyer is 68 years old.  He has suffered a variety of lung ailments, including two severe bouts of bronchitis in 2019, and has a history of pleurisy, a lung condition that causes severe lung inflammation and inhibits breathing.  Rev. Hartkemeyer is thus at higher risk of developing severe complications should he contract COVID-19.

14.     Patients who experience severe infections from COVID-19 require supportive care, including recourse to scarce medical equipment and specialized care providers who are able to monitor and implement such care.  This level of support can exceed local health-care resources.

15.     Patients who survive severe COVID-19 infections often require extensive rehabilitation to mitigate neurological damage and the loss of respiratory capacity.  Many who suffer from severe infections will likely experience lifelong limitations and disabilities.

16.     Although public health officials are optimistic that a COVID-19 vaccine may be available as soon as early winter 2021, there is currently no available vaccine or effective treatment.[10]

17.     The disease is spread by airborne droplets released by infected individuals.  Infected droplets can survive on surfaces for some period of time, ranging from four hours to up to three

---

[9]  Centers for Disease Control and Prevention, *People of Any Age with Underlying Medical Conditions* (updated June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

[10] Andrew Mach, *Covid-19 Transmission Surges as States Continue Reopening*, Bloomberg, https://www.bloomberg.com/news/newsletters/2020-06-24/covid-19-transmission-surges-as-states-continue-reopening (last visited June 29, 2020).

days on some surfaces.  There is growing evidence that the virus may also spread through fecal matter.[11]

18.     Infected persons may begin to experience signs and symptoms two to fourteen days after exposure.  A significant number of infected persons are asymptomatic, however, and do not ever exhibit symptoms.  Both asymptomatic and pre-symptomatic individuals can unwittingly transmit the disease.

### COVID-19 Spreads Rapidly in the Absence of Proper Precautions, and is Notoriously Contagious in Prisons

19.     Since states have begun reopening and relaxing social distancing requirements in public spaces, there have been a rising number of cases around the country.  Twenty-two states that had a downward trajectory in the daily number of new cases saw cases start to climb again in mid-June.[12]  On June 25, 2020, 39,327 new COVID-19 infections were reported by state health departments across the United States – surpassing the previous single-day records of 38,115, cases which was set the day before.[13]  Recognizing the threat of further relaxing social distancing mandates, a growing number of states have paused their plans to reopen.[14]  Some have even begun reimposing restrictions they had lifted earlier.  On June 26, 2020, for example, Texas re-closed bars and reduced restaurant capacity to 50 percent, and Florida took similar measures as daily case counts hit an all-time high in both states.[15]  Governor Eric Holcomb's office acknowledged the

---

[11] Jordan Hindson, *COVID-19: Faecal-Oral Transmission?*, Nature (Mar. 25, 2020), https://www.nature.com/articles/s41575-020-0295-7.

[12] Julie Bosman and Mitch Smith, *Coronavirus Cases Spike Across Sun Belt as Economy Lurches into Motion,* N.Y. Times (updated June 18, 2020), https://www.nytimes.com/2020/06/14/us/coronavirus-united-states.html.

[13] Hanna Knowles, et al., *U.S. sets another single-day record for new coronavirus cases*, Washington Post (June 25, 2020), https://www.washingtonpost.com/nation/2020/06/25/coronavirus-live-updates-us/.

[14] Jasmine C Lee, et al., *See How All 50 States Are Reopening and Closing Again)*, N.Y. Times (updated June 26, 2020), https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html (Michigan, Oregon, Idaho, Nevada, New Mexico, Arkansas, Louisiana, North Carolina, and Delaware among the states to pause reopening plans).

[15] Corky Siemasko, *Texas and Florida Close Bars After Explosion of COVID-19 Cases,* NBC News (June 26, 2020) https://www.nbcnews.com/news/us-news/texas-close-bars-limit-restaurant-dining-due-explosion-covid-19-

potential need for Indiana, too, to postpone its reopening plan and "return to an earlier stage of the governor's Back on Track roadmap."[16]

20.     It is well established that the risk of exposure to and transmission of infectious diseases, as well as the potential harm to those who become infected, is significantly higher in jails and prisons than in the community.[17]  Shared bunkrooms, bathrooms, showers and cafeterias in small, densely packed enclosed spaces makes social distancing—a cornerstone of reducing transmission of COVID-19—impossible for prisoners, staff, and visitors alike.  Lack of sufficient soap and hand sanitizer prevents prisoners from maintaining the level of hygiene recommended by public health officials to combat the spread of the disease.  Additionally, poor ventilation systems—a hallmark of carceral settings—only further facilitate the transmission of COVID-19, an airborne illness.

21.     For these reasons, it is no surprise that "the nation's top five Covid-19 hot spots are all correctional facilities."[18]  Because asymptomatic individuals can spread the disease, universal testing and contact tracing is critical for prisons to gain an effective handle on the scope of the outbreak and take the appropriate quarantine measures.[19]  Several prisons that have conducted universal testing after initially only conducting limited, symptomatic testing reported astonishingly

---

n1232233.

[16] Megan Sanctorum, *Some States See Spike in New COVID-19 Cases. Could Indiana be Next,* RTV6 (June 16, 2020), https://www.theindychannel.com/news/coronavirus/some-states-see-spike-in-new-covid-19-cases-could-indiana-be-next.

[17] *See* John E. Dannenberg, *Prisons as Incubators and Spreaders of Disease and Illness*, Prison Legal News (Aug. 15, 2007), https://www.prisonlegalnews.org/news/2007/aug/15/prisons-as-incubators-and-spreaders-of-disease-and-illness/ (discussing that jails and prisons "have become breeding grounds for infectious epidemics, with severe consequences for both prisoners and the public alike").

[18] *The Coronavirus Crisis Inside Prisons Won't Stay Behind Bars*, N.Y. Times (June 25, 2020), https://www.nytimes.com/2020/06/25/opinion/coronavirus-prisons-compassionate-release.html.

[19] *See* Cary Aspinwall & Jospeph Neff, *These Prisons Are Doing Mass Testing For COVID-19—And Finding Mass Infections*, The Marshall Project (Apr. 24, 2020), https://www.themarshallproject.org/2020/04/24/these-prisons-are-doing-mass-testing-for-covid-19-and-finding-mass-infections.

high infection rates.  When the Montgomery County Correctional Facility in Pennsylvania tested all its prisoners in late April, for example, it found 30 times more cases than previously detected by testing only symptomatic detainees.[20]  Based on universal testing at Neuse state prison in Goldsboro, North Carolina, the number of reported COVID-19 infections jumped from 39 to 444 within one week.[21]  After widespread testing at Marion Correctional Institution in Ohio, nearly 80 percent of its prisoner population was found to have COVID-19.[22]

22.     Responding to the COVID-19 crisis, Defendants implemented drastic policy changes to restrict movement in and out of prisons to combat the spread of the virus, even before there were any positive cases reported from USP Terre Haute.  On March 19, 2020, for example, the BOP suspended prisoner internal movement "with limited exceptions"—a policy still in place today.[23]  On March 26, 2020, Defendant Barr issued a Memorandum directing the prioritization of "home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic."[24]  A week later, Defendant Barr issued yet another memorandum, recognizing the "significant levels of infection at several of our facilities" and again stressing "the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates."[25]

---

[20] Jeremy Roebuck, *Montgomery County's jail tested every inmate for Covid-19 – and found 30 times more cases than previously known*, The Philadelphia Inquirer (Apr. 28, 2020), https://www.inquirer.com/news/coronavirus-testing-montgomery-county-jail-asymptomatic-philadelphia-prisons-20200428.html.

[21] Kevin Johnson, *Mass virus testing in state prisons reveals hidden asymptomatic infections; feds join effort*, USA Today (updated Apr. 27, 2020), https://www.usatoday.com/story/news/politics/2020/04/25/coronavirus-testing-prisons-reveals-hidden-asymptomatic-infections/3003307001/.

[22] *73% of inmates at an Ohio prison test positive for coronavirus*, NPR (Apr. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus.

[23] *Updates to BOP COVID-19 Action Plan*, Federal Bureau of Prisons (last visited June 28, 2020) https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

[24] Mem. from William Barr, Att'y Gen., U.S. Dep't of Justice, on Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.

[25] Mem. from William Barr, Att'y Gen., U.S. Dep't of Justice, on Increasing Use of Home Confinement at

23.     Departments of corrections in jurisdictions across the country have responded to the pandemic by suspending visitation at correctional facilities, though some have allowed limited exceptions for legal visits.[26]   The Indiana Department of Corrections has suspended public visitation to its facilities until further notice and suspended legal visitation until at least July 15, 2020.[27]

24.     On March 13, 2020, BOP closed the doors of every federal prison across the country to all visitation, including legal visits.  To this day, the BOP website still boldly states that "all visiting at [USP Terre Haute] has been suspended until further notice."[28]

25.     Despite the prison's on-going lockdown to visitors, on June 15, 2020, the Department of Justice announced the scheduling of back-to-back executions of three men in July and one in August.  Immediately thereafter, BOP informed counsel for the prisoners that it would reinstate the social, legal, and spiritual visits for the four men under warrant.  Though visitation was resumed, BOP did not have any plan or policies in place to ensure such visits, let alone the executions themselves, could be done safely and in compliance with CDC guidelines during the pandemic.  Despite numerous requests, BOP has provided little information about COVID-19-related safety measures apart from asking for self-reported symptoms, checking temperatures, and requiring masks.  Verbal screens—*i.e.*, asking a person for a subjective report of symptoms—cannot adequately screen new, asymptomatic or pre-symptomatic infections.

---

Institutions Most Affected by COVID-19 (Apr. 3, 2020),
https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf.
[26] *How Prisons in Each State Are Restricting Visits Due to Coronavirus*, The Marshall Project (updated June 29, 2020), https://www.themarshallproject.org/2020/03/17/tracking-prisons-response-to-coronavirus (prisons in only three states—Delaware, Missouri, and Oklahoma—have resumed normal visitation, albeit with additional precautions and limits).
[27] Visitation, Indiana Department of Corrections, https://www.in.gov/idoc/3057.htm (last visited July 1, 2020).
[28] *See* Federal Bureau of Prisons, USP Terre Haute, https://www.bop.gov/locations/institutions/thp/ (last visited July 1, 2020).

26.     Additionally, BOP has provided very limited information about COVID-19 testing at USP Terre Haute.  As of June 29, 2020, BOP reported a total of eight positive cases and one COVID-19-related death.[29]  But, as BOP notes on its website featuring the testing data, "[t]he number of positive tests at a facility is not equal to the number of cases[.]"[30]  Indeed, less than 19 percent of the prisoner population at USP Terre Haute has been tested for the virus.[31]  And, BOP has not disclosed any criteria it has established as necessary for a prisoner at USP Terre Haute to be administered a test.  Nor has BOP disclosed any information about testing for USP Terre Haute staff, or whether any quarantine measures are in place for prisoners and staff who exhibit COVID-19 symptoms, or precautionary measures in place for isolating those with known exposure to COVID-19-positive individuals.  All of this information is critical to understanding the full impact of COVID-19's spread within the facility's walls.  For example, based on the number of prisoners in quarantine with symptoms who have not yet been tested at Metropolitan Correctional Center in New York, an Assistant U.S. Attorney represented at a court hearing that COVID-19 infections at the facility are at least seven times what the BOP publicly reported.[32]  In fact, some BOP facilities have actually stopped testing prisoners who exhibit symptoms as a matter of policy in order to conserve testing resources.[33]  Thus, the number of prisoners who tested positive for the virus

---

[29] Federal Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last visited June 29, 2020) (showing total of five prisoners who tested positive, one prisoner who died, and two prisoners who have recovered at FCC Terre Haute facilities).

[30] *Id.*; *see None of us have ever been told to slow down on Testing*, NPR (June 23, 2020), https://www.npr.org/2020/06/23/881674932/watch-live-fauci-redfield-to-testify-on-trump-administrations-covid-19-response (congressional testimony of Dr. Fauci:  "Right now, the data at a national level suggests that for every documented infection that you have as a case report, there's actually about 10 other individuals that have been infected").

[31] *See* Federal Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last visited June 29, 2020) (reporting COVID-19 tests administered to 230 of the 1,300 prisoners detained at the facility).

[32] Larry Neumeister, *Federal lawyer: COVID-19 at federal jail worse than reported*, Associated Press (June 2, 2020), https://abcnews.go.com/Health/wireStory/fed-lawyer-covid-19-federal-jail-worse-reported-71032387.

[33] Greg LaRose, *Oakdale federal prison stops testing inmates with COVID-19 symptoms*, WDCU News (Mar. 31, 2020), https://www.wdsu.com/article/oakdale-federal-prison-stops-testing-inmates-with-covid-19-symptoms/31989498#.

confirms only that there are active, current COVID-19 infections among USP Terre Haute prisoners.

### Attendance at the Planned Execution at USP Terre Haute Would Pose a Grave Risk to Rev. Hartkemeyer's Health

27.     At least six executions set for this spring and summer have been rescheduled because of the pandemic.[34]  Missouri is the only state to have carried out an execution since mid-March, when the BOP moved to close facilities because of the growing COVID-19 outbreaks.[35]  The death row prisoner had sought a stay of execution on the ground that 50 correctional officers would be involved in carrying out the execution at the Missouri prison.  In response, the State contended that only the Executive Branch had the authority to consider the safety of the outbreak.  On May 19, the date of the execution, Missouri had recently entered its first phase of "re-opening," as had other states.[36]  The Eastern Reception Diagnostic and Correctional Center ("ERDCC") did not have any reported COVID-19 cases before the execution was carried out.  One month later, ERDCC reported 21 positive cases with other tests pending.[37]

---

[34] *See* Jess Bravin, *Prisoner Executions Are Put Off Because of Pandemic*, Wall Street Journal (Mar. 26, 2020); *Tennessee v. Oskar Franklin Smith*, No 89-F-1773 (Tenn. Apr. 17, 2020) (June 4, 2020 execution rescheduled for February 4, 2021 "due to the COVID-19 pandemic"),
http://www.tncourts.gov/sites/default/files/docs/order_execution_reset_for_february_4_2021.pdf; *In re Hummel*, No. WR-81,578-02, 2020 WL 1268970, at *1 (Tex. Crim. App. Mar. 16, 2020) (*sua sponte* order granting 60-day stay of execution "in light of the current health crisis and the enormous resources needed to address that emergency"); *In re Beatty*, No. WR-59,939-04, 2020 WL 1329145, at *1 (Tex. Crim. App. Mar. 19, 2020) (same); *In re Hernandez*, No. WR-81,577-02, 2020 WL 1645052, at *1 (Tex. Crim. App. Apr. 1, 2020) (granting 60-day stay of execution in recognition that execution "should be stayed at the present time"); *In re Busby*, No. WR-70,747-03, 2020 WL 2029306, at *1, (Tex. Crim. App. Apr. 27, 2020) (same); *Texas v. Carlos Trevino*, No. 1997-CR-1717D (Bexar Co. Dist. Ct. Apr. 15, 2020) (order granting unopposed motion to withdraw original execution date and resetting execution date to September 30, 2020 "due to restrictions and concerns caused by the COVID-19/Coronavirus pandemic"), https://files.deathpenaltyinfo.org/documents/Trevino-Carlos-TX-Bexar-Cty-Order-Rescheduling-Execution-2020-04-15.pdf.
[35] Erik Ortiz, *Missouri holds nation's first execution during coronavirus pandemic*, NBC News (May 20, 2020), https://www.nbcnews.com/news/us-news/missouri-holds-nation-s-first-execution-during-coronavirus-pandemic-n1210646.
[36] Jasmine C. Lee et al., *See How All 50 States Are Reopening (And Closing Again)*, N.Y. Times (updated June 29, 2020), https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html.
[37] Bobby Radford, *COVID-19 Outbreak Confirmed at Prison in Bonne Terre*, Daily Journal Online (June 19, 2020), https://dailyjournalonline.com/news/local/govt-and-politics/covid-19-outbreak-confirmed-at-prison-in-bonne-

28.     The scale of necessary, forced human contact for the planned federal execution at USP Terre Haute, involving the participation of hundreds of people, greatly exceeds that which was required for the execution of a state prisoner in Missouri.  The execution itself, and the days of intensive close contact by hundreds of staff and visitors at the prison, threaten to become a super-spreader event.  "Super-Spreading events occur when a single person infects a large number of other people—sometimes 10, 20, sometimes even more in one setting."[38]  Super-spreader events have been well documented across the country during the pandemic.  In Albany, Georgia, for example, COVID-19 spread among more than 100 people who traveled to attend the funeral of a loved one.[39]  After traveling to a conference in Boston, over 100 of 175 attendees contracted the virus and spread it to their respective hometowns in Indiana, Tennessee, and North Carolina, among other locations.[40]  Recognizing the risk of super-spreader events, organizers have already canceled large gatherings scheduled as late as August and September across the state of Indiana.[41]  And Indiana continues to require limited capacity and social distancing measures in most public settings, and to disallow altogether "[c]onventions, fairs, festivals, parades, and similar events."[42]

---

terre/article_c7222072-e242-513d-871a-c63a9c30cfbc.html.

[38] Nicole Brown, *What is a coronavirus "super-spreading" event?*, CBS News (May 15, 2020), https://www.cbsnews.com/news/super-spreader-coronavirus/.

[39] Ellen Barry, *Days After a Funeral in a Georgia Town, Coronavirus 'Hit Like a Bomb'*, N.Y. Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-funeral-albany-georgia.html.

[40] Farah Stockman & Kim Barker, *How a Premier U.S. Drug Company Because a Virus 'Super Spreader'*, N.Y. Times (Apr. 12, 2020), https://www.nytimes.com/2020/04/12/us/coronavirus-biogen-boston-superspreader.html.

[41] *See e.g.*, Chris Sims & Ethan May, *2020 Indiana State Fair cancelled due to coronavirus pandemic*, Indianapolis Star (June 4, 2020), https://www.indystar.com/story/entertainment/state-fair/2020/06/04/2020-indiana-state-fair-canceled- coronavirus-pandemic/3146126001/ (Indiana State Fair scheduled for August 7-23 is canceled because "safety is our number one priority."); Melissa Hudson, *Marshall County Blueberry Festival Cancelled*, ABC57 (June 25, 2020), https://www.abc57.com/news/marshall-county-blueberry-festival-cancelled (annual festival in Marshall County, Indiana, scheduled for September 4-7 is canceled because organizers could not meet governmental requirements during Indiana's re-opening); Mary Willkom, *Rev Indy Cancels 2020 Event*, Inside Indiana Business (June 26, 2020), https://www.insideindianabusiness.com/story/42296271/rev-indy-cancels-2020event (popular Indiana charity event at Indianapolis Motor Speedway officially canceled after being initially postponed to August 23, 2020).

[42] Back on Track Indiana, *Stage 4*, https://backontrack.in.gov/files/BackOnTrack-IN_WhatsOpen-Closed-stage4.pdf (last visited June 29, 2020).

13

29.     In November 2019, Rick Winter, counsel for the Federal Bureau of Prisons North Central Region, submitted a declaration describing the enormous preparation and personnel required under the BOP's protocol for carrying out Mr. Purkey's execution.[43]  The Government's plan for the execution involves "activation of the execution team, which consists of 40 BOP staff members," who normally conduct a "wide range of correctional and administrative positions" and who will spend several days before the execution practicing and preparing for the execution.[44]

30.     In addition to the 40 members of the execution team, the protocol involves approximately 200 FCC Terre Haute staff who will perform security and support for the execution.[45]  These staff will be "pulled away from their normal duties," including preparation of prisoner meals.[46]  BOP plans to staff specialized BOP teams with 50 individuals traveling to FCC Terre Haute from other prisons.[47]  The approximately 300 BOP and FCC Terre Haute staff will be supplemented by additional staff from various federal, state, and local law enforcement agencies to provide additional security.[48]  Many of these individuals will be traveling by air and staying in local hotels.[49]

31.     The Government's plan therefore requires individuals to converge in Terre Haute from around the country and thus face potential exposure to COVID-19 on planes, in airports, and in hotels, and cause others to be exposed.  These individuals will then convene and mix in enclosed spaces with BOP staff drawn from around a prison with known COVID-19 cases for group training, practices, meetings, and on-site work, escalating the risks of infection for the prisoners,

---

[43] *In Re Matter of Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-145-TSC, Declaration of Rick Winter ("Winter Decl."), ECF No. 54 (D.D.C. Nov. 21, 2019).
[44] *Id.* ¶ 5.
[45] *Id.* ¶ 8.
[46] *Id.*
[47] *Id.* ¶ 10.
[48] *Id.* ¶ 7.
[49] *Id.* ¶ 5.

staff, and ultimately anyone attending the execution.  While even the air travel alone poses a significant risk of COVID-19 infection, the BOP plan compounds the exposure through various dangerous touchpoints.

32.      In addition to the BOP staff who will be participating in the execution itself, others including the prisoner's family members, defense team, and spiritual advisor, and the victim's family members, will have to travel great distances, many by plane, and stay in local hotels in order to be present on the day of the execution.  Mr. Purkey's mitigation specialist, for example, who was also designated with Rev. Hartkemeyer as a witness, will need to travel 650 miles from Baltimore to attend the execution.

33.      Protestors and counter protesters are expected to be on the prison grounds and in close contact with staff.[50]  The Government plans to contract buses to transport demonstrators, and send staff, drawn from the wide pool of individuals assembled, for security for the demonstrators.[51]

34.      Large numbers of media can also be expected to converge on the prison grounds. Television news camera crews, reporters, and other media crews will set up tents in order to cover the entire spectacle.  The July 13, 2020 execution date for Danny Lee and July 15, 2020 execution date for Mr. Purkey would be the first federal executions since 2003.  The media presence at the 2001 Timothy McVeigh execution "had the look and feel of a fairground or circus," with a host of media tents and media staff roaming the grounds on golf carts.[52]  The reporters will attend a lottery where ten media witnesses will be selected to view the execution.[53]

---

[50] *A Plan is in Place for Protesters at the Prison*, WTHI TV (June 17, 2020),
https://www.wthitv.com/content/news/A-plan-is-in-place-for-protesters-at-the-prison-571319451.html.
[51] Winter Decl. ¶ 9.
[52] Andrew Cohen, *Same Planet, Different Worlds*, CBS News (June 10, 2001),
https://www.cbsnews.com/news/same-planet-different-worlds/.
[53] *See* Bureau of Prisons, Media Witness Form,
https://www.bop.gov/resources/federal_execution_media_form.jsp?irn=14679%E2%80%90045 (last visited June 29, 2020).

35.     The Federal Regulations direct the attendance of up to 24 witnesses to the execution:  six individuals selected by the death row prisoner, eight citizen witnesses, and ten members of the press.[54]  In addition to the 40-person execution team, the execution facility is expected to hold these 24 witnesses, the death row prisoner, and an unspecified and uncapped number of attorneys for the Department of Justice.

36.     The execution facility, sometimes referred to as the "Death House," is a separate facility on the FCC Terre Haute grounds.  It is a small, single story building, like a small home. The witnesses and prison staff are shuttled together in a van to the facility from the main correctional complex prior to arriving at separate entrances for various groups of witnesses.  In the days leading up to the execution, attorneys have to visit with their client in the Death House.  At the 2003 execution of Louis Jones, Jr., Mr. Jones's attorney, his daughter, and three prison ministers had to stand "shoulder to shoulder" to fit in the room to talk with Mr. Jones before the execution.  During the execution itself, the witnesses are grouped into four separate viewing rooms—one for media; one for the victim's family members; one for attorneys, the prisoner's loved ones, and his spiritual advisor; and one for government officials.

37.     These viewing rooms are cramped and it is not possible to socially distance. Additionally, those in the viewing rooms cannot see the prisoner unless they are inches from the Plexiglass separating the witnesses from the prisoner.  The need to be close to the glass to see and be seen from the viewing room further exacerbates the impracticality of social distancing.

38.     The fact that the government scheduled the July executions back-to-back further adds to the risk of contracting COVID-19 that all attendees and participants face.  July 13, 2020, the scheduled execution date of death row prisoner Danny Lee, will bring Mr. Lee's own group of

---

[54] 28 C.F.R. § 26.4(c)(3)-(4).

counsel and family together with media witnesses, the victim's family members, spiritual support, and government officials from all over the country, interacting with each other and BOP staff within the prison and the Death House.  Just two days later, Rev. Hartkemeyer is expected to attend Mr. Purkey's execution, where a different group of counsel, loved ones, media witnesses, victim's family members, and government officials from different parts of the country will interact with each other and BOP staff, many of whom were exposed during Mr. Lee's execution, and within the same prison and Death House where those who participated in Mr. Lee's execution came in contact.  These are prime conditions, not just for Rev. Hartkemeyer to contract COVID-19, but for a super-spreader event.

39.     Under the Federal Regulations, each death row prisoner is entitled to select a spiritual advisor to attend his execution.[55]  The physical presence of a spiritual advisor of the prisoner's choice is essential to fulfilling the need to comfort and prepare a prisoner for death.

40.     Rev. Hartkemeyer has served as the spiritual advisor to Mr. Purkey for more than eleven years, since January 2009.  Mr. Purkey appointed Rev. Hartkemeyer as his Minister of Record in 2013.  For the last decade prior to the COVID-19 pandemic, he visited Mr. Purkey approximately once a month.  During these visits, Rev. Hartkemeyer provided Mr. Purkey spiritual guidance and counseling consistent with Zen Buddhist traditions.

41.     Rev. Hartkemeyer's last in-person visit with Mr. Purkey was in February 2020. The prison canceled his next visit, scheduled for March 21, 2020, due to the pandemic.  The Religious Services Assistant at BOP notified Rev. Hartkemeyer that religious visits would be canceled through at least June 30, 2020 as a result of BOP's issuance of a "Shelter in Place" order.

---

[55] 28 C.F.R. § 26.4(c)(3)(i).

42.     Mr. Purkey was initially scheduled for execution on December 13, 2019.  A stay of execution was entered on November 20, 2019, and upheld by the U.S. Supreme Court on December 6, 2019 pending a decision by the U.S. Court of Appeals for the District of Columbia Circuit.  Prior to the issuance of the stay, Mr. Purkey designated Rev. Hartkemeyer as his spiritual advisor to attend his execution, and on November 21, 2019, Defendant Watson sent Rev. Hartkemeyer a form to attend the execution.  The form indicated that witnesses had to report to the Vigo County Sheriff's Office parking lot to be transported to FCC Terre Haute for processing.

43.     Rev. Hartkemeyer intended to attend the execution of Mr. Purkey.  Rev. Hartkemeyer's sacred, religious obligation to Mr. Purkey, who has been in Rev. Hartkemeyer's spiritual care for over a decade, compels him to attend the execution, where Mr. Purkey will face this ultimate moment of crisis.  The warrant for the December 13 execution date expired as the result of a stay in ligation challenging the Government's lethal injection protocol, and the execution did not take place.

44.     On June 15, 2020, the Government notified Mr. Purkey that it had set a new warrant for his execution on July 15, 2020.  On the same day, June 15, the Department of Justice issued a press release announcing Mr. Purkey's newly scheduled execution date.  At no time did the Government acknowledge that it had scheduled Mr. Purkey's execution in the midst of an ongoing pandemic.  Nor did it display awareness of the serious public health risks involved or announce any enhanced measures it intended to pursue in response to COVID-19 to ensure the safety of all those present.

45.     Rev. Hartkemeyer is now forced to choose between abandoning his religious obligation to Mr. Purkey and facing an unacceptably high risk of COVID-19 exposure.  In order to protect his health, and consistent with CDC and state guidance, Rev. Hartkemeyer has been self-

isolated in his home since the start of the pandemic.[56]  Now, he would need to break that isolation, comingle with hundreds of other individuals, and enter a prison with an active COVID-19 outbreak.  The prison itself is unsafe for him as a medically vulnerable person, and even entering the prison places him at an unacceptable risk.  But this risk is overshadowed by the even greater risks involved in attending the execution.  The execution would require him to come into repeated and close contact with correctional and security staff who have themselves recently traveled across the country or have been in close contact with others who have.  These contact points include when he:  (1)  is transported from his car to the main security area for the prison; (2) goes through security, hands in his ID, has his hand stamped, and potentially is searched; (3) is transported with others from the main prison admission area to the Death House; (4) is performing his duties to Mr. Purkey during the execution, and while so doing is forced to stand in close contact in a small cramped room and share a ventilation system with over 50 other people; and (5) is escorted out of the Death House with others and returned to his car.  In Rev. Hartkemeyer's own words, Defendants have placed him "in the impossible position of violating my religious duties or risking my health and life to carry them out."

## CAUSE OF ACTION
### Violation of the Religious Freedom Restoration Act
### (42 U.S.C. § 2000bb)

46.     Plaintiff realleges and incorporates by reference the allegations set forth above in paragraphs 1 through 45.

---

[56] *See* CDC, Coronavirus Disease 2019 (COVID-19):  People Who Need to Take Extra Precautions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited July 1, 2020) (advising older adults and people with underlying medical conditions to "[l]imit . . . interactions with other people as much as possible); Ind. Exec. Order No. 20-32 § 3(c) (June 11, 2020), *available at* https://www.in.gov/gov/files/Executive%20Order%2020-32%20(Stage%204).pdf (Governor Holcomb executive order urging individuals "65 and above and those who are sick or have underlying medical issues . . . to stay in their residence to the extent possible, except as necessary to seek medical care.").

47.     Under RFRA, the federal government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government "demonstrates that application of the burden to the person" is (1) "in furtherance of a compelling governmental interest" and (2) "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.

48.     As a Buddhist priest, Rev. Hartkemeyer is religiously called to provide spiritual counseling and guidance to incarcerated individuals. Rev. Hartkemeyer has served as Mr. Purkey's priest for more than a decade and, when Mr. Purkey was previously scheduled for execution in December 2019, was designated as the "spiritual adviser" who "*shall be present*," 28 CFR § 26.4(c), for Mr. Purkey's execution. Rev. Hartkemeyer holds a sincere religious belief that he made a spiritual commitment to serve as Mr. Purkey's priest and that, in order to fulfill this religious commitment, he must be present at the execution.

49.     At the same time, because of his age and respiratory conditions, Rev. Hartkemeyer is highly vulnerable to COVID-19.

50.     Rev. Hartkemeyer's religious exercise is substantially burdened because Defendants—in scheduling Mr. Purkey's execution to take place during a pandemic—have imposed on him substantial pressure to abandon his religious obligations as Mr. Purkey's priest and violate his sincere religious beliefs regarding the nature of his role as a spiritual advisor. Rev. Hartkemeyer has been put to an untenable choice: risk his health, and possibly his life, in order to carry out his sincere religious beliefs, or violate those beliefs by failing to fulfill his religious commitment toward Mr. Purkey.

51.     Under RFRA's robust strict-scrutiny test, Defendants cannot justify imposing this substantial burden on Rev. Hartkemeyer.

52.     Even if Defendants have a compelling interest in carrying out Mr. Purkey's execution at some point, they have no compelling interest in doing so during a pandemic.  On the contrary, the government's interest in this case should weigh toward delaying the execution because proceeding along the current timeline risks the spread of COVID-19 and puts at serious risk the health and lives of every individual who participates, including those who have a right— and, in Plaintiff's case, a religious obligation—to be present for Mr. Purkey's death.

53.     Nor do Defendants have a compelling interest in proceeding with an execution without a witness whose attendance has been mandated by law.

54.     Any asserted urgency by Defendants is belied by the fact that—for more than 16 years—they failed to promulgate a revised execution protocol and only recently began to schedule executions again.

55.     Moreover, whatever interests Defendants may claim, carrying out Mr. Purkey's execution on July 15 is not the least restrictive means available to Defendants of furthering those interests.  In the weeks after Defendants set Mr. Purkey's execution date, coronavirus infections and deaths have surged across the country.  The danger of exposure to COVID-19 is higher than ever, and the nature of an execution conducted at a prison compounds that danger for those in attendance.  Defendants' alleged interests will still be served even if the execution is delayed until a time when it can be attended by Rev. Hartkemeyer without posing a severe risk of harm to his health and life.  Several states have suspended executions for the same reason, and their interests (no doubt similar to Defendants' interests here) have not been vitiated as a result.

**CAUSE OF ACTION**
**Arbitrary and Capricious Agency Action**
**(5 U.S.C. § 706(2))**

56.     Plaintiff realleges and incorporates by reference the allegations set forth above in paragraphs 1 through 55.

21

57.     The APA provides a cause of action in federal district court for any person aggrieved by final agency action.  *See* 5 U.S.C. §§ 702-704.

58.     The APA provides that the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *Id.* § 706(2)(A).

59.     An agency must consider all relevant facts and provide a reasoned explanation for its actions, and must not merely provide conclusory statements to justify its decisions.

60.     An agency action that does not meet these standards is arbitrary and capricious, and must be set aside.

61.     Defendants scheduled Mr. Purkey's execution without considering the import of the ongoing COVID-19 pandemic and the significant public health risks that proceeding with the execution in such an environment poses.  Defendants failed to consider less restrictive, yet easily administered alternatives, most obviously delaying Mr. Purkey's execution until such time as the immediate danger posed by COVID-19 has passed.

62.     Defendants therefore acted arbitrarily and capriciously.  As a result, the currently scheduled date for Mr. Purkey's execution should be set aside.

<div align="center">

**REQUEST FOR RELIEF**

</div>

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and that the Court:

a.  Grant a declaratory judgment finding that carrying out Mr. Purkey's execution during a documented COVID-19 outbreak at USP Terre Haute and in the United States without a vaccine or treatment available imposes a substantial burden on Rev. Hartkemeyer's exercise of religion and is neither justified by a compelling

<div align="center">22</div>

governmental interest nor the least restrictive means of furthering any compelling governmental interest;

b.  Grant a declaratory judgment finding that scheduling Mr. Purkey's execution during the COVID-19 outbreak is arbitrary and capricious action, and setting aside the warrant of execution;

c.  Grant injunctive relief prohibiting the BOP from carrying out the execution until treatment or a vaccine is available;

d.  Award attorney's fees and costs as the Court deems equitable and just; and

e.  Award such other and further relief as the Court deems equitable and just.


Dated:  July 2, 2020

<div style="margin-left: 40%;">

Respectfully submitted,

/s/      *David C. Fathi*

</div>

Douglas Hallward-Driemeier*
Maria G. Calvet*
Michelle H. Behrens*
John T. Dey*
ROPES & GRAY LLP
2099 Pennsylvania Avenue NW
Washington D.C. 20006
Tel:  (202) 508-4600
Douglas.Hallward-Driemeier@ropesgray.com
Maria.Calvet@ropesgray.com
Michelle.Behrens@ropesgray.com
John.Dey@ropesgray.com

David C. Fathi**
Daniel Mach*
Heather L. Weaver*
Jennifer Wedekind*
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 548-6603
dfathi@aclu.org
dmach@aclu.org
hweaver@aclu.org
jwedekind@aclu.org

Cassandra Stubbs*
Amy Fly*
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
201 W. Main St., Suite 402
Durham, NC 27701

(919) 688-4605
cstubbs@aclu.org
afly@aclu.org

*pro hac vice* motion forthcoming

**Not admitted in D.C.; practice limited
to federal courts

*Attorneys for Plaintiff*