**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| DALE HARTKEMEYER (AKA SEIGEN) | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-00336-JMS-MJD |
| | ) | |
| WILLIAM P. BARR, in his official capacity as the Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons; and T.J. WATSON, in his official capacity as Complex Warden for Terre Haute Federal Correctional Complex, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS ........................................................................................ 3

    A.    Defendants' Plan To Carry Out The Execution Of Wesley Purkey Poses A Substantial Risk Of Massive COVID-19 Spread ................................. 3

    B.    Plaintiff, The Designated Spiritual Advisor To Wes Purkey, Is Medically Vulnerable And Faces Heightened Risks From COVID-19.......... 11

    C.    Reverend Hartkemeyer Has A Sincere Religious Belief That He Must Be Present At Mr. Purkey's Execution ................................................................. 12

LEGAL STANDARD ............................................................................................... 14

ARGUMENT .......................................................................................................... 15

I.    REV. HARTKEMEYER IS LIKELY TO SUCCEED ON THE MERITS OF BOTH HIS RFRA AND APA CLAIMS ................................................................. 15

    A.    Defendants' Actions Violate The Religious Freedom Restoration Act .......... 15

        1.    Defendants' Actions Substantially Burden Rev. Hartkemeyer's Exercise Of Religion By Pressuring Him To Abandon His Priestly Duties Toward Mr. Purkey ........................................................ 17

        2.    Defendants Cannot Demonstrate A Compelling Interest For Their Actions ........................................................................................ 21

        3.    The Government Is Not Using The Least Restrictive Means To Further Its Interests........................................................................ 24

    B.    The Government's Decision To Schedule An Execution In The Midst Of A Pandemic Is An Arbitrary And Capricious Agency Action That Violates The Administrative Procedure Act........................................................ 25

        1.    The Government's Scheduling Of Mr. Purkey's Execution Is A Final Agency Action Subject To This Court's Review ........................ 25

        2.    The Government's Decision To Schedule The Execution During A Pandemic Is Arbitrary And Capricious .............................. 29

II.    REV. HARTKEMEYER WILL SUFFER IRREPARABLE HARM IF THIS COURT DOES NOT GRANT THE PRELIMINARY INJUNCTION ...................... 32

III.    THE IRREPARABLE HARM THREATENING REV. HARTKEMEYER OUTWEIGHS ANY PURPORTED HARM TO DEFENDANTS ............................ 32

IV.    THE REQUESTED PRELIMINARY INJUNCTION WOULD FURTHER THE PUBLIC INTEREST........................................................................................ 33

CONCLUSION ....................................................................................................... 34

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Illinois v. Alvarez*,
   679 F.3d 583 (7th Cir. 2012) ...................................................................................................32

*Adams v. Comm'r*,
   170 F.3d 173 (3d Cir. 1999)....................................................................................................15

*Allied-Signal, Inc. v. Nuclear Reg. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ................................................................................................30

*Am. Fed'n of Gov't Emps., Local 2924 v. Fed. Labor Relations Auth.*,
   470 F.3d 375 (D.C. Cir. 2006) ................................................................................................30

*Banks v. Booth*,
   No. CV 20-849 (CKK), 2020 WL 3303006 (D.D.C. June 18, 2020) ......................................22

*In re Beatty*,
   No. WR-59,939-04, 2020 WL 1329145 (Tex. Crim. App. Mar. 19, 2020)..............................30

*Bennett v. Spear*,
   520 U.S. 154 (1997)....................................................................................................26, 28, 29

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014)...........................................................................................................16, 21

*In re Busby*,
   No. WR-70,747-03, 2020 WL 2029306 (Tex. Crim. App. Apr. 27, 2020) .............................30

*Christian Legal Soc'y v.Walker*,
   453 F.3d 853 (7thh Cir. 2006) ................................................................................................33

*Cin. Bell Tel. Co. v. FCC*,
   69 F.3d 752 (6th Cir. 1995) ....................................................................................................30

*CropLife Am. v. EPA*,
   329 F.3d 876 (D.C. Cir. 2003).................................................................................................27

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
   698 F.3d 1101 (9th Cir. 2012) ................................................................................................30

*Darby v. Cisneros*,
   509 U.S. 137 (1993)..................................................................................................................29

*Friedman v. FAA*,
  841 F.3d 537 (D.C. Cir. 2016) ....................................................................................26

*GEFT Outdoors, LLC v. City of Westfield*,
  922 F.3d 357 (7th Cir. 2019) .....................................................................................15

*Gonzales v. O Centro Espirita Beneficente Uniao*,
  546 U.S. 418 (2006)....................................................................................................21

*Gutierrez v. Saenz*,
  No. 19A1052, 2020 WL 3248349 (U.S. June 16, 2020) .....................................15, 16

*In re Hernandez*,
  No. WR-81,577-02, 2020 WL 1645052 (Tex. Crim. App. Apr. 1, 2020) ..............30

*Holistic Candlers & Consumers Ass'n v. FDA*,
  664 F.3d 940 (D.C. Cir. 2012) ....................................................................................27

*Holt v. Hobbs*,
  574 U.S. 352 (2015)..............................................................................................21, 24

*Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Eng'rs*,
  335 F.3d 607 (7th Cir. 2003) .................................................................26, 27, 28, 29

*In re Hummel*,
  No. WR-81,578-02, 2020 WL 1268970 (Tex. Crim. App. Mar. 16, 2020)............30

*Koger v. Bryan*,
  523 F.3d 789 (7th Cir. 2008) ...............................................................................17, 21

*Korte v. Sebelius*,
  735 F.3d 654 (7th Cir. 2013) ...............................................................................17, 32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)......................................................................................................29

*Murphy v. Collier*,
  139 S. Ct. 1475 (2019).........................................................................................15, 16

*Purkey v. United States*,
  135 S.Ct. 355 (2014)...................................................................................................22

*Safari Club Int'l v. Jewell*,
  842 F.3d 1280 (D.C. Cir. 1989)..................................................................................29

*Tennessee v. Oskar Franklin Smith*,
  No 89-F-1773 (Tenn. Apr. 17, 2020)..........................................................................30

*Texas v. Carlos Trevino*,
No. 1997-CR-1717D (Bexar Co. Dist. Ct. Apr. 15, 2020) ......................................................30

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
136 S. Ct. 1807 (2016) ................................................................................................................26

*United States v. Dierckman*,
201 F.3d 915 (7th Cir. 2000) .....................................................................................................30

*Whole Woman's Health All. v. Hill*,
937 F.3d 864 (7th Cir. 2019) .....................................................................................................14

*Willis v. Comm'r, Indiana Dep't of Correction*,
753 F. Supp. 2d 768 (S.D. Ind. 2010) .......................................................................................24

**Statutes**

5 U.S.C. § 301 ..................................................................................................................................26

5 U.S.C. § 701 *et seq.* ............................................................................................................ *passim*

5 U.S.C. § 704 ............................................................................................................................25, 29

5 U.S.C. § 706(2)(A) .......................................................................................................................29

18 U.S.C. § 4001(b) .........................................................................................................................26

42 U.S.C. § 2000bb-1 ............................................................................................................. *passim*

42 U.S.C. § 2000cc *et seq.* .........................................................................................................16, 21

**Other Authorities**

28 C.F.R. § 26.3 ...............................................................................................................................26

28 C.F.R. § 26.4 *et seq.* ........................................................................................................... *passim*

28 C.F.R. § 542.10 ...........................................................................................................................29

Julie Bosman & Mitch Smith, *Coronavirus Cases Spike Across Sun Belt as
Economy Lurches into Motion,* N.Y. Times (updated June 18, 2020),
https://www.nytimes.com/2020/06/14/us/coronavirus-united-states.html ...............................4

Jess Bravin, *Prisoner Executions Are Put Off Because of Pandemic*, Wall Street
Journal (Mar. 26, 2020) ............................................................................................................30

Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): About Cloth Face Coverings*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html (last accessed July 2, 2020) ................................................................................................................7

Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19), Community, Work & School - Considerations for Events and Gatherings* (last updated June 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/considerations-for-events-gatherings.html.............................20

Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19), Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf. ..............................................................................4

Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19), Community, Work & School - Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (May 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ........................23

Centers for Disease Control and Prevention, *People of Any Age with Underlying Medical Conditions* (updated June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html ........................................................................................11

Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19), Your Health - Older Adults* (June 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html..............................................................................................19

Andrew Cohen, *Same Planet, Different Worlds*, CBS News (June 10, 2001), https://www.cbsnews.com/news/same-planet-different-worlds/ ..............................9

Elizabeth Cohen, *Fauci Says COVID-19 Vaccine May Not Get US to Herd Immunity if Too Many People Refuse to Get It*, CNN.com (June 29, 2020, 9:15 PM) ..................................................................................................25

*Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University*, Johns Hopkins University of Medicine, https://cutt.ly/StEyn2U ...........................................................3

*Coronavirus disease 2019 (COVID-19)*, UpToDate, https://cutt.ly/GtJYSkj ................................3

John E. Dannenberg, *Prisons as Incubators and Spreaders of Disease and Illness*, Prison Legal News, Aug. 15, 2007, *available at* https://www.prisonlegalnews.org/news/2007/aug/15/prisons-as-incubators-and-spreaders-of-disease-and-illness/ ...................................................................................4

Dep't of Justice, *Executions Scheduled for Four Federal Inmates Convicted of Murdering Children*, P.R. 20-545 (June 15, 2020), https://www.justice.gov/opa/pr/executions-scheduled-four-federal-inmates-convicted-murdering-children.................................................................27, 31

*Expert Responses*, University of Tennessee Health Science Center, https://uthsc.edu/coronavirus/expert-responses.php (last visited May 19, 2020) ......................3

Federal Bureau of Prisons, *BOP Implementing Modified Operations,* https://www.bop.gov/coronavirus/covid19_status.jsp (last visited July 1, 2020) ...........................................................................................................5

Federal Bureau of Prisons, COVID-19 Cases, www.bop.gov/coronavirus/ (last visited June 27, 2020) .........................................................................................5

Federal Bureau of Prisons, Media Witness Form, https://www.bop.gov/resources/federal_execution_media_form.jsp?irn=14679 %E2%80%90045 (last visited June 29, 2020).............................................................9

Federal Bureau of Prisons, USP Terre Haute, https://www.bop.gov/locations/institutions/thp/ (last visited July 1, 2020) .............................6

Johns Hopkins University COVID-19 Data Center, https://coronavirus.jhu.edu/ (last visited June 28, 2020); Centers for Disease Control and Prevention, Covid Data Tracker, https://www.cdc.gov/covid-data-tracker/#cases (last visited July 1, 2020)...........................................................................................3

Jasmine C Lee, *et al.*, *See How All 50 States Are Reopening and Closing Again)*, N.Y. Times (updated June 26, 2020), https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html ..................................................................................................4

Mem. for Inmate Families and Friends, M. Carvajal, Director, Fed. Bureau of Prisons (Apr. 21, 2020), https://www.bop.gov/resources/news/pdfs/202004211_memo_to_inmate_families_and_friends.pdf..........................................................................................5

Bobby Radford, *COVID-19 Outbreak Confirmed at Prison in Bonne Terre*, Daily Journal Online (June 19, 2020), https://dailyjournalonline.com/news/local/govt-and-politics/covid-19-outbreak-confirmed-at-prison-in-bonne-terre/article_c7222072-e242-513d-871a-c63a9c30cfbc.html..............................................................................31

State of Indiana, *Stage 4: What's Open, What's Closed* (July 2020), https://backontrack.in.gov/files/BackOnTrack-IN_WhatsOpen-Closed-stage4.pdf ...................................................................................................................19

*Terre Haute Prison Inmate With COVID-19 Dies; 3 More Have It*, U.S. News (May 26, 2020), https://www.usnews.com/news/best-states/indiana/articles/2020-05-26/3-terre-haute-federal-prison-inmates-positive-for-covid-19 ...................................................................................................5

Lisa Trigg, Case of COVID-19 Infection Reported at Federal Prison in Terre Haute, Tribute-Star (May 18, 2020), https://www.tribstar.com/news/case-of-covid-19-infection-reported-at-federal-prison-in-terre-haute/article_85a075ee-9940-11ea-87fe-fb3a2398734d.html ...........................................................5

*U.S. Reports Nearly 50,000 New Coronavirus Cases, Another Single-Day Record*, N.Y. Times (July 1, 2020), https://www.nytimes.com/2020/07/01/world/coronavirus-updates.html .................................4

*Updates to BOP COVID-19 Action Plan*, Federal Bureau of Prisons (last visited June 28, 2020) https://www.bop.gov/resources/news/20200319_covid19_update.jsp. .....................................5

Timothy Williams & Rebecca Griesbach, *San Quentin Prison was Free of the Virus.  One Decision Fueled an Outbreak.*, N.Y. Times (June 30, 2020), https://www.nytimes.com/2020/06/30/us/san-quentin-prison-coronavirus.html.......................4

## **PRELIMINARY STATEMENT**

It is hard to imagine a more fundamental violation of religious freedom than a priest being denied the ability to minister to an individual under his longtime pastoral care during that individual's moment of death.  But that is exactly what will happen here unless this Court intervenes to delay the federal execution of Wesley Purkey until a time when Plaintiff, Reverend Seigen Hartkemeyer, can safely attend Mr. Purkey's execution without risking his own health and life due to the current COVID-19 pandemic.

Just weeks ago, Defendants decided to schedule Mr. Purkey's execution among a series of four to take place in July and August of this year, despite the fact that a pandemic rages on and will put at serious risk the health and lives of those obligated to attend the execution.  Defendants have done so in contravention of their own stated policies seeking to limit the spread of the virus, which has been rampant in the prison context, and with no adequate plan to ensure the health and safety of the hundreds of individuals—including prison staff, legal and spiritual advisors, press, and victims' and prisoners' family members—whose presence at the executions is provided for in Defendants' own regulations and protocols.  The rush to perform the executions is all the more perplexing—and reckless—considering that the physical spaces these individuals will occupy will not be large enough to allow for social distancing.  Adding to the hazard is the fact that the vast majority of these individuals will need to travel many miles by various means to the execution site, which will increase the risk of COVID-19 transmission, both during the execution and afterward, when the attendees return to their hometowns.

Among the many who are bound to be present for Mr. Purkey's execution is Rev. Hartkemeyer, an ordained Buddhist priest and Mr. Purkey's longtime spiritual advisor.  Rev. Hartkemeyer has ministered to Mr. Purkey for over a decade.  Mr. Purkey has selected Rev.

1

Hartkemeyer to be present as his spiritual advisor at the moment of execution, which he is entitled to do pursuant to applicable regulations. For his part, Rev. Hartkemeyer feels religiously compelled to be present at Mr. Purkey's execution to provide comfort and spiritual guidance and to perform sacred religious rituals as Mr. Purkey transitions from this life to the next. But Rev. Hartkemeyer is 68 years old and has a medical history that makes him a prime candidate for severe complications, and possibly even death, should he contract COVID-19. As such, Defendants' decision to conduct Mr. Purkey's execution during the current pandemic substantially burdens Rev. Hartkemeyer's religious exercise by pressuring him to abandon his priestly duties.

The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, prohibits the Government from imposing this substantial burden on Rev. Hartkemeyer unless it is in furtherance of a compelling interest and the least restrictive means of furthering that interest. As evidenced by the fact that Mr. Purkey has been on death row for over 16 years, Defendants cannot demonstrate any compelling interest that warrants conducting Mr. Purkey's execution now, before the immediate and serious public health threat posed by COVID-19 has passed. By affirmatively fostering conditions that pose harm to all present at the execution and to the general public, Defendants likewise fail RFRA's second prong.

Accordingly, Defendants have unlawfully infringed upon Rev. Hartkemeyer's statutorily protected free-exercise rights. Moreover, Defendants' actions are arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* Defendants' decision to move forward with Mr. Purkey's execution is not based on reasoned analysis or consideration of the unique and dangerous circumstances presented by the pandemic.

With Mr. Purkey's execution date fast approaching, Rev. Hartkemeyer faces imminent and irreparable harm due to Defendants' actions. The balance of harms and public interest weigh

entirely in his favor.  He accordingly brings forth this action to vindicate his rights and to enjoin the Government from endangering both his exercise of those rights and his health.

### STATEMENT OF FACTS

**A.     Defendants' Plan To Carry Out The Execution Of Wesley Purkey Poses A Substantial Risk Of Massive COVID-19 Spread**

Although the federal government has not conducted an execution in nearly 17 years, Defendants seek to resume executions, including the execution of Wesley Purkey, back to back later this month at the Terre Haute Complex Facility in Terre Haute, Indiana, at the height of a global pandemic.  COVID-19 is a highly contagious and deadly respiratory disease, with no currently available vaccine or effective treatment.  [Filing No. 6-25 at 3-4.]  The number of infections across the United States continues to rise, with over 2.5 million documented cases and over 125,000 deaths.[1]  In severe cases, COVID-19 can require hospitalization and lead to respiratory failure, permanent lung damage, or death, among a number of other serious complications.  [Filing No. 6-25 at 4.]  The death rate for COVID-19 is, in fact, estimated to be several times more than that for the common flu that kills thousands per year.[2]  The only fully preventative measure is to avoid contact with others.  Social distancing—remaining at least six

---

[1] *See* Johns Hopkins University COVID-19 Data Center, https://coronavirus.jhu.edu/ (last visited June 28, 2020); Centers for Disease Control and Prevention, Covid Data Tracker, https://www.cdc.gov/covid-data-tracker/#cases (last visited July 1, 2020).

[2]  The University of Tennessee Health Science Center estimates the fatality rate may be as high as 3.4 percent and notes that the novel coronavirus and COVID-19 are "100s of times worse than influenza." *Expert Responses*, University of Tennessee Health Science Center, https://uthsc.edu/coronavirus/expert-responses.php (last visited May 19, 2020).  As of May 17, 2020, there were 4,651,119 confirmed cases globally, with 312,119 deaths and 1,700,354 recoveries. *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University*, Johns Hopkins University of Medicine, https://cutt.ly/StEyn2U; *see also Coronavirus disease 2019 (COVID-19)*, UpToDate, https://cutt.ly/GtJYSkj (as of May 15, 2020, estimated overall fatality rate of 2.3 percent globally).

feet from all other persons not sharing one's household—is a "cornerstone of reducing transmission of respiratory diseases such as COVID-19." [Filing No. 6-25 at 8.][3]

Since states have begun reopening and relaxing social distancing requirements in public spaces, the statistics have become even more dire. At least 22 states that had experienced a downward trajectory in the daily number of new cases saw significant surges in infections by mid-June.[4] On July 1, 2020, 49,932 new COVID-19 infections were reported by state health departments across the United States—"the fifth single-day case record in eight days."[5] Recognizing that further relaxation of social distancing mandates would be dangerous to public health, a growing number of states are pausing their reopening plans.[6]

The disease is spread through respiratory droplets, and indoor congregate settings like nursing homes, jails, and prisons are hotspots for outbreaks. [Filing No. 6-25 at 9.][7] Indeed, nine of the ten largest outbreaks in the country have occurred in prisons.[8] Prisons pose specific and unique risks for spread because prisoners and staff cannot appropriately practice social distancing, prisons lack adequate personal protective equipment, and prisons are, as a general matter, poorly

---

[3] *See* Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, at 4 (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

[4] Julie Bosman & Mitch Smith, *Coronavirus Cases Spike Across Sun Belt as Economy Lurches into Motion,* N.Y. Times (updated June 18, 2020), https://www.nytimes.com/2020/06/14/us/coronavirus-united-states.html.

[5] *U.S. Reports Nearly 50,000 New Coronavirus Cases, Another Single-Day Record*, N.Y. Times (July 1, 2020), https://www.nytimes.com/2020/07/01/world/coronavirus-updates.html.

[6] Jasmine C Lee, *et al.*, *See How All 50 States Are Reopening and Closing Again)*, N.Y. Times (updated June 26, 2020), https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html (Michigan, Oregon, Idaho, Nevada, New Mexico, Arkansas, Louisiana, North Carolina, and Delaware among the states to pause reopening plans).

[7] *See* John E. Dannenberg, *Prisons as Incubators and Spreaders of Disease and Illness*, Prison Legal News (Aug. 15, 2007) (discussing that jails and prisons "have become breeding grounds for infectious epidemics, with severe consequences for both prisoners and the public alike"), *available at* https://www.prisonlegalnews.org/news/2007/aug/15/prisons-as-incubators-and-spreaders-of-disease-and-illness/.

[8] Timothy Williams & Rebecca Griesbach, *San Quentin Prison was Free of the Virus. One Decision Fueled an Outbreak.*, N.Y. Times (June 30, 2020), https://www.nytimes.com/2020/06/30/us/san-quentin-prison-coronavirus.html.

4

ventilated—all factors that further facilitate the transmission of COVID-19.  [Filing No. 6-25 at 9.]

At USP Terre Haute, where three executions will take place this month, the Federal Bureau of Prisons ("BOP") reported its first case of COVID-19 on May 16, 2020.[9]  Since then, at least one Terre Haute prisoner has died from the virus.[10]  BOP has published limited data about testing, but the available data show that, as of June 27, eight prisoners have tested positive for COVID-19, with five active current infections and one death.[11]  BOP tested only a small portion of the prison population at Terre Haute, so the reported number of positive test results does little more than confirm the presence of the disease in the facility.  [Filing No. 6-25 at 14.]

In order to "mitigate the spread of COVID-19," Defendants have heavily restricted movement in and out of BOP prisons since the start of the pandemic.[12]  In March, BOP suspended internal prisoner movement "with limited exceptions"—a policy still in place today.[13]  Also in March, BOP suspended all visitation, including legal visits at all federal prisons.  [Filing No. 6-6 at 2-3.]  Under this policy, BOP systematically canceled previously scheduled visits and refused to schedule future visits for both contact and non-contact meetings, including at USP Terre Haute. *Id.*  In April, BOP issued a memorandum reporting that stopping visits has had a "major impact" on keeping staff, prisoners, visitors, and the community at large safe from COVID-19.[14]  In May,

---

[9] Lisa Trigg, *Case of COVID-19 Infection Reported at Federal Prison in Terre Haute*, Tribune-Star (May 18, 2020), https://www.tribstar.com/news/case-of-covid-19-infection-reported-at-federal-prison-in-terre-haute/article_85a075ee-9940-11ea-87fe-fb3a2398734d.html.

[10] *Terre Haute Prison Inmate With COVID-19 Dies; 3 More Have It*, U.S. News (May 26, 2020), https://www.usnews.com/news/best-states/indiana/articles/2020-05-26/3-terre-haute-federal-prison-inmates-positive-for-covid-19.

[11] Federal Bureau of Prisons, COVID-19 Cases, www.bop.gov/coronavirus/ (last visited June 27, 2020).

[12] Federal Bureau of Prisons, *BOP Implementing Modified Operations,* https://www.bop.gov/coronavirus/covid19_status.jsp (last visited July 1, 2020).

[13] *Updates to BOP COVID-19 Action Plan*, Federal Bureau of Prisons (last visited June 28, 2020) https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

[14] Mem. for Inmate Families and Friends, M. Carvajal, Director, Fed. Bureau of Prisons (Apr. 21, 2020), https://www.bop.gov/resources/news/pdfs/202004211_memo_to_inmate_families_and_friends.pdf.

BOP issued a "Shelter in Place" order, to remain in effect "throughout June 30, 2020, at which time it [would] be re-evaluated." [Filing No. 6-2 at 4-5.] Even today, the March-issued visitation suspension remains in place: the BOP website affirms that, "all visiting at [USP Terre Haute] has been suspended until further notice."[15]

Defendants' plans to carry out the execution of Mr. Purkey and others will require the upheaval of these visitation policies and bring together in close proximity hundreds of people, many of whom will travel by air across the country. [Filing No. 6-30 at 4.]

Immediately after announcing its plan to carry out the July executions, BOP informed counsel for the prisoners that it would reinstate the social, legal, and spiritual visits for the four men under execution warrant. [Filing No. 6-6 at 3-4.] Visitation at USP Terre Haute involves close and repeated contact between the visitor and staff, other visitors, and prisoners. [Filing No. 6-25 at 11.] BOP did not have a written policy on COVID-19-related safety measures pertaining to visitation when it resumed visitation for the four prisoners with warrants. [Filing No. 6-6 at 3-4.] Though visitation was resumed, BOP has not provided any formal plan or policies designed to ensure that such visits, or the executions themselves, can be conducted safely during the pandemic.[16] Despite numerous requests by Counsel for Mr. Purkey, BOP has failed to provide information about COVID-19-related safety measures apart from noting its informal, minimal plan to ask visitors for self-reported symptoms, check visitors' temperatures, provide hand sanitizer for visitors at the front entrance, install Plexiglass in contact visitation rooms, and provide visitors with masks. [Filing No. 6-6 at 4.]

---

[15] *See* Federal Bureau of Prisons, USP Terre Haute, https://www.bop.gov/locations/institutions/thp/ (last visited July 1, 2020).

[16] [Filing No. 6-16 at 5] (June 16, 2020 email from BOP Counsel, stating "We are still working on a plan that will allow as much visitation as possible while still mitigating the risk of exposure to COVID-19. . . . [B]ut you can being to schedule your legal visits as soon as you wish. . . . [W]e are working on additional precautions re: COVID.").

These measures are simply "insufficient to protect visitors from the risk of COVID-19." [Filing No. 6-25 at 15.] Temperature checks and non-test-based verbal screens cannot adequately screen for new, asymptomatic, or pre-symptomatic infections. *Id.* at 15-16. In addition, the screening form BOP intends to utilize has not been updated since March 13, 2020, and includes only three questions regarding international travel, contact with a COVID-19-positive individual, and a subjective report of three symptoms: fever or chills, cough, and shortness of breath. *Id.* In May 2020, the Centers for Disease Control and Prevention ("CDC") expanded its list of typical COVID-19 symptoms to include not only fever, cough, and shortness of breath, but also fatigue, muscle pain, headache, sore throat, new loss of taste or smell, congestion or runny nose, nausea or vomiting, or diarrhea. *Id.* at 16. "Given our quickly evolving understanding of COVID-19, it is imperative to update safety measures according to updated knowledge about the virus. BOP does not appear to have done this." *Id.* Finally, providing masks to visitors does not protect the visitors themselves from the risk of contracting the virus. *Id.* at 15. As the CDC advises, the cloth face coverings it recommends to stem the spread of the virus "are not personal protective equipment (PPE) [and] are not appropriate substitutes for PPE."[17]

The execution protocol and BOP's plans, set forth in sworn testimony by BOP officials, anticipate the involvement of hundreds of individuals. [Filing No. 6-30 at 3-4.] The Government's plan for the executions contemplates the "activation of the execution team, which consists of 40 BOP staff members," who normally conduct a "wide range of correctional and administrative positions" and who will spend several days before the execution practicing and preparing. *Id.* at 3. Second, the plan will entail the participation of approximately 200 FCC Terre Haute staff, who

---

[17] Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): About Cloth Face Coverings*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html (last visited July 2, 2020).

will perform security and support for the execution. *Id.* at 3-4. These staff will be "pulled away from their normal duties," such as preparation of prisoner meals. *Id.* Third, the plan requires a specially staffed BOP team composed of 50 BOP employees who will travel to Terre Haute from other prisons, *id.* at 4, which may also be experiencing COVID-19 outbreaks.[18] Fourth, according to the plan, the approximately 300 BOP and Terre Haute staff will be supplemented by additional staff from various federal, state, and local law enforcement agencies to provide additional security. *Id.* at 3. Many of these individuals will be traveling by air and staying in local hotels. *Id.* The Government's execution plan thus requires numerous individuals from across the country—who may have been exposed to or infected with COVID-19 on planes,[19] in airports and hotels, at their BOP regional facilities, and in their communities more broadly—to converge in Terre Haute. These individuals will then convene and intermingle in small enclosed spaces with BOP staff drawn from the USP Terre Haute facility itself, which has known COVID-19 cases, for group training, practices, meetings, and on-site work, escalating the risks for the prisoners, staff, and ultimately anyone attending the execution.

The strict security protocol associated with such executions will add to the risk for those in attendance. BOP plans to contract buses for protestors who wish to assemble near the execution site; thus, security personnel and protestors will be confined on buses together in order to reach the site. [Filing No. 6-30 at 4.] Large numbers of media are also expected to converge on the prison grounds and be subjected to in-person screening escorts and security details. The media presence at the 2001 Timothy McVeigh execution, for example, "had the look and feel of a fairground or circus," with a host of media tents and media staff roaming the grounds on golf

---

[18] Federal Bureau of Prisons, COVID-19: Coronavirus, https://www.bop.gov/coronavirus/ (last visited July 2, 2020) (77 BOP facilities have confirmed active cases of COVID-19).

[19] Even the air travel alone "poses a significant risk of COVID-19 infection." [Filing No. 6-25 at 16.]

carts.[20]  The July 13, 2020, scheduled execution date for Danny Lee and July 15, 2020, execution date for Wes Purkey would be the first federal executions since 2003 and will likewise draw a high level of interest.  The reporters present at USP Terre Haute will attend an in-person lottery where the ten media witnesses will be selected.[21]  As security personnel play a role in corralling protestors and the media, their possible exposure to COVID-19 will be passed on to a large and varied group of individuals, who in turn could spread the virus to others.

The execution facility, sometimes referred to as the "Death House," is a separate facility on the Terre Haute grounds.  [Filing No. 6-24 at 3.]  It is a small, single story building, like a small home.  *Id.*  In addition to the 40 members of the execution team, federal regulations direct the attendance of up to 24 witnesses to the execution:  six individuals selected by the death row prisoner, including their spiritual advisor and legal team, eight citizen witnesses, including members of the victim's family, and ten members of the press.[22]  Thus, the execution facility is expected to hold, in close quarters, the execution team, the 24 witnesses, the death row prisoner, and an unspecified and uncapped number of attorneys of the Department of Justice.  Many of these witnesses also will have traveled great distances, including by plane, and stayed in local hotels to be present on the day of the execution.  Mr. Purkey's mitigation specialist, for example, who was also designated alongside Rev. Hartkemeyer as a witness, will need to travel 650 miles from Baltimore to attend the execution.  [Filing No. 6-27 at 2-3.]

The witnesses to the execution and prison staff will be shuttled together in a van to the facility from the main correctional complex prior to arriving at separate entrances for various

---

[20] Andrew Cohen, *Same Planet, Different Worlds*, CBS News (June 10, 2001), https://www.cbsnews.com/news/same-planet-different-worlds/.

[21] *See* Federal Bureau of Prisons, Media Witness Form, https://www.bop.gov/resources/federal_execution_media_form.jsp?irn=14679%E2%80%90045 (last visited June 29, 2020).

[22] *See* 28 C.F.R. § 26.4(c)(3)-(4).

groups of witnesses. [Filing No. 6-24 at 4-5.] In the days leading up to the execution, attorneys must visit with their client in the Death House. *Id.* at 3. At the 2003 execution of Louis Jones, Jr., Mr. Jones's attorney, his daughter, and three prison ministers had to stand "shoulder to shoulder" to fit in the visitation room to talk with Mr. Jones before the execution. *Id.* During the execution itself, the witnesses are grouped into four separate viewing rooms—one for media; one for the victim's family members; one for attorneys, the prisoner's loved ones, and his spiritual advisor; and one for government officials. *Id.* at 4-5. These viewing rooms are cramped and it is not possible to socially distance. *Id.* Additionally, those in the viewing rooms cannot see the prisoner unless they are inches from the Plexiglass separating the witnesses from the prisoner. *Id.* The need to be close to the glass to see and be seen from the viewing room further exacerbates the impracticality of social distancing.

The fact that the government scheduled the July executions back to back further adds to attendees' and participants' risk of contracting COVID-19. The July 13 execution date of prisoner Danny Lee will bring his own group of counsel and family together with media witnesses, the victim's family members, spiritual support, and government officials from all over the country, interacting with each other and BOP staff within the prison and the Death House. Just two days later, Rev. Hartkemeyer is expected to attend Mr. Purkey's execution, where a different group of counsel, loved ones, media witnesses, victim's family members, and government officials from different parts of the country will interact with each other and BOP staff, many of whom were exposed during Mr. Lee's execution, and within the same prison and Death House where those who participated in Mr. Lee's execution spent significant amounts of time. These are prime conditions for a super-spreader event that puts everyone involved at risk, but especially those who are older and medically vulnerable.

**B.** **Plaintiff, The Designated Spiritual Advisor To Wes Purkey, Is Medically Vulnerable And Faces Heightened Risks From COVID-19**

Rev. Hartkemeyer, whom Mr. Purkey designated as his spiritual advisor to be in attendance at his July 15, 2020 execution, is medically vulnerable to infection and resulting serious illness or death. He is 68 years old ([Filing No. 6-2 at 8]), and the risk of hospitalization due to COVID-19 increases significantly beginning at age 50 ([Filing No. 6-25 at 5]). According to the CDC, 84.6 per 100,000 patients age 40-49 years are hospitalized due to COVID-19. That rate increases to 136.1 per 100,000 for patients age 50-64 years; to 198.7 per 100,000 for patients age 65-74 years; and to 329.3 per 100,000 for patients age 75-84 years. *Id.* at 6.

The risk of death from COVID-19 also increases with age, jumping significantly after age 50. *Id.* at 5-6. Patients age 40-49 account for 2.9% of all COVID-19 deaths. *Id.* at 6-8. Patients age 50-64 account for 15% of COVID-19 deaths; patients aged 65-74 account for 20.6% of deaths; patients aged 75-84 account for 26.1% of deaths. *Id.*

The CDC has also reported that people with particular medical conditions, including serious heart conditions or certain lung conditions, are especially vulnerable to severe illness from COVID-19. [Filing No. 6-25 at 5.][23] The case fatality rate for COVID-19 and need for advanced medical intervention and support increases significantly for people of any age with certain underlying medical conditions.[24]

Rev. Hartkemeyer had severe and recurring cases of bronchitis in 2019, and has a history of pleurisy, an illness that causes severe lung infection and impedes the ability to breathe. [Filing No. 6-2 at 8-9.]

---

[23] *See* Centers for Disease Control and Prevention, *People of Any Age with Underlying Medical Conditions* (updated June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.
[24] *Id.*

As a result of his medical vulnerabilities, he faces a grave risk of serious illness and death should he contract the virus.  Accordingly, he has stringently self-isolated during the COVID-19 pandemic in order to protect his health.  *Id.* at 9.

"Given the current health crisis related to the COVID-19 pandemic, and the fact that COVID-19 has already been identified in the prison, with at least one inmate death, and the number of people required to travel to and attend the execution, . . . it is not safe for medically vulnerable individuals (as defined above) to attend an execution at USP Terre Haute."  [Filing No. 6-25 at 19.]  Indeed, "it is not safe for medically vulnerable individuals to visit USP Terre Haute" at all. *Id.* at 16.

### C.     Reverend Hartkemeyer Has A Sincere Religious Belief That He Must Be Present At Mr. Purkey's Execution

The federal protocol specifies that all federal prisoners may designate a spiritual advisor of their choice to attend the execution.  Wesley Purkey, a Buddhist, designated Rev. Hartkemeyer, his longtime priest, as his spiritual advisor to attend and bear witness at his execution.  Being a spiritual advisor to a prisoner sentenced to death is a "sacred responsibility" to those who accept the role.  [Filing No. 6-5 at 3.]  The "heart" of that responsibility is to "prepare that individual for his imminent death and to steadfastly accompany the prisoner during his time on death row and especially during his last hours and the hour of his death."  *Id.*  When a spiritual advisor has formed a bond with a prisoner, over years or even decades, and the prisoner specifically requests the advisor attend his execution, "it is the advisor's moral imperative to be present."  *Id.* at 4.  Indeed, a spiritual advisor cannot fulfill his or her duty without being physically present at the execution because "presence is everything."  *Id.*

Further, the role of a spiritual advisor cannot be transferred to others.  *Id.* at 4-5.  "To mechanically substitute a 'generic chaplain' in the last hours of the prisoner's life . . . is to demean

and denigrate the essential core value of a spiritual advisor and her relationship with the prisoner." *Id.* at 4.

Rev. Hartkemeyer is a Zen Buddhist priest. [Filing No. 6-2 at 2.] As part of his Zen practice, he has been religiously called to provide spiritual counseling to prisoners. *Id.* at 3. Core Mahayana Buddhist precepts direct that Buddhist priests visit with those who are in distress or trouble and provide them with whatever help, relief, or consolation they can. *Id.* Rev. Hartkemeyer believes "wholeheartedly" in this religious mandate. *Id.* He believes he has a religious obligation to show compassion for incarcerated individuals in particular, as they "are too often denied Buddha's immense compassion, his great wish for the well-being of all his children, who include all beings." *Id.*

Rev. Hartkemeyer entered into a pastoral relationship with Mr. Purkey in January 2009. *Id.* at 4. For the past eleven years, Rev. Hartkemeyer has visited Mr. Purkey once a month to provide spiritual guidance and counseling consistent with the Zen Buddhist faith. *Id.* He drives 60 miles, one way, for each visit with Mr. Purkey. *Id.* In 2013, Mr. Purkey designated Rev. Hartkemeyer has his Minister of Record ("MOR"). *Id.*

As Mr. Purkey's priest, Mr. Purkey is under Rev. Hartkemeyer's "spiritual care." *Id.* at 5. As such, Rev. Hartkemeyer is bound by his religious duty to be present at Mr. Purkey's execution. *Id.* When Mr. Purkey was initially scheduled for execution in December 2019, Mr. Purkey designated Rev. Hartkemeyer as the spiritual advisor who shall be present during the execution, per BOP regulations, and Rev. Hartkemeyer planned to attend. *Id.* at 6.

As Rev. Hartkemeyer explains in his declaration, in the Buddhist faith, death is a transition, or a crossing over, to the afterlife. *Id.* at 5. It is considered a "liberation from the limitations and sufferings inherent in our conditions as separate human beings." *Id.* In order for the liberation

13

process to be successful and peaceful, it is essential for Rev. Hartkemeyer—an ordained Buddhist priest whom Mr. Purkey knows and trusts—to be present to serve as a spiritual guide. *Id.* at 5-6. "In the absence of a priest at this crucial moment, carrying out the pastoral function by assisting and supporting the crossing-over process, Mr. Purkey may fail to achieve the full liberation and peaceful transition that death represents." *Id.* at 5.

As Mr. Purkey's priest, Rev. Hartkemeyer intends to deliver a sutra, or a chant with content and meaning, and a dharani, a mantra-like chant, to facilitate Mr. Purkey's dying process and convey equanimity to him. *Id.* at 5-6. It is important that Mr. Purkey be able to see Rev. Hartkemeyer's face during this process, to remind him of the many hours the two spent together and the teachings Rev. Hartkemeyer shared during that time. *Id.*

Given the personal bond the two of them have created over the last eleven years, only Rev. Hartkemeyer can spiritually guide Mr. Purkey through his death. The presence of Rev. Hartkemeyer during Mr. Purkey's transition is comparable to the "last rites" performed by priests in Christian tradition. *Id.* at 5. As such, Rev. Hartkemeyer firmly believes that his failure to be present would "constitute a troubling violation of [his] religious tenets and priestly obligations." *Id.* at 6.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must demonstrate that (1) his claims are likely to succeed on the merits; (2) he would likely suffer irreparable harm without the injunction; (3) the "balance of equities" tips in his favor; and (4) the injunction would be "in the public interest." *See Whole Woman's Health All. v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The Seventh Circuit "'employs a sliding scale approach' for this balancing: if a plaintiff is more likely to win, the balance of harms can weigh

14

less heavily in its favor, but the less likely a plaintiff is to win[,] the more that balance would need to weigh in its favor." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citing *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018)).

**ARGUMENT**

**I.   REV. HARTKEMEYER IS LIKELY TO SUCCEED ON THE MERITS OF BOTH HIS RFRA AND APA CLAIMS**

### A.  Defendants' Actions Violate The Religious Freedom Restoration Act

The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, prohibits the federal government from "substantially burden[ing] a person's exercise of religion," unless the government can demonstrate that the application of the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. Once a plaintiff has met the substantial-burden prong, "the burden shifts to the government to demonstrate that" its conduct satisfies RFRA's strict-scrutiny test. *See Adams v. Comm'r,* 170 F.3d 173, 176 (3d Cir. 1999).

As the Supreme Court has recently recognized, governmental rules regulating the presence of clergy at executions can raise important religious-freedom questions. In the past year or so, the Court has stepped in twice to delay executions where the State refused to allow a prisoner's spiritual advisor into the execution chamber. *See Murphy v. Collier*, 139 S. Ct. 1475 (2019) (staying an execution where Texas refused to allow a Buddhist reverend into the execution chamber); *Gutierrez v. Saenz*, No. 19A1052, 2020 WL 3248349, at *1 (U.S. June 16, 2020) (granting stay of execution and directing the district court to "promptly determine, based on whatever evidence the parties provide, whether serious security problems would result if a prisoner

15

facing execution is permitted to choose the spiritual adviser the prisoner wishes to have in his immediate presence during the execution").

Unlike those cases, the plaintiff here is not the condemned prisoner.[25]  Rather, the plaintiff is Rev. Hartkemeyer, an ordained Buddhist priest and Mr. Purkey's longtime spiritual advisor.  But no matter: RFRA protects both priest and prisoner all the same.  The statute applies whenever the religious exercise of any "person" is substantially burdened.  *See* 42 U.S.C. § 2000bb-1(a) ("Government shall not substantially burden a *person's* exercise of religion . . .") (emphasis added); *id.* § 2000bb-1(c) ("A *person* whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.") (emphasis added).  Indeed, the Supreme Court has interpreted the term "person" so broadly that it includes not only individuals, such as Rev. Hartkemeyer, but also for-profit closely held corporations.  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 719 (2014) (noting that Congress intended for RFRA to "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution") (internal quotation marks omitted).

Defendants' plan to move forward with Mr. Purkey's execution during a dangerous pandemic violates RFRA. It substantially burdens Rev. Hartkemeyer's religious exercise by forcing him to choose between fulfilling his religious duty to attend the execution as Mr. Purkey's priest and protecting himself from risk of serious illness or death as a person especially susceptible to illness or death from COVID-19.  And Defendants cannot meet their heavy burden under RFRA's stringent strict-scrutiny standard.  There is no reason why Defendants must proceed with

---

[25] The plaintiffs in *Murphy* and *Gutierrez* asserted, among other claims, violations of the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.* While RLUIPA applies only to "institutionalized persons," RFRA's reach is more expansive.

the execution during a pandemic. There is an obvious, less restrictive alternative to ensure that both Defendants' interest in carrying out Mr. Purkey's sentence *and* Rev. Hartkemeyer's religious-freedom rights are protected: Delay the execution until Rev. Hartkemeyer and others can safely attend, free from concerns regarding COVID-19.

### 1. Defendants' Actions Substantially Burden Rev. Hartkemeyer's Exercise Of Religion By Pressuring Him To Abandon His Priestly Duties Toward Mr. Purkey

Rev. Hartkemeyer has a sincerely held religious belief that, as Mr. Purkey's priest, he must be present at Mr. Purkey's execution in order to carry out his sacred religious commitment to Mr. Purkey. [Filing No. 6-2 at 6.] And federal regulations provide that, as Mr. Purkey's designated spiritual advisor, Rev. Hartkemeyer "shall be present" at the execution, reflecting the important role that clergy play in the execution process. *See* 28 C.F.R. § 26.4(c)(3). Defendants' decision to put Mr. Purkey to death during a pandemic substantially burdens Rev. Hartkemeyer's religious exercise by rendering it effectively impracticable for him to act on his sincere religious beliefs. *See, e.g.*, *Korte v. Sebelius*, 735 F.3d 654, 682–83 (7th Cir. 2013) ("[A] law, regulation, or other governmental command substantially burdens religious exercise if it bears direct, primary, and fundamental responsibility for rendering a religious exercise effectively impracticable.'" (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (internal quotation marks omitted)); *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008) (holding that prison officials' clergy-verification requirement rendered prisoner's religious exercise "effectively impracticable" and constituted a substantial burden because it "'put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs.'") (quoting *Thomas v. Review Bd*., 450 U.S. 707, 718 (1981)).

Rev. Hartkemeyer has been Mr. Purkey's priest for the last eleven years, visiting him once a month to provide spiritual guidance and counseling. [Filing No. 6-2 at 2-4.] Because Mr. Purkey

17

is under his spiritual care, Rev. Hartkemeyer believes he has a sacrosanct religious duty to be present at Mr. Purkey's execution, where—on the threshold of death, and at his ultimate moment of crisis—Mr. Purkey will suffer the most dire distress. *Id.* at 5.   That duty requires Rev. Hartkemeyer to deliver the Buddhist equivalent of last rites as Mr. Purkey passes to ensure a proper and peaceful crossing over, free from the limitations and sufferings inherent in our condition as separate human beings.  *Id.* at 5-6.

To that end, before it was canceled, Rev. Hartkemeyer had planned to attend Mr. Purkey's previously scheduled execution in December 2019—for which Mr. Purkey designated Rev. Hartkemeyer as the spiritual advisor who "shall be present" in accordance with federal regulations. *Id.* at 4, 6.  During the execution, Rev. Hartkemeyer planned to deliver religious chants to assist Mr. Purkey in his peaceful transition from this life.  *Id.* at 5-6.  Rev. Hartkemeyer believes that his presence in person at the execution is critical to carrying out these religious duties; his visage during his chants will bring to bear for Mr. Purkey the many religious teachings that Rev. Hartkemeyer shared with him over the past decade-plus and help Mr. Purkey achieve equanimity at the moment of death, which has significant karmic implications in the Buddhist faith.  *Id.*  For Rev. Hartkemeyer, his failure to be present at Mr. Purkey's execution to carry out these Buddhist rituals would "constitute a troubling violation of [his] religious tenets and priestly obligations."  *Id.* at 6.

But now, owing to Defendants' decision to reschedule Mr. Purkey's execution to take place during a pandemic, Rev. Hartkemeyer has been put to an intolerable and cruel choice.  He must abandon his priestly obligations toward Mr. Purkey or risk his health and life to exercise his faith. Rev. Hartkemeyer is 68 years old, and according to CDC guidelines, he is especially vulnerable to COVID-19 as a result of his age.  [Filing No. 6-2 at 8.]  Based on the CDC's recent reports, the

18

risk to older adults, such as Rev. Hartkemeyer is alarming:  "In general, your risk of getting severely ill from COVID-19 increases as you get older.  In fact, 8 out of 10 COVID-19-related deaths reported in the United States have been among adults aged 65 years and older."[26]  And, "[a]mong adults, the risk for severe illness from COVID-19 increases with age, with older adults at highest risk."[27]  The significant risk faced by older adults is reflected in Indiana's reopening guidelines, which warn people over the age of 65 that they must remain extremely cautious and practice social distancing everywhere.[28]

Rev. Hartkemeyer also has a history of recurrent bronchitis and pleurisy.  [Filing No. 6-2 at 8-9.]  As a result of his age and particular medical vulnerabilities, he faces a grave risk of serious illness and death should he contract the virus.  [*See* Filing No. 6-25 at 5-8.]  Because of his health concerns, he refrains from visiting indoor public spaces, except the supermarket, where he wears a mask and strictly practices social distancing.  [*See* Filing No. 6-2 at 9.]

Prisons, in particular, present an extraordinarily high risk of transmission of communicable diseases like COVID-19 because of the impracticality of implementing the CDC's virus prevention practices and poor air quality and ventilation.  [*See* Filing No. 6-25 at 12-13.]  USP Terre Haute is no exception; multiple prisoners have tested positive for COVID-19 and at least one has died from the virus.  *See id.* at 14.  All visitation at USP Terre Haute, including legal visitation, has been suspended to mitigate the further spread of COVID-19.  *See id.* at 15.

The BOP's plans for Mr. Purkey's execution will only exacerbate the risk for medically vulnerable individuals like Rev. Hartkemeyer.  The execution will be the type of event that the

---

[26] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19), Your Health - Older Adults* (June 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[27]  *Id.*

[28]  State of Indiana, *Stage 4: What's Open, What's Closed* (July 2020), https://backontrack.in.gov/files/BackOnTrack-IN_WhatsOpen-Closed-stage4.pdf.

19

CDC categorizes as "highest risk"—"large in-person gatherings where it is difficult for individuals to remain spaced at least 6 feet apart and attendees travel from outside the local area." [29] Specifically, Defendants intend to bring hundreds of correctional staff to gather and congregate in this dangerous setting. These staff members will provide security and be in close contact with the witnesses, including Rev. Hartkemeyer. Many of the attendees and staff will have traveled to the execution from other prisons and states, further increasing the likelihood of transmitting the virus. [*See* Filing No. 6-25 at 17-18.] In addition, large numbers of reporters and protestors from around the country are expected, and prison staff will likely interact with them, too. *See id.* at 18; [Filing No. 6-30 at 4.]

Meanwhile, the cramped facility in which the execution will take place at USP Terre Haute is too small to allow for social distancing by the two dozen witnesses mandated by Defendants' regulations, in addition to necessary prison staff, government attorneys, the prisoner's family, spiritual and legal advisors, and the victim's family who will be confined there as Mr. Purkey is put to death. [*See* Filing No. 6-24 at 4-5.]; [Filing No. 6-25 at 16-18]. There will simply be no way for Rev. Hartkemeyer, or anyone else in attendance, to avoid likely exposure to COVID-19. [Filing No. 6-25 at 18.] As recent news reports have demonstrated, it takes only one infected person, who is oftentimes asymptomatic, to spread the virus to dozens or hundreds of people. [30]

As a result of Defendants' actions, it is effectively impracticable for Rev. Hartkemeyer to attend Mr. Purkey's execution without incurring serious risk to his health and life. He thus feels substantial pressure to abandon his religious commitment to Mr. Purkey in violation of his faith

---

[29] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19), Community, Work & School - Considerations for Events and Gatherings* (last updated June 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/considerations-for-events-gatherings.html.

[30] Farah Stockman & Kim Barker, *How a Premier U.S. Drug Company Became a Virus 'Super Spreader'*, N.Y. Times (Apr. 12, 2020), https://www.nytimes.com/2020/04/12/us/coronavirus-biogen-boston-superspreader.html; Ellen Barry, *Days After a Funeral in a Georgia Town, Coronavirus 'Hit Like a Bomb'*, N.Y. Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-funeral-albany-georgia.html.

and priestly obligations.  [Filing No. 6-2 at 5-6.]  This is precisely the type of "substantial burden" the government may not place on any person unless officials can justify it under RFRA's stringent strict-scrutiny test.  *See, e.g.*, *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008).

### 2. Defendants Cannot Demonstrate A Compelling Interest For Their Actions

Defendants must demonstrate that their decision to schedule Mr. Purkey's execution during a pandemic—notwithstanding the extraordinary danger it poses to Rev. Hartkemeyer, and indeed, everyone involved—is in "furtherance of a compelling governmental interest."  *See* 42 U.S.C. § 2000bb-1.  Their burden is heavy, even in the prison and criminal-justice contexts.  As the Supreme Court has held, prison officials are not entitled to "unquestioning deference" by courts applying this prong of RFRA.  *See Holt v. Hobbs*, 574 U.S. 352, 364 (2015).[31]  Rather, courts must "look[] beyond broadly formulated interests justifying the general applicability of government mandates" and "scrutinize[] the asserted harm" of denying the relief or alternative course of action proposed by the religious claimant.  *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006); *see also Burwell*, 573 U.S. at 726 (noting that the governmental interest cannot be "couched in very broad terms").

Defendants will not be able to credibly argue that they have a compelling interest in moving forward with Mr. Purkey's execution immediately, in the midst of the COVID-19 pandemic. Where the government has acted in a way that leaves "appreciable damage" to its alleged interest, RFRA's compelling-interest prong is not satisfied.  *See O Centro*, 546 U.S. at 433 ("The government's asserted compelling interest was deemed insufficient because ''[i]t is established in our strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest "of the

---

[31] Although *Holt* involved a RLUIPA claim, RFRA is RLUIPA's "sister statute," and both laws apply the same legal standard.  *Holt,* 574 U.S. at 357-358.

highest order" . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.'") (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993)).

Defendants have already acted in a manner inconsistent with any suggestion that there is a compelling interest in carrying out this execution immediately. Mr. Purkey was sentenced to death sixteen years ago, and his federal habeas review concluded in 2014. *Purkey v. United States*, 135 S.Ct. 355 (2014). For the six intervening years, from 2014 until the summer of 2019, in which the sentence could have been carried out without subjecting Rev. Hartkemeyer to the intolerable burden on his religious exercise, the Government did not seek to effectuate the interests it now will likely assert. Indeed, Defendants have not executed anyone in almost two decades yet now, inexplicably, seek to press forward with the execution during a pandemic and require Rev. Hartkemeyer to risk his health and life in order to carry out his religious obligations to Mr. Purkey. Having delayed six years in carrying out the death penalty, a further delay to accommodate the presence of Mr. Purkey's priest to perform essential ministry during Mr. Purkey's hour of greatest need does not interfere with any compelling interest on the part of Defendants.

Moreover, Defendants' asserted interest in proceeding with the execution on July 15, 2020, is undermined by the fact that the plan runs counter to other governmental interests. The Defendants' supervisory role over the thousands of prisoners detained at USP Terre Haute prohibits them from showing deliberate indifference to the conditions of confinement of those individuals. *See, e.g., Banks v. Booth*, No. CV 20-849 (CKK), 2020 WL 3303006, at *12 (D.D.C. June 18, 2020) (plaintiffs likely to succeed on constitutional deliberate indifference claims where Warden and Department of Corrections Director failed "to take comprehensive, timely, and proper steps to stem the spread of the virus"). Holding an execution that requires an enormous influx of

22

people contravenes the BOP's bureau-wide policy of prohibiting visitation at prisons to reduce COVID-19 spread, including at the Terre Haute facility. The government has no interest in holding an execution under conditions that threaten to create a super-spreader event, expanding infections throughout USP Terre Haute, other prisons, and communities across the country.

Defendants' choice to schedule an execution at this time also frustrates compliance with its own regulations. FCC Terre Haute has not allowed in-person visitation for months, including from legal counsel. [Filing No. 6-6 at 2-4.] The conditions of Mr. Purkey's execution would contradict the guidance in BOP's influenza response protocol, which includes such measures as ending visitations and maintaining strict social distancing in the event of an influenza pandemic.[32] The BOP offers the CDC website as a resource for guidance on COVID-19,[33] and CDC guidelines urge social distancing and suggest prisons should promote non-contact visits to reduce the spread of COVID-19 to both prisoners and visitors.[34]

Further, the Government's own regulations mandate that certain individuals, including a spiritual advisor, "*shall* be present" at the execution, *see* 28 C.F.R. § 26.4(c) (emphasis added). This list of mandated witnesses includes family members of the victim who will also be confronted with the difficult choice of risking their own safety or electing to attend. By scheduling the execution during a pandemic, the government makes it less likely that many of the specified witnesses will attend. The delay in carrying out the death sentence, the absence of any identified need for doing so urgently, and the fact that proceeding with the execution would violate several

---

[32] Federal Bureau of Prisons, *Pandemic Influenza Plan - Module 1: Surveillance and Infection Control* at 6 (Oct. 2012), https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (guidance outlines proposed prison response to an influenza pandemic, a health crisis that poses similar threats as the COVID-19 pandemic).

[33] Federal Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/index.jsp

[34] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19), Community, Work & School - Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (May 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

of the government's own regulations, confirms that there is no compelling governmental interest in proceeding with the execution at this time.

### 3.   The Government Is Not Using The Least Restrictive Means To Further Its Interests

Nor can Defendants demonstrate that their decision execute Mr. Purkey on July 15, 2020, during a pandemic is the least restrictive means of furthering any interest they may assert. *See* 42 U.S.C. § 2000bb-1. As the Supreme Court has explained, "[t]he least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Holt*, 574 U.S. at 364-65 (quoting *Burwell*, 573 U.S. at 728 (internal quotation marks omitted)). If the Government has an available, less restrictive alternative means to achieve its interests, the Government "'*must* use it.'" *Id.* at 365 (quoting *United States v. Playboy Entm't. Grp., Inc.*, 529 U.S. 803, 815 (2000)). In making this showing, the Government must demonstrate that it has actually "considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Willis v. Comm'r, Indiana Dep't of Correction*, 753 F. Supp. 2d 768, 779 (S.D. Ind. 2010) (quoting *Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008) (internal quotation marks omitted)).

Here, any interest the Government has in carrying out Mr. Purkey's execution can be carried out in a less restrictive way—namely, postponing the execution until a time in which it is not "effectively impracticable" for Rev. Hartkemeyer to safely fulfill his sacred duty as Mr. Purkey's priest. Defendants should postpone Mr. Purkey's execution until there is an effective COVID-19 treatment or vaccine. According to media reports, at least three COVID-19 vaccines

24

are slated to enter large-scale clinical trials in the next three months.[35]  The federal government's

interest could be served at that later time, but in a way that does not violate RFRA by infringing

on Rev. Hartkemeyer's religious exercise.

## B. The Government's Decision To Schedule An Execution In The Midst Of A Pandemic Is An Arbitrary And Capricious Agency Action That Violates The Administrative Procedure Act

Following the stay that postponed Mr. Purkey's December 2019 execution date, the

Government decided just weeks ago to reschedule his execution for July 15, 2020.  The Attorney

General issued a press release announcing the new execution date, but has not acknowledged the

changed circumstances the country and the world now face due to the spread of a deadly virus.

The dangers COVID-19 poses are serious and potentially life-threatening for people of Rev.

Hartkemeyer's age and health status, to say nothing of the hundreds of others who would be in

attendance at the execution and those with whom they will later come into contact.  By ignoring

this reality, the Government failed to provide any reasoned explanation for its decision to proceed

despite the pandemic.  This failure amounts to an arbitrary and capricious action that this Court

should set aside as unlawful.

### 1. The Government's Scheduling Of Mr. Purkey's Execution Is A Final Agency Action Subject To This Court's Review

The APA applies to "agency action [that] is committed to agency discretion by law."  5

U.S.C. § 701(a)(2).  A court's review is limited to "[a]gency action made reviewable by statute

and final agency action for which there is no other adequate remedy in a court."  *Id.* § 704.  The

Supreme Court has instructed that, to be considered "final," an agency action (1) "must mark the

consummation of the agency's decisionmaking process" and (2) "must be one by which rights or

---

[35] Elizabeth Cohen, *Fauci Says COVID-19 Vaccine May Not Get US to Herd Immunity if Too Many People Refuse to Get It*, CNN.com (June 29, 2020, 9:15 PM), https://www.cnn.com/2020/06/28/health/fauci-coronavirus-vaccine-contact-tracing-aspen/index.html.

obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotations omitted). Further, courts are directed to apply the finality requirement in a flexible and "pragmatic" manner. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016); *see Friedman v. FAA*, 841 F.3d 537, 541 (D.C. Cir. 2016).

The Seventh Circuit has explained that agency action satisfies the first *Bennett* prong "when 'its impact is sufficiently direct and immediate and has a direct effect . . . on day-to-day business.'" *Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 614 (7th Cir. 2003) (quoting *Western Ill. Home Health Care, Inc. v. Herman*, 150 F.3d 659, 662 (7th Cir. 1998)). The "core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Id.* (citations omitted).

There is no doubt that the Government's decision to proceed with Mr. Purkey's execution on July 15 is final and subject to this Court's review. First, the authority to schedule executions is delegated to the Attorney General by statute. *See* 5 U.S.C. § 301; 18 U.S.C. § 4001(b). And indeed, the Attorney General has established, through the promulgation of regulations, specific protocols for scheduling and carrying out executions, including the presence of a spiritual advisor designated by the prisoner. *See* 28 C.F.R. §§ 26.3-26.4.

Second, the Attorney General's scheduling announcement clearly marks the consummation of the decisionmaking process. On its face, the announcement leaves no room for doubt, stating pointedly that "the BOP has scheduled" Mr. Purkey's execution in accordance with the applicable

26

regulation, and that "no legal impediments prevent" the execution from proceeding.[36]  Courts regularly look to the relevant language of the challenged agency action to determine its effect.  *See Home Builders Ass'n*, 335 F.3d at 615 (observing that "[t]he language and subject matter of the provisions" of an interagency agreement were "such as to indicate that the Corps has completed its decisionmaking process"); *CropLife Am. v. EPA*, 329 F.3d 876, 881 (D.C. Cir. 2003) (holding that the "clear and unequivocal language" of an agency's press release "create[d] a binding norm that is finally determinative of the issues or rights to which it is addressed") (internal quotation marks and citation omitted); *cf. Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (holding that precatory language in FDA warning letters precluded the conclusion that the letters marked the consummation of the agency's decisionmaking process).  The unambiguous wording of the Attorney General's announcement can lead only to the conclusion that his order to BOP to conduct Mr. Purkey's execution is final.

Third, the Government has made clear its intent to carry out Mr. Purkey's execution on July 15, 2020 through its actions subsequent to issuing the execution warrant.  For example, on March 13, 2020, BOP suspended all visitation at all of its facilities, including USP Terre Haute. [Filing No. 6-6 at 2.]  To date, this policy is still in effect, as prominently noted on BOP's website. *Id.* at 3-4.  However, on June 15, 2020, the same day Defendants issued Mr. Purkey a warrant, BOP started allowing Mr. Purkey to schedule legal, spiritual, and social visits again. *Id.* at 3; [*see* Filing No. 6-2 at 4-5.].  Indeed, this exception to the visitation suspension applies only to Mr. Purkey and the three other prisoners scheduled to be executed this summer.  [Filing No. 6-6 at 6.] The Government also has indicated its intention to proceed with Mr. Purkey's execution by

---

[36] Dep't of Justice, *Executions Scheduled for Four Federal Inmates Convicted of Murdering Children*, P.R. 20-545 (June 15, 2020), https://www.justice.gov/opa/pr/executions-scheduled-four-federal-inmates-convicted-murdering-children.

actively opposing preliminary injunction motions to stay the execution on various grounds in three different cases. *See In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, Case No. 19-mc-145 (TSC), Resp. to Mot. for Prelim. Injunction, ECF No. 111 (D.D.C. June 25, 2020); *Purkey v. United States*, No. 19-3318, Resp. in Opp'n to Mot. to Stay Execution, ECF No. 34 (7th Cir. June 22, 2020); *Purkey v. Barr et al.*, No. 1:19-cv-03570, Mem. in Opp'n to Mot. for Prelim. Injunction Barring Execution of Wesley Purkey Pending Disposition on the Merits, ECF No. 26 (D.D.C. June 29, 2020).

The Attorney General's decision will result in the Government carrying out Mr. Purkey's execution, which will certainly have a direct effect on Mr. Purkey, and will also directly impact all those who have a legal right, and in the case of Rev. Hartkemeyer, a religious obligation, to attend. As described above, Rev. Hartkemeyer has a right under BOP regulations, and feels a religious obligation, to attend Mr. Purkey's execution; in doing so, he will be subject to serious risk of contracting COVID-19. [Filing No. 6-2 at 9]; [Filing No. 6-25 at 14-18]. Alternatively, as explained *supra* pp. 17-21, he will be forced to violate his religious convictions by abandoning his priestly duties to Mr. Purkey in Mr. Purkey's hour of greatest need. That is an untenable choice that undoubtedly "directly affect[s]" Rev. Hartkemeyer. *Home Builders Ass'n*, 335 F.3d at 614. The Attorney General's decision thus satisfies the first requirement for a finding of final agency action under *Bennett*.

As for the second *Bennett* prong, the Seventh Circuit has noted that the question of whether "rights or obligations have been determined" or "legal consequences will flow" is "closely related to the question of ripeness, under which the court must decide (1) whether the issues are fit for judicial decision and (2) what hardship will be inflicted on the parties if court consideration is withheld." *Id.* at 615-16.

28

The Attorney General's decision is one that determines obligations and is one from which legal consequences will flow. As the D.C. Circuit has observed, the "definitiveness" of an agency decision that satisfies the first *Bennett* prong may "also lead[] inexorably to the conclusion that [a plaintiff's] 'rights . . . have been determined.'" *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 1989) (quoting *Bennett*, 520 U.S. at 178). It is difficult to fathom a more definitive decision than one that sets the date for a prisoner's execution. Certainly, the decision determines Mr. Purkey's rights, but it also determines the rights and obligations of Rev. Hartkemeyer, who, again, must decide between fulfilling his legally protected and sanctioned religious obligations and preserving his own health. Far from the mere "inconvenience" that the plaintiffs claimed in *Home Builders*, *see* 335 F.3d at 616, the Attorney General's scheduling of the execution in this case presents an unconscionable hardship.

The legal and practical consequences of the Attorney General's decision to schedule Mr. Purkey's execution are stark and not subject to further agency review.[37] The Court therefore may review that decision as a final agency action under the APA.

### 2. The Government's Decision To Schedule The Execution During A Pandemic Is Arbitrary And Capricious

Under the APA, a reviewing court is to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To avoid this result, the agency must demonstrate that its action was based on "reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

---

[37] Under the APA, an affected party is required to exhaust administrative remedies by appealing an adverse agency decision "to superior agency authority" only when "expressly required by statute" or "otherwise require[d] by rule." 5 U.S.C. § 704; *see Darby v. Cisneros*, 509 U.S. 137, 154 (1993). No statute or regulation imposes such a requirement here. And BOP's existing administrative remedies apply only to prisoners. *See* 28 C.F.R. § 542.10 (describing the scope of BOP's Administrative Remedy Program as allowing "inmates" and "former inmates" to seek review of aspects of their confinement).

29

*Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  Further, the agency must be able to provide the "essential facts upon which the administrative decision was based" and demonstrate that it based its decision on actual evidence beyond mere "conclusory statement[s]." *United States v. Dierckman*, 201 F.3d 915, 926 (7th Cir. 2000) (quoting *Bagdonas v. Dep't of the Treasury*, 93 F.3d 422, 426 (7th Cir. 1996)); *Allied-Signal, Inc. v. Nuclear Reg. Comm'n*, 988 F.2d 146, 152 (D.C. Cir. 1993).  Agency actions that stem from "illogical" reasoning or fail to consider important, relevant factors, including the policy effects of a decision, may be found to be arbitrary and capricious.  *See Am. Fed'n of Gov't Emps., Local 2924 v. Fed. Labor Relations Auth.*, 470 F.3d 375, 380 (D.C. Cir. 2006); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1124 (9th Cir. 2012).  So, too, may agency actions that fail to consider "less restrictive, yet easily administered" alternatives be deemed arbitrary and capricious.  *Cin. Bell Tel. Co. v. FCC*, 69 F.3d 752, 761 (6th Cir. 1995).

The Attorney General's decision to schedule of a series of executions in the midst of a dangerous pandemic lacks any of the hallmarks of reasoned decisionmaking.  Defendants chose to schedule back-to-back executions—the first federal executions in nearly two decades—at a time when other jurisdictions have postponed executions that were scheduled well before the pandemic arose.[38]  The only execution that has been carried out during the pandemic was in May, when

---

[38] *See* Jess Bravin, *Prisoner Executions Are Put Off Because of Pandemic*, Wall Street Journal (Mar. 26, 2020); *Tennessee v. Oskar Franklin Smith*, No 89-F-1773 (Tenn. Apr. 17, 2020) (June 4, 2020 execution rescheduled for February 4, 2021 "due to the COVID-19 pandemic"), http://www.tncourts.gov/sites/default/files/docs/order_execution_reset_for_february_4_2021.pdf; *In re Hummel*, No. WR-81,578-02, 2020 WL 1268970, at *1 (Tex. Crim. App. Mar. 16, 2020) (*sua sponte* order granting 60-day stay of execution "in light of the current health crisis and the enormous resources needed to address that emergency"); *In re Beatty*, No. WR-59,939-04, 2020 WL 1329145, at *1 (Tex. Crim. App. Mar. 19, 2020) (same); *In re Hernandez*, No. WR-81,577-02, 2020 WL 1645052, at *1 (Tex. Crim. App. Apr. 1, 2020) (granting 60-day stay of execution in recognition that execution "should be stayed at the present time"); *In re Busby*, No. WR-70,747-03, 2020 WL 2029306, at *1, (Tex. Crim. App. Apr. 27, 2020) (same); *Texas v. Carlos Trevino*, No. 1997-CR-1717D (Bexar Co. Dist. Ct. Apr. 15, 2020) (order granting unopposed motion to withdraw order setting execution date until September 30, 2020 "due to restrictions and concerns caused by the COVID-19/Coronavirus pandemic").

COVID-19 numbers were steady or dropping around the country. Since then, the number of COVID-19 cases in the United States has risen dramatically. And indeed, the facility where the May execution took place—the Eastern Reception Diagnostic and Correctional Center—was the subject of a reported outbreak of 21 confirmed COVID-19 cases just one month after the execution.[39]

Yet the announcement of the newly scheduled execution dates, made just weeks ago, included no acknowledgment whatsoever of the unique circumstances created by the COVID-19 pandemic, including the serious health risks posed to the many individuals who will be required to attend each execution, and to the untold numbers of people with whom they will come into contact afterward. [40] Relatedly, it contained no mention of any COVID-19-related safety measures.[41] The Attorney General and BOP cannot plausibly argue that there is any sufficiently important reason to proceed with Mr. Purkey's execution in the face of such clear danger. Their decision places in imminent jeopardy the lives of all of the people who participate in or witness the execution, particularly those who are medically vulnerable, like Rev. Hartkemeyer. Indeed, the Government's failure to consider the clear "less restrictive, yet easily administered" alternative of waiting to schedule the execution at a time when the immediate threat of the pandemic has passed is fatal to any contention that it acted in a rational manner.

The reckless decisionmaking that the Government has displayed in this instance is precisely the type of arbitrary and capricious action and abuse of discretion that the APA was enacted to prevent. The Court accordingly should hold the Attorney General's decision unlawful.

---

[39] *See* Bobby Radford, *COVID-19 Outbreak Confirmed at Prison in Bonne Terre*, Daily Journal Online (June 19, 2020), https://dailyjournalonline.com/news/local/govt-and-politics/covid-19-outbreak-confirmed-at-prison-in-bonne-terre/article_c7222072-e242-513d-871a-c63a9c30cfbc.html.

[40] *See* Dep't of Justice, *Executions Scheduled for Four Federal Inmates Convicted of Murdering Children*, P.R. 20-545 (June 15, 2020), https://www.justice.gov/opa/pr/executions-scheduled-four-federal-inmates-convicted-murdering-children.

[41] *See id.*

31

**II.      REV. HARTKEMEYER WILL SUFFER IRREPARABLE HARM IF THIS COURT DOES NOT GRANT THE PRELIMINARY INJUNCTION**

Rev. Hartkemeyer will suffer irreparable harm by being forced to either abandon his religious beliefs or risk exposing himself to a highly contagious, life-threatening disease. "'[T]he loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury[.]" *ACLU of Illinois v. Alvarez,* 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). The same reasoning applies to religious-freedom injuries that will occur under RFRA *Korte,* 735 F.3d at 666) ("Although [plaintiffs'] claim is statutory, RFRA protects First Amendment free-exercise rights[.]"). Here, Rev. Hartkemeyer has demonstrated that Defendants' actions have violated RFRA.

The harm Rev. Hartkemeyer would suffer if he were unable to guide Mr. Purkey during the execution as Mr. Purkey transitions from this life would be devastating. Attending the execution of a prisoner with whom a spiritual advisor has formed a bond is a sacred religious obligation and a "moral imperative." [*See* Filing No. 6-5 at 3-4.] Given his longtime pastoral relationship with Mr. Purkey, "it is inconceivable that [Rev. Hartkemeyer] should be absent and fail to share in his final tribulation." [Filing No. 6-2 at 6.] It would be a deeply "troubling violation of [his] religious tenets and priestly obligations." *Id.* If Defendants move forward with the execution during this time, no remedy could make Rev. Hartkemeyer whole from the harm he would suffer by not being present at Mr. Purkey's execution.

**III.     THE IRREPARABLE HARM THREATENING REV. HARTKEMEYER OUTWEIGHS ANY PURPORTED HARM TO DEFENDANTS**

In actions alleging violations of core rights, where a plaintiff has shown likelihood of success on the merits, the "balance of harms normally favors granting preliminary injunctive relief[.]" *Alvarez,* 679 F.3d at 589-90 (citation omitted). Rev. Hartkemeyer has demonstrated a

32

likelihood of success on both the RFRA and APA claims, meriting a presumption of granting injunctive relief.

If the Court engages in a "balance of harms" analysis, the harm to Rev. Hartkemeyer outweighs any speculative harm to which Defendants' may point. Defendants' actions could lead to devastating consequences by preventing Rev. Hartkemeyer from carrying out a key tenet of his religious beliefs as a Buddhist priest. Defendants, on the other hand, will not be harmed if this Court grants Rev. Hartkemeyer's requested relief. Defendants have not carried out Mr. Purkey's death sentence for the last six years and have not carried out a single federal execution in nearly seventeen years. There is no justifiable reason to do so in the midst of a global pandemic, and there is no harm to delaying Mr. Purkey's execution until a time when the pandemic's risks have ebbed.

**IV.   THE REQUESTED PRELIMINARY INJUNCTION WOULD FURTHER THE PUBLIC INTEREST**

Granting Rev. Hartkemeyer's requested relief would be in the public interest because it would vindicate significant religious-liberty interests and potentially avoid severe adverse health consequences. The Seventh Circuit has routinely found that protecting religious freedom is in the public interest. *See, e.g., Christian Legal Soc'y v.Walker,* 453 F.3d 853, 859 (7th[h] Cir. 2006) (" [I]njunctions protecting First Amendment freedoms are always in the public interest.") (citation omitted). Here, the public interest in granting injunctive relief is particularly significant as it will protect Rev. Hartkemeyer's religious freedom, as well as Mr. Purkey's and the religious-freedom interests advanced by the Government through its own regulations. As discussed above, BOP regulations recognize the important role that clergy play in an execution, mandating that a designated spiritual advisor "shall be present" at every execution. Yet, clergy or religious laypeople may not be willing to enter into such vital relationships with death row prisoners if they

33

believe they will not be able to see through their religious obligations to the end.  [*See, e.g.,* Filing No. 6-5 at 3-4.] ("A spiritual advisor cannot commit to building trust and developing a relationship with a prisoner over the course of years—in some cases, decades—only to abandon the prisoner when he is most in need.").

Further, delaying Mr. Purkey's execution until a time when the devastating effects of the COVID-19 pandemic have subsided will not only protect core religious liberties, but could also prevent potentially fatal health consequences to Rev. Hartkemeyer as well as the numerous other individuals involved in the execution and members of the communities across the country to which those individuals will return after Mr. Purkey's death sentence is carried out.

## CONCLUSION

For the foregoing reasons, Plaintiff Hartkemeyer respectfully requests that the Motion for Preliminary Injunction be granted.

Dated: July 2, 2020

Respectfully submitted,

/s/      *David C. Fathi*

Douglas Hallward-Driemeier*                    David C. Fathi**
Maria G. Calvet*                               Daniel Mach*
Michelle H. Behrens*                           Heather L. Weaver*
John T. Dey*                                   Jennifer Wedekind*
ROPES & GRAY LLP                               AMERICAN CIVIL LIBERTIES UNION
2099 Pennsylvania Avenue NW                       FOUNDATION
Washington D.C. 20006                          915 15th Street NW
Tel:  (202) 508-4600                           Washington, DC 20005
Douglas.Hallward-Driemeier@ropesgray.com       (202) 548-6603
Maria.Calvet@ropesgray.com                     dfathi@aclu.org
Michelle.Behrens@ropesgray.com                 dmach@aclu.org
John.Dey@ropesgray.com                         hweaver@aclu.org
                                               jwedekind@aclu.org

34

Cassandra Stubbs*
Amy Fly*
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
201 W. Main St., Suite 402
Durham, NC 27701
(919) 688-4605
cstubbs@aclu.org
afly@aclu.org

*pro hac vice motion forthcoming

**Not admitted in D.C.; practice limited
to federal courts

Attorneys for Plaintiff

35