In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 19-3318

WESLEY IRA PURKEY,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA, *et al.*,

*Respondents-Appellees.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:19-cv-00414-JPH-DLP — **James P. Hanlon**, *Judge.*

———————————

ARGUED JUNE 16, 2020 — DECIDED JULY 2, 2020

———————————

Before WOOD, *Chief Judge*, and BRENNAN and ST. EVE, *Circuit Judges*.

WOOD, *Chief Judge*. Accuracy and finality are both central goals of the judicial system, but there is an inherent conflict between them. Suppose later information comes to light in a criminal case, and that information reveals potential factual or constitutional errors in the original proceeding. Do we privilege accuracy and re-open the case, or do we privilege finality and leave the errors unexamined? And if we do

permit a second look, is a third or fourth also proper? The case before us presents just such a question, and the stakes could not be higher. We must decide whether Wesley Purkey, who sits on federal death row at the U.S. Penitentiary in Terre Haute, Indiana, has run out of opportunities to challenge his conviction and death sentence for kidnapping and murder. Purkey urges that his proceedings up to now have been undermined by ineffective assistance of counsel, first at the trial level, and then on collateral review. The United States argues that Purkey already has had an opportunity to challenge the effectiveness of trial counsel and, under the governing statutes, he has come to the end of the line. The district court ruled for the government. We conclude that this is not one of those rare cases in which the defendant is entitled to another day in court, and so we affirm the district court's judgment.

## I

We can be brief about the underlying facts, since we are concerned almost exclusively about procedure in this appeal. On January 22, 1998, Purkey (then 46 years old) saw Jennifer Long at a grocery store in Kansas City, Missouri. He asked her if she wanted to party with him. She accepted the invitation and got into Purkey's pickup truck. At the time, Long was 16 years old; she commented to Purkey that she had been at her high school but had left after an argument with some friends.

Matters almost immediately took a bad turn: Purkey told Long that he needed to stop off briefly at his house in nearby Lansing, Kansas, but Long objected. Purkey then threatened her by removing a boning knife from the glove box and placing it under his thigh, while telling her that he would not let her out of the truck. He drove her across the state line to his

No. 19-3318 3

home, where he raped her, stabbed her repeatedly with the boning knife, and ultimately killed her.

In order to conceal the murder, Purkey stored Long's body in a toolbox for a few days; he later dismembered it and burned the pieces in his fireplace. What he could not destroy, he dumped into a septic lagoon.

That was not Purkey's only murder during 1998. In October, he killed 80-year-old Mary Ruth Bales using only the claw end of a hammer. This took place in Kansas, where he was quickly caught and placed in custody. In December 1998, while awaiting trial in the Bales case, Purkey sent a letter to Detective Bill Howard of the Kansas City, Kansas, police department, stating that he wanted to talk about a kidnapping and homicide that had occurred earlier that year. Purkey also insisted that an FBI agent come along. His reason was this: he realized that he faced a life sentence in Kansas for the Bales murder, but he thought that if he were convicted on federal charges, he would also receive a life sentence, but he could serve it in a federal facility. It apparently did not occur to him that the death penalty is possible for certain federal crimes.

Purkey had several conversations with Detective Howard and FBI Special Agent Dick Tarpley. In each of them, he said that he planned to plead guilty in the Bales case. He also expressed a willingness to confess to another murder in exchange for a life sentence in federal prison. Howard and Tarpley promised to inform the U.S. Attorney in Kansas of Purkey's offer, but they made no other commitment. Purkey then confessed that nine months earlier, he had kidnapped a young woman named Jennifer in Kansas City, Missouri, transported her to his home, and had raped, killed, dismembered, and disposed of her. Howard and Tarpley passed this

information along to the U.S. Attorney, who indicated that if Purkey cooperated further, he might be willing to prosecute the case.

Purkey did cooperate, by taking Howard and Tarpley to the crime scene, showing them the septic pond where he had deposited the remains, giving handwritten and oral confessions, and identifying Long's photograph from a lineup. Purkey was under the impression that he was negotiating for a life sentence, but Howard and Tarpley denied that any such deal was on the table. And indeed, on October 10, 2001, after Purkey pleaded guilty in Kansas court to the Bales murder, a grand jury in the Western District of Missouri indicted him for the kidnapping, rape, and murder of Long, in violation of 18 U.S.C. §§ 1201(a), 1201(g), and 3559(d). The U.S. Attorney filed a notice that the government planned to seek the death penalty. See 18 U.S.C. § 3593(a).

## II

### A

At the trial, Purkey was represented by Attorneys Frederick Duchardt, Jr. (principal counsel) and Laura O'Sullivan. Because Purkey had repeatedly confessed that he kidnapped Long (four times, by the government's count), his defense depended on the jury's accepting his contention that he had lied when he said that he took her by force, and that the truth was instead that he thought she was a prostitute who willingly accompanied him from Missouri to Kansas. He testified that he had fabricated the claim of force because he wanted to be prosecuted in federal court. The government responded with certain statements from Purkey's suppression hearing, at which he admitted that he took Long across state lines against

No. 19-3318                                                                    5

her will, to impeach his trial testimony. Purkey's lawyers made no effort to exclude this evidence, which he now says was ultimately used not just for impeachment, but (impermissibly) to prove the truth about coercion. The jury was not persuaded by Purkey's account; on November 5, 2003, it returned a verdict of guilty.

The penalty phase of the trial began shortly thereafter, on November 10, 2003. Purkey's lawyers submitted evidence on 27 mitigating factors, though as we will see, current counsel believe that their work fell short of the constitutional minimum. Experts testified that Purkey both had organic brain damage, principally stemming from severe injuries suffered in car accidents, and that his mental capacity was diminished. The government offered evidence in opposition to the alleged mitigating factors, and it also introduced evidence of six statutory and four non-statutory aggravating factors. See 18 U.S.C. § 3592(c) (listing 16 statutory aggravating factors and permitting consideration of any other aggravating factor for which the defendant received notice). The jury found that the government had proven the existence of all six statutory factors. See 18 U.S.C. §§ 3592(c)(1), (2), (3), (4), (6), and (11). It also found three of the four non-statutory factors: loss because of personal characteristics and impact on the family; previous vicious killing of Bales; and substantial criminal history.

The penalty question was submitted to the jury on November 19, 2003; it returned a death sentence on the same day. Although the verdict form included space for findings on mitigating factors, the jury left that section blank. When the jury announced its verdict, defense counsel initially objected to this omission and the court offered to send the jury back for further deliberations. But the government objected, and

6                                                          No. 19-3318

defense counsel dropped the point without further comment. The court thus never resolved the question whether the blank form meant that the jury neglected to address the question of mitigation, or if it meant that it thought about the subject and concluded that there was nothing to report. The court formally imposed a sentence of death and entered its judgment on January 23, 2004.

Purkey appealed to the Eighth Circuit, which affirmed the conviction and sentence. *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005) (*Purkey I*). The Supreme Court denied Purkey's petition for a writ of certiorari. *Purkey v. United States*, 549 U.S. 975 (2006). Purkey then filed a motion for postconviction relief under 28 U.S.C. § 2255.

B

Purkey raised two primary claims in his section 2255 proceedings: (1) ineffective assistance of trial counsel in 17 different particulars, in violation of his Sixth Amendment rights; and (2) several alleged violations of his due process rights during the trial (namely, government misconduct during the trial, insufficient evidence to find kidnapping beyond a reasonable doubt, and error in the jury's failure to address the question of mitigating evidence). He urged the district court to give him an evidentiary hearing on the ineffectiveness-of-counsel claim. In order to respond to that charge, the government submitted a 117-page affidavit from attorney Duchardt, in which Duchardt defended his work.[1] Purkey asserted that

---

[1] The district court ordered the preparation of that affidavit in response to a motion from the government. See *Purkey v. United States,* No. 06-8001-CV-W-FJG, 2008 WL 11429383 at *2 (W.D. Mo. Feb. 1, 2008). In the same order, the court denied Purkey's counsel's motion to compel the Federal Bureau of Prisons (BOP) to provide Purkey with necessary psychiatric

No. 19-3318                                                          7

the court could not take Duchardt's word on these points, and worse, that Duchardt had misrepresented certain things and had violated his duty of confidentiality to Purkey. The district court decided, however, that Purkey had failed to overcome the presumption that Duchardt's actions reflected trial strategy. It therefore denied relief under section 2255. *Purkey v. United States*, No. 06-8001-CV-W-FJG, 2009 WL 3160774 (W.D. Mo. Sept. 29, 2009) (*Purkey II*).

Through counsel, Purkey moved to alter or amend the court's rejection of his section 2255 motion; at the same time, he filed a pro se motion "to Withdraw Habeas Proceedings and Set an Expeditious Execution Date." *Purkey v. United States*, No. 06-8001-CV-W-FJG, 2009 WL 5176598 (W.D. Mo. Dec. 22, 2009) (*Purkey III*). The district court denied the motion insofar as it sought reconsideration of the denial of relief under section 2255, and it permitted Purkey to withdraw the pro se motion seeking the abandonment of his section 2255 request and an early execution date. Nearly a year later, the court issued a lengthy opinion in which it denied Purkey's request for a certificate of appealability. *Purkey v. United States*, No. 06-8001-CV-W-FJG, 2010 WL 4386532 (W.D. Mo. Oct. 28, 2010) (*Purkey IV*).

Turning to the Eighth Circuit, Purkey was successful in obtaining a certificate of appealability "to review whether Purkey received effective assistance of counsel during the penalty phase of the trial and whether the district court abused its discretion by denying relief without conducting an

---

treatment, it denied Purkey's pro se motion seeking leave to dismiss counsel and proceed pro se, and it gave the government an extension of time in which to respond to the motion under section 2255.

evidentiary hearing." *Purkey v. United States*, 729 F.3d 860, 861 (8th Cir. 2013) (*Purkey V*). The certificate permitted "Purkey to challenge three aspects of Duchardt's performance in this proceeding: (1) his alleged failure to adequately prepare and present the testimony of three expert witnesses, (2) his alleged failure to adequately investigate and prepare two mitigating witnesses, which resulted in their testimony being more prejudicial than beneficial, and (3) his alleged failure to adequately investigate and present other mitigating evidence." *Id.* at 862.

The Eighth Circuit found that Duchardt had presented "a lengthy and detailed mitigation case" during the penalty phase. *Id.* at 863. Over two days, he offered testimony from 18 witnesses—family members, inmates, and religious counselors—all of whom stated that Purkey's parents had inflicted significant physical and emotional abuse on him. Both were alcoholics, his mother (and many others) humiliated him because he was a stutterer, and his mother sexually abused both him and his brother in the most graphic ways imaginable. Purkey's medical and mental health records were introduced; they showed that Purkey had a serious personality disorder and a below-average IQ. Although section 2255 counsel had more to offer, the Eighth Circuit found that the new material was "entirely cumulative." *Id.* at 865. Moreover, the court added, to the extent the proffered information did not cover the same ground as the penalty-phase evidence, it could not conclude that there was a reasonable probability that the new evidence would have changed the result, given the particularly gruesome nature of the crime. *Id.* at 866. Finally, it saw no abuse of discretion in the district court's decision not to hold an evidentiary

No. 19-3318                                                                 9

hearing. Purkey sought certiorari from this decision, but the Supreme Court denied review. 574 U.S. 933 (2014).

## C

That set the stage for the current proceedings—and we mean to use the plural, because there are three moving pieces, although we are involved in only one of them. As are all federal prisoners under a sentence of death, Purkey is housed in the U.S. Penitentiary in Terre Haute, Indiana. For many years—to be exact, since March 18, 2003, when Louis Jones, Jr. was executed—the federal government has not carried out any executions. But policy changed in the current Administration, which is moving quickly to resume executions. On July 25, 2019, the government issued a notice scheduling Purkey's execution for December 13, 2019. Losing no time, on August 27, 2019, Purkey filed a detailed petition under 28 U.S.C. § 2241 in the Southern District of Indiana challenging the constitutionality of his conviction and death sentence. We refer to this as the "Habeas Corpus" case; it is the one presently before us. Second, on October 21, 2019, Purkey filed a complaint in the District of Columbia challenging the execution protocol that the Bureau of Prisons (BOP) proposes to use. We refer to this as the "Execution Protocol" case. Finally, on November 11, 2019, Purkey filed another complaint in the District of Columbia, asserting that he was entitled to relief from the death penalty under the Supreme Court's ruling in *Ford v. Wainwright*, 477 U.S. 399 (1985). We refer to this as the *Ford* claim.

## 1

Before turning to the Habeas Corpus case, we say a word about the Execution Protocol litigation and the *Ford* claim. The impetus for the Execution Protocol litigation came from

10                                                        No. 19-3318

the fact that the Federal Death Penalty Act of 1994 (FDPA) calls for federal executions to be done "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). At the time the Department of Justice announced that it had scheduled Purkey's execution for December 13, 2019, there was a consolidated action pending in the district court for the District of Columbia. In that case numerous death-row inmates (some of whom also had fixed execution dates) challenged the execution protocol that BOP planned to use for them. The Protocol, adopted in 2019, calls for BOP to use a single drug, pentobarbital, to carry out executions. See *Matter of Federal Bureau of Prisons' Execution Protocol Cases*, Nos. 19-mc-145 (TSC) *et al.*, 2019 WL 6691814 (D.D.C. Nov. 20, 2019).

The details of this litigation need not detain us. What is important is that the D.C. district court preliminarily enjoined the Department of Justice from moving ahead under the 2019 Protocol, noting among other things that it had taken DOJ eight years to come up with the Protocol, that the defendants had a strong interest in litigating the legality of their executions, and that a minor additional delay would not irreparably injure the government. The initial dates thus came and went with no executions. The government promptly appealed, however, and a divided panel of the Court of Appeals for the District of Columbia Circuit vacated the injunction and remanded the case to the district court. See *In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020). The majority held that the FDPA does not compel the DOJ to follow every last detail of the relevant state's execution procedures, and that the Department did not violate the Administrative Procedure Act, because this matter is exempt from notice-and-comment rulemaking. The inmates

No. 19-3318                                                              11

immediately filed a petition for a writ of certiorari, which was docketed as No. 19-1348 under the name *Bourgeois v. Barr*. On June 29, the Supreme Court denied the petition along with an application for a stay. We have no role in the Execution Protocol litigation.

2

Purkey's *Ford* claim is, by definition, an individual one. In it, he asserts that he is now afflicted with dementia (Alzheimer's type) and schizophrenia, and that these conditions have worsened over the time he has been in prison, to the point that he no longer appreciates why he faces execution. The government contests these assertions. *Ford* holds that the Eighth Amendment bars the execution of a person who, as of the planned time for death, is "insane." See 477 U.S. at 410 (plurality opinion of Marshall, J.), 421–22 (Powell, J., concurring in the judgment). See also *Panetti v. Quarterman*, 551 U.S. 930 (2007) (confirming *Ford* holding and holding that a *Ford* claim is not ripe until execution is imminent). On February 24, 2020, the government filed a motion to dismiss the *Ford* claim, or in the alternative to transfer it from the District of Columbia (where Purkey filed it) to the Southern District of Indiana. Purkey filed his motion in opposition on March 16, and the government responded on March 20. To date, the district court has not yet ruled on the motion.

In the midst of all this, the Department of Justice issued a statement on June 15 resetting Purkey's execution date for July 15, 2020. Purkey responded with a motion filed on June 22 for a preliminary injunction barring the execution. The government's response to that motion was due on June 29, and Purkey's reply is due on July 2. We have no current role in the *Ford* litigation.

3

That brings us to the case before us, which Purkey brought under the basic habeas corpus statute, 28 U.S.C. § 2241. We held oral argument in this case on June 16, a date that had long been scheduled as of the time the government issued the new execution schedule on June 15. The most important question we must answer is whether Purkey is entitled to use section 2241. Only if the answer is yes may we reach the merits of the claims he wishes to bring.

In the great majority of cases, the exclusive post-conviction remedy for a federal prisoner is the one Purkey already has invoked: a motion under 28 U.S.C. § 2255. Strict procedures govern the way such a motion must be presented. First, there is a one-year statute of limitations, which runs from one of four dates specified in the statute. See 28 U.S.C. § 2255(f). The only relevant date in Purkey's case is the first: "the date on which the judgment of conviction becomes final." Purkey met that deadline; his section 2255 motion was the subject of the district court's decisions in *Purkey II* through *IV* and the Eighth Circuit's ruling in *Purkey V*. Second, a federal prisoner is limited to one motion under section 2255 unless he receives permission to file a second or successive motion from the appropriate court of appeals. See 28 U.S.C. § 2255(h). The criteria for authorization are draconian: they are met only if there is compelling newly discovered evidence of innocence or "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court." *Id.* Purkey concedes that he cannot satisfy either of these criteria.

Finally, the statute recognizes a narrow pathway to the general habeas corpus statute, section 2241, in the provision

No. 19-3318                                                          13

that has come to be called the "safety valve." Here is what it
says:

> *An application for a writ of habeas corpus* in behalf of
> a prisoner who is authorized to apply for relief by mo-
> tion pursuant to this section, *shall not be entertained* if it
> appears that the applicant has failed to apply for relief,
> by motion, to the court which sentenced him, or that
> such court has denied him relief, *unless it also appears*
> *that the remedy by motion is inadequate or ineffective to test*
> *the legality of his detention*.

28 U.S.C. § 2255(e) (emphasis added). We thus turn to the
question whether Purkey's case fits within the narrow con-
fines of the safety valve.

### III

This court has had a number of opportunities to consider
the safety valve, but three cases are central: *In re Davenport*,
147 F.3d 605 (7th Cir. 1998); *Garza v. Lappin*, 253 F.3d 918 (7th
Cir. 2001); and *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015)
(*en banc*). The district court, regarding these three as defining
the limits of the safety valve, examined each of them and con-
cluded that Purkey's situation was distinguishable. We do not
agree with the idea that those cases rigidly describe the outer
limits of what might prove that section 2255 is "inadequate or
ineffective to test the legality" of a person's detention, but as
we will see, Purkey's case does not require us to move beyond
what we already have done.

Our first occasion to find the safety valve applicable oc-
curred in *Davenport*, a case that actually involved two defend-
ants, Davenport and Nichols. The part of the opinion perti-
nent here involved Nichols. He had been convicted of using a

14                                                    No. 19-3318

firearm in the commission of a drug offense, in violation of
the version of 18 U.S.C. § 924(c) that existed in 1990. After his
conviction and a failed motion under section 2255, the Su-
preme Court decided *Bailey v. United States*, 516 U.S. 137
(1995), which held that "use" for purposes of section 924(c)
did not include mere possession. Because Nichols's case had
involved only possession, Nichols sought relief under the All
Writs Act, 28 U.S.C. § 1651. The district court rejected that mo-
tion as an attempt to evade the need to obtain permission from
the court of appeals to file a successive section 2255 motion.
147 F.3d at 607.

We noted that Nichols's situation fell outside the narrow
rules under which a second or successive motion may be au-
thorized: he did not claim to have any new evidence, nor was
there a new rule of *constitutional* law that applied to his case.
Instead, the Supreme Court had cut the legs out from under
the interpretation of his statute of conviction, leaving him in
prison for actions that (as clarified by the Court) did not con-
stitute a crime. Under those circumstances, we held that

> A procedure for postconviction relief can fairly be
> termed inadequate when it is so configured as to deny
> a convicted defendant *any* opportunity for judicial rec-
> tification of so fundamental a defect in his conviction
> as having been imprisoned for a nonexistent offense.

*Id.* at 611. We went on to add three qualifications to that hold-
ing. First, "the change of law has to have been made retroac-
tive by the Supreme Court." *Id.* Second, "it must be a change
that eludes the permission in section 2255 for successive mo-
tions." *Id.* And third, "'change in law' is not to be equated to
a difference between the law in the circuit in which the pris-
oner was sentenced and the law in the circuit in which he is

No. 19-3318                                                    15

incarcerated." *Id.* at 612. None of these qualifications applied to Nichols's case, and so we held that he was entitled to proceed under section 2241.

The circumstances in *Garza* were even more unusual than those in *Davenport*. Like Purkey, petitioner Garza was on federal death row awaiting execution. He had been convicted on a number of charges, including three counts of killing in furtherance of a continuing criminal enterprise, in violation of 18 U.S.C. § 848(e). The wrinkle was this: the murders in question had occurred in Mexico, and he had never been charged or convicted there for them. Instead, the jury in his U.S. prosecution had found beyond a reasonable doubt at the capital sentencing phase of his trial that he had committed the murders. See 18 U.S.C. § 3593(c) (requiring the government to prove aggravating factors beyond a reasonable doubt). After Garza exhausted his direct appeals and his motion under section 2255, he turned to the Inter-American Commission on Human Rights for relief. This Commission, established pursuant to the Organization of American States (to which the United States is a party), exists to hear this type of claim. This was the earliest point at which Garza could seek relief, because the Commission requires applicants to exhaust national remedies. The Commission concluded that "Garza's death sentence was a violation of international human rights norms to which the United States had committed itself." 253 F.3d at 920.

Garza followed up in the district court with a petition under section 2241; he conceded that he did not satisfy the criteria for a successive motion under section 2255. We concluded that he was entitled to use section 2241, because it would have been impossible under the Inter-American Commission's exhaustion rule to have sought relief there in time to include its

findings in either his direct appeal or his original section 2255 motion. The treaty on which he relied does not give rise to private rights of action, and so he could not invoke it in his original case. But, he contended, the Commission's process did create private rights. We found that this was not such an outlandish claim that our jurisdiction was defeated, although when we reached the merits in his case, we concluded that the Commission had only the power to make recommendations to the U.S. government, which remained free to take them or leave them. That was not enough to justify a stay of his execution, and so we denied his petition.

The last case in this line is *Webster*, which was decided by the *en banc* court. Once again, the result hinged on the availability of section 2241 (via the safety valve) for a federal prisoner who had completed his direct appeals and had unsuccessfully pursued a motion under section 2255. Webster found himself on death row after being convicted of the federal crime of kidnapping resulting in death and related offenses. 784 F.3d at 1124. Turning to section 2241, he sought to present "newly discovered evidence that would demonstrate that he is categorically and constitutionally ineligible for the death penalty under the Supreme Court's decisions in *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Hall* [*v. Florida*, 572 U.S. 701 (2014)]." *Id.* at 1125. At the trial, a central question was whether Webster was so intellectually impaired that he should not be subject to the death penalty. The defense introduced evidence of Webster's school records, intelligence testing, and inability to fake test results. The government responded with lay witnesses who all said that Webster "did not seem mentally retarded to them," *id.* at 1130, and experts who said that Webster was able to perform adequately in school and beyond. Throughout, the government urged that

No. 19-3318                                                        17

Webster was faking his mental limitations in an effort to avoid the death penalty.

Years after his conviction and the denial of his section 2255 motion, new counsel discovered evidence that gravely under-mined the government's theory. It turned out that Webster's trial counsel had asked the Social Security Administration for records on Webster and had been told that there were none. That was wrong. In fact, the Administration had records da-ting from a year *before* his crime in which Webster had been described as someone whose "[i]deation was sparse and this appeared to be more of a function of his lower cognitive abil-ity than of any mental illness." *Id.* at 1133. The same doctor concluded that Webster was both "mentally retarded and an-tisocial," and that there was no evidence of malingering. *Id*. There were other records to the same effect.

This was a game-changer for Webster. As we pointed out in the opinion, there was no question of late fabrication of the new evidence, and (taking the facts favorably to Webster), his lawyer had diligently sought evidence from that very source—the Social Security Administration. Counsel had no duty to continue pestering the Administration after he had been informed that it had nothing; he was entitled to take the government at its word. Moreover, these records were far from cumulative. They directly contradicted the government's assertion at trial that Webster had concocted a story of mental disability solely to avoid the death penalty. A jury aware of those records could conclude that Webster is categorically ineligible for capital punishment under the Supreme Court's decision in *Atkins*. Much more, therefore, than garden-variety newly discovered evidence was at play.

18 No. 19-3318

See 784 F.3d at 1140. Only by using the safety valve could Webster test the constitutionality of his capital sentence.

Purkey recognizes that his case does not fit the profile of any of the three we have just discussed, but he argues that at a broader level, he has presented the same type of problem and we should thus extend our earlier cases to his situation. In essence, he argues that section 2255 is structurally inadequate to test the legality of a conviction and sentence any time a defendant receives ineffective assistance of counsel in his one permitted motion. He recognizes that he faces a problem in the line of Supreme Court decisions holding that there is no right to counsel in collateral proceedings, and thus no right to effective assistance of counsel. See *Coleman v. Thompson*, 501 U.S. 722 (1991). But, he points out, *Coleman* is not the last word on this subject. In *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), the Supreme Court recognized that a state prisoner whose first opportunity (either *de jure* or *de facto*) to raise an ineffectiveness-of-counsel argument is in state post-conviction proceedings can avoid procedural default in a later action under 28 U.S.C. § 2254 if he can show ineffectiveness of post-conviction counsel. And, he adds, this court held in *Ramirez v. United States*, 799 F.3d 845 (7th Cir. 2015), that a federal prisoner could seek to reopen an action under section 2255 using Federal Rule of Civil Procedure 60(b) on reasoning that is analogous to *Martinez* and *Trevino*.

With that much established, Purkey jumps from the ability to use Rule 60(b) to reopen a section 2255 case to the assumption that *any* federal prisoner whose counsel is ineffective during his initial section 2255 proceeding can show that a motion under section 2255 is inadequate or ineffective and thus that he is entitled to avail himself of section 2241. At oral

No. 19-3318                                                    19

argument, Purkey also offered a narrower version of this theory, applicable only to capital cases. Because defendants facing the federal death penalty have a statutory right to counsel in a section 2255 proceeding, see 18 U.S.C. § 3599(a)(2), Purkey reasons that ineffectiveness of that counsel deprives a defendant of effective collateral review and thus permits the defendant to resort to section 2241.

The government strenuously opposes this line of reasoning, which it sees as unraveling all of the restrictions Congress has imposed on collateral relief for federal prisoners. It also points out that there is a difference between lacking an opportunity to raise a claim, and having that opportunity but not using it effectively. At best, it concludes, Purkey is in the latter situation. He had and used the opportunity to raise his complaints about ineffective assistance of trial counsel during his section 2255 proceeding. The fact that new counsel have now uncovered even more instances of ineffective assistance is not surprising, but, it says, the same will be true in countless other cases. Vincit omnia finis.

## IV

Although we do not believe that *Davenport*, *Garza*, and *Webster* create rigid categories delineating when the safety valve is available—and such a finding would be inconsistent with the standard-based language of section 2255(e)—we do think that the words "inadequate or ineffective," taken in context, must mean something more than unsuccessful. We said as much in *Webster*. 784 F.3d at 1136. In *Davenport*, that something more came from the structure of the statute. Statutory problems are simply not covered in section 2255, whether through oversight or through confidence that the safety valve would solve the rare problem that arises when, because of an

intervening Supreme Court decision, a person discovers that
he is in prison for something that the law does not criminalize.
In *Garza*, that something more arose because of an interna-
tional treaty whose machinery could not be invoked until af-
ter the person had exhausted national remedies. And in *Web-*
*ster*, the combined facts of the Social Security Administra-
tion's alleged mis-information to counsel, counsel's diligence,
the timing of the discovery of the critical evidence, and the
constitutional ban on executing the mentally disabled had the
effect of making section 2255 structurally unavailable and
opening the door to the section 2241 proceeding. We need not
speculate on what other scenarios might satisfy the safety
valve, other than to say that there must be a compelling show-
ing that, as a practical matter, it would be impossible to use
section 2255 to cure a fundamental problem. It is not enough
that proper use of the statute results in denial of relief.

At the time Purkey filed his motion under section 2255,
nothing formally prevented him from raising each of the three
errors he now seeks to raise in his petition under 2241. The
first of those relates to the failure of trial counsel not to spot
the fact that Juror 13 (whose first name was also Jennifer) had
disclosed on her jury questionnaire that she too had been the
victim of an attempted rape when she was 16 years old. Be-
cause trial counsel never noticed that glaring fact, he did not
object to Juror 13's being seated, and she in fact served on the
jury that convicted Purkey and voted for the death penalty.

We can accept as true the fact that Purkey's trial counsel
missed this disturbing coincidence, and it may be likely that
if counsel had noticed it and moved to strike Juror 13 for
cause, such a motion would have been granted. But that is not
the proper question before us now. It is instead whether,

No. 19-3318                                                      21

having raised in his section 2255 motion 17 specific ways in which his trial counsel were ineffective, Purkey is now entitled to add additional allegations not by obtaining permission to file a successive section 2255 motion, but through section 2241. Purkey says yes and points to the fact that section 2255 counsel also missed the problem with Juror 13. But how far are we supposed to take that? What if we were now to permit a section 2241 proceeding, Purkey were to lose, and new counsel were to come in and discover that trial counsel also failed to make a meritorious *Batson* objection? Would the ineffectiveness of the first lawyers who litigated the section 2241 proceeding entitle him to a new section 2241 proceeding? If not, why not? And if so, what would stop a never-ending series of reviews and re-reviews (particularly since there is no numerical limit for section 2241)? Purkey has offered no satisfactory answers to these questions, and we can think of none.

Instead, as the law now stands, once a Sixth Amendment claim of ineffective assistance of counsel has been raised, as happened in Purkey's case, that is the end of the line. In evaluating applications for permission to file a second or successive petition under 28 U.S.C. § 2254 (the habeas corpus statute for state prisoners), we are required to dismiss a claim "that was presented in a prior application." 28 U.S.C. § 2244(b)(1). We apply the same rule to second or successive motions under section 2255. Pertinent here, if an applicant has already raised a Sixth Amendment ineffectiveness claim in an earlier application—even if the specific details of the ineffective performance are different—we must dismiss a new claim of ineffective assistance of the same lawyer. This rule flows from the Supreme Court's instruction to "consider the totality of the evidence before the judge or jury" in evaluating a claim of ineffectiveness, not each particular instance of ineffective

performance in isolation. *Strickland v. Washington*, 466 U.S. 668, 695 (1984).

No system is perfect, and we find it troubling that these rules will leave some people under even a sentence of death (the ultimate irrevocable action) in the position of never having received effective assistance of counsel in the critical respect. It is thus worth nothing that nothing prevents Congress from changing the rules, especially for capital cases, to ensure that the ultimate penalty is not carried out on someone who fell through the cracks and did not get the quality of legal assistance to which the Constitution entitles him. But, as we noted at the outset, in a human institution there is always some risk of error. All we can do is to strive to minimize it and to follow the law to the best of our ability.

Our analysis of Purkey's second proposed argument for his section 2241 petition is similar. Current counsel have undertaken a much more comprehensive search for, and analysis of, the extensive mitigating evidence than trial counsel or section 2255 counsel had performed. The section 2241 petition sets out this evidence over nearly 100 pages. Most of this evidence goes well beyond the evidence that post-conviction counsel presented in *Purkey II* and that the Eighth Circuit discussed in *Purkey V*. We agree with Purkey that the efforts of trial counsel to build a case for mitigation fell short of what current counsel have now found. But the critical question, as the Eighth Circuit noted in *Purkey V*, is whether there is a reasonable probability that this evidence would have changed the jury's sentencing recommendation, or if, on the other hand, it was essentially cumulative.

At this point, we must comment that we are disturbed that the jury left blank the spaces on the verdict form for its

consideration of Purkey's many trial arguments in mitigation, and that trial counsel did not insist that the case be returned to the jury for completion of those blanks when he had the chance. If the jury really meant that it thought that Purkey had failed to carry his burden on each and every point, it should have been required to say so. Once it was focusing on mitigation, however, it may have found some points in Purkey's favor. There is no doubt, even based on only the trial evidence, that Purkey has had a hideous life. It was for the jury to balance aggravating and mitigating factors, but it is hard to know whether it did that.

Once again, however, this fault was apparent to everyone from the minute the jury returned its verdict. Trial counsel commented on it; original appellate counsel knew about it; and section 2255 counsel knew about it. We have no idea at this remove why counsel did not preserve this point throughout these proceedings. What we do know is that lawyers must pick and choose among issues, and it is not out of the question that Purkey's lawyers thought it better to focus on more promising arguments. Even if they did not analyze this point, we are left with the fundamental problem for Purkey: the mechanisms of section 2255 gave him an opportunity to complain about ineffective assistance of trial counsel, and he took advantage of that opportunity. There was nothing structurally inadequate or ineffective about section 2255 as a vehicle to make those arguments.

Finally, Purkey would like to argue that section 2255 counsel fell below the standards established by the Sixth Amendment (and perhaps section 3599(a)(2)) when counsel omitted any challenge to the use of Purkey's testimony at his suppression hearing. Recall that Purkey had confessed several times

to both local police and the FBI that he had "kidnapped" Long, meaning that he had taken her across state lines without her consent. At the suppression hearing (according to Purkey), trial counsel advised him to stick with that story, even though trial counsel knew that it was untrue and that Purkey believed that Long had gone with him willingly. This is somewhat convoluted, in our view, but as best we understand it, Purkey complied with counsel's advice at the suppression hearing and continued to maintain that he had coerced Long into driving to Kansas with him. At the suppression hearing, Purkey also wanted to show that this confession was involuntary, because he gave it only in the erroneous belief that the government was prepared to seek a lighter sentence in federal court if he confessed.

At the trial Purkey gave the jury a new version of events: he thought Long was a prostitute, she went willingly with him not only into the truck but from Missouri to Kansas, and only then did the murder occur. Obviously that would have invited prosecution from Kansas, but the link necessary for federal jurisdiction would have disappeared (or so Purkey thought). When Purkey presented his account, however, the government impeached his testimony with his statements at the suppression hearing. Trial counsel did not object, nor did he object when the government used the same statements to prove the truth of the matter in its closing argument.

These too are arguments about effectiveness of counsel that were apparent from the start. The question of Long's willingness to travel with Purkey was relevant, but it was up to the jury to decide whether to believe his confessions or his recantation. The record shows that both stories were on the record, and so the government was entitled to use his earlier

version as impeachment. If it strayed over the line, that is a problem, but it is too late to correct it (and it is not clear to us that this would have been prejudicial, in light of all the evidence against Purkey at the trial).

## V

Purkey has raised serious arguments in this appeal—particularly his points about Juror 13 and the failure to conduct an adequate mitigation investigation—and we do not mean to minimize them even though we have ruled against him. He is correct that the Supreme Court's decisions in *Martinez* and *Trevino* can be read to say that a person can overcome a procedural bar to bringing a claim of ineffective assistance of trial counsel in a federal court, if counsel in post-conviction proceedings was him- or herself ineffective. The idea of an entitlement to *one* untainted opportunity to make one's case is deeply embedded in our law. Purkey argues that he has yet to have that one opportunity. He also asks why it should matter if, in *Martinez* and *Trevino*, the ineffective lawyer was engaged in a state-court proceeding, whereas here, the ineffective lawyer was engaged in a federal-court proceeding, particularly after our ruling in *Ramirez*.

But the problem is that the availability of further relief for someone in Purkey's position is not a simple matter of federal common law. It is governed by statutes. In this case, the pertinent statute is 28 U.S.C. § 2255(e), a statute that played no part in *Ramirez*. For the reasons we have discussed, we conclude that Purkey is not entitled to raise his new arguments in a petition for a writ of habeas corpus under 28 U.S.C. § 2241. We thus AFFIRM the judgment of the district court.

Before concluding this opinion, however, we have one more piece of unfinished business to be resolved. As we noted earlier, 24 hours before the oral argument in this appeal, the government set Purkey's execution date for July 15, 2020. Purkey promptly moved for a stay of execution during the pendency of these proceedings. The government has opposed his motion.

The Supreme Court set forth the requirements for a stay in *Nken v. Holder*, 556 U.S. 418 (2009):

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 434. Importantly, although the *Nken* Court held that something more than a "better than negligible" chance of success is necessary, it also stressed that the injury the applicant faced in its own case was not "categorically irreparable." *Id.* at 434–35. Although we have ruled against Purkey on the merits, we have emphasized that at least two of the points he has raised are worthy of further exploration—the seating of Juror 13, and the failure of trial counsel to conduct a proper mitigation analysis. We have rejected those points not on the merits, but because of our understanding of the safety valve language, 28 U.S.C. § 2255(e). If our reading of the safety valve is too restrictive, there would be significant issues to litigate. And, unlike the alien in *Nken*, Purkey faces categorically irreparable injury—death. A brief stay to permit the orderly conclusion of the proceedings in this court will not substantially harm the government, which has waited at least seven

No. 19-3318                                                27

years to move forward on Purkey's case. Finally, the public interest is surely served by treating this case with the same time for consideration and deliberation that we would give any case. Just because the death penalty is involved is no reason to take short-cuts—indeed, it is a reason not to do so.

For these reasons, we grant Purkey's motion on the following terms. His July 15, 2020, date of execution is temporarily stayed pending the completion of proceedings in the Seventh Circuit. This stay will expire upon the issuance of this court's mandate or as specified in any subsequent order that is issued.