UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

|  |  |  |
|---|---|---|
| DALE HARTKEMEYER (AKA SEIGEN) | ) ) ) | |
| Plaintiff, | ) ) | Case No. 2:20-cv-00336-JMS-MJD |
| v. | ) ) ) | |
| WILLIAM P. BARR, in his official capacity as the Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons; and T.J. WATSON, in his official capacity as Complex Warden for Terre Haute Federal Correctional Complex, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

BACKGROUND.................................................................................................................3

I.     PROCEDURAL HISTORY............................................................................................3

II.    BOP'S EXECUTION PREPARATIONS....................................................................6

STANDARD OF REVIEW ...............................................................................................8

ARGUMENT....................................................................................................................9

I.    PLAINTIFF IS UNLIKELY TO SUCCEED ON HIS RFRA CLAIM...........................9

    A.    Plaintiff Cannot Show that His Exercise of Religion Will Be Substantially Burdened by Mr. Purkey's Execution Date Because the Execution Schedule Is a Quintessential Internal Government Affair, and Any Impact on Plaintiff Is Merely Incidental ..............................................................9

    B.    The Government Has a Compelling Interest in Proceeding Promptly With Mr. Purkey's Execution....................................................................14

    C.    The Government Has Employed the Least Restrictive Means of Furthering Its Compelling Interest in Proceeding Promptly With Mr. Purkey's Execution ......................................................................................16

II.    PLAINTIFF IS UNLIKELY TO SUCCEED IN SHOWING THAT BOP'S PROMPT SCHEDULING OF MR. PURKEY'S EXECUTION VIOLATES THE APA...............18

    A.    The Decision as to When To Schedule An Execution Is Committed to Agency Discretion By Law ...........................................................................19

    B.    Plaintiff Is Outside the Zone of Interests Protected By Any Applicable Law....................................................................................................21

    C.    The Attorney General's Decision to Promptly Schedule Mr. Purkey's Execution Is Not Arbitrary and Capricious......................................................22

III.    THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A PRELIMINARY INJUNCTION..............................................................................................25

CONCLUSION..............................................................................................................27

i

## INTRODUCTION

In 2003, Wesley Ira Purkey was convicted of the "exceptionally heinous" crime of kidnapping, raping, and murdering a 16-year-old girl whose body he burned after dismembering it with a chainsaw. *Barr v. Roane*, 140 S. Ct. 353, 353 (2019) (statement of Alito, J.). His initial execution date of December 13, 2019, was preliminarily enjoined by the U.S. District Court for the District of Columbia in his suit challenging the Government's lethal injection protocol. Upon the Supreme Court's instruction that the court of appeals adjudicate the appeal of that preliminary injunction with "appropriate dispatch," *id.* (mem.), the D.C. Circuit vacated the injunction and the Government promptly rescheduled Mr. Purkey's execution as required by regulation. Although the Seventh Circuit has now temporarily stayed Mr. Purkey's execution date of July 15, 2020 in yet another suit by Mr. Purkey—despite concluding that the suit is precluded—the Government has petitioned for emergency reconsideration by the panel and by the en banc court. *See Purkey v. United States*, No. 19-3318, Doc. 38 (7th Cir.) (July 4, 2020).

Plaintiff Reverend Dale Hartkemeyer is Mr. Purkey's Buddhist spiritual advisor. Rev. Hartkemeyer is seeking to enjoin the Government from carrying out Mr. Purkey's lawful death sentence on the grounds that the July 15 execution date violates Rev. Hartkemeyer's rights under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §2000bb *et seq.*, and the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq. See* Pl.'s Mot. for Preliminary Inj., ECF No. 7 (July 2, 2020) [hereinafter, "Pl.'s Mot."]. Rev. Hartkemeyer contends that because of his age and health conditions and because of the number of people that are expected to travel to and be present at the execution, he would be subject to an unacceptably high risk of exposure to COVID-19 if he chooses to attend Mr. Purkey's execution, which he feels is compelled by his religious obligation. Rev. Hartkemeyer's claims may be novel, but they are not meritorious.

Put simply, Supreme Court precedent forecloses Rev. Hartkemeyer's contention that the Government's prompt setting of Mr. Purkey's execution imposes a substantial burden on his exercise of religion. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 448-49 (1988); *Bowen v. Roy*, 476 U.S. 700 (1986). The execution schedule is purely a matter of the

Government conducting its own internal affairs. Rev. Hartkemeyer is not being regulated by the Government here, and any burden on his free exercise is merely an "incidental effect of [a] government program[]," which the Supreme Court has said does not constitute a substantial burden. *See Lyng*, 485 U.S. at 450. Indeed, under Rev. Hartkemeyer's theory, he could similarly raise an objection to the execution date if he had a scheduling conflict unrelated to COVID-19, which would directly conflict with the established principle that free exercise of religion does not allow an individual who is not subject to the government's coercive power to dictate how the government should organize its internal affairs. As the Supreme Court has recognized, "government simply could not operate if it were required to satisfy every citizen's religious needs and desires. *Id*. at 452.

Even if the Government's execution schedule could be deemed to substantially burden Rev. Hartkemeyer's exercise of religion—which it clearly cannot—the Government can demonstrate that it is employing the least restrictive means to further its compelling interest in the timely enforcement of Mr. Purkey's capital punishment—an interest well recognized by the Supreme Court. Rev. Hartkemeyer would prefer that the Government postpone Mr. Purkey's execution until there is a vaccine or an effective treatment for COVID-19 that would minimize the risk to him of visiting the prison. Such an indefinite delay would render it impossible for the Government to further its compelling interest in the timely administration of justice.

This is all the more so given that the Federal Bureau of Prisons ("BOP") is prepared to take an extensive array of precautions to mitigate the risk to Rev. Hartkemeyer's health, including giving him the opportunity to utilize Personal Protective Equipment ("PPE"); limiting his interaction with BOP staff and restricting his interaction with other witnesses, inmates, media, and the public; allowing him to visit Mr. Purkey in a non-contact visiting room that will be disinfected before his visit and either without other visitors or segregated from other visitors except possibly for Mr. Purkey's legal team, whose members will also be provided PPE if they choose; and permitting him inside the execution room itself at a social distance from all but his security escort who will also be wearing PPE. With these measures in place, the Government is likely to carry its

2

burden of establishing that it is employing the least restrictive means of achieving its compelling interest by proceeding with the prompt execution of Mr. Purkey. Rev. Hartkemeyer does not identify any other practical measure the Government can take while still proceeding with the scheduled execution, and his proposed alternative of indefinite delay is not one that can achieve the government's compelling interest.

Rev. Hartkemeyer's Administrative Procedure Act ("APA") claim is equally specious. The Attorney General's decision to schedule Mr. Purkey's execution was an agency action committed to agency discretion by law, and is therefore unreviewable under the APA. *See* 5 U.S.C. § 701(a)(2). Furthermore, Rev. Hartkemeyer is not within the "zone of interests" protected by RFRA, the Federal Death Penalty Act ("FDPA"), or any relevant regulation. *See Am. Fed'n of Gov't Empls., Local 2119 v. Cohen*, 171 F.3d 460, 465 (7th Cir. 1999).

Finally, the Attorney General's decision was not arbitrary and capricious. Even aside from the compelling government interest in the timely enforcement of capital punishment, Department of Justice ("DOJ") regulations mandate that the BOP Director schedule executions promptly after the lifting of the stay of a previously scheduled execution. 28 C.F.R. § 26.3(a). BOP is acutely aware of the risks posed by the COVID-19 pandemic and has taken appropriate measures to mitigate those risks while still performing its important duties. Accordingly, Rev. Hartkemeyer has no likelihood of success on his APA claim.

Moreover, as discussed in detail below, the balance of harms also tips against the issuance of a preliminary injunction. Accordingly, this Court should deny Rev. Hartkemeyer's motion for a preliminary injunction.

## BACKGROUND

### I.  PROCEDURAL HISTORY

In 2003, a federal jury in Missouri convicted Wesley Purkey of the interstate kidnap, rape, and murder of a 16-year-old girl named Jennifer Long. *United States v. Purkey*, 428 F.3d 738, 744 (8th Cir. 2005). Mr. Purkey confessed to the crime against Ms. Long while awaiting a separate

prosecution for the murder of an 80-old woman, Mary Ruth Bales. *Id.* at 745. He disclosed the location where he had discarded Ms. Long's undergarments and jawbone, but the remainder of Ms. Long's body was unrecoverable because he had dismembered it with a chain saw and then burned the remains. *Id.* At the penalty phase of the trial in 2004, the jury found as an aggravating factor that Mr. Purkey had indeed killed Ms. Bales by repeatedly striking her in the head with a hammer, and determined that he should be sentenced to death. *Id.* at 746. Mr. Purkey exhausted his post-conviction remedies in 2014. *See Purkey v. United States*, 729 F.3d 860 (8th Cir. 2013), *reh'g denied*, 729 F.3d 860 (2013), *cert. denied*, 574 U.S. 933 (2014).

In 2011, while Mr. Purkey litigated his post-conviction remedies, DOJ announced that BOP did not have the drugs necessary to implement its lethal injection protocol, which at the time called for the use of three drugs. In separate litigation challenging that protocol, BOP also disclosed that it had decided to modify its lethal injection protocol as a result of the drug scarcity. *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 12-CV-0782, 2019 WL 6691814, at *2 (D.D.C. Nov. 20, 2019), *vacated by*, 955 F.3d 106 (D.C. Cir. 2020) [hereinafter "*Execution Protocol Cases*"]. In fact, the scarcity of lethal injection drugs as a result of public pressure by anti-death penalty advocates was a widespread problem for the next several years. *See generally Glossip v. Gross*, 135 S. Ct. 2726, 2733-34 (2015) (recounting the history of the problem); *cf. Gray v. McAuliffe*, No. 3:16CV982, 2017 WL 102970, at *7 (E.D. Va. Jan. 10, 2017) ("In light of the pressure waged by death penalty opponents, it has become increasingly difficult to obtain the drugs Virginia traditionally used to render a prisoner unconscious during the initial stage of the execution process."). Meanwhile, BOP engaged in an "extensive study" of its options: it "explored the possible use of other lethal substances[,] . . . visited state execution sites and evaluated their protocols[,] . . . consulted with medical experts, reviewed assessments of difficult executions, and studied relevant judicial decisions." *Execution Protocol Cases*, 955 F.3d at 110 (per curiam). It also considered "three-drug protocols using . . . barbiturates, three-drug protocols using weaker sedatives, and one-drug protocols." *Id*.

On July 25, 2019, at the direction of the Attorney General, BOP adopted a revised addendum to its lethal injection protocol that replaced the three-drug procedure with the use of a single drug, pentobarbital sodium, as the lethal agent. *Id.* In announcing this change, DOJ also established execution dates for five condemned federal inmates, including Mr. Purkey. *Id.* at 111. Mr. Purkey's execution was set for December 13, 2019.[1] Mr. Purkey filed suit challenging BOP's single-drug protocol and on November 20, 2019, succeeded in obtaining a preliminary injunction staying his execution. *Id.* On April 7, 2020, the D.C. Circuit vacated the district court's injunction, *id.* at 108, but the mandate did not issue until June 12, 2020. Pl.'s Mot. Ex. C ¶ 2, ECF No. 6-6. On June 15, 2020, the Attorney General directed BOP to schedule the executions of four federal death-row inmates, including Mr. Purkey. Mr. Purkey's execution date was accordingly set for July 15, 2020.[2] Mr. Purkey is currently imprisoned in the United States Penitentiary at Terre Haute, Indiana ("USP Terre Haute").[3] Ex. A, Decl. of Rick Winter ¶ 3 (July 6, 2020).

On July 2, 2020, a panel of the Seventh Circuit temporarily stayed Mr. Purkey's execution date pending issuance of the mandate in that case or until further order of that court. *Purkey v. United States*, No. 19-3318 (7th Cir.) (July 2, 2020). Mr. Purkey had filed a new petition under 28 U.S.C. § 2241 in 2019 raising additional claims of error during his 2003 trial. The Seventh Circuit panel unanimously concluded that Mr. Purkey's habeas corpus suit is precluded by his prior collateral challenge under 28 U.S.C. § 2255. It nevertheless issued a temporary stay. The Government has petitioned for emergency reconsideration by the panel or the en banc court because the issuance of the stay conflicts with the stay standard articulated by the Supreme Court

---

[1] *See* Press Release, Dep't of Justice, "Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse" (July 25, 2019), https://www.justice.gov/opa/pr/federal-governmentresume-capital-punishment-after-nearly-two-decade-lapse.

[2] *See* Press Release, Dep't of Justice, "Executions Scheduled for Four Federal Inmates Convicted of Murdering Children" (June 15, 2020), https://www.justice.gov/opa/pr/executions-scheduled-four-federal-inmates-convicted-murdering-children.

[3] The Terre Haute Federal Correction Complex ("FCC Terre Haute") consists of USP Terre Haute, as well as a Federal Correctional Institution ("FCI Terre Haute") and a prison camp. Rev. Hartkemeyer will not need to be at FCI Terre Haute or the prison camp. Winter Decl. ¶ 7.

5

in *Nken v. Holder*, 556 U.S. 418 (2009)—as well as *Hill v. McDonough*, 547 U.S. 573, 584 (2006), and *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004)—and by multiple recent decisions of the Seventh Circuit.

## II.    BOP'S EXECUTION PREPARATIONS

Under BOP's Execution Protocol, *see* Winter Decl. ¶ 3, Ex. A-1, a condemned inmate such as Mr. Purkey is permitted to inform the Warden of whom he wishes to designate as his spiritual advisor. *Id.*, Ex. A-1 at 9. Mr. Purkey has designated Rev. Hartkemeyer as his spiritual advisor. Winter Decl. ¶ 4. Rev. Hartkemeyer lives 60 miles from USP Terre Haute and will therefore travel to USP Terre Haute by car. Pl.'s Mot. Ex. A ¶ 8, ECF No. 6-2. Beginning seven days prior to the date of execution, Mr. Purkey will be afforded access to Rev. Hartkemeyer. Winter Decl. ¶ 8, Ex. A-1 at 13. BOP has put in place numerous mitigation measures to minimize the health risk to Rev. Hartkemeyer to the extent he visits Mr. Purkey. If Rev. Hartkemeyer chooses to visit Mr. Purkey, he will be permitted to do so in the Special Confinement Unit ("SCU") of USP Terre Haute, where Mr. Purkey is housed and where there have been no cases of COVID-19.

Rev. Hartkemeyer will be given the opportunity to utilize PPE in the form of a surgical face mask, gloves, a gown, and a plastic face shield, and will also have access to hand sanitizer and a bathroom with a sink and soap once he is inside USP Terre Haute. *Id.* ¶ 8. In addition, BOP staff that come into close proximity with Rev. Hartkemeyer will be wearing face masks. *Id.* All BOP staff are required to pass a temperature check and symptom screening daily before being allowed on the grounds of USP Terre Haute. *Id.* ¶ 7. They are also required to wear face masks. *Id.* Upon arriving at FCC Terre Haute, Rev. Hartkemeyer will be escorted through security by BOP staff to a SCU visiting room. *Id.* ¶ 8. That visiting room is a "non-contact" visiting room— *i.e.*, the inmate is separated from his or her visitor by a partition—utilized only by visitors of SCU inmates. *Id.* The equipment and surfaces in the area of the visit will be disinfected after use. *Id.* Rev. Hartkemeyer will have no interaction with any other inmates, visitors, or members of the public during these visits. *Id.* ¶ 9.

Beginning twenty-four hours prior to the execution, the Protocol provides that certain individuals, including the inmate's spiritual advisor(s), will be given visiting privileges as determined by the Warden. Winter Decl., Ex. A-1 at 17. Those visits will also be conducted in the SCU under the same circumstances as the prior seven-day period until Mr. Purkey is transferred to the execution facility. *Id*. ¶ 12.

On the day of his execution, Mr. Purkey will be taken from the SCU to the execution facility, which is a separate facility from USP Terre Haute. Rev. Hartkemeyer will be given the opportunity to visit Mr. Purkey at the execution facility. In order to do so, he will again be met at a designated area and will be given an opportunity to utilize PPE in the form of a surgical face mask, gloves, a gown, and a plastic face shield. *Id*. ¶ 12. He will then be subject to a brief escort to the execution facility where he will be met by a BOP employee who will then escort him throughout the execution facility grounds. *Id*. That BOP security escort will wear an N-95 face mask, a face shield, and gloves while in close proximity with Rev. Hartkemeyer. *Id*. Rev. Hartkemeyer's visit will again be non-contact. *Id*. ¶ 13. The equipment and surfaces in the area of the visit will be disinfected prior to use. *Id*. The visit will conclude a reasonable amount of time prior to the execution, at which time Rev. Hartkemeyer's BOP escort will lead him away from the execution facility. *Id*. Under the Protocol, in the final thirty minutes prior to execution, the inmate will be removed from his holding cell and escorted to the execution room. Winter Decl., Ex. A-1 at 22. The inmate will then be restrained to the execution table. *Id*. at 23. Rev. Hartkemeyer's BOP security escort will then bring Rev. Hartkemeyer back to the execution room to have a brief non-contact visit. Winter Decl. ¶ 14. Rev. Hartkemeyer will then be permitted to remain in the execution room with the assigned BOP security escort during the execution. Others who will be present in the execution room include only a United States Marshals' Service ("USMS") representative and a BOP official—both of whom will be at a social distance from Rev.

Hartkemeyer. *Id*. At the conclusion of the execution, Rev. Hartkemeyer will be escorted away from FCC Terre Haute and back to his vehicle. *Id*. ¶ 15.[4]

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted). It is "never awarded as of right," *id*. at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). To obtain a preliminary injunction, "a plaintiff must establish that [he] has some likelihood of success on the merits; that [he] has no adequate remedy at law; that without relief [he] will suffer irreparable harm." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citation and quotation marks omitted). "If the plaintiff fails to meet any of these threshold requirements, the court must deny the injunction." *Id*. (citation and quotation marks omitted); *accord Lankford v. Talbot*, No. 1:18-cv-03935-JMS-TAB, 2020 WL 2128580 (S.D. Ind. May 5, 2020) (Magnus-Stinson, J.) (quoting same). Only after a plaintiff passes this threshold must a court "weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *GEFT Outdoors*, 922 F.3d at 364 (citation and quotation marks omitted).

The Seventh Circuit "'employs a sliding scale approach' for this balancing: if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *Id*. (citation and quotation marks omitted). However, if a plaintiff cannot show a likelihood of success on the merits of his claim, "there [is] no need for the district court to conduct further analysis of the 'threshold phase' for preliminary injunctive relief, or to move to the 'balancing phase.'" *Id*. at 367-68 (citing *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018)); *see also Glossip*, 135 S. Ct. at

---

[4] During the status conference on July 6, 2020, this Court raised several questions regarding BOP's current situation with respect to COVID-19. Defendants have included the available information in the attached declaration of Rick Winter. *See* Winter Decl. ¶ 7.

8

2737; *see also Hill*, 547 U.S. at 584 ("[I]nmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of *a significant possibility of success on the merits*.") (emphasis added). And a plaintiff "seeking preliminary relief [must] demonstrate that irreparable injury is *likely*," not merely possible, "in the absence of an injunction." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). As discussed below, Rev. Hartkemeyer has failed to make the requisite showing.

## ARGUMENT

### I.   PLAINTIFF IS UNLIKELY TO SUCCEED ON HIS RFRA CLAIM

RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb-1(a), (b). Rev. Hartkemeyer's RFRA claim is unlikely to succeed in all respects.

#### A.   Plaintiff Cannot Show that His Exercise of Religion Will Be Substantially Burdened by Mr. Purkey's Execution Date Because the Execution Schedule Is a Quintessential Internal Government Affair, and Any Impact on Plaintiff Is Merely Incidental

Rev. Hartkemeyer argues that because his age and health conditions put him at higher risk of contracting, and developing complications from, COVID-19, BOP's plan to execute Mr. Purkey on July 15, 2020 makes it "effectively impracticable" for him to attend the execution as Mr. Purkey's spiritual advisor and thus substantially burdens Rev. Hartkemeyer's religious exercise in violation of the RFRA. *See* Pl.'s Mot. at 17-19. The law is squarely contrary to his argument.

To begin, Rev. Hartkemeyer's claim of "substantial burden" under RFRA is foreclosed by Supreme Court precedent holding that the free exercise of religion does not include the right to dictate how the Government conducts its own internal affairs, and that incidental effects on individuals who are not themselves the subject of government regulation do not constitute a

9

substantial burden on religious exercise. *See Lyng*, 485 U.S. at 450-51; *Bowen*, 476 U.S. 699-700.[5]

In *Lyng*, the United States Forest Service adopted a plan allowing timber harvesting and road construction in an area of a national forest that was traditionally used for Native American religious practices. 485 U.S. at 441-42. Although the harvesting and road construction would likely prevent the continuation of those religious practices, the Supreme Court held that the plaintiffs had failed to identify a substantial burden on the free exercise of religion because the plaintiffs had shown only "*incidental effects* of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs." *Id.* at 450 (emphasis added). The Court further noted that the government was not "penaliz[ing] religious activity by denying any person equal rights, benefits, [or] privileges." *Id.* at 449. "For the Free Exercise Clause is written in terms of what the government cannot do the individual," the Court explained, "not in terms of what the individual can exact from the government." *Id.* at 451.

*Bowen* involved a statute requiring that applicants seeking certain welfare benefits provide a Social Security number for such applications, and further that state agencies use the Social Security number in administering the benefits program. 476 U.S. at 695. As to the latter, the Supreme Court held that this requirement did not impose a substantial burden on the free exercise

---

[5] That the plaintiffs in *Lyng* and *Bowen* brought their claims under the First Amendment's Free Exercise Clause (and not RFRA, which did not exist at the time) does not change the analysis. *See* 485 U.S. at 442; 476 U.S. at 694-95. RFRA was enacted after the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), which held that "neutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment." *See Holt v. Hobbs*, 574 U.S. 352, 356-57 (2015) (citing *Smith*, 494 U.S. at 878-82). Congress enacted RFRA to restore, as a matter of statutory right, "the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1). Although RFRA does not codify any particular pre-*Smith* court decision, Congress expected courts considering RFRA claims to "look to free exercise cases decided prior to *Smith*"—such as *Lyng* and *Bowen*—"for guidance." S. Rep. No. 103-111 at 8-9 (1993); *see* H.R. Rep. No. 103-88, p. 6-7 (1993) (same).

rights of parents who applied for benefits but, for religious reasons, objected to the State's use of their 2-year-old daughter's Social Security number. *Id*. at 697, 699-700. The Court stated: "The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Id*. at 699. That is, free exercise of religion "affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Id*. at 700. Put differently, the Free Exercise Clause does not "require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development." *Id*. at 699.

Here, Rev. Hartkemeyer seeks a preliminary injunction that would require BOP to change the date it has chosen to carry out the valid death sentence of one of its inmates, merely because Rev. Hartkemeyer might choose not to attend on the current schedule. That request reflects an attempt to impose an impermissible "religious servitude" on the Government, *see Lyng*, 485 U.S. at 452, by dictating the terms of BOP's calendar, a quintessential internal government affair that at most incidentally affects Rev. Hartkmeyer's religious exercise. The law gives the Government, not Rev. Hartkemeyer, the power to carry out federal executions, including setting the date thereof, and the Government has exercised that power in this case by scheduling Purkey's execution for July 15, 2020. *See* 28 C.F.R. § 26.3(a)(1)("[A] sentence of death shall be executed . . . [o]n a date . . . designated by the Director of the Federal Bureau of Prisons."). RFRA no more entitles Rev. Hartkemeyer to hijack the schedule of Mr. Purkey's execution than the free exercise of religion includes the right to dictate the "size or color of the Government's filing cabinets." *See Bowen*, 476 U.S. at 700. Indeed, "government simply could not operate if it were required to satisfy every citizen's religious needs and desires." *Lyng*, 485 U.S. at 452; *see also id.* ("The First Amendment must apply to all citizens alike, and it can give to none of them a veto over public programs that do not prohibit the free exercise of religion.").

Notably, Rev. Hartkemeyer is not the subject of government regulation here; is under no government compulsion to change his religious practices; and will not be penalized by the

11

Government if he does not fulfill his religious obligations to Mr. Purkey. Thus, while he has been designated by Mr. Purkey as his religious advisor, Rev. Hartkemeyer is nonetheless a bystander to the Government's internal process of carrying out a lawful sentence of death as to one of its inmates, and he cannot halt that process merely because of the "indirect burden" that the schedule imposes on his decision whether to attend the execution. *See Braunfeld v. Brown*, 366 U.S. 599, 606 (1961); *see also id.* at 606 (rejecting a similar free exercise claim challenging a law proscribing certain retail sales on Sunday because the law did not directly regulate the religious exercise and merely had the incidental effect of "operat[ing] to make the practice of the [the plaintiffs'] religious beliefs more expensive"). And it is further notable that the only impediment Rev. Hartkemeyer identifies—the global pandemic—is not one of the Government's making, but one that the Government has assiduously attempted to mitigate.

What is more, Rev. Hartkemeyer does not seek an exception from a generally applicable government rule, which is the typical relief in RFRA cases. Instead, he seeks an injunction that would require BOP to postpone Mr. Purkey's execution "until there is an effective COVID-19 treatment or vaccine." Pl.'s Mot. at 24. Such relief would essentially prevent BOP from conducting its own affairs indefinitely. Rev. Hartkemeyer cites no authority supporting such extraordinary bystander rights under RFRA or the Supreme Court's First Amendment jurisprudence. This is all the more so given that, under Rev. Hartkemeyer's logic, RFRA would provide the same extraordinary remedy to someone who is not even Mr. Purkey's spiritual advisor, but who independently has a sincere religious belief that he should visit FCC Terre Haute to pray for the condemned inmates outside the walls of the facility. It cannot possibly be the case that such a person satisfies RFRA's "substantial burden" test and thus requires the Government to satisfy strict scrutiny. That is precisely why RFRA and pre-*Smith* Free Exercise Clause law is properly limited to policies that directly regulate the religious objector, not those that regulate the Government's own affairs in a manner that has merely incidental effects on the religious objector.

Rev. Hartkemeyer's reliance on *Murphy v. Collier*, 139 S. Ct. 1475 (2019), and *Gutierrez v. Saenz*, 19-8695, 2020 WL 3248349 (U.S. June 16, 2020), is unavailing. *See* Pl.'s Mot. at 15.

12

Both cases involved condemned inmates' challenges to state policies denying or limiting the presence of religious advisors in the execution room during the execution. *See Murphy*, 139 S. Ct. at 1475; *Gutierrez v. Saenz*, 2020 WL 3250050 (S. Ct. June 12, 2020). No such policy exists here, as Rev. Hartkemeyer will be permitted to be present in the execution room during Mr. Purkey's execution. *See* Winter Decl. ¶ 14 & Ex. A-2. Plus, those cases concerned *the condemned inmate's* religious exercise, not that of the spiritual advisors. To that end, it makes no difference that DOJ regulations provide that "one spiritual advisor . . . shall be present at the execution." 28 C.F.R. § 26.4(c)(3). That regulation is plainly intended for the condemned inmate's benefit and in no way dictates that BOP must schedule executions based on the availability of the inmate's chosen spiritual advisor. In other words, Rev. Hartkemeyer at most alleges only an incidental harm resulting from BOP's regulation of a third party (here, Mr. Purkey). Supreme Court precedent is clear that a "substantial burden" cannot rest on such indirect effects of the government's regulation of third parties. *See Lyng*, 485 U.S. at 448-49; *Bowen*, 476 U.S. at 699. That principle defeats Rev. Hartkemeyer's attempt to use RFRA as a means to control BOP's execution schedule for Mr. Purkey.

Rev. Hartkemeyer cannot cure the fatal flaws in his RFRA claim by pointing to the Seventh Circuit's decisions in *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013), and *Koger v. Bryan*, 523 F.3d 789 (7th Cir. 2008). *See* Pl.'s Mot. at 17. Neither case is relevant here, as they both involved government actions that imposed coercive mandates directly on religious objectors. The plaintiffs in *Korte* were business-owners challenging the federal government's "contraception mandate," which required the plaintiffs to either "provide coverage for contraception and sterilization procedures in their employee health-care plans on a no-cost-sharing basis," 735 F.3d at 659, or suffer "ruinous fines" of "$100 per day per employee," *id.* at 683-84. In concluding that the contraception mandate imposed a substantial burden on the plaintiffs' free exercise of religion, the court emphasized "the 'intensity of the coercion'" and "enormous pressure" on the plaintiffs. *See id.* In *Koger*, the plaintiff was a former inmate challenging prison officials' denial of his religious request for a non-meat diet in part because the inmate had not provided written verification of his

13

religious membership from a clergy member of that religion.   523 F.3d at 793, 798-99.   There, like in *Korte*, the government action directly impacted the plaintiff and imposed coercive conditions on his religious exercise.

Here, by contrast, any burden BOP's execution schedule has placed on Rev. Hartkemeyer is incidental, indirect, and non-coercive.   Indeed, as explained above, the date of a federal execution is an internal government affair that requires nothing from Rev. Hartkemeyer, much less coerces him not to exercise his religion.   That is so even though Rev. Hartkemeyer may ultimately decide not to attend Purkey's execution and thus would be prevented from "carry[ing] out his sacred religious commitment to Mr. Purkey." Pl.'s Mot. at 17; *see Lyng*, 485 U.S. at 449, 451 (no substantial burden even though "the challenged Government action would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs" and even assuming that the challenged action "will virtually destroy the . . . [plaintiffs'] ability to practice their religion").

For these reasons, Rev. Hartkemeyer is not likely to establish a "substantial burden" on his exercise of religion under RFRA.

**B.      The Government Has a Compelling Interest in Proceeding Promptly with Mr. Purkey's Execution**

Even if Rev. Hartkemeyer can establish a substantial burden, he is still unlikely to succeed on the RFRA claim.  First, it is unassailable that the Government has a compelling interest in the timely enforcement of a capital sentence.  The Supreme Court has repeatedly emphasized that "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a [death] sentence." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019) (quoting *Hill*, 547 U.S. at 584); *see also Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (explaining that once post-conviction proceedings "have run their course . . . finality acquires an added moral dimension"); *Baze v. Rees*, 553 U.S. 35, 61 (2008) (noting the "State's legitimate interest in carrying out a sentence of death in a timely manner"); *Execution Protocol Cases*, 955 F.3d at 126 ("In this case, the district court failed to recognize the important governmental and public interest

14

in the timely implementation of capital punishment.") (Katsas, J., concurring). "Only with an assurance of real finality can the [government] execute its moral judgment in a case," and "[o]nly with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Calderon*, 523 U.S. at 556. Unduly delaying executions can also frustrate the death penalty by undermining its retributive and deterrent functions. *See Bucklew*, 139 S. Ct. at 1134; *id.* at 1144 (Breyer, J., dissenting).

Rev. Hartkemeyer questions this compelling government interest because the Government did not schedule an execution date for six years after Mr. Purkey exhausted his post-conviction remedies in 2014. *See* Pl.'s Mot. at 22, 33. But Rev. Hartkemeyer fails to acknowledge that "a long and successful campaign of obstruction by opponents of capital punishment" resulted in the removal of earlier lethal-injection drugs "by 2011 [and] . . . [a]t that point, the government's options were severely limited." *Execution Protocol Cases*, 955 F.3d at 128 (Katsas, J., concurring). The Government "can hardly be faulted for proceeding with caution," and "[t]he government's care in selecting an available and effective execution substance does not diminish the importance of carrying out [Mr. Purkey's] sentences." *Id.* (Katsas, J., concurring) (noting that the Government "took time to study the successful track record of pentobarbital" before adopting a protocol utilizing it). Furthermore, Rev. Hartkemeyer also fails to acknowledge that BOP initially scheduled Mr. Purkey's execution for December 2019, long before the pandemic. Through no fault of BOP's, that execution date was stayed until June 12, 2020. And under DOJ regulations, the BOP Director must "promptly" designate "a new date" after any "stay of execution … is lifted." 28 C.F.R. § 26.3(a). Thus, the procedural history leading up to the scheduling of Mr. Purkey's execution does not negate the Government's undeniable compelling interest in the timely enforcement of capital punishment.

Rev. Hartkemeyer argues that the Government's interest in the timely enforcement of Mr. Purkey's death sentence is rendered less than compelling when juxtaposed against the Government's separate interest in maintaining the health and safety of federal inmates, BOP staff, visitors, and members of the public in and around USP Terre Haute. Pl.'s Mot. at 22-23. BOP is

15

of course concerned with the safety of its staff and visitors, which is precisely why BOP has taken numerous safety precautions and mitigating measures to date and as described in Mr. Winter's declaration. *See* Winter Decl. ¶¶ 6-15. However, Rev. Hartkemeyer fails to cite a single case in which an unarguable government interest failed to pass muster under RFRA's compelling interest factor due to other, potentially competing, governmental interests. In fact, such a rule would be contrary to the statute itself, which merely requires that the Government demonstrate that its action "is in furtherance of *a* compelling government interest." 42 U.S.C. § 2000bb-1(b)(1) (emphasis added). As long as the Government can demonstrate that it has chosen the least restrictive means to achieve the articulated compelling interest, the RFRA inquiry is at an end. It is not the role of the courts or a nominal bystander such as Rev. Hartkemeyer to dictate how the Government should otherwise balance that compelling interest with other government interests. In fact, Rev. Hartkemeyer sets forth no support for his extraordinary theory, which is plainly incorrect.

**C.    The Government Has Employed the Least Restrictive Means of Furthering Its Compelling Interest in Proceeding Promptly with Mr. Purkey's Execution**

The Government recognizes that "'[t]he least-restrictive-means standard is exceptionally demanding,' and that it requires the government to 'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].'" *Holt*, 574 U.S. at 364-65 (quoting *Burwell v. Hobby Lobby*, 573 U.S. 682, 728 (2014)). "'[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it.'" *Id*. (quoting *United States v. Playboy Entm' Grp., Inc.*, 529 U.S. 803, 815 (2000)).

As described above, BOP has put in place numerous mitigation measures to minimize the health risk to Rev. Hartkemeyer consistent with the operational safety and security of the execution itself. *See* Winter Decl. ¶¶ 6-15; *supra* at 6-7. As the attached declaration of Rick Winter demonstrates, BOP will give Rev. Hartkemeyer the opportunity to utilize PPE upon his entrance to FCC Terre Haute, in the form of a surgical face mask, gloves, a gown, and a plastic face shield— which is more than Rev. Hartkemeyer concededly wears to the grocery store, *see* Pl.'s Mot. Ex. A ¶ 29—as well as access to hand sanitizers and a bathroom with a sink and soap throughout his

16

visit(s) to USP Terre Haute. Winter Decl. ¶ 8.[6] All BOP staff are required to wear face masks. *Id*. ¶ 7. Moreover, BOP staff are required to pass a temperature check and symptom screening daily before being allowed on the grounds of FCC Terre Haute. *Id*. BOP will also take steps to ensure that Rev. Hartkemeyer has no interaction with any other inmate at FCC Terre Haute, and has minimal interaction with other witnesses, visitors, or any members of the public. *Id*. ¶ 9.

If Rev. Hartkemeyer chooses to visit Mr. Purkey in the hours leading up to the execution, he will be transported from a designated area to USP Terre Haute's execution facility, which is a separate facility from USP Terre Haute. *Id*. ¶ 12. When he arrives at the execution facility, Rev. Hartkemeyer will be met by a BOP staff escort who will be wearing PPE in the form of an N95 face mask, a face shield, and gloves. *Id*. Rev. Hartkemeyer's security escort will take him through the execution facility's security screening area and to a disinfected visiting room to visit with Mr. Purkey. *Id*. ¶¶ 12-13. The visit will also be non-contact and Rev. Hartkemeyer should have no or minimal interaction with other visitors. *Id*. ¶ 11.

Shortly before the execution, Rev. Hartkemeyer will be able to have a brief non-contact visit with Mr. Purkey in the execution room. *Id*. ¶ 14. Rev. Hartkemeyer will then remain in the execution room during the execution. *Id*. Besides Mr. Purkey, Rev. Harkemeyer and his PPE-wearing security escort, the only other individuals in the execution room will be a USMS representative and a BOP official. *Id*. Both will be at a social distance from Rev. Hartkemeyer. *Id*. At the conclusion of the execution, Rev. Hartkemeyer will be escorted back to his vehicle in the same way he arrived. *Id*. ¶ 15.

Rev. Hartkemeyer has failed to identify additional measures BOP can take consistent with its goal of executing Mr. Purkey in a timely manner. Instead, Rev. Hartkemeyer's solution is for BOP to "postpone[e] the execution until a time in which it is not 'effectively impracticable' for Rev. Hartkemeyer to safely fulfill his sacred duty," *i.e.*, "until there is an effective COVID-19 treatment or vaccine." Pl.'s Mot. at 24. Since no one can identify when either an approved

---

[6] BOP cannot supply Rev. Hartkemeyer with an N-95 mask because in order for such masks to be effective, Rev. Hartkemeyer must be clean shaven and undergo fit testing. Winter Decl. ¶ 12 n.2.

17

treatment or a vaccine might be available, let alone effective, for Rev. Hartkemeyer given his extensive medical issues, this suggestion is essentially a demand that the Government indefinitely delay Mr. Purkey's execution until such time as Rev. Hartkemeyer feels that it is safe for him to attend the execution. Rev. Hartkemeyer's position is untenable and contrary to law. RFRA does not require the Government to abstain entirely from carrying out its duties for an indefinite period of time so as not to substantially burden an individual's exercise of his religion when such an individual is not even regulated by the government. *See supra* at 9-13. Where there is "no way for the Government to accommodate [an individual] while still furthering its interests," RFRA does not require the Government to entirely abstain from its conduct. *See United States v. Anderson*, 854 F.3d 1033, 1037 (8th Cir. 2017) (denying a RFRA claim by a criminal defendant challenging his prosecution under the Controlled Substances Act ("CSA") where he claimed that he could not stop distributing heroin under any circumstances because to do so would compromise his faith; holding that the Government had to have the ability under the CSA to prosecute unlawful drug distribution); *see also United States v. Christie*, 825 F.3d 1048, 1054 (9th Cir. 2016) (same, involving the distribution of marijuana). Indeed, the whole point of the "least restrictive means" inquiry is that it takes the "compelling governmental interest," or the "desired goal," as given, *Holt*, 574 U.S. at 364-65; a "means" of accomplishing a goal is not abandoning that goal.

In sum, Rev. Hartkemeyer is unlikely to succeed on his RFRA claim where he has not shown that BOP's scheduling of Mr. Purkey's execution imposes a substantial burden on his exercise of religion and where the Government has shown that it has a compelling interest in the timely enforcement of a capital sentence and is employing the least restrictive means to do so while allowing Rev. Hartkemeyer to act as Mr. Purkey's spiritual advisor.

## II. PLAINTIFF IS UNLIKELY TO SUCCEED IN SHOWING THAT BOP'S PROMPT SCHEDULING OF MR. PURKEY'S EXECUTION VIOLATES THE APA

Rev. Hartkemeyer challenges BOP's decision to promptly schedule Mr. Purkey's execution as arbitrary and capricious in violation of the APA. But judicial review is unavailable under the APA here, and even if it is, Rev. Hartkemeyer does not even arguably fall within the

18

zone of interests of any relevant law to be the right party to challenge it.  And in any event, the Attorney General's decision is not arbitrary or capricious.

## A.    The Decision as to When To Schedule An Execution Is Committed to Agency Discretion By Law

The APA excludes from its "basic presumption of judicial review," *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993), agency actions that are "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).[7]  The Supreme Court has explained that if a statute provides no "judicially manageable standards" to judge "how and when an agency should exercise its discretion," it is impossible for a court to determine whether that agency "abuse[d] [its] discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Review under the APA is thus unavailable when "'statutes are drawn in such broad terms that in a given case there is no law to apply,'" *id.* (quoting S. Rep. No. 79-752, at 26 (1945)), or "no meaningful standard against which to judge the agency's exercise of discretion," *id.*  The decision as to when to set execution dates for death row inmates who have exhausted their appellate and post-conviction process is just such an exercise of discretion.

"When deciding whether a decision is committed to agency discretion, [the court] first review[s] the applicable statutes and regulations."  *Menominee Indian Tribe of Wis. v. EPA*, 947 F.3d 1065, 1072 (7th Cir. 2020), *reh'g denied* (May 8, 2020).  Here, the Federal Death Penalty Act ("FDPA") entrusts the Attorney General with discretion concerning when to carry out a lawful sentence of death once the appellate and post-conviction process is complete.  As relevant here, it provides that after "exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence," and "when the sentence is to be implemented," the Attorney General shall release the inmate to a United States Marshal, who shall supervise implementation of the sentence.  18 U.S.C. § 3596(a).  DOJ regulation further provides that unless a court orders otherwise, a

---

[7] Rev. Hartkemeyer incorrectly asserts that the opposite is true. Pl.'s Mot. at 25 ("The APA applies to 'agency action [that] is committed to agency discretion by law.' 5 U.S.C. § 701(a)(2)."). That section of the APA in fact says: "This chapter applies, according to the provisions thereof, *except to the extent that . . .* agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (emphasis added).

sentence of death shall be executed on a date designated by the Director of BOP that is "no sooner than 60 days from the entry of the judgment of death." 28 C.F.R. § 26.3(a)(1). The only other limitations on the choice of the execution date are either designed to afford notice to the inmate— *i.e.* that the inmate will be given 20 days' notice, *id*. § 26.4(a)—or to ensure that a new execution date is "designated promptly" if the initial date was postponed, *id*. § 26.3(a)(1).

Thus, once the inmate has exhausted the procedures for appeal of the judgment of conviction and for review of the sentence and the minimum timing requirements are met, the statute and regulation provide no standard to review the Attorney General's setting of the execution date.[8] There are no legal norms by which this Court may "evaluate the challenged action, and [ ] no concrete limitations to impose on the agency's exercise of discretion." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). Although Rev. Hartkemeyer briefs the finality of the agency action at some length, he points to no law by which the setting of Mr. Purkey's execution date could be evaluated. Instead, he agrees that "the authority to schedule executions is delegated to the Attorney General by statute." Pl.'s Mot. at 26. Indeed, the decision of when to carry out a lawful sentence of death is a quintessential law enforcement decision that the Attorney General has the sole authority to determine. It is also no different than any other BOP decisions that may impact inmates subject to them, yet are nevertheless committed to agency discretion by law. *See, e.g.*, *Harris v. United States*, No. 2:13-CV-214, 2013 WL 3724861, at *2 (S.D. Ind. July 15, 2013) (holding unreviewable, as committed to agency discretion by law, the decision to place prisoner in special housing unit). Accordingly, the Attorney General's decision to set July 15, 2020 for Mr. Purkey's execution is unreviewable.

---

[8] Both BOP and USMS are DOJ components supervised and controlled by the Attorney General. *See* 28 U.S.C. § 561(a), (c); 18 U.S.C. §§ 4041-4042. Congress has (with certain inapplicable exceptions) "vested" "[a]ll functions of other officers of the [DOJ] and all functions of agencies and employees of the Department of Justice" in the Attorney General, 28 U.S.C. § 509, and has authorized him to "make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the [DOJ] of any function of the Attorney General," *id*. § 510.

20

### B.       Plaintiff Is Outside the Zone of Interests Protected By Any Applicable Law

Even if the agency action of scheduling Mr. Purkey's execution were reviewable under the APA, that still does not mean that Rev. Hartkemeyer could challenge it. In his complaint, Compl. ¶ 57, ECF No. 1, Rev. Hartkemeyer invokes 5 U.S.C. § 702, the APA provision that permits judicial review if a person is "aggrieved by agency action," though he pointedly omits the remainder of the relevant provision, which says "within the meaning of a relevant statute." To qualify for judicial review, Rev. Hartkemeyer's claim must at least be "arguably within the zone of interests" that Congress sought to protect or regulate under the statute in question. *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970). As the Supreme Court has explained, the zone of interests test "serve[s] to limit the role of the courts in resolving public disputes," by asking "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see also Air Courier Conference of Am. v. Postal Workers*, 498 U.S. 517, 523–524 (1991) (a plaintiff must "establish that the injury he complains of . . . [is] protected by the statutory provision whose violation forms the legal basis for his Complaint"). Specifically, the court uses "traditional tools of statutory interpretation" to determine whether "a legislatively conferred cause of action encompasses a particular plaintiff's claim" or whether the plaintiff "has a cause of action under the statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 (2014).[9]

Here, Rev. Hartkemeyer makes no serious attempt to identify a statute or regulation on which to rest his APA claim. To the extent he intended for RFRA to serve as such a basis, he does not even arguably fall within "the class of plaintiffs whom Congress has authorized to sue" under RFRA. *Id.* at 128. Congress intended RFRA to protect those whose exercise of religion is substantially burdened by government action. But the predicate to invoking RFRA is that the individual burdened by the government action must be subject to government regulation in some

---

[9] Although previously analyzed as a "prudential standing" question, the Supreme Court has clarified that "zone of interests" is more appropriately considered a question of whether the plaintiff has adequately pled a claim. *See Lexmark*, 572 U.S. at 127-28.

manner, not when there is only an attenuated connection between the government regulation and the individual's exercise of religious, such as is the case here.

Similarly, the FDPA, which authorizes the Attorney General to carry out the sentence of death, makes no provision for spiritual advisors attending an execution, much less provides them a cause of action to protect *their* rights. *See* 18 U.S.C. § 3596. The DOJ regulation specifying that the inmate shall have a spiritual advisor present at the execution, 28 C.F.R. § 26.4(c)(3), clearly is intended for the *inmate's* benefit, not the inmate's spiritual advisor's benefit. In sum, because Rev. Hartkemeyer does not arguably fall within the zone of interests of any relevant statute or regulation, his APA claim is unlikely to succeed on this basis as well.

## C. The Attorney General's Decision to Promptly Schedule Mr. Purkey's Execution Is Not Arbitrary and Capricious

Rev. Hartkemeyer's only challenge under the APA is that the Attorney General's decision to schedule Mr. Purkey's execution on July 15, 2020 is arbitrary and capricious. The scope of review under the "arbitrary and capricious" standard is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Under this highly deferential standard, an administrative decision should be upheld as long as the agency's path may be reasonably discerned." *Sierra Club v. U.S. EPA*, 774 F.3d 383, 393 (7th Cir. 2014) (internal quotation marks omitted). "A court is not to ask whether [an agency's] decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). Rather, the court's task is to ensure that the agency remained "within the bounds of reasoned decisionmaking" and that there has been no "clear error in judgment." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

Under this standard, it is evident that Rev. Hartkemeyer is unlikely to succeed in showing that the Attorney General made a clear error in judgment. Much of what Rev. Hartkemeyer takes issue with comes down to the fact that the Attorney General did not, in announcing the execution date, also explain why he decided to do so during the COVID-19 pandemic (rather than postponing

22

it) and what protections would be afforded participants attending the execution. Pl.'s Mot. at 31. Of course, nothing requires that the decision on the execution date be made on the record, with a full explanation publicly provided. *See* 18 U.S.C. § 3596; 5 U.S.C. § 554(a).

The Attorney General's reasons for setting the execution date expeditiously are self-evident. BOP initially scheduled Mr. Purkey's execution for December 13, 2019, the announcement of which was made nearly a year ago on July 25, 2019, upon BOP's adoption of a new lethal injection protocol.[10] The execution date was preliminarily enjoined by the U.S. District Court for the District of Columbia in litigation challenging the lethal injection protocol, and although both the D.C. Circuit and the Supreme Court denied the Government's stay applications or vacatur of the preliminary injunction, the Supreme Court noted its "expect[ation] that the Court of Appeals will render its decision with *appropriate dispatch*." *Barr v. Roane*, 145 S. Ct. 353 (2019) (mem.) (emphasis added). Throughout the preliminary injunction litigation, the Government repeatedly emphasized the Supreme Court's recognition that "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a death sentence." *See e.g.*, *Bucklew*, 139 S. Ct. at 1133 (quoting *Hill*, 547 U.S. at 584); Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj. at 45, ECF No. 16, *In re Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145 (D.D.C. Oct. 18, 2019). When the D.C. Circuit vacated the preliminary injunction and the Supreme Court denied Mr. Purkey's and other inmates' request to stay the issuance of the mandate by the D.C. Circuit, the Government promptly rescheduled the long-delayed executions, as required by regulation, 28 C.F.R. § 26.3(a)(1) ("[A] new date shall be designated promptly by the Director of the Federal Bureau of Prisons when the stay is lifted."). Rather than being arbitrary and capricious, that action reflects the Government's consistent position that a lawful sentence of death should be carried out promptly.

Rev. Hartkemeyer's primary argument is that BOP failed to consider "the clear 'less restrictive, yet easily administered' alternative of waiting to schedule the execution at a time when

---

[10] *See* DOJ Press Release No. 19-807, *available at* https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse.

the immediate threat of the pandemic has passed," Pl.'s Mot. at 31, and he asks that the execution be postponed "until there is an effective COVID-19 treatment or vaccine." *Id*. at 24. But, as previously discussed, such an indefinite delay is contrary to the Government's compelling interest in promptly carrying out Mr. Purkey's death sentence. *Supra* at 16-18. Any "less restrictive, yet easily administered" alternative that a court may require an agency to have considered must nevertheless allow the agency to accomplish its "objective." *See Cincinnati Bell Tel. Co. v. FCC*, 69 F.3d 752, 761 (6th Cir. 1995).

There is also no basis for Rev. Hartkemeyer to speculate that BOP acted at random. *United States v. Chem. Found., Inc.*, 272 U. S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties"). As part of selecting the date, it is inconceivable that BOP would not have considered COVID-19 and its effects on the individuals involved. Indeed, Rev. Hartkemeyer himself cites multiple BOP COVID-19 response plans that have evolved over time, including actions that BOP has taken to prevent the spread of COVID-19. Pl.'s Mot. at 5-6. The attached declaration of Rick Winter also details the measures that will be taken to mitigate Rev. Harkemeyer's potential exposure to COVID-19 should he choose to attend Mr. Purkey's execution. Winter Decl. ¶¶ 6-15. Thus, there is no basis to find that BOP "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. While Rev. Hartkemeyer may have weighed the importance of a speedy execution against the possible effects of COVID-19 differently and come to a difference conclusion, he may not substitute his judgment for that of BOP. *See id*. Nor should this Court do so.

Finally, Rev. Hartkemeyer attempts to bolster his claim by relying on the purported risk of COVID-19 infection to "all of the people who participate in or witness the execution." Pl.'s Mot. at 31. He does not advance any serious argument that he is actually trying to assert other people's interests in addition to his own. Even if he did, such an argument would clearly fail because he has no standing to do so—i.e., he has no close relationship with those other participants nor do those individuals have any impediment to bringing their own claims. *See Kowalski v. Tesmer*, 543

24

U.S. 125, 130 (2004) (holding that to have third-party standing, the litigant must have a close relation to the third party and there must exist some hindrance to the third party's ability to protect his or her own interest). This leaves just the risk to Rev. Hartkemeyer himself, which means that in Rev. Hartkemeyer's view, BOP's decision was arbitrary and capricious because it failed to consider the risk of spread of COVID-19 to Rev. Hartkemeyer. Even if BOP did not consider that issue specifically, it has done so now, *see* Winter Decl. ¶¶ 6-15, and concluded that it can and will take sufficient measures to mitigate that risk. Accordingly, Rev. Hartkemeyer is unlikely to succeed on his claim that the setting of the execution date was arbitrary and capricious.

## III.   THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A PRELIMINARY INJUNCTION

Because Rev. Hartkemeyer has failed to establish a likelihood of success on the merits, the Court need not proceed further to consider the remaining threshold preliminary injunction factors: irreparable injury and no other adequate remedy at law. *See GEFT Outdoors, LLC*, 922 F.3d at 367-68 (noting that if a plaintiff cannot show a likelihood of success on the merits of his claim, "there [is] no need for the district court to conduct further analysis of the 'threshold phase' for preliminary injunctive relief, or to move to the 'balancing phase'"); *accord Lankford*, 2020 WL 2128580 (Magnus-Stinson, J.) (quoting same). This is consistent with the Supreme Court's application of the preliminary injunction standard in Eighth Amendment method-of-execution challenges, where an inmate's failure to establish a likelihood of success alone warrants denial of the inmate's motion to preliminarily enjoin his execution. *See Glossip*, 135 S. Ct. at 2737. Because Rev. Hartkemeyer has shown no likelihood of success on the merits of his claims, the Court should deny his motion for a preliminary injunction.

Should the Court proceed further, though, the balance of equities tip against issuing an injunction. First, the mere "possibility" that Rev. Hartkemeyer will be exposed to COVID-19 if he attends the execution is insufficient to establish irreparable harm, because a plaintiff "seeking preliminary relief [must] demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Given the precautions BOP has taken and will take as

25

described above, it cannot be said that Rev. Hartkemeyer is likely to contract COVID-19 in the absence of an injunction.   Furthermore, Rev. Hartkemeyer cannot dispute the Government's overwhelming interest in the timely enforcement of criminal sentences imposed by unanimous federal juries after fair trials and upheld through extensive appellate and post-conviction proceedings in federal courts. *See Bucklew*, 139 S. Ct. at 1123.  The American people have chosen to make capital punishment available in the federal system.   If that decision is to be given meaningful effect, sentences must be enforced in cases like this.   Although Rev. Hartkemeyer argues that "there is no harm to delaying Mr. Purkey's execution until a time when the pandemic's risk have ebbed," Pl.'s Mot. at 33, such an indefinite delay is inconsistent with the Supreme Court's teaching that "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a [death] sentence," *Bucklew*, 139 S. Ct. at 1133 (quoting *Hill*, 547 U.S. at 584); *see also Calderon*, 523 U.S. at 556 (explaining that once post-conviction proceedings "have run their course . . . finality acquires an added moral dimension").   "Only with an assurance of real finality can the [Government] execute its moral judgment in a case," and "[o]nly with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Calderon*, 523 U.S. at 556.   Unduly delaying executions can also frustrate the death penalty by undermining its retributive and deterrent functions.  *See Bucklew*, 139 S. Ct. at 1134; *id*. at 1144 (Breyer, J., dissenting).

Indeed, the Supreme Court has routinely denied stay-of-execution applications even by condemned inmates while their challenges to execution protocols were pending.  *See Storey v. Lombardi*, 135 S. Ct. 1198 (2015) (mem.) (denying stay-of-execution applications by Missouri inmates while challenges to Missouri's single-drug pentobarbital protocol were pending), and *Warner v. Gross*, 135 S. Ct. 824 (2015) (mem.) (same, involving a challenge to Oklahoma's execution protocol).   It begs belief to think that a third party's interests merit a stay of an execution when the Supreme Court has rejected such requests from the inmates themselves.

Finally, the Government's interest in implementing Mr. Purkey's sentence is "magnified by the heinous nature" of his offense. *Execution Protocol Cases*, 955 F.3d at 127 (Katsas, J.,

26

concurring) (discussing Mr. Purkey's crimes). Mr. Purkey kidnapped, raped, murdered, and dismembered a sixteen-year-old girl. *See Purkey*, 428 F.3d at 744-45. Among the nine aggravating factors found by the jury was its conclusion that Mr. Purkey had previously bludgeoned an 80-year-old woman to death with a hammer. *Id.* at 746. This sentence has been upheld throughout Mr. Purkey's many years of direct and post-conviction review. *See Purkey*, 729 F.3d at 860. Rev. Hartkemeyer's contention that his interest in rescheduling Mr. Purkey's execution outweighs the Government's interest in finally implementing the lawful capital sentence Mr. Purkey incurred finds no support in equity.

For all these reasons, the balance of equities tips against granting a preliminary injunction.

## CONCLUSION

For the foregoing reasons, this Court should deny the motion for a preliminary injunction.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney


By:     _s/ Shelese Woods_____
        Shelese Woods
        Assistant United States Attorney

27

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2020, the foregoing was filed electronically through ECF/CM. On this same date, electronic service will be made to all counsel of record through the Court's ECF/CM system.

s/ *Shelese Woods*
Shelese Woods
Assistant United States Attorney

Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, IN 46204
(317) 226-6333
(317) 226-6125 [Fax]