**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | |
|---|---|
| EARLENE BRANCH PETERSON, KIMMA GUREL, and MONICA VEILLETTE, <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM P. BARR, in his official capacity as Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as Director of the Federal Bureau of Prisons; and T.J. WATSON, in his official capacity as Complex Warden for Terre Haute Federal Correction Complex, <br><br> Defendants. | Case No. _____ |

**[PROPOSED] COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Earlene Branch Peterson, Kimma Gurel, and Monica Veillette (collectively "Plaintiffs"), by and through their undersigned counsel, bring this Complaint and in support thereof they allege as follows:

**Nature of Action**

1. This action is for declaratory relief, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, and related injunctive relief, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, and it arises out of Defendants' ongoing and future violation of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (the "APA").

2. As alleged below, Defendants are egregiously violating the APA because they have announced their intention to execute Daniel Lewis Lee on July 13, 2020 at the United States

1

Penitentiary in Terre Haute (USP Terre Haute), even though the COVID-19 pandemic is worsening and currently ravaging the federal prison system, including USP Terre Haute. Plaintiffs, who are all members of Mr. Lee's victims' families, have been selected to attend the execution and they have a well-established right to do so.  Defendants, however, have placed Plaintiffs in an untenable position because Plaintiffs cannot exercise those rights unless they put their own lives at grave risk by traveling to USP Terre Haute and being exposed to COVID-19 while there,

3.      There is no legitimate reason for Defendants to go forward with Mr. Lee's execution on July 13, 2020 as opposed to a later date.  Defendants have arbitrarily and capriciously set that execution date, despite the COVID-19 pandemic, without adequately taking into account Plaintiffs' health and safety.  Thus, Plaintiffs' rights to attend Mr. Lee's execution have been subverted, and the agency action in setting the execution violates the APA because it is "arbitrary and capricious" and "not in accordance with law." 28 U.S.C. § 706(2)(A).

4.      Accordingly, through this Complaint, Plaintiffs seek (1) a declaration that Defendants' action is unlawful and should be set aside; and (2) an injunction barring Defendants from setting an execution date for Mr. Lee until such time as Plaintiffs are able to exercise their right to attend Mr. Lee's execution without endangering their own lives.[1]

**Parties**

5.      Plaintiff Earlene Branch Peterson is the mother of victim Nancy Mueller and the grandmother of victim Sarah Powell.

---

[1]      The spiritual advisor for another prisoner, Wesley Purkey, has also filed an action in this Court regarding the risks posed to him by attending Mr. Purkey's execution, which is scheduled for July 15, 2020.  *See Hartkemeyer v. Barr et al.*, 20-cv-00336 (S.D. Ind.) (the "*Hartkemeyer* Action").

6.      Plaintiff Kimma Gurel is Nancy Mueller's sister and Sarah Powell's aunt.

7.      Plaintiff Monica Veillette is Nancy Mueller's niece and Sarah Powell's cousin.

8.      Defendant William P. Barr is the Attorney General of the United States.  He scheduled Mr. Lee's execution for July 13, 2020 and has responsibility over carrying out death sentences against federal prisoners.  Defendant Barr maintains an office in Washington, D.C. and is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

9.      Defendant Michael Carvajal is the Acting Director the Federal Bureau of Prisons ("BOP").  He is responsible for the supervision and operation of all federal prisons, including USP Terre Haute, where Mr. Lee is scheduled to be executed on July 13, 2020.  Defendant Carvajal maintains an office in Washington, D.C. and is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

10.     Defendant T.J. Watson is the Complex Warden for the Federal Correctional Complex, Terre Haute (FCC Terre Haute).  Defendant Watson maintains an office in Terre Haute, Indiana and is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

### Jurisdiction and Venue

11.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because Plaintiffs seek relief pursuant to 28 U.S.C. §§ 2201 and 2202.

12.     Venue lies in the Southern District of Indiana, where FCC Terre Haute, which includes USP Terre Haute, is located. Venue is also appropriate under 28 U.S.C. § 1391, as venue is proper in any district in which a defendant resides.

### Statement of Facts

**I.**     **Plaintiffs Suffer from A Variety of Ailments.**

13.     Plaintiff Earlene Branch Peterson is 81 years old. She lives in Hector, Arkansas, a distance of more than 500 miles from Terre Haute, Indiana. She suffers from congestive heart failure and, in addition to her age being a risk factor, also has other underlying conditions, that put her at increased risk for developing COVID-19-related complications. She attended Mr. Lee's capital trial on a daily basis. She has been contacted over the years by members of the prosecution, who have updated her on the status of proceedings in the case.

14.     Plaintiff Kimma Gurel is 61 years old.  She lives in Spokane Valley, Washington, a distance of nearly 2,000 miles from Terre Haute, Indiana.  In addition to her age being a risk factor, she suffers from underlying health conditions that put her at increased risk for developing COVID-19-related complications. She attended Mr. Lee's capital trial on a daily basis.

15.     Plaintiff Monica Veillette is 43 years old. She lives in Deer Park, Washington, a distance of nearly 2,000 miles from Terre Haute, Indiana. She suffers from asthma and other underlying conditions that put her at increased risk for developing COVID-19-related complications. She attended Mr. Lee's capital trial on a daily basis, and she testified as a witness for the prosecution.

**II.**     **Plaintiffs Will Be Exposed to Unnecessary and Life-Threatening Risks by Attending Mr. Lee's Execution.**

16.     Defendants have relied on 28 C.F.R. Part 26 in announcing their intent to execute Mr. Lee on July 13, 2020.   28 C.F.R. § 26.4 lists the persons who "shall be present" during an execution and it includes "[e]ight citizens" selected by the Warden.  28 C.F.R. § 26.4(c)(4)(i).

17.     The BOP Execution Protocol (2019) (the "Protocol"), attached hereto as Exhibit A, repeats the requirement from 28 C.F.R. § 26.4 that the Warden must select eight citizens to attend

an execution. *See* Ex. A, Ch. 1, III.G.1.c.(1), 10-11. The Protocol further provides that, in identifying those individuals, the Warden "will ask the United States Attorney for the jurisdiction in which the inmate was prosecuted to recommend up to eight individuals who are victims or victim family members to be witnesses of the execution." *Id.*

18. The process set forth in the Code of Federal Regulations and Protocol has taken place and Plaintiffs are among the witnesses selected to attend Mr. Lee's execution. Therefore, pursuant to 28 C.F.R. § 26.4, Plaintiffs have the right to attend Mr. Lee's execution.

**III. COVID-19 is a serious, debilitating and potentially lethal disease, which hits vulnerable populations with particular severity.**

19. The SARS-CoV-2 virus, and the human infection it causes – COVID-19 – is a global pandemic, was designated a global health emergency by the World Health Organization, and was declared a national emergency on March 13, 2020, by President Donald Trump.

20. In his Proclamation, declaring this national state of emergency, President Trump noted that "[t]he spread of COVID-19 within our Nation's communities threatens to strain our Nation's healthcare systems. As of March 12, 2020, 1,645 people from 47 States have been infected with the virus that causes COVID-19." *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (issued on March 13, 2020).[2]

21. Those numbers have increased dramatically over the past four months. According to the Centers for Disease Control and Prevention ("CDC"), as of July 4, 2020, there have been

---

[2] Available at: https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited July 5, 2020).

2,789,678 total confirmed cases of COVID-19 in the United States, and 129,305 deaths. *Cases, Date & Surveillance: Cases in the U.S.* (July 4, 2020).[3]

22.     As of July 4, 2020, the number of new confirmed cases reported compared to July 3, 2020, was 57,718, including 661 new deaths. *Id.*

23.     The number of new deaths tends to lag by two weeks or more behind the number of new COVID cases.

24.     COVID-19 is a serious, debilitating, and sometimes deadly disease.  Although it is often compared to influenza, the overall case fatality rate is 5-35 times the fatality rate associated with influenza infection.  And unlike influenza, overall, some 20% of cases will have more severe disease requiring medical intervention and support.

25.     There is currently no vaccine or known cure for COVID-19.

26.     The virus enters the body when someone inhales respiratory droplets containing SARS-CoV-2, or when these droplets enter via the eyes. The coronavirus then enters cells in the nose and throat where it invades them by latching onto a receptor at the cell surface. It then proliferates by using the invaded cell's own machinery. From there, the virus can spread from the nose and throat to the lungs, where the virus—and the body's immune response—can disrupt the flow of oxygen into the blood, causing coughing and shortness of breath. SARS-CoV-2 can invade many other organs in the body with a wide range of effects: seizures and strokes in the brain; blood clots and cardiac inflammation in the vessels and heart; and liver and kidney damage.[4]

---

[3] Available at:  https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 5, 2020).

[4]  Wadman, Couzin-Frankel, Kaiser, Matacic, *How does coronavirus kill?  Clinicians trace a ferocious rampage through the body, from brain to toes*, Science, April 17, 2020.

27.     The course of illness in any particular person is unpredictable. Some individuals with COVID-19 may have no symptoms or only mild symptoms, while others may develop severe illness.

28.     The "mild" symptoms for COVID-19 are fever, chills, cough, shortness of breath, fatigue, muscle or body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea or vomiting, and diarrhea.  Many COVID-19 infections resolve within a few weeks. However, a subset of individuals has enduring symptoms that last months. Many of these individuals are young and previously healthy.[5]

29.     Once contracted, COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity.

30.     It can also permanently damage tissues in other vital organs, as well, such as the heart, central nervous system, and liver.

31.     There are multiple ways in which COVID-19 can be deadly.  Among patients who have more serious disease, some 30% will progress to Acute Respiratory Distress Syndrome (ARDS), a condition in which oxygen levels in the blood and blood pressure falls dramatically.

---

Available at: https://www.sciencemag.org/news/2020/04/how-does-coronavirus-kill-clinicians-trace-ferocious-rampage-through-body-brain-toes. (last visited July 6, 2020).

[5] *Symptoms of Coronavirus*, Centers for Disease Control and Prevention, (noting "This list does not include all possible symptoms.") https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited July 6, 2020); Ed Young, *COVID-19 can last for several months*, The Atlantic, June 4, 2020 Available at: https://www.theatlantic.com/health/archive/2020/06/covid-19-coronavirus-longterm-symptoms-months/612679/ (last visited July 6, 2020).

ARDS has a 30% mortality rate overall, higher in those with other health conditions. Some 13% of these patients will require mechanical ventilation.[6]

32.    COVID-19 can also cause heart damage, blood clots, and constriction of blood vessels, all of which can play a role in causing death.  Kidney failure can also be involved in COVID-19 mortality.

33.    Even when it does not kill, COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, cause permanent loss of breathing capacity. COVID-19 may also target the heart, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can reduce the heart's ability to pump.

34.    An exaggerated response of the immune system called a "cytokine storm" can come from a COVID-19 infection. When that occurs, a flood of inflammatory signaling molecules are unleashed onto the body. These molecules cause blood vessels to become leaky, resulting in a drop in blood pressure. Blood clots become more likely to form and obstruct vessels. Organs may not get the oxygen they need to function. This is a complication of grave concern.[7]

35.    Age is a critical risk factor for the severe illness and potential fatality associated with COVID-19. There are multiple estimates of the ratio between all known cases and known

---

[6] Sinha, Matthay & Calfee, *Is a "cytokine storm" relevant to COVID-19?,* JAMA Internal Medicine, June 30, 2020.  Available at: https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2767939 (last visited July 6, 2020).
[7] *Id.*

deaths (the "case-fatality ratio") for COVID-19 but risk for severe illness and mortality rises steeply above 60-70 years of age.[8]

36.     A number of underlying conditions, other than age, create higher risk and influence the course of symptoms and mortality rate.  For example, people with type 2 diabetes are nearly 4 times more likely to develop serious disease or die from COVID-19.[9]  Heart disease, COPD, hypertension, and cancer are all risk factors for ICU admission, ventilation, or death.[10]

37.     The COVID-19 mortality rate is twelve times higher among those with underlying conditions.  Specifically, 19.5% of people with COVID-19 who had underlying health conditions died as compared to 1.6% of those without underlying conditions.[11]

38.     Epidemiologists have collected additional demographic data on populations of COVID sufferers.  Individuals with obesity are about twice as likely to be hospitalized with

---

[8] *Older Adults*, Centers for Disease Control and Prevention, updated June 25, 2020. Available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited July 6, 2020).

[9] Zheng Z, Peng F, Xu B, et al. Risk factors of critical & mortal COVID-19 cases: A systematic literature review and meta-analysis [published online ahead of print, 2020 Apr 23]. *J Infect*. 2020;S0163-4453(20)30234-6. doi:10.1016/j.jinf.2020.04.021

[10] Guan WJ, Liang WH, Zhao Y, et al. Comorbidity and its impact on 1590 patients with COVID-19 in China: a nationwide analysis. *Eur Respir J*. 2020;55(5):2000547. Published 2020 May 14. doi:10.1183/13993003.00547-2020.

[11] Stokes EK, Zambrano LD, Anderson KN, et al. *Coronavirus Disease 2019 Case Surveillance – United States, January 22-May 30, 2020,* MMWR Morb Mortal Wkly Rep 2020;69:759-765.  DOI: http://dx.doi.org/10.15585/mmwr.mm6924e2. Available at: https://www.cdc.gov/mmwr/volumes/69/wr/mm6924e2.htm?s_cid=mm6924e2_w#T1_down (last visited July 6, 2020).

COVID-19.  Younger patients with obesity are more likely to require hospital admission and ICU care when infected than their non-obese counterparts.[12]

39.    To be classified as a confirmed case of COVID-19, an individual must meet confirmatory laboratory evidence.[13] A viral test identifies people with current SARS-CoV-2 infection. Additionally, antibody tests can be used to identify people with a previous viral infection.

40.    To be determined a confirmed case, an individual must have undergone diagnostic testing, which is often limited in availability.

41.    If diagnostic testing is limited, either by availability or by choice, the number of actual infected individuals may greatly exceed the number of reported confirmed cases.

42.    The Indiana State Department of Health confirmed its first case of COVID-19 on March 6, 2020 and recorded its first death due to the virus on March 16.

---

[12] Petrilli Christopher M, Jones Simon, A. Yang Jie, Rajagopalan Harish, O'Donnell Luke, Chernyak Yelena et al. Factors associated with hospital admission and critical illness among 5279 people with coronavirus disease 2019 in New York City: prospective cohort study *BMJ* 2020; 369 :m1966;  Jennifer Lighter, Michael Phillips, Sarah Hochman, Stephanie Sterling, Diane Johnson, Fritz Francois, Anna Stachel, Obesity in Patients Younger Than 60 Years Is a Risk Factor for COVID-19 Hospital Admission, *Clinical Infectious Diseases*, , ciaa415, https://doi.org/10.1093/cid/ciaa415;  Kass DA, Duggal P, Cingolani O. Obesity could shift severe COVID-19 disease to younger ages. *Lancet*. 2020;395(10236):1544-1545. doi:10.1016/S0140-6736(20)31024-2

[13] *Coronavirus Disease 2019 (COVID-19) 2020 Interim Case Definition, approved April 5, 2020,* Centers for Disease Control and Prevention. https://wwwn.cdc.gov/nndss/conditions/coronavirus-disease-2019-covid-19/case-definition/2020/ (Last visited July 6, 2020)

43.    Children, while initially thought to be safe from effects of the virus, are now recognized as being susceptible to multisystem inflammatory syndrome (MIS-C) associated with COVID-19.

44.    On May 18, 2020, Indiana confirmed its first case of MIS-C in a child.

45.    As of July 5, 2020, the Indiana State Department of Health (ISDU) announced that 522 additional Indiana residents had been diagnosed with COVID-19 from the previous day, bringing to 47,432 the total number of Indiana residents known to have the novel coronavirus. On July 6, 2020, the ISDU reported 596 additional state residents diagnosed with COVID-19 over the previous day's count, bringing the state total to 48,008.[14] This represents a 14% increase over the number of cases added the previous day.

46.    This number represents a jump in the State of Indiana of almost 11,000 new cases reported since June 5, 2020. *Compare Health Department Updates Statewide COVID-19 Case Counts,* June 5, 2020,[15] with *Health Department Updates Statewide COVID-19 Case Counts,* July 4, 2020.[16]

47.    As of July 4, 2020, the ISDU reported that a total of 2,494 Indiana residents were confirmed to have died from COVID-19, and that an additional 193 probable deaths had been reported based on clinical diagnoses in patients for whom no positive test was on record.

---

[14] *Health Department updates statewide COVID-19 case counts*, Indiana State Department of Health, IN.gov. Available at: https://calendar.in.gov/site/isdh/event/health-department-updates-statewide-covid-19-case-counts-65/ (last visited July 6, 2020).

[15] Available at: https://calendar.in.gov/site/isdh/event/health-department-updates-statewide-covid-19-case-counts-36/ (last visited July 5, 2020).

[16] Available at: https://calendar.in.gov/site/isdh/event/health-department-updates-statewide-covid-19-case-counts-64/ (last visited July 5, 2020).

48.     On July 1, 2020, Indiana Governor Eric Holcomb renewed the COVID-19 public health emergency to extend from July 4 (the then-current expiration date) to August 3, 2020, "unless further renewed." *Executive Order 20-34, for: Fourth Renewal of Public Health Emergency Declaration for the COVID-19 Outbreak,* ¶ 2, State of Indiana Executive Department.[17]

49.     COVID-19 cases continue to rise in the United States.  Just in the past week, rates in some states and counties that had previously seen little disease have risen dramatically.

50.     For example, COVID-19 has continued to spread in Arkansas. In the last month, the number of cases has almost tripled (5,644 cases reported on May 21st; 15,142 cases reported June 21st). In response to the climbing cases, on June 18, 2020, the Governor extended the Public Health Emergency Order for another forty-five days.  Pulaski County, which includes Little Rock, has one of the highest number of cases in Arkansas and reported 1,499 positive cases and 52 deaths from COVID-19 as of June 21, 2020.

## IV.     COVID-19 is highly transmissible.

51.     COVID-19 passes from person to person primarily through respiratory droplets. This can happen whenever a person expels droplets into the air, and increases when an infected individual speaks, shouts, sings, coughs, or sneezes.

52.     COVID-19 can survive on hard surfaces for hours to days.  It can live for 72 hours on plastic and metal, 48 hours on stainless steel, and 24 hours on cardboard.[18]

---

[17] Available at: https://www.in.gov/gov/files/Executive%20Order%2020-34%20Extention%20of%20the%20Public%20Health%20Emergency.pdf (last visited, July 5, 2020.)

[18] Neeltje van Doremalen et al., "Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1," letter, *New England Journal of Medicine* (Massachusetts

53.    New information indicates that COVID-19 may also be transmissible through aerosolized fecal contact.

54.    The longer the time a person spends in an environment that harbors the virus increases his or her chance of contracting it.  While a very short period of time may be enough for someone to contract it if the viral load is heavy, a longer period of time in the presence of even a small amount of virus increases the chance of infection.

55.    For contact tracing purposes to determine a high likelihood of exposure, "close contact" is defined by the CDC as "any individual who was within 6 feet for more than 15 minutes of an infected person starting from 2 days *before* illness onset (or, for asymptomatic patients, 2 days prior to a positive specimen collection) until the time the patient is isolated.[19]

56.    The most dangerous transmission scenarios are indoor environments with poor ventilation in which people are close together. Research suggests that speech droplets which carry the virus that causes COVID-19 can linger in the air in closed environments for 8 to 14 minutes.[20]  A study currently under review found that among 1,245 cases during the COVID-19 outbreak in China, there

---

Medical Society, March 17, 2020),  Available at: https://www.nejm.org/doi/10.1056/NEJMc2004973 (last visited July 6, 2020).  *See also*, *COVID-19 basics: symptoms, spread and other essential information about the new coronavirus and COVID-19*, Harvard Health Publishing, Harvard Medical School, updated July 2, 2020.  (last visited July 6, 2020).

[19] *Contact tracing for COVID-19*, Centers for Disease Control and Prevention, Updated June 17, 2020.  Available at: https://www.cdc.gov/coronavirus/2019-ncov/php/contact-tracing/contact-tracing-plan/contact-tracing.html (last visited July 6, 2020).

[20] Valentyn Stadnytskyi, Christina E. Bax, Adriaan Bax, Philip Anfinrud. The airborne lifetime of small speech droplets and their potential importance in SARS-CoV-2 transmission. *PNAS*. May 2020, 202006874; DOI: 10.1073/pnas.2006874117

was only one case of COVID-19 transmission that was in an outdoor environment, highlighting the overwhelming predominance of COVID-19 transmission in indoor environments.[21]

57. Wearing face masks helps to mitigate transmission of SARS-CoV-2, but does not guarantee full protection. Even surgical masks, for example, block 75% of airborne particles, but not all.[22] This is why medical personnel wear full coverage Personal Protective Equipment (PPE).

58. When wearing non-N95 face masks, social distancing must be maintained to avoid acquiring the virus. The two measures must be taken in combination – wearing a mask *and* social distancing.

59. Poorly ventilated spaces increase the likelihood of COVID-19 transmission. Some airflow studies have found that respiratory droplets can travel between people even from 10 feet away, suggesting that even the social distancing recommendation of 6 feet may be insufficient depending on ventilation.[23] The Indiana State Department of Health warns that droplets expelled when a person

---

[21] Hua Qian, Te Miao, Li Liu et al. *Indoor transmission of SARS-CoV-2*, medRxiv. April 2, 2020. Available at: https://doi.org/10.1101/2020.04.04.20053058 (last visited July 6, 2020).

[22] Amy Mueller and Loretta Fernandez, *Assessment of fabric masks as alternatives to standard Masks in terms of particle filtration efficiency*, medRxiv. April 17, 2020. Available at: https://www.medrxiv.org/content/10.1101/2020.04.17.20069567v2.full.pdf (last visited July 6, 2020).

[23] Feng Y, Marchal T, Sperry T, Yi H. Influence of wind and relative humidity on the social distancing effectiveness to prevent COVID-19 airborne transmission: A numerical study [published online ahead of print, 2020 May 18]. *J Aerosol Sci*. 2020;147:105585. Available at: www.sciencedirect.com/science/article/pii/S0021850220300744?via%3Dihub (last visited July 6, 2020).

infected with COVID-19 speaks, coughs, sneezes or speaks can travel up to 25 feet.[24]  Airflow direction may also influence transmission.[25]

60.    Wearing a mask helps keep the person wearing it from spreading disease to another ("source control") but it does not confer much protection on the person wearing it unless it is an N95 mask.[26]

61.    N95 masks with vents, however, expel air so the wearer is protected but can still transmit the virus.

62.    Because the virus can also enter one's body through his or her eye membranes, no mask confers complete protection.

63.    The onset and duration of viral shedding, which propagates spread, and the period of infectiousness for COVID-19, are not well understood, and therefore, cannot be easily prevented.  Epidemiologists report that individuals who are contagious do not necessarily show symptoms, either because they are asymptomatic (i.e. has a mild enough case of the virus that they are unaware they have it) or because they are pre-symptomatic.  A pre-symptomatic person will go on to develop symptoms but can be infectious for up to 3 days before symptoms first develop.

---

[24] *State encourages Hoosiers to wear masks to help curb COVID-19*, Indiana State Department of Health, IN.gov. July 1, 2020.  Available at: https://calendar.in.gov/site/isdh/event/state-encourages-hoosiers-to-wear-masks-to-help-curb-covid-19/ (last visited July 6, 2020).

[25] Lu J, Gu J, Li K, et al. COVID-19 Outbreak Associated with Air Conditioning in Restaurant, Guangzhou, China, 2020. *Emerging Infectious Diseases*. 2020;26(7):1628-1631. Available at: https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article (last visited July 6, 2020).

[26] *Considerations for wearing cloth face coverings,* Centers for Disease Control and Prevention, updated June 28, 2020. Available at:  https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html (last visited July 6, 2020).

64.     The combined effect of asymptomatic and pre-symptomatic carriers is thought to account for a substantial portion of SARS-CoV-2 transmission, with some estimates putting it at between 50 to 80% of all transmission.[27]

65.     Because asymptomatic and pre-symptomatic carriers are infectious at early stages of infection, screening measures that do not include testing, such as restricting access to buildings if someone has a fever or symptoms, do little to prevent the introduction of the virus into any environment.

66.     The State of Missouri is the only jurisdiction in the United States that has carried out an execution since the President declared COVID-19 a national emergency on March 13, 2020. The Missouri prison where that execution occurred on May 19, 2020, experienced an outbreak of 21 COVID-19 infections in the weeks after the execution.[28]

67.     Upon information and belief, the COVID-19 screening measures employed by BOP at FCC Terre Haute, including USP Terre Haute, have been and continue to be inadequate. Widespread testing of staff and inmates has not taken place at the correctional complex, and asymptomatic individuals are not tested. In March 2020, the BOP employed a screening tool for visitors, volunteers and contractors seeking entrance to a prison that asked the individual to self-report if she had fever or chills, cough, or shortness of breath, and required a temperature check.

---

[27] Gandhi, Yokoe, & Havlir, *Asymptomatic transmission, the Achilles' heel of current strategies to control COVID-19*, N Engl J Med 2020; 382:2158-2160. May 28, 2020.  Available at: https://www.nejm.org/doi/full/10.1056/NEJMe2009758?query=recirc_curatedRelated_article (last visited July 6, 2020).

[28] Bobby Radford, *COVID-19 Outbreak Confirmed at Prison in Bonne Terre,* Daily Journal Online (June 19, 2020), https://dailyjournalonline.com/news/local/govt-and-politics/covid-19-outbreak-confirmed-at-prison-in-bonne-terre/article_c7222072-e242-513d-871a-c63a9c30cfbc.html (last visited July 7, 2020)

The form also asked if the person had traveled within the previous 14 days to China, Iran, South Korea, Italy, or Japan, or had had close contact with anyone "diagnosed" with the COVID-19 illness with the last 14 days. According to the BOP website, this remains the screening tool being used for visitors to BOP prisons. *See BOP Visitor/Volunteer/Contractor COVID-19 Screening Tool*[29] and *BOP Implementing Modified Operations.*[30]

68.    The BOP also employs an inadequate staff screening tool that requires a temperature check, and an employee self-report as to whether he or she has a "new on-set cough," "new onset trouble speaking because of needing to take a breath," or "stuffy/runny nose." With a temperature above a certain designated point, the staff member is to be denied access. But with a yes answer to the other screening questions, the staff member is only instructed to "contact the medical officer on call for the Institution to provide Disposition." *See Coronavirus Disease 2019 (COVID-19) Staff Screening Tool,* March 27, 2020.[31]

69.    Based on data collected in a study conducted by the Indiana University Richard M. Fairbanks School of Public Health, researchers estimated that 43% of all Indiana residents who were currently infected showed no symptoms. *IUPUI, ISDH release findings from 2nd phase of COVID-19 testing in Indiana*, June 17, 2020.[32]

---

[29] Available at: https://www.bop.gov/coronavirus/docs/covid19_screening_tool.pdf (last visited July 5, 2020).

[30] Available at: https://www.bop.gov/coronavirus/covid19_status.jsp (last visited July 5, 2020).

[31] Available at: https://www.bop.gov/coronavirus/docs/covid19_staff_screening_tool_v2.8_20200327.pdf (last visited July 5, 2020.)

[32] Available at: https://calendar.in.gov/site/isdh/event/iupui-isdh-release-findings-from-2nd-phase-of-covid-19-testing-in-indiana/ (last visited July 5, 2020).

70.    This number strongly suggests that a large percentage of those people who would successively pass the BOP's screening test and be admitted in its prisons would nevertheless have an active case of COVID-19.

71.    Because individuals without symptoms transmit COVID-19, until a vaccine is developed, the only effective screening measure is regular, rapid-result COVID testing for everyone entering the facility.[33]

## V.    In Order to Travel to Attend Mr. Lee's Execution, Plaintiffs Will Be Exposed to Considerable Risk of contracting COVID-19.

72.    In order to participate as witnesses to Mr. Lee's execution, Plaintiffs will have to undertake long distance interstate travel to and from Terre Haute, Indiana, where the execution will take place. Because the execution is scheduled for the afternoon of Monday, July 13, 2020, Plaintiffs will have to spend two nights in hotels. Plaintiffs Veillette and Gurel will have to travel by air and will be riding in a small van provided by the Government, in which their ability to maintain social distancing—from the driver, from each other, and from anyone else in the van—will not be feasible. Plaintiffs Veillette and Gurel have been practicing social distancing during the pandemic, both generally and from each other as well. Neither has been with Plaintiff Peterson during the pandemic. Plaintiff Peterson will be driven to Terre Haute by her son who has multiple sclerosis.

---

[33] Gandhi, Yokoe, & Havlir, *supra* at n.27.

73. Travel has the potential to cause new outbreaks across the country. The outbreak of COVID-19 in New York is estimated to be responsible for 60-65% of cases nationwide, and travel from Seattle spread the virus to at least 12 different states.[34]

74. The CDC has published "Considerations for Travelers – Coronavirus in the US," which cautions "*staying home is the best way to protect yourself and others from getting sick.*" (emphasis in original). The list of considerations includes the following: "(a) You can get infected while traveling. (b) Even if you don't have symptoms, you can spread COVID-19 to others while traveling. (c) Being within 6 feet of others increases your changes of getting infected and infecting others. (d) Individuals who have an increased risk of severe illness from COVID-19 should limit their travel. (e) If you get infected while traveling you can spread COVID-19 to loved ones when you return, even if you don't have symptoms."[35]

75. Every stage and mode of travel involves significant risks of exposure for the traveler. According to the CDC, "airports, bus stations, train stations, and rest stops are all places travelers can be exposed to the virus in the air and on surfaces. These are also places where it can be hard to social distance (keep 6 feet apart from other people)."[36]

---

[34] Benedict Carey and James Glanz, *Travel from New York City Seeded Wave of U.S. Outbreaks*, The New York Times, May 7, 2020. Available at: https://www.nytimes.com/2020/05/07/us/new-york-city-coronavirus-outbreak.html (last visited July 6, 2020).

[35] *Considerations for Travelers – Coronavirus in the US,* Centers for Disease Control and Prevention, Updated June 28, 2020. Available at: https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html (last visited July 6, 2020).

[36] *Id.*

76.    Travel by car involves "[m]aking stops along the way for gas, food, or bathroom breaks [which] can put you and your traveling companions in close contact with other people and surfaces." [37]

77.    All airports pose a risk of COVID-19 due to the need to stand in security lines, as well as exposure to high contact surfaces, close proximity to others, and spending extended periods of time in an indoor environment.[38]

78.    The amount of time spent in airports in cities with higher cases counts increases one's risk of exposure to an infected person or surface.

79.    This means traveling from, laying over, and arriving into cities with higher case counts increases one's risk of exposure, as well.

80.    Air travel itself, separate from the hazards of being in airports, can lead to numerous risks of transmission.

81.    The risk of transmission inside an airplane depends in small part on the number of individuals on a plane, and the amount of space left between them, but, according to at least one airline executives, social distancing is largely impossible on planes.[39]

---

[37] *Id.*

[38] *Id.*

[39] Where some airlines have promised to block middle seats as a safety precaution, Josh Earnest, United's chief communications officer, said on July 1 that blocking middle seats is just a public relations strategy. "When you're onboard the aircraft, if you're sitting in the aisle, and the middle seat is empty, the person across the aisle is within six feet from you, the person at the window is within six feet of you, the people in the row in front of you are within six feet of you, the people in the row behind you are within 6 feet of you." Chris Fuhrmeister, *Delta reiterates middle-seat policy after criticism from United*, Atlanta Business Chronicle, July 1, 2020. Available at: https://www.bizjournals.com/atlanta/news/2020/07/01/delta-blocking-middle-seat-united-criticism.html (last visited July 5, 2020).  In other words, there is no way to social distance on commercial airlines.

82.    Universal mask wearing, especially on long flights during which passengers must remove their masks to eat or drink, is largely unenforceable. Air circulation on planes may not be uniform or subject to the control of an individual passenger.  A fellow traveler, for example, may choose to increase the air flow from his personal vent or point it away from himself, towards another passenger.

83.    Taking cabs and other car services leads to close contact with the driver, who may spread the virus.  A study from Zhuhai, China found that sharing a car with someone infected significantly increased the risk of that person then becoming infected. [40]  In addition, if cab owners do not wipe down the interior after each passenger, there may be residual risk of infection from the prior trip.

84.    The risk of infection from using public restrooms varies, depending on how often and how thoroughly they are cleaned.  However, the distance between bathroom stalls and sinks may not provide adequate distancing, especially in an environment that may seem private enough for one to remove his or her mask. And, as noted earlier, new information indicates that COVID-19 may also be transmissible through aerosolized fecal contact.

85.    The risks from staying in a hotel includes the virus remaining on surfaces if rooms were not properly cleaned. This may occur if staff who clean the rooms are infected but are not taking proper precautions (wearing a mask, washing their hands, etc.) or are engaging in any improper cleaning practices (using cleaners that are too weak, for instance).[41]

---

[40] Jian Wu et al., "Household Transmission of SARS-CoV-2, Zhuhai, China, 2020," *Clinical Infectious Diseases: An Official Publication of the Infectious Diseases Society of America*, May 11, 2020, Available at: https://doi.org/10.1093/cid/ciaa557 (last visited July 6, 2020).

[41] Maggie O'Neill, *Is it safe to stay in a hotel during COVID-19?  What you need to know before you plan a vacation*, Health, May 22, 2020.  Available at: https://www.health.com/condition/infectious-diseases/coronavirus/is-it-safe-to-stay-in-a-hotel-

86.    During check-in, as well, it may be difficult to remain 6 feet or more from others, including guests and staff. It may also be difficult to avoid elevators which present a risk of infection, as they are a close, confined space. Individuals who are infected may touch the buttons or join others in the elevator, thus exposing others to the virus.

87.    It is presumably for these reasons that federal government agencies, including the DOJ and the BOP suspended most official travel.  *See Federal Bureau of Prisons COVID-19 Action Plan: Agency-wide Modified Operations*, March 13, 2020;[42]  *Memorandum from Lee Lofthus, Assistant Attorney General for Administration to Heads of Department Components and United States Attorneys*, U.S. Department of Justice, Justice Management Division, May 18, 2020.[43]  *See also, Federal Judiciary COVID-19 Recovery Guidelines*, at p. 9, April 24, 2020

during-covid-19 (last visited July 6, 2020).  *See also Coronavirus Disease 2019 (COVID-19) Personal and Social Activities*, Centers for Disease Control and Prevention, updated June 15, 2020.  Available at:  https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/personal-social-activities.html#hotel (last visited July 6, 2020).

[42] Available at:  https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited July 5, 2020).

[43] Available at:  https://www.justice.gov/doj/page/file/1284406/download (last visited July 5, 2020).  In this memorandum, it was announced that "[o]nly essential travel is permissible in Phase 1.  Staff traveling to areas that still have significant levels of COVID-19 cases must follow the CDC quarantine guidelines before returning to the office.  … [T]ravel to significant outbreak areas should be considered only in light of the state/locality operating announcements and, as noted above, travelers are subject to the CDC post-travel isolation guidelines.  *As a general matter*, routine travel for discretionary training, events, conferences, speeches and the like should continue to be postponed in Phase 1 and Phase 2 (considering both departure points and destinations). … In July we will assess whether we can more broadly return to in-person even scheduling and travel."  (emphasis added.)

In this same memorandum, DOJ "recognizes that some employees are in vulnerable populations or may be at higher risk for severe illness, or are caring for family members or others in these groups. . . . Those at higher risk for severe illness include individuals who are over 65 years of age and people of all ages with underlying medical conditions, particularly if not well controlled, including those who suffer from chronic lung disease, moderate to severe asthma,

(requiring employees to maximize physical distance from others;  instructing all vulnerable individuals so continue teleworking, including employees who live with or provide care for vulnerable individuals to "reduce chances that they could carry the virus to these vulnerable individuals," and notably, "MINIMIZE PERSONAL TRAVEL (i.e., leisure travel, non-business related) and adhere to CDC guidelines and local state orders regarding travel destination and potential for self-isolation upon return." [44]

## VI.    Attending Mr. Lee's Execution Will Place Plaintiffs at Great Risk of Contracting COVID-19.

88.      Plaintiff Earlene Branch Peterson is 81 years old and has congestive heart failure. She lives in Hector, Arkansas, at a distance of roughly 500 miles from FCC Terre Haute.

89.      Plaintiff Kimma Gurel is over 60 years old and has underlying health conditions that put her at increased risk.  She lives in Spokane Valley, Washington, a distance of more than 2,000 miles from FCC Terre Haute.

90.      Plaintiff Monica Veillette has asthma. She lives in Deer Park, Washington, a distance of roughly 2,000 miles from FCC Terre Haute.

91.      As noted above, the greatest risks for transmission of COVID-19 result from spending time in an enclosed indoor space without the ability to maintain social distancing and where one is in contact with someone who has the virus.  Wearing masks does not protect the

---

serious heart conditions, immune disorders, obesity, diabetes, or chronic kidney or liver disease should work with supervisors to continue telework."  These employees are to be afforded workplace flexibilities to "help reduce the chances that they could carry the virus to these vulnerable individuals."

[44] Available at:  https://www.fedbar.org/wp-content/uploads/2020/04/Federal-Judiciary-COVID-19-Recovery-Guidelines.pdf (last visited July 5, 2020).

wearer, and one's eye membranes are an entry point for the virus. Sharing toilet facilities creates additional risk, as fecal matter may be aerosolized when one flushes a toilet, and surfaces within a bathroom may become contaminated.

92.    For the Plaintiffs to witness Mr. Lee's execution, they would of necessity be in contact with many other people in close proximity to them.

93.    Upon information and belief, Plaintiffs will not be permitted to come to the prison grounds on their own but will be escorted there by BOP personnel.

94.    Upon information and belief, Plaintiffs will be brought into the main prison and kept there for some period of time before being escorted to the execution facility.

95.    Prisons are known to have poor infection control mechanisms available, and are often hotspots for infectious diseases, including SARS-CoV-2, as well as HIV, tuberculosis, hepatitis viruses, influenza, and others.[45]

96.    As with other contaminate environments, like nursing homes, to receive basic necessities, prisoners are required to interact with numerous correctional officers daily: to receive food, receive medication, be let outside into recreational facilities. One infected correctional officer can spread infections between different areas of the prison.

---

[45] Joseph A. Bick, "Infection Control in Jails and Prisons," *Clinical Infectious Diseases: An Official Publication of the Infectious Diseases Society of America* 45, no. 8 (October 15, 2007): 1047–55, https://doi.org/10.1086/521910;  C. Raina MacIntyre et al., "Impact of Tuberculosis Control Measures and Crowding on the Incidence of Tuberculous Infection in Maryland Prisons," *Clinical Infectious Diseases* 24, no. 6 (June 1, 1997): 1060–67, https://doi.org/10.1086/513632;  Masoud Dara et al., "Tuberculosis Control in Prisons: Current Situation and Research Gaps," *International Journal of Infectious Diseases*, Special Issue: Commemorating World Tuberculosis Day 2015, 32 (March 1, 2015): 111–17, https://doi.org/10.1016/j.ijid.2014.12.029.

97.    As noted above, the screening of staff conducted at FCC Terre Haute, including USP Terre Haute, does not provide adequate measures to detect infected staff members or other personnel with whom Plaintiffs might have to interact.

98.    It is evident the screening measures at FCC Terre Haute, including USP Terre Haute, have permitted the virus to gain entry there because prisoners have contracted the virus, and at least one inmate has died of COVID-19.[46]

99.    The Government's plan for the execution involves "activation of the execution team, which consists of 40 BOP staff members," who normally conduct a "wide range of correctional and administrative positions" and who will spend several days before the execution practicing and preparing for the execution.[47]

100.    In addition to the 40 members of the execution team, the BOP protocol involves approximately 200 FCC Terre Haute staff who will perform security and support for the execution.[48] These staff are "pulled away from their normal duties," including, for example, preparation of prisoners' meals.[49] The plans for the execution also involve specialized BOP teams with 50 individuals traveling to FCC Terre Haute from other prisons.[50] Approximately 300 BOP

---

[46]*COVID-19 Cases*, BOP.gov, July 5, 2020.  Available at: https://www.bop.gov/coronavirus/ (July 6, 2020).

[47] *See In re Matter of Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-145-TSC, Declaration of Rick Winter ("Winter Dec."), ECF No. 54 (D.D.C. No. 21, 2019), ¶5.

[48] *Id.* at ¶8.

[49] *Id.*

[50] *Id.* at ¶10.

and FCC Terre Haute staff will be supplemented by additional staff from various federal, state, and local law enforcement agencies to provide additional security.[51] Many of these individuals will be traveling by air and staying in local hotels.[52]

101.    The execution protocol requires the Director of the BOP to select eight witnesses to the execution, including members of the victim's family.[53] Plaintiffs will thus presumably be in the company of any other individuals selected, who will likely also have been involved in interstate transit to attend the execution, and who will not have been in quarantine prior to being in close quarters with Plaintiffs.

102.    The execution "house," which consists of several small, cramped rooms, is located on the FCC Terre Haute grounds.[54] It is a small, single story building, like a small home.[55] For the execution, witnesses, including the Plaintiffs, are shuttled in a small van to the facility from the main correctional complex, to clear a security checkpoint.[56] They are then escorted by BOP personnel through separate entrances to four small, cramped viewing rooms for each of the various groups of witnesses, including a room for media, a room for Government witnesses, and a room for the victims' family members—to witness the execution.[57]

---

[51] *Id.* at ¶7.

[52] *Id.* at ¶5.

[53] *See* Exh. A, Ch. 1, III.G.1.c.(1), 10-11.

[54] *See* Motion for Preliminary Injunction, *Hartkemeyer v. Barr, et al.*, No. 2:20-cv-0036-JMS-MJD (S.D. Ind. July 2, 2020), Exh. D, Declaration of Timothy Floyd, ¶¶ 4-5.

[55] *Id.*

[56] *Id.* at ¶¶ 4, 9.

[57] *Id.* at ¶9.

103.     At each stage of these proceedings, which are likely to last several hours, Plaintiffs will be in the company of Defendants' staff and other witnesses in circumstances during which social distancing is not possible.

104.     At each stage of these proceedings, which are likely to last several hours, Plaintiffs will be captive participants, unable to walk away if their escorts, other personnel, or other witnesses remove their masks, and/or potentially exposed to COVID-19 due to its being on hard surfaces.

105.     At each stage of these proceedings and their travel to participate in them, Plaintiffs face grim risks of exposure to COVID-19, a disease which for these vulnerable Plaintiffs, could prove lethal.

## Cause of Action
### Agency Action in Violation of 5 U.S.C. § 706(2)(A)

106.     Plaintiffs reallege and incorporate by references all of the preceding paragraphs of the Complaint as if they were set forth fully below.

107.     The APA states that a reviewing court "shall … hold unlawful and set aside agency action" that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.SC. §706(2)(A).

108.     The agency action here — the setting of Mr. Lee's execution date for July 13, 2020 — is both (1) arbitrary and capricious; and (2) "not in accordance with law."

109.     Defendants acted arbitrarily and capriciously because, in setting Mr. Lee's execution date, they failed to consider important issues, including the effect of COVID-19 on

Plaintiffs' rights to attend the execution. As alleged above, Defendants have directly impaired such rights because Plaintiffs can attend the execution only if they put their own lives at risk.

110.    Defendants' action is also "not in accordance with law" because it effectively nullifies 28 U.S.C. § 26.4, which, in combination with the Protocol, states that Plaintiffs are entitled to attend Mr. Lee's execution. As a result of Defendants' action, Plaintiffs' rights to the attend the execution have been rendered illusory.

111.    Defendants easily could have avoided the foregoing violations of the APA by delaying the setting of Mr. Lee's execution date until such time as the COVID 19 abates sufficiently so as to allow for safe travel and indoor gathering or there is an effective vaccine. However, without good cause, Defendants have refused to change Mr. Lee's execution date.

112.    An actual controversy exists between the parties regarding Defendants' action and, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, Plaintiffs request that the Court declare their rights in connection with the setting of Mr. Lee's execution date.

113.    Accordingly, the Court should hold that Defendants have acted unlawfully, in violation of 5 U.S.C. § 706(2)(A), and it should issue a declaratory judgment setting aside Defendants' selection of July 13, 2020 as Mr. Lee's execution date.

114.    In addition, the Court should enter injunctive relief, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, barring Defendants and their agents from establishing a new execution date until they demonstrate to the Court that Plaintiffs will not be exposed to an undue health risk by attending Mr. Lee's execution.

## Request for Relief

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and that the Court:

a.  Grant a declaratory judgment finding that carrying out Mr. Lee's execution during a pandemic caused by SARS-CoV-2 and national health emergency without a vaccine or treatment available for COVID-19 infringes on and constructively prevents Plaintiffs' exercise of their legal right to attend the execution;

b.  Grant a declaratory judgment finding that the scheduling of Mr. Lee's execution during a national health emergency that creates substantial health risks to Plaintiffs is arbitrary and capricious action, and set aside the warrant of execution;

c.  Grant injunctive relief prohibiting the BOP from carrying out the execution until treatment or a vaccine is available;

d.  Award attorney's fees and costs as the Court deems equitable and just; and

e.  Award such other and further relief as the Court deems equitable and just.

Respectfully submitted

/s/ H. Baker Kurrus

H. Baker Kurrus, PLLC
10816 Crestdale Lane
Little Rock, AR 72212
Phone: (501) 831-0325
Email:  Bkurrus@aol.com
Arkansas Bar No. 80082

*Attorney for Plaintiffs*

Dated:  July 7, 2020