**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| DALE HARTKEMEYER (AKA SEIGEN), | : | |
|  | : | |
| Plaintiff, | : | Case No. 2:20-CV-00336-JMS-MJD |
|  | : | |
| v. | : | |
|  | : | |
| WILLIAM P. BARR, in his official capacity as the Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons; and T.J. WATSON, in his official capacity as the Complex Warden for the United States Penitentiary, Terre Haute, | : : : : : : : : | |
|  | : | |
| Defendants. | : | |
|  | : | |

**MEMORANDUM IN SUPPORT OF THE MOTION OF**
**FATHER MARK O'KEEFE TO INTERVENE AS A PLAINTIFF**

Father Mark O'Keefe, a Roman Catholic priest and a member of the Order of St. Benedict (Ordo Sancti Benedicti), respectfully moves to intervene as a plaintiff as of right under Rule 24(a)(2), or alternatively, for permissive intervention under Rule 24(b). Counsel is informed that Plaintiff takes no position on Father O'Keefe's request for intervention and Defendants indicated that they would likely oppose intervention.

**INTRODUCTION**

Father O'Keefe, a Catholic Priest, is the designated spiritual advisor to Dustin Lee Honken, a federal inmate who is currently scheduled to be executed on July 17, 2020. Mr. Honken has requested that Father O'Keefe, as spiritual advisor, be present with him at his execution, to minister to him and to offer him the sacraments prescribed by the Catholic Church for the dying. For Father

1

O'Keefe, this is a sacred obligation and represents among the most important roles that he can play as a Catholic priest, shepherding a soul into the next life in the grace of God.

By scheduling Mr. Honken's execution in the midst of the novel Covid-19 pandemic, the Government has arbitrarily and substantially burdened, and will continue to arbitrarily and substantially burden, Father O'Keefe's exercise of his religion, by putting him in a position where he can exercise his spiritual obligation to minister to Mr. Honken only at the cost of putting himself, and others to whom he ministers outside the prison, to a heightened and unnecessary risk of Covid-19 exposure, which carries the possibility of serious health complications and even death. Father O'Keefe seeks to prohibit the Government from carrying out Mr. Honken's execution until Father O'Keefe can carry out his sacred religious duty without jeopardizing his life and health in the middle of a surging pandemic, such as when an effective course of treatment and a vaccine becomes available.  To this end, Father O'Keefe seeks injunctive and declaratory relief, pursuant to 28 U.S.C. §§ 1331, 1343, 2201(a), and 2202, for (i) violation and threatened violation of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq*.; and (ii) violations of the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*  The proposed intervenor complaint is attached as Exhibit A, and Father O'Keefe's declaration in support is attached as Exhibit B.

Father O'Keefe's claims, and the underlying facts and legal rights, mirror those at issue in the instant suit filed by plaintiff Dale Hartkemeyer (aka Seigen), who is a Buddhist priest who ministers to another inmate under death warrant, Wesley Purkey.  Mr. Purkey's execution is scheduled for July 15, 2020, two days before Mr. Honken's.  Rev. Hartkemeyer is 68 years old, and Father O'Keefe is 64 years old.  Rev. Hartkemeyer seeks to prohibit the Government from carrying out Mr. Purkey's execution at this time on the same legal grounds and for much the same

reasons cited by Father O'Keefe.  However, Rev. Hartkemeyer seeks relief only as to himself and his religious duty to minister to Mr. Purkey.

As it stands, the instant suit does not advance or protect the rights of Father O'Keefe. Without intervention, Father O'Keefe would be left with the worst of both worlds:  no relief from the burden on his religious practice if Rev. Hartkemeyer's claims succeed, and no say to counter the Government's arguments.  As the Seventh Circuit has recognized this is "[t]he strongest case for intervention." *Solid Waste Agency of N. Cook v. United States Army Corps of Eng'rs*, 101 F.3d 503, 506 (7th Cir. 1996).  Father O'Keefe is therefore entitled to intervention as of right under Rule 24(a)(2), or alternatively, permissive intervention under Rule 24(b).

**FACTUAL BACKGROUND**

Father Mark O'Keefe is a Roman Catholic priest and a member of the Order of St. Benedict (Ordo Sancti Benedicti).  He is a Professor of Moral theology at Saint Meinrad Seminary and School of Theology.  On a volunteer basis, he also ministers to inmates at the United States Penitentiary in Terre Haute, Indiana (USP Terre Haute).  He is the designated spiritual adviser to Dustin Lee Honken.  He is a U.S. citizen and resides in Indiana.

**A.      Father O'Keefe's Crucial Role as Spiritual Advisor to Dustin Lee Honken.**

Father O'Keefe is accredited by the BOP to minister—and before the Covid-19 pandemic, routinely did minister—to inmates at Terre Haute USP, including those on death row.  In this capacity, Father O'Keefe has ministered to Dustin Lee Honken, meeting with him  one-on-one several times.  Mr. Honken is a death row inmate whose execution is scheduled for July 17, 2020. Mr. Honken has been a sincere, practicing Catholic for more than ten years.  He attends Catholic Mass and receives Communion regularly; he receives Catholic ministry regularly; and he believes sincerely in the Catholic faith.

On June 23, 2020, Mr. Honken made a written request to BOP that he be allowed "to choose a Catholic priest or bishop to be in my immediate presence in the execution chamber before and during my execution. . . . Please let me know if this will be approved and by when I should provide the name of my chosen priest or bishop."  On June 30, 2020, Mr. Honken designated Father O'Keefe as the spiritual advisor to attend his execution pursuant to 28 C.F.R. § 26.4(c)(3)(i), and requested that Father O'Keefe be permitted to accompany Mr. Honken in the execution chamber. And, on or about July 5, 2020, the BOP approved Mr. Honken's request to have Father O'Keefe attend his execution as his spiritual advisor, including to be present with him in the execution room, with certain limitations.

Mr. Honken seeks Father O'Keefe's presence at the execution to permit Mr. Honken to receive the sacraments prescribed by the Catholic Church for the dying, which only an ordained priest can administer.  Father O'Keefe, consistent with Catholic teachings and his duty as a Catholic priest, seeks to assist Mr. Honken in availing himself of the redemption that the death of Jesus offers at the critical hour and moment of his death.

Having been asked to fulfil this important role, Father O'Keefe feels spiritually and morally duty-bound to honor the request, and to be present at Mr. Honken's execution to administer the sacraments and to minister to him as he is put to death.  Confession and true contrition are a key part of the Catholic sacrament originally referred to as Extreme Unction, or what is commonly called Last Rites or Anointing of the Sick.  Last Rites is no mere ritual but one of the seven holy sacraments (Baptism, Confession, Communion (Eucharist), Confirmation, Marriage, Ordination, Last Rites), and can be administered only by an ordained Catholic priest.  The guidance and accompaniment of a priest, and the Last Rites and the sacraments of the Eucharist and Confession

which Mr. Honken seeks, helps the dying avail themselves of the redemption offered by Jesus for eternal life with God.

Father O'Keefe's presence at the execution is critical to Mr. Honken's exercise of his religion, is also critical to the exercise of Father O'Keefe's religion, and is critical to their shared exercise of their religion. As a Catholic priest, Father O'Keefe feels (and is) obligated to minister to those seeking God's grace, particularly at the critical moment of death. His sincerely-held religious beliefs compel him to accede to Mr. Honken's request to be present at his execution, to administer the sacraments that may enable Mr. Honken to seek salvation, and to prepare Mr. Honken to enter the next life in a state of God's grace. The Catholic Church teaches, and Father O'Keefe sincerely believes, that this is one of the most important roles that a priest can possibly play in helping a member of the flock achieve salvation.

**B.      Clergy Presence at Executions in Catholic and American Traditions.**

In Christianity, the tradition of clergy presence at the time of death derives from Jesus Christ's execution and ministry to the men being crucified alongside him. *See Luke* 23:42-43 (assuring the repentant criminal, "today you shall be with me in Paradise"). The belief that a person's dying moments are critical to salvation has long persisted. *See, e.g.*, Ralph Houlbrooke, *Death, Religion, and the Family in England, 1480-1750* 147–49 (1998) ("The last moments of life were believed to be crucially important during the later Middle Ages. . . . [A]t this critical juncture, the Church offered help generally regarded as indispensable in making a safe departure from the world . . . .").

The Catholic Church teaches that the final moments offer a unique final chance to prepare for "our heavenly homeland" and for pardon and redemption. *See Catechism of the Catholic Church* §§ 1525; 1524 (concerning viaticum administered to those "at th[e] moment of 'passing

over' to the Father"); 1501-1502 (effect of expected death on discernment); § 1013 (moment of death "decides [man's] ultimate destiny"). This tradition remains an important part of modern Catholicism: "The presence of a priest or deacon shows more clearly that the Christian dies in communion with the church," and is "intended to help the dying person, if still conscious, to face the natural human anxiety about death by imitating Christ in his patient suffering and dying." Liturgy Training Publications, *The Liturgy Documents Volume Two: Essential Documents for Parish Sacramental Rites and Other Liturgies* 228 (2nd ed. 2012).[1]

Throughout American history, clergy have accompanied condemned prisoners in their last moments. *See* Stuart Banner, *The Death Penalty: An American History* 1 (2002) (recounting execution where the condemned asked a clergyman to read his final words for him). At the nation's founding, a clergyman's "execution sermon" from the scaffold went hand-in-hand with "the formulaic lives, last words, and dying confessions of the prisoner[.]" Louis P. Masur, *Rites of Execution: Capital Punishment and the Transformation of American Culture 1776-1865* 26 (1989). This clerical role "was so routine that in 1791 William Smith could publish a guide-book for ministers [that contained] suitable devotions before, and at the time of Execution." *Id.* at 18.[2]

---

[1] *See also Pope encourages group working to end use of death penalty*, Cath. News Agency (Feb. 27, 2019), https://www.catholicnewsagency.com/news/pope-encourages-group-working-to-end-use-of-death-penalty-89197 (Pope stating that, in executions, "there should at the very least be clergy available to hear a person's confession and offer reconciliation, even up to the moment of death.").

[2] Unsurprisingly, these American traditions were similar to English practices during the colonial era. *See, e.g.*, Randall McGowen, *The Body and Punishment in Eighteenth-Century England*, 59 J. Mod. Hist. 651, 651 (1987) ("The condemned . . . were accompanied by a clergyman who shadowed their last moments urging them to repent or consoling them with the offer of divine forgiveness.").

6

Federal executions have long followed this tradition. The first known federal execution, the hanging of Thomas Bird in 1790,[3] incorporated "solemn religious exercises." *See Portland*, Cumberland Gazette, June 28, 1790, at 3. Mr. Bird's final statement closed with a prayer for divine forgiveness. *The Dying Speech of Thomas Bird, executed at Portland, June 25, 1790, for the murder of Capt. John Connor, on board the Mary, near the coast of Africa, taken from his mouth on the last day of his life*, Cumberland Gazette, July 26, 1790 at 4. As in other executions of the day, the condemned man's exercise of religion with and through clergy continued to the place and time of death. *See May 10*, Vergennes Gazette & Vt. & N.Y. Advertiser, May 29, 1800, at 3 (reporting federal executions in which condemned prisoners were "attended to the place of execution" by clergymen, where they prayed and expressed contrition); *The Execution of Edward F. Douglass and Thomas Benson for the Murder of Ava A. Havens*, Bos. Herald, Jul. 28, 1851, at 1 (reporting federal executions in which clergymen accompanied and embraced condemned prisoners on the gallows, and then conveyed their final declarations of innocence).

The tradition of clergy accompaniment during federal executions has since been incorporated into firing squads, *see* R. Michael Wilson, *Legal Executions in the Western Territories, 1847-1911*, 173 (2010); the gas chamber, *see Arthur Brown Executed In Gas Chamber*, Streator Daily Times-Press, Feb. 24, 1965, at 1; and electrocutions, as when a rabbi accompanied Ethel and Julius Rosenberg to the electric chair in 1953, *see* Jack Woliston, *Rosenbergs go silently to electric chair*, UPI (June 20, 1953), https://www.upi.com/Archives/1953/06/20/Rosenbergs-go-

---

[3] *See* "Historical Federal Executions," United States Marshals Service, *available at* https://www.usmarshals.gov/history/executions.htm (last checked July 3, 2020).

silently-to-electric-chair/5084629411212/.[4]  Today, the right to a spiritual advisor at executions is

memorialized in BOP regulations.  28 C.F.R. § 26.4(c)(3)(i).

### C.  The Grave Risks Imposed by Scheduling Mr. Honken's Execution During the Covid-19 Pandemic

The scheduling of Mr. Honken's execution during the ongoing Covid-19 pandemic means

that Father O'Keefe can exercise his sincerely-held religious beliefs and practices, as provided in

Catholic teachings and as requested by Mr. Honken, only by putting himself, and those he ministers

to outside the prison, at serious risk of infection and even death.

### i.  The Serious Health Risks Posed by Covid-19

Covid-19 is a highly contagious and deadly respiratory disease caused by a novel

coronavirus known in the scientific community as SARS-CoV-2.  The death rate of Covid-19 is

estimated to be several times higher than that of the common flu that kills thousands a year.[5]  The

World Health Organization estimates that one in five people who contract the disease becomes

seriously ill.[6]  There is currently no available vaccine or cure for Covid-19 infections.

According to the Centers for Disease Control and Prevention (CDC), a person's risk for

severe illness from Covid-19 increases with age, rising significantly after the age 50.[7]  Patients

aged 50-64 account for approximately 15 percent of Covid-19 deaths; patients aged 65-74 account

---

[4] *See also* Ari L. Goldman, *Rabbi Irving Koslowe, 80; Gave Rosenbergs Last Rites*, N.Y. Times, Dec. 8, 2000, at C15 (describing the same rabbi's attendance at 17 executions where "[h]e would go into the execution chamber, stand opposite as the inmate was strapped into the electric chair, and stay until the end").

[5] *See Expert Responses*, University of Tennessee Health Science Center, https://uthsc.edu/coronavirus/expert-responses.php (last visited Jul. 6, 2020) (estimating that the morbidity rate of Covid-19 is "100s of times worse than influenza").

[6] *See* https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited Jul. 6, 2020).

[7] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html

for approximately 21 percent of deaths; and patients aged 75-84 account for approximately 26 percent of deaths.[8]

Patients who experience severe infections from Covid-19 require supportive care, including recourse to scarce medical equipment and specialized care providers who are able to monitor and implement such care. This level of support can exceed local health-care resources. Patients who survive severe Covid-19 infections often require extensive rehabilitation to mitigate neurological damage and the loss of respiratory capacity. Many who suffer from severe infections will likely experience lifelong limitations and disabilities.

The disease is spread, among other ways, by airborne droplets released by infected individuals.  Infected droplets can survive on surfaces for some period of time, ranging from four hours to up to three days on certain surfaces.  Health experts also believe that the virus can linger in the air well after an infected person coughs or breathes, particularly in poorly ventilated areas.[9] The risk of transmission is also exacerbated when multiple individuals are in close proximity in an indoor setting, particularly (though not exclusively) when social distancing is not possible.  Both asymptomatic and pre-symptomatic individuals can unwittingly transmit the disease.

Indiana Governor Eric Holcomb first declared a state-wide public health disaster emergency in response to the Covid-19 virus on March 6, 2020.[10]  On March 23, 2020, in light of

---

[8] Centers for Disease Control and Prevention, Demographic Trends of Covid-19 cases and deaths in the US reported to CDC (updated Jul 6, 2020), https://www.cdc.gov/covid-data-tracker/index.html#demographics.

[9] *See* https://www.nytimes.com/2020/07/04/health/239-experts-with-one-big-claim-the-coronavirus-is-airborne.html (last visited Jul. 6, 2020).

[10] *See* https://www.in.gov/gov/files/20-02ExecutiveOrder(DeclarationofPublicHealthEmergencyforCOVID-19)FINAL.pdf

the serious threat posed by Covid-19, Governor Holcomb expanded his March 6th Order by requiring the denizens of Indiana to stay at home except for essential travel, for all non-essential businesses to close, for all public gatherings of over ten people to be prohibited, and imposing social distancing requirements, among other things.[11]

Although limited steps have been taken to re-open Indiana, Governor Holcomb extended the declaration of a state-wide public health disaster emergency several times over the past several months.  As recently as July 1, 2020, Governor Holcomb extended the emergency until at least August 3, 2020.[12]

On March 23, 2020, the Supreme Court of Indiana declared a public health emergency and required all counties to submit plans to deal with the tolling of speedy trials, the suspension of jury trials, the release of non-violent prisoners, the suspension of issuing civil attachments and body warrants, and other measures related to the public health crisis.[13]  After each county submitted their plans, the Indiana Supreme Court extended the deadlines for these life-saving measures several times.[14] The most recent order of the Indiana Supreme Court addressing trial court practice was issued on May 29, 2020, which further extended the tolling of speedy trial rights through August 14, 2020, extends the suspension of civil attachments and body warrants until August 15,

---

[11] *See* https://www.in.gov/gov/files/Executive_Order_20-08_Stay_at_Home.pdf.

[12] *See* https://www.in.gov/gov/files/Executive%20Order%202020-34%20Extention%20of%20the%20Public%20Health%20Emergency.pdf.

[13] *See* https://www.in.gov/judiciary/files/order-other-2020-20S-CB-123a.pdf

[14] *See* https://www.in.gov/judiciary/3679.htm.

2020, and extends the use of remote proceedings through January 1, 2021.[15] The Indiana Appellate Court likewise issued an Order suspending all in-person filing requirements until further notice.[16]

In federal court, the Southern District of Indiana has issued a General Order continuing jury trials (currently through July 20), conducting most civil proceedings via teleconference (currently until August 17), conducting most criminal proceedings via teleconference (currently until July 20), and postponing naturalization ceremonies (currently until August 13).[17]

It is well established that the risk of exposure to and transmission of infectious diseases, as well as the potential harm to those who become infected, is significantly higher in jails and prisons than in the community. BOP recognizes the serious risks of Covid-19 transmission within the prison population and to those who come in contact with the prison population. On March 13, 2020, BOP closed the doors of every federal prison across the country to visitation, including visits by accredited religious volunteers such as Father O'Keefe.

On June 15, 2020, while federal prisons around the country remained essentially on lockdown to prevent the spread of Covid-19, the Department of Justice announced that it had scheduled four executions at USP Terre Haute within a matter of weeks, including Mr. Honken's execution for July 17, 2020. The Covid-19 pandemic has continued unabated in the United States, and indeed has worsened, since that time. The BOP has indicated that it will reinstate visits for Mr. Honken and the other three inmates under death warrant, but it continues to prohibit other inmate visits, including spiritual advisor and legal visits. To this day, the BOP website features a

---

[15] *See* https://www.in.gov/judiciary/files/order-other-2020-20S-CB-123k.pdf.

[16] *See id.*

[17] *See* https://www.insd.uscourts.gov/sites/insd/files/Court%20General%20Order%20RE%20COVID-19%20-%203-19-20.pdf

prominent advisory that "all visiting at [USP Terre Haute] has been suspended until further notice."[18]  Just this morning, on July 7, 2020, Father O'Keefe received an email from USP Terre Haute staff stating:  "FCC Terre Haute is NOT allowing volunteer entry the Complex at this time.  Additionally, all training has been postponed.  We will contact you with further information, once it becomes available."  (original emphasis).

The Government's plan for the upcoming executions involves a 40-person execution team, as well as the reassignment of approximately 200 prison employees from their normal duties to assist with security and support the executions.  It entails individuals converging in Terre Haute from around the country, thereby facing potential exposure to Covid-19 on planes, in airports, and in hotels, and causing others to be exposed as well. These individuals will then convene and mix in enclosed spaces with BOP staff drawn from around a prison with known Covid-19 cases for group training, practices, meetings, and on-site work, escalating the risks of infection for the prisoners, staff, and ultimately anyone attending the execution, including Father O'Keefe.

Before Mr. Honken's execution, Father O'Keefe and Mr. Honken's lawyers will have to visit with him in the execution facility, sometimes referred to as the "Death House." At the 2003 execution of Louis Jones, Jr., Mr. Jones's attorney, his daughter, and three prison ministers had to stand "shoulder to shoulder" to fit in the room to talk with Mr. Jones before the execution.

The execution facility is a separate facility on the FCC Terre Haute grounds. It is a small, single story building, like a small home. The witnesses and prison staff are shuttled together in a van to the facility from the main correctional complex prior to arriving at separate entrances for various groups of witnesses.  Many of the individuals in attendance will have traveled from other

---

[18] *See* https://www.bop.gov/locations/institutions/thp/ (last visited Jul. 6, 2020).

states in the days immediately preceding the execution, increasing the risk of virus transmission to Father O'Keefe and others in attendance.  Upon information and belief, it will not be possible to maintain social distancing at Mr. Honken's execution.

### ii.    These Health Risks Burden Father O'Keefe's Religious Practice

Father O'Keefe is 64 years old.  He is thus at higher risk of serious complications should he contract Covid-19.

As part of his ministry, Father O'Keefe is a Resident Chaplain for the nuns who are cloistered at the Carmelite Monastery in Terre Haute.  In this capacity, he holds a daily Mass for the cloistered nuns, at which he administers the sacrament of Communion.  Several of the nuns who attend daily Mass as a central part of their own religious practice are over the age of 60 and a few are over 80 years old; they thus are at an increased risk of serious complications in the event they contract Covid-19.

Father O'Keefe understands that his presence at Mr. Honken's execution will expose him to the risk of Covid-19 infection and even death.  He also understands, and the cloistered nuns understand, that if Father O'Keefe continues to hold daily Mass for them following Mr. Honken's execution, as the nuns have requested, he may also expose them to a risk of infection and even death.  He has agreed to risk life and limb, because of his sincerely held belief that he must be available to minister to Mr. Honken at his execution, including to offer Mr. Honken the sacraments that will enable him to seek salvation.  Father O'Keefe nonetheless fears for his health and life, and the health and life of those outside the prison to whom he ministers, as a result of the timing of Mr. Honken's execution in the midst of the pandemic and the risks that he must take in order to carry out his sacred duties as a Catholic priest and as Mr. Honken's spiritual advisor.

By scheduling Mr. Honken's execution to take place in the midst of a pandemic, Defendants have substantially burdened, and will continue to substantially burden, Father O'Keefe's exercise of his religion—to wit, his spiritual and moral obligation to accompany, guide, and assist Mr. Honken at the time and place of his death—by conditioning that religious exercise on Father O'Keefe's willingness to face exposure to the deadly Covid-19 virus. While Father O'Keefe intends to bear this burden rather than deny Mr. Honken in his time of greatest spiritual need, that does not change the significance of the burden that Defendants have placed on Father O'Keefe and his religious practice.

### D.    Procedural History.

On July 2, 2020, plaintiff Dale Hartkemeyer (aka Seigen) filed the instant suit seeking to enjoin the imminent execution of inmate at USP Terre Haute, Wesley Purkey, scheduled for July 15, 2020, two days before Mr. Honken. Mr. Purkey's execution arises from the same June 15, 2020 announcement that set the date for Mr. Honken's execution.

Rev. Hartkemeyer is a Buddhist priest and the spiritual advisor to Mr. Purkey, and Mr. Purkey has requested that Rev. Hartkemeyer minister to him at his death, just as Mr. Honken requested of Father O'Keefe. Like Father O'Keefe, Rev. Hartkemeyer is over 60 years old; he is 68. And like Father O'Keefe, Rev. Hartkemeyer argues that the Defendants are placing an arbitrary and substantial burden on his religious practice by forcing him to choose between, on the one hand, ministering to his congregant at the sacred hour of death and, on the other, avoiding risk to his own life and health and of those close to him. Rev. Hartkemeyer has filed the same claims that Father O'Keefe seeks to bring, against the same Defendants, and relying on much the same facts. Preliminary injunction briefing is ongoing, and the Government filed its opposition papers last night.

But Rev. Hartkemeyer's requested relief is limited to himself and the execution of Mr. Purkey, and does not extend to Father O'Keefe and the execution of Mr. Honken. Father O'Keefe therefore respectfully requests to intervene in this action so that he can realize the benefit of any judicial relief and have a say in in the outcome, particularly where an adverse ruling on the legal and factual issues would directly impair his own protected interests.

**ARGUMENT**

I.    **FATHER O'KEEFE SATISFIES THE REQUIREMENTS FOR INTERVENTION AS OF RIGHT.**

Rule 24 authorizes intervention as of right if the movant meets four elements: "(1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and (4) lack of adequate representation of the interest by the existing parties to the action." *Planned Parenthood of Wisconsin, Inc. v. Kaul*, 942 F.3d 793, 797 (7th Cir. 2019) (internal quotation marks and citation omitted). "The Court must accept as true all non-conclusory allegations in the motion to intervene and should not deny the motion 'unless it appears to a certainty that the intervenor is not entitled to relief under any set of facts which could be proved under the complaint.'" *Kluge v. Brownsburg Comm. Sch. Corp.*, 432 F. Supp. 3d 823, 856 (S.D. Ind. 2020) (Magnus-Stinson, J.) (quoting *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995)).

A.    **Father O'Keefe's Application Is Timely.**

Father O'Keefe's prompt motion to intervene is timely. Courts "look to four factors to determine whether a motion is timely: (1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; (4) any other unusual circumstances." *State v. City of Chicago*, 912 F.3d 979, 984 (7th Cir. 2019) (internal quotation marks and citation

omitted).  "The test for timeliness is essentially one of reasonableness:  potential intervenors need to be reasonably diligent in learning of a suit that might affect their rights, and upon so learning they need to act reasonably promptly."  *Lopez-Aguilar v. Marion County Sheriff's Dep't*, 924 F.3d 375, 388 (7th Cir. 2019) (citation and internal quotation marks omitted).  Additionally, "when intervention of right is sought, because the would-be intervenor may be seriously harmed if intervention is denied, courts should be reluctant to dismiss such a request for intervention as untimely. . . ."  *Id.* at 388-89.

Father O'Keefe acted with more than reasonable diligence: his  request comes just five days after Rev. Hartkemeyer brought suit.  And he does not seek to disrupt the accelerated briefing schedule on Rev. Hartkemeyer's motion for a preliminary injunction.  Intervention therefore no poses prejudice to the parties.

Refusing intervention would substantially prejudice Father O'Keefe, however.  Rev. Hartkemeyer seeks to enjoin Mr. Purkey's execution until he can perform his duties as spiritual advisor without the burden of  subjecting himself and others to the risk of a widespread and deadly virus with no vaccine and no cure.  Father O'Keefe seeks the same with respect to Mr. Honken's execution, and on the same religious liberty grounds.  Accordingly, adverse findings and rulings on Rev. Hartkemeyer's claims would directly and negatively affect Father O'Keefe, even though he would be denied any opportunity to be heard.  Conversely, any findings and rulings in favor of Rev. Hartkemeyer would not benefit Father O'Keefe, because Rev. Hartkemeyer seeks relief only as to himself, and a favorable ruling may come only after Mr. Honken's July 17 execution date.  Intervention is therefore necessary for Father O'Keefe to have an opportunity to be heard and to obtain relief based on findings and rulings on common, dispositive legal and factual issues.

**B.      Father O'Keefe Meets the Substantive Requirements for Intervention as of Right.**

Father O'Keefe also meets the remaining substantive elements for intervention as of right. Father O'Keefe has "a direct, significant, and legally protectable interest in the question at issue in the lawsuit," and this interest is unique to him, such that disposition of this lawsuit may impair his interest as a practical matter and the existing parties do not adequately represent his interest. *See Kluge*, 432 F. Supp. 3d at 856.

The Seventh Circuit has "interpreted statements of the Supreme Court as encouraging liberality in the definition of an interest." *Lopez-Aguilar*, 924 F.3d at 392. The Supreme Court has embraced a broad definition of the requisite interest, *see Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129 (1967), describing it as one that is "significantly protectable," *Donaldson v. United States*, 400 U.S. 517, 531 (1971). The interest at issue is the right of the spiritual advisor to a condemned inmate to fulfill his sacred religious duty to minister at the time of death—without being compelled to assume the burden of placing at risk his own life and health, as well as the life and health of those close to him.

Rev. Hartkemeyer and Father O'Keefe share in this interest, but each clergy's interest is unique. Rev. Hartkemeyer seeks relief only as to himself, and not as to any other spiritual advisor. As the suit now stands, the only execution that may be enjoined pending the pandemic is that of Mr. Purkey, the inmate ministered by Rev. Hartkemeyer. Accordingly, without intervention, this lawsuit may result in Rev. Hartkemeyer being spared the burden on his religious practice, while Father O'Keefe's burden remains. At the same time, adverse determinations would harm Father O'Keefe. If the Court were to conclude in the course of the lawsuit that, for example, the Government's competing interest in executing prisoners during a surging pandemic is compelling, that the burden on a spiritual advisor under these circumstances is not substantial, or that the

17

Government's decision to proceed with execution is the least restrictive action possible, these findings and rulings would directly impair Father O'Keefe—even though he would have been unable to address the issues beforehand.

As this Court has observed, "the baseline rule is liberal: inadequacy requirement is satisfied if the proposed intervenor shows that the parties' representation of its interest may be inadequate." *Kluge*, 432 F. Supp. 3d at 856 (citation and internal quotation marks omitted). That is the case here, since the ultimate goal of Rev. Hartkemeyer's suit is to protect his own religious rights, and not those of Father O'Keefe too. Unlike in *Kluge*, therefore, the proposed intervenor and the similarly-situated party do not share precisely "the same goal." *See id.* at 857-58. Still, the two clergy share the same fundamental interests in exercising of their sacred religious duty by ministering to a member of their flock at the time of death, and the legal and factual issues are substantially the same.

Without intervention, Father O'Keefe would be left with the worst of both worlds: no relief from his burden if Rev. Hartkemeyer's claims succeed, and no say to counter the Government's arguments. The Seventh Circuit has recognized this as "[t]he strongest case for intervention," one in which "the intervenor-aspirant has no claim against the defendant yet a legally-protected interest that could be impaired by the suit." *Solid Waste Agency of N. Cook v. United States Army Corps of Eng'rs*, 101 F.3d 503, 506 (7th Cir. 1996). Father O'Keefe is therefore entitled to intervention as of right under Rule 24(a)(2).

## II.   ALTERNATIVELY, FATHER O'KEEFE IS ENTITLED TO PERMISSIVE INTERVENTION.

Alternatively, the Court should exercise its discretion to grant Father O'Keefe permissive intervention under Rule 24(b). "On timely motion, the court may permit anyone to intervene . . . who has a claim or defense that shares with the main action a common question of law or fact."

Fed. R. Civ. P. 24(b)(1).  "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  Beyond this consideration, permissive intervention is "wholly discretionary" and the Court has "ample authority to consider a wide variety of factors and mange the litigation before it."  *Kluge*, 432 F. Supp. 3d at 858 (internal quotation marks and citation omitted).

At its core, permissive intervention is "about economy in litigation."  *City of Chicago v. FEMA*, 660 F.3d 980, 987 (7th Cir. 2011).   Father O'Keefe's interests mirror those of Rev. Hartkemeyer, except that Father O'Keefe seeks to bring identical claims directly on his own behalf so he can receive judicial relief.  The legal and factual issues regarding the rights of a spiritual advisor to minister to a condemned prisoner, and the Defendants' interest in executing inmates at USP Terre Haute during this pandemic, are much the same. Judicial economy strongly favors intervention here.  Father O'Keefe does not seek to disturb the current motion schedule, so there is no undue delay or prejudice to the parties.  Without intervention, he will be required to file a separate lawsuit in order to protect his own rights, rather than allowing everyone involved, including the courts, to address these issues together.  "Perhaps the most obvious benefits of intervention in general are the efficiency and consistency that result from resolving related issues in a single proceeding."  *Sec. Ins. Co. of Hartford v. Schipporeit*, 69 F.3d 1377, 1381 (7th Cir. 1995).

19

## CONCLUSION

For the foregoing reasons, Father O'Keefe respectfully requests that the Court either grant his motion for intervention as of right under Rule 24(a)(2), or alternatively, exercise its discretion to grant him permissive intervention under Rule 24(b).

Dated:   July 7, 2020                         Respectfully submitted,

**PROPOSED PLAINTIFF INTERVENOR**
**FATHER MARK O'KEEFE, OSB**

By:      */s/  Abigail A. Clapp*

     Abigail A. Clapp (Ind. Atty. No. 25444-45)
     Greenberg Traurig, LLP
     77 W. Wacker Dr., Ste. 3100
     Chicago, IL   60601
     Tel.    (312) 456-8400
     Fax    (312) 899-0393
     Email   ClappA@gtlaw.com

     Edward C. Wallace*
     Greenberg Traurig, LLP
     200 Park Avenue
     New York, NY 10166
     Tel:  (212) 801-9200
     WallaceE@gtlaw.com

     Michael M. Krauss*
     Greenberg Traurig, LLP
     90 South Seventh Street, Suite 3500
     Minneapolis, MN  55402
     Tel:  (612) 259-9700
     KraussM@gtlaw.com

     Kyle R. Freeny*
     Greenberg Traurig, LLP
     2101 L Street, N.W., Suite 1000
     Washington, DC  20037
     Tel:  (202) 331-3100
     FreenyK@gtlaw.com

     **pro hac vice* motion forthcoming

20

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2020, a copy of the foregoing **Memorandum in Support of the Motion of Father Mark O'Keefe to Intervene as a Plaintiff** was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the court's system.

/s/ Abigail A. Clapp