# EXHIBIT A

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| DALE HARTKEMEYER (AKA SEIGEN), | : | |
| Plaintiff, | : | Case No. 2:20-CV-00336-JMS-MJD |
| | : | |
| v. | : | |
| | : | |
| WILLIAM P. BARR, in his official capacity as the Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons; and T.J. WATSON, in his official capacity as the Complex Warden for the United States Penitentiary, Terre Haute, | : | |
| Defendants. | : | |
| | : | |
| FATHER MARK O'KEEFE, | : | |
| Intervenor Plaintiff, | : | |
| v. | : | |
| WILLIAM P. BARR, in his official capacity as the Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons; and T.J. WATSON, in his official capacity as the Complex Warden for the United States Penitentiary, Terre Haute, | : | |
| Defendants. | : | |

**INTERVENOR PLAINTIFF'S COMPLAINT
FOR INJUNCTIVE AND DECLARATORY RELIEF**

1

Intervenor Plaintiff Father Mark O'Keefe, for his Complaint against Defendants, hereby alleges as follows:

## NATURE OF THE ACTION

1.      Intervenor Plaintiff Father Mark O'Keefe brings this action seeking injunctive and declaratory relief, pursuant to 28 U.S.C. §§ 1331, 1343, 2201(a), and 2202, for (i) violation and threatened violation of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.*; and (ii) violations of the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*

2.      Father O'Keefe is the designated spiritual advisor to Dustin Lee Honken, a federal inmate who is currently scheduled to be executed on July 17, 2020.  Mr. Honken has requested that Father O'Keefe, as spiritual advisor, be present with him at his execution, to minister to him and to offer him the sacraments prescribed by the Catholic Church for the dying.  For Father O'Keefe, this is a sacred obligation and represents among the most important roles that he can play as a Catholic priest, shepherding a soul into the next life in the grace of God.

3.      By scheduling Mr. Honken's execution in the midst of the novel Covid-19 pandemic, the Defendants have arbitrarily and substantially burdened, and will continue to arbitrarily and substantially burden, Father O'Keefe's exercise of his religion, by putting him in a position where he can exercise his spiritual obligation to minister to Mr. Honken only at the cost of putting himself, and others to whom he ministers, to a heightened and unnecessary risk of Covid-19 exposure, which carries the possibility of serious health complications and even death.

## PARTIES

4.      Father Mark O'Keefe is a Roman Catholic priest and a member of the Order of St. Benedict (Ordo Sancti Benedicti).  He is a Professor of Moral theology at Saint Meinrad Seminary

2

and School of Theology.  On a volunteer basis, he also ministers to inmates at the United States Penitentiary in Terre Haute, Indiana (USP Terre Haute).  He is the designated spiritual adviser to Dustin Lee Honken.  He is a U.S. citizen and resides in Indiana.

5.　　　Defendant William P. Barr is the Attorney General of the United States. Attorney General Barr is the highest ranking official in the Department of Justice (DOJ) and has authority over the Bureau of Prisons (BOP), an agency of DOJ.  He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

6.　　　Defendant Michael Carvajal is the Director of the BOP. As Director of the BOP, Defendant Carvajal is charged with directing executions.  Defendant Carvajal is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

7.　　　Defendant T.J. Watson is the Complex Warden of USP Terre Haute. In his position as complex warden, Defendant Watson is charged with management of USP Terre Haute and the oversight and implementation of operations there, including of executions at the prison. Defendant Watson is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

8.　　　Defendants are acting, and each of them at all relevant times were acting, in their official capacities with respect to all acts described herein, and were in each instance acting under the color and authority of federal law. Upon information and belief, unless preliminarily and permanently enjoined, each of the Defendants intends to act in his official capacity and under the authority of federal law in violating Father O'Keefe's religious rights and in exposing Father O'Keefe and others to unnecessary health risks.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because (i) it arises under the laws of the United States; (ii) one purpose of this action is to secure declaratory relief under 28 U.S.C. § 2201(a); (iii) one purpose of this action is to secure preliminary and permanent injunctive relief under 28 U.S.C. § 2202; and (iv) one purpose of this action is to secure equitable relief under an act of Congress providing for the protection of civil rights as described in 28 U.S.C. § 1343.

10.     This Court has venue under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims made by Father O'Keefe have taken place or will take place in this District.

## FACTUAL BACKGROUND

**A.      The Crucial Role of Father O'Keefe as Spiritual Advisor to Dustin Lee Honken**

11.     Intervenor Plaintiff Father O'Keefe is the designated spiritual advisor to death row inmate Dustin Lee Honken.  On June 23, 2020, Mr. Honken made a written request to BOP that he be allowed "to choose a Catholic priest or bishop to be in my immediate presence in the execution chamber before and during my execution. . . . Please let me know if this will be approved and by when I should provide the name of my chosen priest or bishop."

12.     On June 30, 2020, Mr. Honken designated Father O'Keefe as the spiritual advisor he would like to attend his execution pursuant to 28 C.F.R. § 26.4(c)(3)(i), and requested that Fr. O'Keefe be permitted to accompany Mr. Honken in the execution chamber.   Father O'Keefe is accredited by the BOP to minister—and prior to the Covid-19 pandemic, routinely did minister—to inmates at Terre Haute USP, including those on death row.  In this capacity, Father O'Keefe has met with Mr. Honken one-on-one several times.

13.     On or about July 5, 2020, the BOP notified Mr. Honken that it had approved his request to have Father O'Keefe attend his execution as his spiritual advisor, including to be present with him in the execution room, with certain limitations.

14.  Mr. Honken seeks Father O'Keefe's presence at the execution to permit Mr. Honken to receive the sacraments prescribed by the Catholic Church for the dying, which only an ordained priest can administer.   Father O'Keefe, consistent with Catholic teachings and his duty as a Catholic priest, seeks to assist Mr. Honken in availing himself of the redemption that the death of Jesus offers at the critical hour and moment of his death.

15.     Having been asked to fulfil this important role, Father O'Keefe feels spiritually and morally duty-bound to honor the request, and to be present at Mr. Honken's execution to administer the sacraments and to minister to him as he is put to death.   Confession and true contrition are a key part of the Catholic sacrament originally referred to as Extreme Unction, or what is commonly called Last Rites or Anointing of the Sick.   Last Rites is no mere ritual but one of the seven holy sacraments (Baptism, Confession, Communion (Eucharist), Confirmation, Marriage, Ordination, Last Rites), and can be administered only by an ordained Catholic priest. The guidance and accompaniment of a priest, and the Last Rites and the sacraments of the Eucharist and Confession which Mr. Honken seeks, helps the dying avail themselves of the redemption offered by Jesus for eternal life with God.

16.     Father O'Keefe's presence at the execution is critical to Mr. Honken's exercise of his religion, is also critical to the exercise of Father O'Keefe's religion, and is critical to their shared exercise of their religion.   As a Catholic priest, Father O'Keefe feels (and is) obligated to minister to those seeking God's grace, particularly at the critical moment of death.   His sincerely-held religious beliefs compel him to accede to Mr. Honken's request to be present at his execution,

5

to administer the sacraments that may enable Mr. Honken to seek salvation, and to prepare Mr. Honken to enter the next life in a state of God's grace. The Catholic Church teaches, and Father O'Keefe sincerely believes, that this is one of the most important roles that a priest can possibly play in helping a member of the flock achieve salvation.

**B.     Clergy Presence at Executions**

**1.     The Christian Tradition of Clergy Presence at Death.**

17.     In Christianity, the tradition of clergy presence at the time of death derives from Jesus Christ's execution and ministry to the men being crucified alongside him. *See Luke* 23:42-43 (assuring the repentant criminal, "today you shall be with me in Paradise"). The belief that a person's dying moments are critical to salvation has long persisted. *See*, *e.g.*, Ralph Houlbrooke, *Death, Religion, and the Family in England, 1480-1750* 147–49 (1998) ("The last moments of life were believed to be crucially important during the later Middle Ages. . . . [A]t this critical juncture, the Church offered help generally regarded as indispensable in making a safe departure from the world . . . .").

18.     The Catholic Church teaches that the final moments offer a unique final chance to prepare for "our heavenly homeland" and for pardon and redemption. *See Catechism of the Catholic Church* §§ 1525; 1524 (concerning viaticum administered to those "at th[e] moment of 'passing over' to the Father"); 1501-1502 (effect of expected death on discernment); § 1013 (moment of death "decides [man's] ultimate destiny"). This tradition remains an important part of modern Catholicism: "The presence of a priest or deacon shows more clearly that the Christian dies in communion with the church," and is "intended to help the dying person, if still conscious, to face the natural human anxiety about death by imitating Christ in his patient suffering and

6

dying." Liturgy Training Publications, *The Liturgy Documents Volume Two: Essential Documents for Parish Sacramental Rites and Other Liturgies* 228 (2nd ed. 2012).[1]

19.    As a Catholic priest, Father O'Keefe believes and understands that it is essential that he be able to administer the Last Rites and the sacraments of the Eucharist and Confession to Mr. Honken, as well as to minister at his side at the time at his execution.  The current pandemic has provided stark reminders that this tradition remains a central part of modern religious life.  As a Jesuit chaplain said in explaining clergy efforts to see gravely ill Covid-19 patients, "The whole point of the sacrament is a reminder that we are not alone. . . . The church is present with this person, and God is present with this person."  Elizabeth Dias, *The Last Anointing*, N.Y. Times (June 6, 2020), https://www.nytimes.com/interactive/2020/06/06/ us/coronavirus-priests-last-rites.html.  Another priest said of the abiding importance of sacrament:  "The most significant moment, the defining moment of our life, is how we die."  *Id.*

### 2.    The American Tradition of Clergy Presence at Executions.

20.    Throughout American history, clergy presence at the time and place of executions has been recognized as a fundamental interest of the condemned, and a crucial role played by the clergy.  *See* Stuart Banner, *The Death Penalty: An American History* 1 (2002) (recounting execution where the condemned asked a clergyman to read his final words for him).  At the nation's founding, a clergyman's "execution sermon" from the scaffold went hand-in-hand with "the formulaic lives, last words, and dying confessions of the prisoner[.]"  Louis P. Masur, *Rites of Execution: Capital Punishment and the Transformation of American Culture 1776-1865* 26

---

[1] *See also Pope encourages group working to end use of death penalty*, Cath. News Agency (Feb. 27, 2019), https://www.catholicnewsagency.com/news/pope-encourages-group-working-to-end-use-of-death-penalty-89197 (Pope stating that, in executions, "there should at the very least be clergy available to hear a person's confession and offer reconciliation, even up to the moment of death.").

(1989). This clerical role "was so routine that in 1791 William Smith could publish a guide-book for ministers [that contained] suitable devotions before, and at the time of Execution." *Id.* at 18.[2]

21. Federal executions have long followed this tradition. The first known federal execution, the hanging of Thomas Bird in 1790,[3] incorporated "solemn religious exercises." *See Portland*, Cumberland Gazette, June 28, 1790, at 3. Mr. Bird's final statement closed with a prayer for divine forgiveness. *The Dying Speech of Thomas Bird, executed at Portland, June 25, 1790, for the murder of Capt. John Connor, on board the Mary, near the coast of Africa, taken from his mouth on the last day of his life*, Cumberland Gazette, July 26, 1790 at 4. As in other executions of the day, the condemned man's exercise of religion with and through clergy continued to the place and time of death. *See May 10*, Vergennes Gazette & Vt. & N.Y. Advertiser, May 29, 1800, at 3 (reporting federal executions in which condemned prisoners were "attended to the place of execution" by clergymen, where they prayed and expressed contrition); *The Execution of Edward F. Douglass and Thomas Benson for the Murder of Ava A. Havens*, Bos. Herald, Jul. 28, 1851, at 1 (reporting federal executions in which clergymen accompanied and embraced condemned prisoners on the gallows, and then conveyed their final declarations of innocence).

22. The tradition of clergy accompaniment during federal executions has since been incorporated into firing squads, *see* R. Michael Wilson, *Legal Executions in the Western Territories, 1847-1911*, 173 (2010); the gas chamber, *see Arthur Brown Executed In Gas Chamber*,

---

[2] Unsurprisingly, these American traditions were similar to English practices during the colonial era. *See, e.g.*, Randall McGowen, *The Body and Punishment in Eighteenth-Century England*, 59 J. Mod. Hist. 651, 651 (1987) ("The condemned . . . were accompanied by a clergyman who shadowed their last moments urging them to repent or consoling them with the offer of divine forgiveness.").

[3] *See* "Historical Federal Executions," United States Marshals Service, *available at* https://www.usmarshals.gov/history/executions.htm (last visited July 3, 2020).

8

Streator Daily Times-Press, Feb. 24, 1965, at 1; and electrocutions, as when a rabbi accompanied Ethel and Julius Rosenberg to the electric chair in 1953, *see* Jack Woliston, *Rosenbergs go silently to electric chair*, UPI (June 20, 1953), https://www.upi.com/Archives/1953/06/20/Rosenbergs-go-silently-to-electric-chair/5084629411212/.[4]  Today, the right to a spiritual advisor at executions is memorialized in BOP regulations.  28 C.F.R. § 26.4(c)(3)(i).

### 3.    *Murphy v. Collier* and *Gutierrez v. Saenz*

23.    Recent orders from the United States Supreme Court confirm the significant legal interests that condemned prisoners have in being accompanied by clergy at their executions.  It necessarily follows that clergy who are duty-bound under their faith to provide such ministry also have a significant legal interest in accompanying their spiritual charges at the time of execution.

24.    The State of Texas scheduled the execution of Patrick Henry Murphy, a Buddhist, for March 28, 2019.  At that time, Texas permitted condemned prisoners to have a State-employed chaplain (all of whom were Christian or Muslim) with them in the execution room at the time of their execution, but not any other spiritual adviser.  Murphy requested that his Buddhist minister be permitted to accompany him into the execution chamber, but Texas denied that request.  Mr. Murphy filed suit, alleging that the refusal to permit a Buddhist spiritual adviser in the execution room violated his rights under the First Amendment and the Religions Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc-2000cc-5, which is the RFRA analogue that applies to state-funded prisons.

---

[4] *See also* Ari L. Goldman, *Rabbi Irving Koslowe, 80; Gave Rosenbergs Last Rites*, N.Y. Times, Dec. 8, 2000, at C15 (describing the same rabbi's attendance at 17 executions where "[h]e would go into the execution chamber, stand opposite as the inmate was strapped into the electric chair, and stay until the end").

25.    On March 28, 2019, the United States Supreme Court stayed Mr. Murphy's execution. *Murphy v. Collier*, 139 S. Ct. 1475, 1475 (2019).  Justice Kavanaugh expressed his view that the State could cure its "denominational discrimination" by either "(1) allow[ing] all inmates to have a religious adviser of their religion in the execution room; or (2) allow[ing] inmates to have a religious adviser, including any state-employed chaplain, only in the viewing room, not the execution room." *Id*. (Kavanaugh, J., concurring in grant of application for stay).  On April 2, 2019, Texas adopted Justice Kavanaugh's second suggestion and revised its policy to prohibit all religious and spiritual advisers from entering the execution chamber at the time of an execution.

26.    Following the change in policy, another Texas prisoner, Ruben Gutierrez, filed suit alleging that the prohibition against the presence of Christian clergy in the execution chamber violated his rights under RLUIPA and the First Amendment.  On June 9, 2020, the district court stayed his execution, which had been set for June 16, 2020.  The Fifth Circuit vacated the stay, but on June 16, 2020, shortly before the scheduled execution, the Supreme Court stayed his execution and remanded to the district court to determine "whether serious security problems would result if a prisoner facing execution is permitted to choose the spiritual adviser the prisoner wishes to have in his immediate presence during the execution." *Gutierrez v. Saenz*, No. 19A1052, --- S. Ct. ---, 2020 WL 3248349, at *1 (U.S. Jun. 26, 2020).

### C.    The Grave Risks Imposed by Scheduling Mr. Honken's Execution During the Covid-19 Pandemic

27.    The scheduling of Mr. Honken's execution during the ongoing Covid-19 pandemic means that Father O'Keefe can exercise his sincerely-held religious beliefs and practices, as provided in Catholic teachings and as requested by Mr. Honken, only by putting himself, and those he ministers to outside the prison, at serious risk of infection and even death.

### 1.    The Serious Health Risks Posed by COVID-19

28.    Covid-19 is a highly contagious and deadly respiratory disease caused by a novel coronavirus known in the scientific community as SARS-CoV-2.  The death rate of Covid-19 is estimated to be several times higher than that of the common flu that kills thousands a year.[5]  The World Health Organization estimates that one in five people who contract the disease becomes seriously ill.[6]

29.    According to the Centers for Disease Control and Prevention (CDC), a person's risk for severe illness from COVID-19 increases with age, rising significantly after the age 50.[7] Patients aged 40-49 account for approximately 3 percent of all Covid-19 deaths; patients aged 50-64 account for approximately 15 percent of Covid-19 deaths; patients aged 65-74 account for approximately 21 percent of deaths; and patients aged 75-84 account for approximately 26 percent of deaths.[8]

30.    Patients who experience severe infections from Covid-19 require supportive care, including recourse to scarce medical equipment and specialized care providers who are able to monitor and implement such care. This level of support can exceed local health-care resources.

---

[5] *See Expert Responses*, University of Tennessee Health Science Center, https://uthsc.edu/coronavirus/expert-responses.php (last visited Jul. 6, 2020) (estimating that the morbidity rate of COVID-19 is "100s of times worse than influenza").

[6] *See* https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited Jul. 6, 2020).

[7] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Jul. 6, 2020).

[8] Centers for Disease Control and Prevention, Demographic Trends of Covid-19 cases and deaths in the US reported to CDC (updated Jul 6, 2020), https://www.cdc.gov/covid-data-tracker/index.html#demographics.

31.    Patients who survive severe Covid-19 infections often require extensive rehabilitation to mitigate neurological damage and the loss of respiratory capacity. Many who suffer from severe infections will likely experience lifelong limitations and disabilities.

32.    There is currently no available vaccine or cure for Covid-19 infections.

33.    The disease is spread, among other ways, by airborne droplets released by infected individuals.  Infected droplets can survive on surfaces for some period of time, ranging from four hours to up to three days on certain surfaces.  Health experts also believe that the virus can linger in the air well after an infected person coughs or breathes, particularly in poorly ventilated areas.[9] The risk of transmission is also exacerbated when multiple individuals are in close proximity in an indoor setting, particularly (though not exclusively) when social distancing is not possible.

34.    Infected persons may begin to experience signs and symptoms two to fourteen days after exposure. A significant number of infected persons are asymptomatic, however, and do not ever exhibit symptoms. Both asymptomatic and pre-symptomatic individuals can unwittingly transmit the disease.

35.    Indiana Governor Eric Holcomb first declared a state-wide public health disaster emergency in response to the Covid-19 virus on March 6, 2020.[10]  On March 23, 2020, in light of the serious threat posed by Covid-19, Governor Holcomb expanded his March 6th Order by requiring the denizens of Indiana to stay at home except for essential travel, for all non-essential

---

[9] *See* https://www.nytimes.com/2020/07/04/health/239-experts-with-one-big-claim-the-coronavirus-is-airborne.html (last visited Jul. 6, 2020).

[10] *See* https://www.in.gov/gov/files/20-02ExecutiveOrder(DeclarationofPublicHealthEmergencyforCOVID-19)FINAL.pdf

businesses to close, for all public gatherings of over ten people to be prohibited, and imposing social distancing requirements, among other things.[11]

36.    Although limited steps have been taken to re-open Indiana, Governor Holcomb extended the declaration of a state-wide public health disaster emergency several times over the past several months.  As recently as July 1, 2020, Governor Holcomb extended the emergency until at least August 3, 2020.[12]

37.    On March 23, 2020, the Supreme Court of Indiana declared a public health emergency and required all counties to submit plans to deal with the tolling of speedy trials, the suspension of jury trials, the release of non-violent prisoners, the suspension of issuing civil attachments and body warrants, and other measures related to the public health crisis.[13]  After each county submitted their plans, the Indiana Supreme Court extended the deadlines for these life-saving measures several times.[14] The most recent order of the Indiana Supreme Court addressing trial court practice was issued on May 29, 2020, which further extended the tolling of speedy trial rights through August 14, 2020, extends the suspension of civil attachments and body warrants until August 15, 2020, and extends the use of remote proceedings through January 1, 2021.[15]  The Indiana Appellate Court likewise issued an Order suspending all in-person filing requirements until further notice.[16]

---

[11] *See* https://www.in.gov/gov/files/Executive_Order_20-08_Stay_at_Home.pdf.

[12] *See* https://www.in.gov/gov/files/Executive%20Order%2020-34%20Extention%20of%20the%20Public%20Health%20Emergency.pdf.

[13] *See* https://www.in.gov/judiciary/files/order-other-2020-20S-CB-123a.pdf
[14] *See* https://www.in.gov/judiciary/3679.htm.

[15] *See* https://www.in.gov/judiciary/files/order-other-2020-20S-CB-123k.pdf.

[16] *See id.*

38.    In federal court, the Southern District of Indiana has issued a General Order continuing jury trials (currently through July 20), conducting most civil proceedings via teleconference (currently until August 17), conducting most criminal proceedings via teleconference (currently until July 20), and postponing naturalization ceremonies (currently until August 13).[17]

39.    It is well established that the risk of exposure to and transmission of infectious diseases, as well as the potential harm to those who become infected, is significantly higher in jails and prisons than in the community.

40.    BOP recognizes the serious risks of COVID-19 transmission within the prison population and to those who come in contact with the prison population.  On March 13, 2020, BOP closed the doors of every federal prison across the country to visitation, including visits by accredited religious volunteers such as Father O'Keefe.

41.    On June 15, 2020, while federal prisons around the country remained essentially on lockdown to prevent the spread of COVID-19, the Department of Justice announced that it had scheduled Mr. Honken's execution for July 17, 2020.  The COVID-19 pandemic has continued unabated in the United States, and indeed has worsened, since that time.  The BOP has indicated that it will reinstate visits for Mr. Honken and the other three inmates under death warrant, but it continues to prohibit other inmate visits, including spiritual advisor and legal visits.  To this day, the BOP website features a prominent advisory that "all visiting at [USP Terre Haute] has been

---

[17] *See* https://www.insd.uscourts.gov/sites/insd/files/Court%20General%20Order%20RE%20COVID-19%20-%203-19-20.pdf

14

suspended until further notice."[18]  Just this morning, on July 7, 2020, Father O'Keefe received an email from USP Terre Haute staff stating:  "FCC Terre Haute is NOT allowing volunteer entry the Complex at this time.  Additionally, all training has been postponed.  We will contact you with further information, once it becomes available."  (original emphasis).

42.    The Government's plan for the upcoming executions involves a 40-person execution team, as well as the reassignment of approximately 200 prison employees from their normal duties to assist with security and support the executions.  It entails individuals converging in Terre Haute from around the country, thereby facing potential exposure to COVID-19 on planes, in airports, and in hotels, and causing others to be exposed as well. These individuals will then convene and mix in enclosed spaces with BOP staff drawn from around a prison with known COVID-19 cases for group training, practices, meetings, and on-site work, escalating the risks of infection for the prisoners, staff, and ultimately anyone attending the execution, including Father O'Keefe.

43.    Prior to Mr. Honken's execution, Father O'Keefe and Mr. Honken's lawyers will have to visit with him in the execution facility, sometimes referred to as the "Death House." At the 2003 execution of Louis Jones, Jr., Mr. Jones's attorney, his daughter, and three prison ministers had to stand "shoulder to shoulder" to fit in the room to talk with Mr. Jones before the execution.

44.    The execution facility is a separate facility on the FCC Terre Haute grounds. It is a small, single story building, like a small home. The witnesses and prison staff are shuttled together in a van to the facility from the main correctional complex prior to arriving at separate entrances

---

[18] *See* https://www.bop.gov/locations/institutions/thp/ (last visited Jul. 6, 2020).

for various groups of witnesses.  Many of the individuals in attendance will have traveled from other states in the days immediately preceding the execution, increasing the risk of virus transmission to Father O'Keefe and others in attendance.  Upon information and belief, it will not be possible to maintain social distancing at Mr. Honken's execution.

### i.    These Health Risks Burden Father O'Keefe's Religious Practice

45.    Father O'Keefe is 64 years old.  He is thus at higher risk of serious complications should he contract COVID-19.

46.    As part of his ministry, Father O'Keefe is a Resident Chaplain for the nuns who are cloistered at the Carmelite Monastery in Terre Haute.  In this capacity, he holds a daily Mass for the cloistered nuns, at which he administers the sacrament of Communion.  Several of the nuns who attend daily Mass as a central part of their own religious practice are over the age of 60 and a few are over 80 years old; they thus are at an increased risk of serious complications in the event they contract COVID-19.

47.    Father O'Keefe understands that his presence at Mr. Honken's execution will expose him to the risk of COVID-19 infection and even death.  He also understands, and the cloistered nuns understand, that if Father O'Keefe continues to hold daily Mass for them following Mr. Honken's execution, as the nuns have requested, he may also expose them to a risk of infection and even death.  He has agreed to risk life and limb, because of his sincerely held belief that he must be available to minister to Mr. Honken at his execution, including to offer Mr. Honken the sacraments that will enable him to seek salvation.  Father O'Keefe nonetheless fears for his health and life, and the health and life of those outside the prison to whom he ministers, as a result of the timing of Mr. Honken's execution in the midst of the pandemic and the risks that he must take in order to carry out his sacred duties as a Catholic priest and as Mr. Honken's spiritual advisor.

## COUNT I
### (Violation of RFRA)

48.     Intervenor Plaintiff realleges and incorporates by reference the allegations set forth above in paragraphs 1 through 47.

49.     The RFRA establishes "very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014).   The RFRA "prohibits the Federal Government from taking any action that substantially burdens the exercise of religion unless that action constitutes the least restrictive means of serving a compelling government interest." *Id.* at 690-91; *see* 42 U.S.C. §§ 2000bb–1(a), (b).  As amended, RFRA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc–5(7)(A).

50.     Catholicism, as understood and practiced by Plaintiff and as taught by the Catholic Church, recognizes the importance and incorporates the practice of having clergy present at the time and place of death, including at executions.  Father O'Keefe feels a sincere religious obligation to be present with Mr. Honken at his execution, consistent with his Catholic beliefs and practice, and in order to discharge his religious duty to help Mr. Honken seek the redemption offered by Jesus in his critical last moments.

51.     From the very beginnings of Christianity until now, the presence of clergy with a dying person has been considered essential, particularly in Catholicism, and from its inception the United States has permitted clergy to be present with the condemned—praying, ministering, and listening—up until the moment of death.  By scheduling Mr. Honken's execution to take place in the midst of a pandemic, Defendants have substantially burdened, and will continue to substantially burden, Father O'Keefe's exercise of his religion—to wit, his spiritual and moral obligation to accompany, guide, and assist Mr. Honken at the time and place of his death—by

17

conditioning that religious exercise on Father O'Keefe's willingness to face exposure to the deadly COVID-19 virus. While Father O'Keefe intends to bear this burden rather than deny Mr. Honken in his time of greatest spiritual need, that does not change the significance of the burden that Defendants have placed on Father O'Keefe and his religious practice.

52.    Defendants lack a compelling interest in placing this burden on Father O'Keefe's religious exercise. Defendants waited years to schedule Mr. Honken's execution, and there is no compelling interest in scheduling it now, in the midst of a worldwide pandemic.

53.    Alternatively, even if Defendants have a compelling interest, feasible, less restrictive alternatives would adequately serve that interest, including by rescheduling Mr. Honken's execution to a date in the future, after the immediate threat of COVID-19 had passed, such as when a cure or vaccine is available.

54.    Defendants are violating and will violate RFRA unless they agree to postpone Mr. Honken's execution to a date when Father O'Keefe can carry out his final ministry to Mr. Honken without serious risk to his health and the health of those outside the prison to whom he has a separate obligation to minister.

**COUNT II**
**(Arbitrary and Capricious Agency Action, 5 U.S.C. § 706)**

55.    Intervenor Plaintiff realleges and incorporates by reference the allegations set forth above in paragraphs 1 through 54.

56.    The APA provides a cause of action in federal district court for any person aggrieved by final agency action. *See* 5 U.S.C. §§ 702-704.

57.    The APA provides that the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.* § 706(2)(A).

18

58.    An agency must consider all relevant facts and provide a reasoned explanation for its actions, and must not merely provide conclusory statements to justify its decisions.

59.    An agency action that does not meet these standards is arbitrary and capricious, and must be set aside.

60.    Defendants scheduled Mr. Honken's execution without considering the import of the ongoing COVID-19 pandemic and the significant public health risks that proceeding with the execution in such an environment poses, including to spiritual advisors authorized by law to be present at the execution, *see* 28 C.F.R. § 26.4(c)(3).  Defendants failed to consider less restrictive, yet easily administered alternatives, most obviously delaying Mr. Honken's execution until such time as the immediate danger posed by COVID-19 has passed.

61.    Defendants therefore acted arbitrarily and capriciously. As a result, the currently scheduled date for Mr. Honken's execution should be set aside.

### PRAYER FOR RELIEF

WHEREFORE, to prevent the violations of the RFRA and APA as alleged above, Intervenor Plaintiff requests that the Court enter a judgment:

1.    Declaring that the Defendants' actions and decisions carrying out Mr. Honken's execution during a documented COVID-19 outbreak at USP Terre Haute and in the United States without a vaccine or treatment available imposes a substantial burden on Father O'Keefe's exercise of religion and is neither justified by a compelling governmental interest nor the least restrictive means of furthering any compelling governmental interest;

2.    Declaring that scheduling Mr. Honken's execution during the COVID-19 outbreak is arbitrary and capricious action, and setting aside the warrant of execution;

19

3.  Granting injunctive relief prohibiting the BOP from carrying out the execution until the COVID-19 outbreak is under control, such as when a cure or a vaccine is available;

4.  Award attorney's fees and costs as the Court deems equitable and just; and

5.  Award such other and further relief as the Court deems equitable and just.

Dated:  July 7, 2020                    Respectfully submitted,

                                        **PROPOSED INTERVENOR PLAINTIFF**
                                        **FATHER MARK O'KEEFE, OSB**

                                        By:     */s/  Abigail A. Clapp*

                                        Abigail A. Clapp (Ind. Atty. No. 25444-45)
                                        Greenberg Traurig, LLP
                                        77 W. Wacker Dr., Ste. 3100
                                        Chicago, IL   60601
                                        Tel.    (312) 456-8400
                                        Fax     (312) 899-0393
                                        Email   ClappA@gtlaw.com

                                        Edward C. Wallace*
                                        Greenberg Traurig, LLP
                                        200 Park Avenue
                                        New York, NY 10166
                                        Tel:  (212) 801-9200
                                        WallaceE@gtlaw.com

                                        Michael M. Krauss*
                                        Greenberg Traurig, LLP
                                        90 South Seventh Street, Suite 3500
                                        Minneapolis, MN  55402
                                        Tel:  (612) 259-9700
                                        KraussM@gtlaw.com

                                        Kyle R. Freeny*
                                        Greenberg Traurig, LLP
                                        2101 L Street, N.W., Suite 1000
                                        Washington, DC  20037
                                        Tel:  (202) 331-3100
                                        FreenyK@gtlaw.com

                                        **pro hac vice* motion forthcoming

20