**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| DALE HARTKEMEYER (AKA SEIGEN) | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 2:20-cv-00336-JMS-DLP |
| WILLIAM P. BARR, in his official capacity as the Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons; and T.J. WATSON, in his official capacity as Complex Warden for Terre Haute Federal Correctional Complex, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**SUPPLEMENTAL DECLARATION OF DR. JOE GOLDENSON**

I, Dr. Joe Goldenson, declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am a medical physician with 33 years of experience in correctional health care. For 28 years, I worked for Jail Health Services of the San Francisco Department of Public Health. For 22 of those years, I served as the Director and Medical Director. In that role, I provided direct clinical services, managed public health activities in the San Francisco County jail, including the management of HIV, tuberculosis, Hepatitis C, and other infectious diseases in the facility, planned and coordinated the jail's response to H1N1, and administered the correctional health enterprise, including its budget, human resources services, and medical, mental health, dental, and pharmacy services.

2.      I served as a member of the Board of Directors of the National Commission on Correctional Health Care for eight years and was past President of the California chapter of the American Correctional Health Services Association. In 2014, I received the Armond Start Award of Excellence from the Society of Correctional Physicians, which recognizes its recipient as a representative of the highest ideals in correctional medicine.

3.      For 35 years, I held an academic appointment as an Assistant Clinical Professor at the University of California, San Francisco.

1

4.      I have worked extensively as a correctional health medical expert and court monitor. I have served as a medical expert for the United States District Court for the Northern District of California for 25 years. I am currently retained by that Court as a medical expert in *Plata v. Newsom*, Case No. 3:01-cv-01351 (N.D. Cal.), to evaluate medical care provided to inmate patients in the California Department of Correctional Rehabilitation. I have also served as a medical expert/monitor at Cook County Jail in Chicago and Los Angeles County Jail, at other jails in Washington, Texas, and Florida, and at prisons in Illinois, Ohio, and Wisconsin.

5.      On July 1, 2020, I signed a declaration that was submitted in this case.

6.      Since the time of my July 1 declaration, the COVID-19 pandemic has continued to escalate around the country. As of July 6, 2020, the seven-day average of cases in 12 states reached new highs.[1] In Indiana, the governor has paused the state's reopening plans as a result of an increase in COVID-19 cases.[2]

7.      In addition, 239 scientists released a journal article to emphasize the risks of airborne transmission of COVID-19.[3] The authors conclude that studies have "demonstrated beyond any reasonable doubt that viruses are released during exhalation, talking, and coughing in microdroplets small enough to remain aloft in the air and pose a risk of exposure at distances beyond 1 to 2 m from an infected individual. . . . There is every reason to expect that [COVID-19] behaves similarly, and that transmission via airborne microdroplets is an important pathway."[4] As such, while hand washing and social distancing are "appropriate," these measures are "insufficient to provide protection from virus-carrying respiratory microdroplets released into the air by infected people"[5] The authors note that concerns around airborne transmission are "especially acute in indoor or enclosed environments, particularly those that are crowded and have inadequate ventilation."[6] To respond to these risks, the following measures should be taken: (1) ensure sufficient and effective ventilation; (2) supplement that ventilation with airborne infection controls; and (3) avoid overcrowding.[7]

8.      As noted in my prior declaration, prison environments are enclosed, crowded environments with poor ventilation, which facilitates the transmission of airborne illnesses, such as COVID-19. Simple solutions such as opening windows and doors, as recommended by the Centers for Disease Control and Prevention (CDC)[8] are not possible in prisons.

---

[1] Joshua Partlow & Nick Miroff, *States mandate masks, begin to shut down again as coronavirus cases soar and hospitalizations rise*, Wash. Post (July 6, 2020), https://www.washingtonpost.com/national/coronavirus-rises-states-shutdown/2020/07/06/d8805d18-bf9e-11ea-9fdd-b7ac6b051dc8_story.html.

[2] Liz Nagy, *Coronavirus Indiana: IN reports 330 new COVID-19 cases, 5 deaths as Phase 4.5 begins*, ABC 7 (July 6, 2020), https://abc7chicago.com/health/indiana-covid-19-cases-increase-by-330-5-deaths/6302466/.

[3] Lidia Morawska & Donald K. Milton, *It is Time to Address Airborne Transmission of COVID-19*, Clinical Infectious Diseases, ciaa939, https://doi.org/10.1093/cid/ciaa939.

[4] *Id.* at 2 (internal citations omitted).

[5] *Id.* at 3.

[6] *Id.*

[7] *Id.* at 4.

[8] Centers for Disease Control and Prevention, *Cleaning and Disinfecting Your Facility* 2 (Apr. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility-H.pdf.

9.      I have reviewed the declaration of Rick Winter, submitted in this case on July 6, 2020. Mr. Winter describes the measures that the Bureau of Prisons (BOP) is taking, or will be taking, such as temperature checks and symptom screening for staff; providing personal protective equipment (PPE), including a surgical face mask, gloves, gown and face shield, to Rev. Hartkemeyer; providing hand sanitizer and soap to Rev. Hartkemeyer; providing an N-95 mask to Rev. Hartkemeyer's security escort; and attempts to limit the number of people in contact with Rev. Hartkemeyer. According to Mr. Winter, the BOP will not be conducting testing of staff or others participating in the execution procedures. Mr. Winter's declaration also indicates that the government is not taking any protective measures to increase ventilation or avoid overcrowding in the small rooms of the Death House.

10.     These measures are inadequate. As someone who is medically vulnerable to COVID-19 due to my age and medical history, I personally would not enter any of the buildings at issue, even with the mitigation efforts described by Mr. Winter.

11.     **Testing.** The BOP will not be conducting testing on any of the hundreds of individuals involved in the execution. Tests are not foolproof. For example, individuals with recent infections can still test negative. However, testing is a helpful way to screen out people who are potentially infectious and who could spread the disease to those around them. Instead, BOP requires staff to pass daily temperature checks and symptom screening. As I noted in my prior declaration, temperature checks and non-test based verbal screens such as this cannot adequately screen for new, asymptomatic or pre-symptomatic infections. Infected staff are a key vector for introducing COVID-19 into a correctional facility. Screening, as described above, is insufficient to eliminate this risk.

12.     **Ventilation.** The BOP is not taking any measures to improve the ventilation in the facility or the areas where Rev. Hartkemeyer will be visiting. As described above, there is strong and mounting evidence that COVID-19 is spread through airborne droplets. Appropriate ventilation that ensures the air is not recirculated, and that air is allowed to flow outside of the building, is critical to reducing the risk of COVID-19 transmission. Without adequate ventilation, the risk of transmission remains high. Concerns about inadequate ventilation are particularly acute in the Death House where the execution will take place. Publically available images depict a small, windowless building. See Figure 1. Separating Rev. Hartkemeyer from other witnesses and media who will be in different observation rooms does not prevent the spread of an airborne virus when poor ventilation circulates the same air between the rooms.

3

Figure 1:



Source: https://www.burlingtonfreepress.com/story/news/local/vermont/2015/06/25/donald-fell-death-row-lawsuit/29243195/

13.      **Masks and PPE.** Mr. Winter's declaration states that Rev. Hartkemeyer will be provided with a surgical mask and Rev. Hartkemeyer's security escort will be wearing an N-95 mask. The type of mask provided for Rev. Hartkemeyer will not eliminate the risk of possible infection. Surgical masks primarily protect those around the wearer; they do not eliminate the risk of infection to the wearer himself. Mr. Winter's declaration indicates that Rev. Hartkemeyer may come in contact with members of Mr. Purkey's legal team, who like the other witnesses, are given the option, but not required, to wear PPE. In addition, the security escort's use of an N-95 mask provides limited, if any, additional protection to Mr. Hartkemeyer beyond that of a typical mask. N-95 masks are designed to protect the wearer. Unlike surgical masks, they filter the air during inspiration. Furthermore, individuals can catch the virus through the membranes in their eyes, a risk that masking does not eliminate. Rev. Hartkemeyer will also be offered additional PPE, including gloves, gown and face shield. However, without a guarantee of social distancing and ventilation in the buildings where Rev. Hartkemeyer will be visiting, the risk of COVID-19 transmission remains.

14.      **Visitation in the SCU**. Mr. Winter's declaration states that Rev. Hartkemeyer will be visiting his spiritual advisee in the Special Confinement Unit (SCU). This is the same

visitation location described in Rev. Hartkemeyer's declaration, which I reviewed previously. The visitation process is similar to other prisons I have visited, and inevitably involves close and repeated contact between the visitor and custodial staff, other visitors, and prisoners. Upon review of Mr. Winter's declaration, the visitation process, and the attendant risks, remains the same as described in my prior declaration, with perhaps the exception of exposure to other visitors. Even if BOP makes efforts to limit the number of individuals with whom Rev. Hartkemeyer comes into direct contact, those individuals themselves are still in contact with any number of other people throughout the day and in the days leading up to Rev. Hartkemeyer's visits. Those individuals may be unable to socially distance, will likely be in poorly ventilated, enclosed spaces, and may not be wearing full PPE at all times. Further, the potential for aerosolization of COVID-19 creates a risk of transmission from individuals with whom that Rev. Hartkemeyer does not have direct contact. As such, the risk of COVID-19 spread remains substantial.

15.     Mr. Winter states that the visitation room will be sanitized between visits, but he provides no information about the cleaning products that will be used. Only certain cleaning products, used at full strength, are effective against COVID-19. In my experience, prisons typically utilize watered-down cleaning products. If such products were used to "sanitize" the visitation room, they would be ineffective at killing any virus that remained on surfaces.

16.     Mr. Winter's assertion that there are no confirmed COVID-19 cases in the SCU is irrelevant. My understanding is the SCU is one housing unit within the larger USP Terre Haute building, and there have been a number of confirmed COVID-19 cases in USP Terre Haute. In any typical prison environment, staff go back and forth between various parts of the facility. Staff are the primary vector for transmission in prisons, and their movement allows COVID-19 to spread between units. For example, San Quentin State Prison in San Quentin, California, is experiencing a widespread COVID-19 outbreak.[9] I have been to San Quentin and am familiar with the layout. The facility's death row is housed in a separate building and contained to its own floor. The outbreak began in the main housing units. Nevertheless, the outbreak has spread from the main housing units to the death row unit at that facility; three men on death row have now died of COVID-19.[10]

17.     In addition, as a result of the low rates of testing at USP Terre Haute, there may be undiagnosed individuals in the SCU with COVID-19. Further, asymptomatic and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread.

18.     **Visitation at the Death House**. Mr. Winter indicates Rev. Hatkemeyer will have the opportunity to visit with Mr. Purkey in the Death House as well. This visitation necessarily includes the same type of close contact with custodial staff as visitation at the SCU, and carries the same attendant risks. In addition, I previously reviewed the declaration of Mr.

---

[9] Richard Winton & Taryn Luna, *San Quentin coronavirus outbreak spreads: 1,113 prisoners infected, death row inmate dies*, L.A. Times (June 30, 2020), https://www.latimes.com/california/story/2020-06-30/san-quentin-coronavirus-outbreak-prisoners-infected-death-row-inmate-dies-covid-19.

[10] Leonardo Castañeda, *Three death row inmates in San Quentin die of COVID-19 amid growing prison outbreak*, The Mercury News (updated July 6, 2020), https://www.mercurynews.com/2020/07/03/two-death-row-inmates-in-san-quentin-die-of-covid-19-amid-growing-prison-outbreak/.

Floyd. In Mr. Floyd's experience, these Death House visits were attended not just by the spiritual advisor, but also by members of the legal team, and took place in a small, cramped room. Mr. Winter does not address whether there will be any measures taken to allow for social distancing during these visits, and does not address any measures taken to improve the ventilation in these visitation rooms.

19.     **Execution Procedures.** Mr. Winter's declaration indicates that Rev. Hartkemeyer will be in a waiting room adjacent to the execution chamber, and the execution chamber itself. In the chamber itself, there will be at least five individuals: Mr. Purkey, Rev. Hartkemeyer, Rev. Harkemeyer's security escort, a U.S. Marshals' representative and a BOP official. It is unclear if the U.S. Marshals' representative and BOP official will be wearing full PPE. Publically available images depict a small, narrow room that is not large enough to allow five individuals to remain six feet apart at all times. See Figure 2. Rev. Hartkemeyer will be in these small, enclosed spaces, with no ability to socially distance, and no measures taken to improve ventilation.

Figure 2:



Source: https://www.wthitv.com/content/news/Judge-halts-federal-executions-scheduled-to-take-place-in-Terre-Haute-565274511.html

20.     The measures described by Mr. Winter are inadequate to protect an individual who is vulnerable to COVID-19. Even with such measures in place, a vulnerable individual is still at risk of contracting COVID-19 and suffering serious illness as a result. Rev. Hartkemeyer will repeatedly be in small, enclosed spaces with no ability to socially distance from other

individuals who may be COVID-19 positive, and in spaces which may be filled with aerosolized droplets containing COVID-19. These spaces will also be poorly ventilated, with air recirculating within the building. The risk of COVID-19 transmission remains high.


       I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 8, 2020 in Alameda County, California.


Dr. Joe Goldenson