**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | |
|---|---|
| DALE HARTKEMYER (AKA SEIGEN), | : |
| | : |
| Plaintiff, | :     Case No. 2:20-CV-00336-JMS-DLP |
| | : |
| v. | : |
| | : |
| WILLIAM P. BARR, in his official capacity as | : |
| the Attorney General of the United States; | : |
| MICHAEL CARVAJAL, in his official capacity | : |
| as the Director of the Federal Bureau of Prisons; | : |
| and T.J. WATSON, in his official capacity as the | : |
| Complex Warden for the United States | : |
| Penitentiary, Terre Haute, | : |
| | : |
| Defendants. | : |
| | : |

**MEMORANDUM IN SUPPORT OF THE MOTION OF**
**FATHER MARK O'KEEFE FOR PRELIMINARY INJUNCTION**

Plaintiff Intervenor Father Mark O'Keefe, a Roman Catholic priest and a member of the Order of St. Benedict (Ordo Sancti Benedicti), respectfully moves for a preliminary injunction prohibiting Defendants from carrying out the execution of Dustin Lee Honken, currently scheduled for July 17, 2020 at USP Terre Haute, until Father O'Keefe can carry out his sacred religious duty to minister Mr. Honken at his execution without jeopardizing his life and health. Rather than compel Father O'Keefe to exercise his religious duties in the middle of a surging pandemic, this Court should enjoin Mr. Honken's execution until Covid-19 is controlled, such as when an effective course of treatment and a vaccine becomes available.

1

**INTRODUCTION**

As this Court has observed, Father O'Keefe's claims mirror those of Rev. Dale Hartkemeyer, and Father O'Keefe adopts and incorporates the arguments and authorities in Rev. Hartkemeyer's papers in support of his parallel motion for a preliminary injunction.

As a Catholic priest, Father O'Keefe has a sacred obligation to minister to Mr. Honken up to the moment of death, including by administering the Last Rites. Because the Defendants insist on executing Mr. Honken now, Father O'Keefe can fulfill his religious duty only by placing his own life and health at risk. That alone is a substantial burden on his religious exercise and cause of irreparable harm.

An essential part of his ministry is also to administer Communion to the nuns at the Carmelite Monastery on a daily basis. Several of them are over 60, like Father O'Keefe himself, and some are over 80. Because of the Defendants' insistence, Father O'Keefe can fulfill his religious duty only by placing their lives and health at risk as well. That is still another substantial burden, and cumulatively an intolerable burden, which magnifies an already irreparable harm.

By scheduling Mr. Honken's execution to take place in the midst of a pandemic, Defendants have substantially burdened, and will continue to substantially burden, Father O'Keefe's exercise of his religion—to wit, his spiritual and moral obligation to accompany, guide, and assist Mr. Honken at the time and place of his death—by conditioning that religious exercise on Father O'Keefe's willingness to face exposure to the deadly Covid-19 virus.

No one should be forced to assume the risk of contracting and spreading Covid-19 in order to perform a sacred religious duty. The preliminary injunction should issue, and Father O'Keefe should be allowed the freedom to practice his faith—to do his duty—without jeopardizing the lives and health of himself and those around him.

## FACTUAL BACKGROUND

Father Mark O'Keefe is a Roman Catholic priest and a member of the Order of St. Benedict (Ordo Sancti Benedicti). (O'Keefe Decl. (Ex. 1) ¶ 1.)[1] He is a Professor of Moral theology at Saint Meinrad Seminary and School of Theology. (*Id.* ¶ 21.) On a volunteer basis, he also ministers to inmates at the United States Penitentiary in Terre Haute, Indiana (USP Terre Haute). (*Id.* ¶ 1.) He is the designated spiritual adviser to Dustin Lee Honken. (*Id.* ¶ 1.)

**A.   Father O'Keefe's Crucial Role as Spiritual Advisor to Dustin Lee Honken.**

Father O'Keefe is accredited by the BOP to minister—and before the Covid-19 pandemic, routinely did minister—to inmates at Terre Haute USP, including those on death row. (*Id.* ¶ 5.) In this capacity, Father O'Keefe has ministered to Dustin Lee Honken, meeting with him one-on-one several times. (*Id.* ¶ 5.) Mr. Honken is a death row inmate whose execution is scheduled for July 17, 2020. (*Id.* ¶ 1.) Mr. Honken has been a devout and pious Catholic for more than ten years. (*Id.* ¶ 5.)

On June 30, 2020, Mr. Honken designated Father O'Keefe as the spiritual advisor to attend his execution pursuant to 28 C.F.R. § 26.4(c)(3)(i), and requested that Father O'Keefe be permitted to accompany Mr. Honken in the execution chamber. (*Id.* ¶ 2.) And, on or about July 5, 2020, the BOP approved Mr. Honken's request to have Father O'Keefe attend his execution as his spiritual advisor, including to be present with him in the execution room, with certain limitations. (BOP letter to Mr. Honken (Ex. 2).)

---

[1] While we are mindful of the Local Rule on using docket entry numbers for fact citations, another party is now filing a stream of documents and we cannot be sure of the final docket numbers for our citations. We are also working to meet the filing deadline of 11:59 Eastern. Accordingly, we are citing to documents by exhibit number and/or description as appropriate, and we can file an amended memorandum with updated citations if the Court prefers.

Mr. Honken seeks Father O'Keefe's presence at the execution to permit Mr. Honken to receive the sacraments prescribed by the Catholic Church for the dying, which only an ordained priest can administer. (O'Keefe Decl. (Ex. 1) ¶¶ 2, 6.) Father O'Keefe, consistent with Catholic teachings and his duty as a Catholic priest, seeks to assist Mr. Honken in availing himself of the redemption that the death of Jesus offers at the critical hour and moment of his death. (*Id.* ¶¶ 2, 7-13.)

Having been asked to fulfil this important role, Father O'Keefe feels spiritually and morally duty-bound to honor the request, and to be present at Mr. Honken's execution to administer the sacraments and to minister to him as he is put to death. (*Id.* ¶¶ 2, 7-13, 20.) Confession and true contrition are a key part of the Catholic sacrament commonly called Last Rites. (*Id.* ¶¶ 7-9.) Last Rites is no mere ritual but one of the seven holy sacraments (Baptism, Confession, Communion (Eucharist), Confirmation, Marriage, Ordination, Last Rites), and can be administered only by an ordained Catholic priest. (*Id.* ¶ 8.) The guidance and accompaniment of a priest, and the Last Rites and the sacraments of the Eucharist and Confession which Mr. Honken seeks, helps the dying avail themselves of the redemption offered by Jesus for eternal life with God. (*Id.* ¶¶ 9-13, 20.)

Father O'Keefe's presence at the execution is critical to Mr. Honken's exercise of his religion, is also critical to the exercise of Father O'Keefe's religion, and is critical to their shared exercise of their religion. As a Catholic priest, Father O'Keefe feels (and is) obligated to minister to those seeking God's grace, particularly at the critical moment of death. (*Id.* ¶¶ 7-13, 20.) His sincerely-held religious beliefs compel him to accede to Mr. Honken's request to be present at his execution, to administer the sacraments that may enable Mr. Honken to seek salvation, and to prepare Mr. Honken to enter the next life in a state of God's grace. (*Id.* ¶¶ 7-13, 20.) The Catholic Church teaches, and Father O'Keefe sincerely believes, that this is one of the most important roles

4

that a priest can possibly play in helping a member of the flock achieve salvation. (*Id.* ¶¶ 7-13, 20.)

**B.      Clergy Presence at Executions in Catholic and American Traditions.**

In Christianity, the tradition of clergy presence at the time of death derives from Jesus Christ's execution and ministry to the men being crucified alongside him. *See Luke* 23:42-43 (assuring the repentant criminal, "today you shall be with me in Paradise"). The belief that a person's dying moments are critical to salvation has long persisted. *See*, *e.g.*, Ralph Houlbrooke, *Death, Religion, and the Family in England, 1480-1750* 147–49 (1998) ("The last moments of life were believed to be crucially important during the later Middle Ages. . . . [A]t this critical juncture, the Church offered help generally regarded as indispensable in making a safe departure from the world . . . .").

The Catholic Church teaches that the final moments offer a unique final chance to prepare for "our heavenly homeland" and for pardon and redemption. *See Catechism of the Catholic Church* §§ 1525; 1524 (concerning viaticum administered to those "at th[e] moment of 'passing over' to the Father"); 1501-1502 (effect of expected death on discernment); § 1013 (moment of death "decides [man's] ultimate destiny"). This tradition remains an important part of modern Catholicism: "The presence of a priest or deacon shows more clearly that the Christian dies in communion with the church," and is "intended to help the dying person, if still conscious, to face the natural human anxiety about death by imitating Christ in his patient suffering and dying." Liturgy Training Publications, *The Liturgy Documents Volume Two: Essential Documents for Parish Sacramental Rites and Other Liturgies* 228 (2nd ed. 2012).[2]

---

[2] *See also Pope encourages group working to end use of death penalty*, Cath. News Agency (Feb. 27, 2019), https://www.catholicnewsagency.com/news/pope-encourages-group-working-to-end-use-of-death-penalty-89197 (Pope stating that, in executions, "there should at the very least be

Throughout American history, clergy have accompanied condemned prisoners in their last moments.  *See* Ex. 3 (historical newspaper articles) at 1-3; *see also* Stuart Banner, *The Death Penalty: An American History* 1 (2002) (recounting execution where the condemned asked a clergyman to read his final words for him).  At the nation's founding, a clergyman's "execution sermon" from the scaffold went hand-in-hand with "the formulaic lives, last words, and dying confessions of the prisoner[.]"  Louis P. Masur, *Rites of Execution: Capital Punishment and the Transformation of American Culture 1776-1865* 26 (1989).  This clerical role "was so routine that in 1791 William Smith could publish a guide-book for ministers [that contained] suitable devotions before, and at the time of Execution."  *Id.* at 18.[3]

Federal executions have long followed this tradition.  The first known federal execution, the hanging of Thomas Bird in 1790,[4] incorporated "solemn religious exercises."  *See Portland*, Cumberland Gazette, June 28, 1790, at 3 (Ex. 3 at 1).  Mr. Bird's final statement closed with a prayer for divine forgiveness.  *The Dying Speech of Thomas Bird, executed at Portland, June 25, 1790, for the murder of Capt. John Connor, on board the Mary, near the coast of Africa, taken from his mouth on the last day of his life*, Cumberland Gazette, July 26, 1790 at 4.  As in other executions of the day, the condemned man's exercise of religion with and through clergy continued

---

clergy available to hear a person's confession and offer reconciliation, even up to the moment of death.").

[3] Unsurprisingly, these American traditions were similar to English practices during the colonial era. *See, e.g.*, Randall McGowen, *The Body and Punishment in Eighteenth-Century England*, 59 J. Mod. Hist. 651, 651 (1987) ("The condemned . . . were accompanied by a clergyman who shadowed their last moments urging them to repent or consoling them with the offer of divine forgiveness.").

[4] *See* "Historical Federal Executions," United States Marshals Service, *available at* https://www.usmarshals.gov/history/executions.htm (last checked July 3, 2020).

to the place and time of death. *See May 10*, Vergennes Gazette & Vt. & N.Y. Advertiser, May 29, 1800, at 3 (Ex. 3 at 2) (reporting federal executions in which condemned prisoners were "attended to the place of execution" by clergymen, where they prayed and expressed contrition); *The Execution of Edward F. Douglass and Thomas Benson for the Murder of Ava A. Havens*, Bos. Herald, Jul. 28, 1851, at 1 (reporting federal executions in which clergymen accompanied and embraced condemned prisoners on the gallows, and then conveyed their final declarations of innocence).

The tradition of clergy accompaniment during federal executions has since been incorporated into firing squads, *see* R. Michael Wilson, *Legal Executions in the Western Territories, 1847-1911*, 173 (2010); the gas chamber, *see Arthur Brown Executed In Gas Chamber*, Streator Daily Times-Press, Feb. 24, 1965, at 1 (Ex. 3 at 3); and electrocutions, as when a rabbi accompanied Ethel and Julius Rosenberg to the electric chair in 1953, *see* Jack Woliston, *Rosenbergs go silently to electric chair*, UPI (June 20, 1953), https://www.upi.com/Archives/1953/06/20/Rosenbergs-go-silently-to-electric-chair/5084629411212/.[5]   Today, the right to clergy at executions is memorialized in BOP regulations: a spiritual advisor selected by the prisoner is among the few who "shall be present at the execution."  28 C.F.R. § 26.4(c)(3)(i).

## C.     The Grave Risks Imposed by Scheduling Mr. Honken's Execution During the Covid-19 Pandemic

The scheduling of Mr. Honken's execution during the ongoing Covid-19 pandemic means that Father O'Keefe can exercise his sincerely-held religious beliefs and practices, as provided in

---

[5] *See also* Ari L. Goldman, *Rabbi Irving Koslowe, 80; Gave Rosenbergs Last Rites*, N.Y. Times, Dec. 8, 2000, at C15 (describing the same rabbi's attendance at 17 executions where "[h]e would go into the execution chamber, stand opposite as the inmate was strapped into the electric chair, and stay until the end").

Catholic teachings and as requested by Mr. Honken, only by putting himself, and those he ministers to outside the prison, at serious risk of infection and even death.  (O'Keefe Decl. (Ex. 1) ¶¶ 3-4, 14-20, 22.)

### i.     The Serious Health Risks Posed by Covid-19

Covid-19 is a highly contagious and deadly respiratory disease caused by a novel coronavirus known in the scientific community as SARS-CoV-2.  The death rate of Covid-19 is estimated to be several times higher than that of the common flu that kills thousands a year.[6]  The World Health Organization estimates that one in five people who contract the disease becomes seriously ill.[7]  There is currently no available vaccine or cure for Covid-19 infections.[8]

According to the Centers for Disease Control and Prevention (CDC), a person's risk for severe illness from Covid-19 increases with age, rising significantly after the age 50.[9]   Patients aged 50-64 account for approximately 15 percent of Covid-19 deaths; patients aged 65-74 account for approximately 21 percent of deaths; and patients aged 75-84 account for approximately 26 percent of deaths.[10]

---

[6]  *See Expert Responses*, University of Tennessee Health Science Center, https://uthsc.edu/coronavirus/expert-responses.php (last visited Jul. 6, 2020) (estimating that the morbidity rate of Covid-19 is "100s of times worse than influenza").

[7]  *See* https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited Jul. 6, 2020).

[8] *See id.*

[9] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html

[10] Centers for Disease Control and Prevention, Demographic Trends of Covid-19 cases and deaths in the US reported to CDC (updated Jul 6, 2020), https://www.cdc.gov/covid-data-tracker/index.html#demographics.

Patients who experience severe infections from Covid-19 require supportive care, including recourse to scarce medical equipment and specialized care providers who are able to monitor and implement such care. This level of support can exceed local health-care resources.[11] Patients who survive severe Covid-19 infections often require extensive rehabilitation to mitigate neurological damage and the loss of respiratory capacity. Many who suffer from severe infections will likely experience lifelong limitations and disabilities.[12]

The disease is spread, among other ways, by airborne droplets released by infected individuals. Infected droplets can survive on surfaces for some period of time, ranging from four hours to up to three days on certain surfaces.[13] Health experts also believe that the virus can linger in the air well after an infected person coughs or breathes, particularly in poorly ventilated areas.[14] The risk of transmission is also exacerbated when multiple individuals are in close proximity in an indoor setting, particularly (though not exclusively) when social distancing is not possible.[15] Both asymptomatic and pre-symptomatic individuals can unwittingly transmit the disease.[16]

---

[11] Mary Van Beusekom, *Study: Wuhan-like COVID-19 scenario could crush US hospitals*, Center for Infectious Disease Research and Policy (CIDRAP) News (May 6, 2020).

[12] Denise Grady, *Fauci Warns That the Coronavirus Pandemic Is Far From Over*, New York Times (June 9, 2020), available at https://www.nytimes.com/2020/06/09/health/fauci-vaccines-coronavirus.html

[13] Katie McCallum, *How Long Can Coronavirus Survive on Surfaces?* Houston Methodist (Mar. 24, 2020), available at https://www.houstonmethodist.org/blog/articles/2020/mar/how-long-can-coronavirus-survive-on-surfaces/

[14] *See* https://www.nytimes.com/2020/07/04/health/239-experts-with-one-big-claim-the-coronavirus-is-airborne.html (last visited Jul. 6, 2020).

[15] *See id.*

[16] *See* https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses

Indiana Governor Eric Holcomb first declared a state-wide public health disaster emergency in response to the Covid-19 virus on March 6, 2020.[17]  On March 23, 2020, in light of the serious threat posed by Covid-19, Governor Holcomb expanded his March 6th Order by requiring the denizens of Indiana to stay at home except for essential travel, for all non-essential businesses to close, for all public gatherings of over ten people to be prohibited, and imposing social distancing requirements, among other things.[18]

Although limited steps have been taken to re-open Indiana, Governor Holcomb extended the declaration of a state-wide public health disaster emergency several times over the past several months.  As recently as July 1, 2020, Governor Holcomb extended the emergency until at least August 3, 2020.[19]

On March 23, 2020, the Supreme Court of Indiana declared a public health emergency and required all counties to submit plans to deal with the tolling of speedy trials, the suspension of jury trials, the release of non-violent prisoners, the suspension of issuing civil attachments and body warrants, and other measures related to the public health crisis.[20]  After each county submitted their plans, the Indiana Supreme Court extended the deadlines for these life-saving measures several times.[21]  The most recent order of the Indiana Supreme Court addressing trial court practice

---

[17] *See* https://www.in.gov/gov/files/20-02ExecutiveOrder(DeclarationofPublicHealthEmergencyforCOVID-19)FINAL.pdf

[18] *See* https://www.in.gov/gov/files/Executive_Order_20-08_Stay_at_Home.pdf.

[19] *See* https://www.in.gov/gov/files/Executive%20Order%2020-34%20Extention%20of%20the%20Public%20Health%20Emergency.pdf.

[20] *See* https://www.in.gov/judiciary/files/order-other-2020-20S-CB-123a.pdf

[21] *See* https://www.in.gov/judiciary/3679.htm.

was issued on May 29, 2020, which further extended the tolling of speedy trial rights through August 14, 2020, extends the suspension of civil attachments and body warrants until August 15, 2020, and extends the use of remote proceedings through January 1, 2021.[22] The Indiana Appellate Court likewise issued an Order suspending all in-person filing requirements until further notice.[23]

In federal court, the Southern District of Indiana has issued a General Order continuing jury trials (currently through July 20), conducting most civil proceedings via teleconference (currently until August 17), conducting most criminal proceedings via teleconference (currently until July 20), and postponing naturalization ceremonies (currently until August 13).[24]

It is well established that the risk of exposure to and transmission of infectious diseases, as well as the potential harm to those who become infected, is significantly higher in jails and prisons than in the community.[25]  BOP recognizes the serious risks of Covid-19 transmission within the prison population and to those who come in contact with the prison population.  On March 13, 2020, BOP closed the doors of every federal prison across the country to visitation, including visits by accredited religious volunteers such as Father O'Keefe.[26]

On June 15, 2020, while federal prisons around the country remained essentially on lockdown to prevent the spread of Covid-19, the Department of Justice announced that it had

---

[22] *See* https://www.in.gov/judiciary/files/order-other-2020-20S-CB-123k.pdf.

[23] *See id.*

[24]                                                                                          *See* https://www.insd.uscourts.gov/sites/insd/files/Court%20General%20Order%20RE%20COVID-19%20-%203-19-20.pdf

[25] *See, e.g.*, *Terre Haute Prison Inmate with COVID-19 Dies; 3 More Have It*, Associated Press (May 26, 2020) https://apnews.com/68728df5667ad81ce3d86a255fc4c4fb

[26] *See* https://www.bop.gov/resources/news/20200313_covid-19.jsp

scheduled four executions at USP Terre Haute within a matter of weeks, including Mr. Honken's execution for July 17, 2020.[27]  The Covid-19 pandemic has continued unabated in the United States, and indeed has worsened, since that time.[28]  The BOP has indicated that it will reinstate visits for Mr. Honken and the other three inmates under death warrant, but it continues to prohibit other inmate visits, including spiritual advisor and legal visits.  To this day, the BOP website features a prominent advisory that "all visiting at [USP Terre Haute] has been suspended until further notice."[29]  Just yesterday morning, on July 7, 2020, Father O'Keefe received an email from USP Terre Haute staff stating:  "FCC Terre Haute is NOT allowing volunteer entry the Complex at this time.  Additionally, all training has been postponed.  We will contact you with further information, once it becomes available."  (BOP's July 7, 2020 email to Father O'Keefe (Ex. 4) (original emphasis).)

The Government's plan for the upcoming executions involves a 40-person execution team, as well as the reassignment of approximately 200 prison employees from their normal duties to assist with security and support the executions.[30]  It entails individuals converging in Terre Haute from around the country, thereby facing potential exposure to Covid-19 on planes, in airports, and in hotels, and causing others to be exposed as well. These individuals will then convene and mix

---

[27]     https://www.justice.gov/opa/pr/executions-scheduled-four-federal-inmates-convicted-murdering-children

[28] Amy Goldstein, *Fauci Worries U.S. Covid-19 Cases Could Climb to 100,000 Daily,* Washington Post (June 30, 2020), available at https://www.washingtonpost.com/health/fauci-worries-us-covid-19-cases-could-climb-to-100000-daily/2020/06/30/917617ba-bafc-11ea-80b9-40ece9a701dc_story.html

[29] *See* https://www.bop.gov/locations/institutions/thp/ (last visited Jul. 6, 2020).

[30] *See In Re Matter of Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-145-TSC, Declaration of Rick Winter ("Winter Decl.") ¶¶ 5-8, ECF No. 54 (D.D.C. Nov. 21, 2019).

in enclosed spaces with BOP staff drawn from around a prison with known Covid-19 cases for group training, practices, meetings, and on-site work, escalating the risks of infection for the prisoners, staff, and ultimately anyone attending the execution, including Father O'Keefe.[31]

Before Mr. Honken's execution, Father O'Keefe and Mr. Honken's lawyers will have to visit with him in the execution facility, sometimes referred to as the "Death House." At the 2003 execution of Louis Jones, Jr., Mr. Jones's attorney, his daughter, and three prison ministers had to stand "shoulder to shoulder" to fit in the room to talk with Mr. Jones before the execution.[32]

The execution facility is a separate facility on the FCC Terre Haute grounds. It is a small, single story building, like a small home. The witnesses and prison staff are shuttled together in a van to the facility from the main correctional complex prior to arriving at separate entrances for various groups of witnesses.[33]  Many of the individuals in attendance will have traveled from other states in the days immediately preceding the execution, increasing the risk of virus transmission to Father O'Keefe and others in attendance.[34]  Upon information and belief, it will not be possible to maintain social distancing at Mr. Honken's execution.

### ii.    These Health Risks Burden Father O'Keefe's Religious Practice

Father O'Keefe is 64 years old.   (O'Keefe Decl. (Ex. 1)  ¶ 14).  He is thus at higher risk of serious complications should he contract Covid-19.

---

[31] *See generally* Declaration of Timothy Floyd, Filing No. 6-24.

[32] *See id.* ¶ 9.

[33] *See id.*

[34] *See In Re Matter of Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-145-TSC, Declaration of Rick Winter ("Winter Decl.") ¶¶ 5, 10 ECF No. 54 (D.D.C. Nov. 21, 2019).

13

As part of his ministry, Father O'Keefe is a Resident Chaplain for the nuns who are cloistered at the Carmelite Monastery in Terre Haute. (*Id.* ¶ 18.) In this capacity, he holds a daily Mass for the cloistered nuns, at which he administers the sacrament of Communion. (*Id.* ¶¶ 18-19.) Several of the nuns who attend daily Mass as a central part of their own religious practice are over the age of 60 and a few are over 80 years old; they thus are at an increased risk of serious complications in the event they contract Covid-19. (*Id.* ¶ 19.)

Father O'Keefe understands that his presence at Mr. Honken's execution will expose him to the risk of Covid-19 infection and even death. (*Id.* ¶ 20.) He also understands, and the cloistered nuns understand, that if Father O'Keefe continues to hold daily Mass for them following Mr. Honken's execution, as the nuns have requested, he may also expose them to a risk of infection and even death. (*Id.*) He has agreed to risk life and limb, because of his sincerely held belief that he must be available to minister to Mr. Honken at his execution, including to offer Mr. Honken the sacraments that will enable him to seek salvation. (*Id.*) Father O'Keefe nonetheless fears for his health and life, and the health and life of those outside the prison to whom he ministers, as a result of the timing of Mr. Honken's execution in the midst of the pandemic and the risks that he must take in order to carry out his sacred duties as a Catholic priest and as Mr. Honken's spiritual advisor. (*Id.*)

## ARGUMENT

To obtain a preliminary injunction, the moving party must show: (1) a significant possibility of success on the merits; (2) irreparable harm without the injunction; (3) that the "balance of equities" is in its favor; and (4) the injunction is in the public interest. *Hill v. McDonough*, 547 U.S. 573, 584 (2006); *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013).

14

Where fundamental religious rights are threatened, the plaintiff who demonstrates a significant possibility of success establishes the remaining factors too. *Korte*, 735 F.3d at 666.

**I.   FATHER O'KEEFE IS LIKELY TO SUCCEED ON THE MERITS OF BOTH HIS RFRA AND APA CLAIMS.**

Defendants have acknowledged that Father O'Keefe's claims are "nearly identical" to those of Rev. Hartkemeyer. (Filing No. 52 at p. 1.) As the court summarized: "Fr. O'Keefe's claims are undeniably similar to Mr. Hartkemeyer's. Like Mr. Hartkemeyer, he is the designated spiritual advisor chosen by an inmate to be present for the inmate's scheduled execution. And like Mr. Hartkemeyer, he challenges the scheduling of the relevant execution (1) under RFRA as a substantial burden on his sincerely held religious beliefs and (2) under the APA as arbitrary and capricious." (Filing No. 54 at pp. 2-3.) To avoid redundancy, Father O'Keefe incorporates by reference and joins in Rev. Hartkemeyer's arguments regarding his likelihood of success on these claims, and further addresses additional facts specific to substantial burden on the exercise of religion under RFRA. (*See* Filing No. 7, Point I, at pp. 15-31.)

Father O'Keefe, like Rev. Hartkemeyer, is substantially burdened in his religious exercise because Defendants "are forcing him to choose between fulfilling his religious duty to attend the execution as [Mr. Honken's] priest and protecting himself from risk of serious illness or death as a person especially susceptible to illness or death from COVID-19." (Filing No. 7 at p. 16.)

If anything, the burden on Father O'Keefe is potentially greater. Like Rev. Hartkemeyer, Father O'Keefe is over 60 years old; at age 64, he understands that he is "at a high risk of serious complications and even death attendant to the spread of COVID-19, which has intensified in recent days." (O'Keefe Decl. (Ex. 1) ¶ 14.) Additionally, Father O'Keefe is the Resident Chaplain at the Carmelite Monastery in Terre Haute, where he says a daily Mass for the cloistered nuns, at which he provides them with the holy sacrament of Communion. (*Id.* ¶ 18.) As he explains: "It is an

15

essential part of ministry that I am able to administer Communion to the nuns on a daily basis. There are several nuns over the age of 60 and a few who are over 80 years old. I understand this means they too are at a heightened risk of serious COVID-19 complications, including death, associated with the current pandemic and with the close contact with others that will be inevitable when I attend [Mr. Honken's] execution." (*Id.* ¶ 19.)

As a Catholic priest, Father O'Keefe is morally and spiritually obligated, in the most sacred of duties, to minister to Mr. Honken at the time of death, which includes the administering of Last Rites. (*Id.* ¶¶ 2-4, 12-14, 20.) He also is morally and spiritually obligated, as "an essential part of [his] ministry," to administer Communion to the nuns on a daily basis. (*Id.* ¶ 19.) Because of the Defendants' insistence of executing Mr. Honken in the midst of this surging pandemic, Rev. O'Keefe can perform his religious duties only by jeopardizing not just his own life and health, but also the life and health of "those closest to [him] in the faith." (*Id.* ¶ 20.) RFRA does not allow the Government to levy such a tax on the conduct of religion.

To the contrary, "RFRA was designed to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). A substantial burden exists when the Government puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 141 (1987). The risk of contracting and spreading COVID-19 has caused the entire world population to modify its behavior in the drastic and fundamental ways. The Defendants' stance brings that pressure to bear directly on Father O'Keefe's commitment to his most solemn religious duty. The Defendants themselves acknowledge the severe burden that the risk of Covid-19 places on religious practice. Just yesterday morning, the BOP reinforced that "FCC Terre Haute is <u>NOT</u> allowing volunteer [ministry] entry the Complex at this time. Additionally, all training has been postponed." (Ex.

16

4.)    For months, the Defendants have prevented Father O'Keefe—and all other clergy—from ministering to Mr. Honken—and all other inmates at USP Terre Haute—in the name of Covid-19. (O'Keefe Decl. (Ex. 1) ¶¶ 16-17.)

Courts at every level have held that forcing a person to choose between his religion and his well-being—let alone the well-being of others—is a substantial burden on the free exercise of religion. *See Scherbert v. Verner*, 374 U.S. 398, 404 (1963) ("The ruling [disqualifying plaintiff from benefits because of her refusal to work on Saturday in violation of her faith] forces her to choose. . . . Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against [her] for her Saturday worship."); *Thompson v. Holm*, 809 F.3d 376, 380 (7th Cir. 2016) ("We have repeatedly held that forcing an inmate to choose between daily nutrition and religious practice is a substantial burden"); *Nelson v. Miller*, 570 F.3d 868, 870 (7th Cir. 2009) (holding that a substantial burden exists where the government "forces [a prisoner] to choose between his religious practice and adequate nutrition"); *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990) (upholding a free exercise claim where a prisoner is "put to an improper choice between adequate nutrition and observance of the tenets of his faith"); *Univ. of Notre Dame v. Sebelius*, 988 F. Supp. 2d 912, 924 (N.D. Ind. 2013) ("it violates RLUIPA to give a prisoner the Hobson's choice of either starving himself or observing his religion").

In its opposition to Father O'Keefe's motion to intervene, Defendants betray their fundamental misunderstanding of the burden they have placed on him. Defendants write that "[i]f Father O'Keefe *wishes* to have physical contact with Mr. Honken for purposes of performing the Last Rites, he may do so in the holding cell of the execution facility." (Filing No. 52 at p. 4, n.1 (emphasis added).) Father O'Keefe's ministry to Mr. Honken at the time of death, including administration of the Last Rites which requires physical contact, is not a matter of desire, but of

duty.  (*See* O'Keefe Decl. ¶¶ 12-15, 20.)   By forcing Father O'Keefe to assume the risk of contracting and spreading Covid-19 in order to honor his religious obligation, the Defendants have imposed a substantial burden on Father O'Keefe's exercise of religion.

## II.    FATHER O'KEEFE MEETS THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF.

Where fundamental religious rights are threatened, the plaintiff who demonstrates a significant possibility of success establishes the remaining factors too.  This is true because even a brief deprivation of religious rights constitutes irreparable harm, and the balance of harms and public interest weigh heavily in favor of preventing the irreparable injury.  *See Korte v. Sebelius*, 735 654, 666 (7th Cir. 2013).

As set forth in Point I and Rev. Hartkemeyer's briefing incorporated by reference, Father O'Keefe has demonstrated a significant possibility of success on his RFRA claim, such that he is entitled to injunctive relief to put a stop to this infringement of his religious liberty.  Indeed, at age 64, Father O'Keefe is at an increased risk for severe illness from COVID-19, as are several of the nuns to whom he ministers daily, including some over 80.  The Defendants deem the risk of Covid-19 so serious that since March they have curtailed all volunteer minister visits at USP Terre Haute—except, just now, for the scheduled executions.  Without an injunction, the only way Father O'Keefe could avoid this risk to himself and those close to him would be to shirk his solemn religious duties.  Father O'Keefe endures irreparable injury as long as he is forced to make this choice in the midst of a global pandemic.   Father O'Keefe further incorporates by reference and joins in Rev. Hartkemeyer's arguments regarding irreparable harm, the balance of equities, and the public interest.  (*See* Filing No. 7, Points II-IV, at pp. 32-34.)

18

**CONCLUSION**

For the foregoing reasons, Father O'Keefe respectfully requests that the Court grant his Motion for a Preliminary Injunction.

Dated:   July 8, 2020                    Respectfully submitted,

**PLAINTIFF INTERVENOR**
**FATHER MARK O'KEEFE, OSB**

By:       */s/  Abigail A. Clapp*

Abigail A. Clapp (Ind. Atty. No. 25444-45)
Greenberg Traurig, LLP
77 W. Wacker Dr., Ste. 3100
Chicago, IL   60601
Tel.    (312) 456-8400
Fax     (312) 899-0393
Email   ClappA@gtlaw.com

Edward C. Wallace*
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
Tel:  (212) 801-9200
WallaceE@gtlaw.com

Michael M. Krauss (*pro hac vice*)
Greenberg Traurig, LLP
90 South Seventh Street, Suite 3500
Minneapolis, MN  55402
Tel:  (612) 259-9700
KraussM@gtlaw.com

Kyle R. Freeny (*pro hac vice*)
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, DC  20037
Tel:  (202) 331-3100
FreenyK@gtlaw.com

*pro hac vice* motion forthcoming

19