**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| DALE HARTKEMEYER (AKA SEIGEN) | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:20-cv-00336-JMS-DLP |
| WILLIAM P. BARR, in his official capacity as the Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons; and T.J. WATSON, in his official capacity as Complex Warden for Terre Haute Federal Correctional Complex, | ) | |
| Defendants. | ) | |

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION...........................................................................................................................1

ARGUMENT................................................................................................................................2

I.    DEFENDANTS' MITIGATION EFFORTS ARE WHOLLY INADEQUATE
      TO PROTECT REV. HARTKEMEYER FROM THE SUBSTANTIAL
      RISKS POSED BY COVID-19, INCLUDING SERIOUS ILLNESS OR
      DEATH .............................................................................................................................2

II.   REV. HARTKEMEYER IS LIKELY TO SUCCEED ON THE MERITS OF
      BOTH HIS RFRA AND APA CLAIMS .........................................................................6

      A.    Rev. Hartkemeyer's Religious Exercise Is Substantially Burdened By
            Defendants' Decision To Execute Mr. Purkey During a Pandemic ..................6

            1.    As The BOP's Own Policies And Regulations Affirm, Clergy
                  Play A Unique And Important Role In Executions ..............................7

            2.    The Government's Decision To Execute Mr. Purkey During A
                  Pandemic Intrudes On Rev. Hartkemeyer's Religious Exercise..........9

      B.    The Government Has Failed To Show A Compelling Interest In
            Carrying Out Mr. Purkey's Execution During A Pandemic ..........................12

      C.    The Government Has Failed To Show It Will Use The Least
            Restrictive Means To Carry Out Its Interests....................................................15

      D.    The Government's Scheduling Decision Is Reviewable Under The
            Administrative Procedure Act And Must Be Set Aside ...................................17

            1.    The Government Exceeded Its Discretion In Scheduling
                  Mr. Purkey's Execution During The Pandemic...................................18

            2.    Rev. Hartkemeyer Falls Within The Relevant "Zone Of
                  Interests".................................................................................................19

            3.    The Government's Decision Is Arbitrary And Capricious.................22

III.  DEFENDANTS' BALANCE OF HARMS ANALYSIS IS UNSOUND ....................24

CONCLUSION .........................................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Askins v. U.S. Dep't of Homeland Sec.*,
  899 F.3d 1035 (9th Cir. 2018) ...................................................................................16

*Baze v. Rees*,
  553 U.S. 35 (2008) ....................................................................................................14

*Bowen v. Roy*,
  476 U.S. 693 (1986) ..................................................................................................11

*Bucklew v. Precythe*,
  139 S. Ct. 1112 (2019) ..............................................................................................14

*Burwell v. Hobby Lobby*,
  573 U.S. 682 (2014) ..............................................................................................15, 17

*Calderon v. Thompson*,
  523 U.S. 538 (1998) ..................................................................................................14

*Carter v. Broadlawns Med. Ctr.*,
  857 F.2d 448 (8th Cir. 1988) ......................................................................................8

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 399 (1987) ..................................................................................................20

*Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*,
  2020 WL 3271746 (U.S. June 18, 2020) ...............................................................22, 23

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
  955 F.3d 106 (D.C. Cir. 2020) ..................................................................................21

*Freedom from Religion Found., Inc. v. Lew*,
  983 F. Supp. 2d 1051 (W.D. Wis. 2013), *vacated and remanded on standing
  grounds*, 773 F.3d 815 (7th Cir. 2014) .....................................................................8

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
  565 U.S. 171 (2012) ....................................................................................................8

*Katcoff v. Marsh*,
  755 F.2d 223 (2d Cir. 1985) ...............................................................................8, 11, 12

*Korte v. Sebelius*,
  528 F. App'x 583 (7th Cir. 2012) ..............................................................................24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)..................................................................................................19, 21

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
  485 U.S. 439 (1988)..........................................................................................................11

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
  138 S. Ct. 1719 (2018)......................................................................................................8

*McAllen Grace Brethren Church v. Salazar*,
  764 F.3d 465 (5th Cir. 2014) ..........................................................................................16

*McDaniel v. Paty*,
  435 U.S. 618 (1978)..........................................................................................................7

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ......................................................................................20

*Nebraska Press Ass'n v. Stuar*t,
  427 U.S. 539 (1976)..........................................................................................................16

*Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*,
  144 F. Supp. 3d. 35 (D.D.C. 2015) ................................................................................20

*Physicians for Soc. Responsibility v. Wheeler*,
  956 F.3d 634 (D.C. Cir. 2020) ........................................................................................18

*Procunier v. Martinez*,
  416 U.S. 396 (1974)..........................................................................................................10

*Purkey v. United States*,
  No. 19-3318, 2020 WL 3603779 (7th Cir. July 2, 2020).............................................13, 14, 25

*Trammel v. United States*,
  445 U.S. 40 (1980)..........................................................................................................8

*Turner v. Safley*,
  482 U.S. 78 (1987)..........................................................................................................10

*United States v. Anderson*,
  854 F.3d 1033 (8th Cir. 2017) ........................................................................................17

*United States v. Christie*,
  825 F.3d 1048 (9th Cir. 2016) ........................................................................................17

**Statutes**

18 U.S.C. § 3596..................................................................................................................21

26 U.S.C. § 107 ....................................................................................................................8

42 U.S.C. § ch. 21B ..................................................................................................... *passim*

50 U.S.C. § 3806 ..................................................................................................................8

Mo. Rev. Stat. § 546.740 (2013) ......................................................................................21

**Other Authorities**

28 C.F.R. § 26.3(a)(1) .......................................................................................................19

28 C.F.R. § 26.4(c) ...................................................................................................... *passim*

Bureau of Prisons, Program Statement P5360.09 (Dec. 31, 2004),
    https://www.bop.gov/policy/progstat/5360_009.pdf. ..............................................9

Centers for Disease Control & Prevention, "COVID-19 Pandemic Planning
    Scenarios," https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-
    scenarios.html (updated May 20, 2020) ...................................................................23

*COVID-19 vaccine a matter of 'when not if,' but must be produced safely: Fauci*,
    CBC (Updated June 23, 2020) https://www.cbc.ca/news/world/dc-house-
    coronavirus-briefing-1.5623382 .............................................................................16

*Fact Sheet: Explaining Operation Warp Speed*, U.S. Dep't of Health and Human
    Servs. (June 16, 2020), https://www.hhs.gov/about/news/2020/06/16/fact-
    sheet-explaining-operation-warp-speed.html ..........................................................16

Heather Good, *Union Reps Raise Concern About Safety Inside Federal Prison
    Amid Outbreak*, WTHI-TV 10 (updated Mar. 27, 2020),
    https://www.wthitv.com/content/news/Union-reps-raise-concerns-about-
    safety-inside-federal-prison-amid-outbreak-569141811.html. ..................................4

Johns Hopkins University Coronavirus Resource Center (July 8 2020),
    https://coronavirus.jhu.edu/map.html ......................................................................24

*Trump Administration's Operation Warp Speed Accelerates AstraZeneca COVID-
    19 Vaccine to be Available Beginning in October*, U.S. Dep't of Health and
    Human Servs. (May 21, 2020),
    https://www.hhs.gov/about/news/2020/05/21/trump-administration-
    accelerates-astrazeneca-covid-19-vaccine-to-be-available-beginning-in-
    october.html ............................................................................................................16

## INTRODUCTION

After a nearly two-decade hiatus from federal executions, Defendants intend to carry out back-to-back executions during the peak of the most serious pandemic in a century in one of the most dangerous settings for COVID-19 transmission: an indoor prison facility with a known COVID-19 outbreak, poor ventilation, no ability to socially distance, and extensive exposure to BOP staff—each with likely sustained and frequent close contact with hundreds of individuals, all in similarly high-risk settings. Defendants' Opposition to Plaintiff's Motion to merely reschedule—not cancel—Mr. Purkey's execution for a time when attending will not jeopardize Rev. Hartkemeyer's life is based not on the opinion of any medical or public health expert but solely on counsel's arguments, which are uninformed and erroneous as evidenced by the misguided comparison of COVID-19 exposure in a prison to that in a grocery store. The entirety of Defendants' position that the risk will be adequately mitigated on the day of the execution rests on the declaration of a BOP attorney, Rick Winter, outlining Defendants' *post hoc* and limited plans.[1] Indeed, Defendants' continued failure to respond to specific questions about COVID-19 safety measures asked by counsel for Mr. Purkey, and now this Court and Rev. Hartkemeyer's counsel (at the direction of the Court) further demonstrate that the Government is ill-prepared to take Mr. Purkey's life without threatening Rev. Hartkemeyer's. *See* [Filing No. 59 at 1]. Mr. Winter's declaration demonstrates the serious shortcomings in BOP's hastily crafted plan, and is therefore insufficient to overcome the high bar Defendants must meet to justify their arbitrary and

---

[1] *See* [Filing No. 6-6 at 3-4] (BOP Legal Counsel stated the day after issuing Mr. Purkey's 30-day execution warrant that "we do not have anything written [about COVID safety measures] but I am working on it"); *id*. at 4 ("BOP Legal Counsel stat[ed] 'We are still working on a plan'. . . and that she would have something in writing for me by the next day. The following day I received nothing."); *id*. at 4-5 (BOP Legal Counsel responded to the repeated requests of Mr. Purkey's counsel for specific COVID-19 safety procedures by stating, "It is unclear what additional protocols you are seeking"); *id*. at 7 (stating that, as of June 29, 2020, "BOP Legal Counsel has provided no information pertaining to COVID-19 related safety measures that will be implemented on the day of the scheduled execution" apart from making masks and sanitizer available).

capricious actions, which substantially burden, in violation of the Religious Freedom Restoration Act ("RFRA"), Rev. Hartkemeyer's ability to exercise his priestly duties as at Mr. Purkey's execution.

## ARGUMENT

I.    **DEFENDANTS' MITIGATION EFFORTS ARE WHOLLY INADEQUATE TO PROTECT REV. HARTKEMEYER FROM THE SUBSTANTIAL RISKS POSED BY COVID-19, INCLUDING SERIOUS ILLNESS OR DEATH**

Defendants assert that they plan to implement a handful of measures intended to mitigate the serious risks posed by the COVID-19 pandemic. *See generally* [Filing No. 33-1]. The measures Mr. Winter describes, however, are minimal at best and inadequate to protect an individual like Rev. Hartkemeyer, who is medically vulnerable to COVID-19. [Filing No. 57 at 6-7.] Further, even with such measures in place, the risk of COVID-19 transmission remains high, and Rev. Hartkemeyer is still at risk of contracting COVID-19 should he visit USP Terre Haute or attend the execution. *Id.* at 6-7.

The limited testing at FCC Terre Haute has already revealed a COVID-19 outbreak at the prison. But BOP's existing testing practices are insufficient to determine the extent of that outbreak or to prevent viral spread within the prison complex and to visitors.[2] To date, BOP has tested only 16 percent of prisoners at FCC Terre Haute for COVID-19.[3] This limited testing

---

[2] The COVID-19 testing data provided by BOP is internally inconsistent and evokes questions about the reliability of the data itself. Mr. Winter's Declaration cites BOP's own website as a source for BOP testing statistics. [Filing No. 33-1 at 3.] Yet, this website states in one area that only one prisoner at FCI Terre Haute has tested positive, and in another area on the same webpage that three prisoners have tested positive. Federal Bureau of Prisons, Coronavirus, https://www.bop.gov/coronavirus/ (last visited July 8, 2020) (one chart stating three prisoners at FCI tested positive for COVID-19; while another chart states that one prisoner at FCI currently has COVID-19, zero prisoners have recovered, and zero have died from the virus). Similarly, the website states both that ten prisoners at USP Terre Haute have tested positive, and that only eight have tested positive. *Id.* (one chart stating ten prisoners at USP tested positive for COVID-19 while the other states that four prisoners currently have COVID-19, four prisoners recovered, and one died from the virus).

[3] *Id.* (264 of the 1,227 prisoners at USP Terre Haute were tested and 141 of the 1,300 prisoners at FCI Terre Haute were tested).

conducted at FCC Terre Haute renders the statistics for positive cases meaningless. Only two prisoners were tested at the Special Confinement Unit ("SCU"), the housing unit where Mr. Purkey is currently housed and where Rev. Hartkemeyer would be required to visit Mr. Purkey should he choose to do so in the days leading up to the execution. *Id.* at 2-3. In his declaration, Mr. Winter glosses over the threat to Rev. Hartkemeyer by relying on the negative results of those two SCU prisoners' tests with no mention of their statistical insignificance or consideration of the documented active cases within the rest of the building, USP Terre Haute, *id.* at 2-3, through which Rev. Hartkemeyer must travel in order to visit Mr. Purkey in the SCU.

Defendants have not indicated whether staff move between buildings within FCC Terre Haute or whether they are restricted to any particular housing unit. Indeed, staff are the primary vector for transmission as they move between units and intermingle with other staff, prisoners, and the influx of individuals arriving for the execution. [Filing No. 57 at 3-5.] Further, prisons are poorly ventilated, confined spaces, which add to the risk that the virus may be transmitted throughout the building through airborne droplets. *Id.* at 2. Thus, Defendants' assertion that "there have been zero cases of COVID-19 in the SCU" offers nothing by way of risk mitigation given the dearth of testing and the high degree of staff movement between facilities and housing units. [Filing No. 33-1 at 2-3.]

Testing is the only way to determine who is a carrier of the virus. *See* [Filing No. 6-25 at 10]; [Filing No. 58 at 8-9] ("The lack of testing is a major concern[.]"). Despite this, Mr. Winter freely admits that BOP *does not intend* to conduct COVID-19 testing to screen any of the staff or visitors with whom Rev. Hartkemeyer is likely to interact. [Filing No. 33-1 at 3.] Instead, BOP's intends to rely on "temperature check[s] and symptom screening," which fall woefully short, [Filing No. 33-1 at 2], since neither can "adequately screen for new, asymptomatic or pre-

3

symptomatic infections," [Filing No. 6-25 at 10-11]. Defendants further fail to address the fact that these outdated screening procedures, put in place at the start of the pandemic, have proven ineffective at preventing the virus from entering and spreading within the prison. At the time these screening measures were implemented, there were zero positive cases. But today, BOP reports at least 14 positive cases among prisoners and staff even without adequate testing.[4] As one employee at FCC Terre Haute described, "It's very confined spaces, very confined areas and when we get sickness that comes in, it goes through that place like wildfire."[5]

Further, Defendants' Opposition neglects to address the poor ventilation systems in both the SCU within USP Terre Haute and the Death House itself—a critical factor in determining the risk of infection related to an airborne virus. [Filing No. 6-25 at 15-16.] Without appropriate ventilation systems to direct airflow outside of the building and prevent recirculation of air, there is a strong possibility of airborne transmission even when individuals are separated into different rooms within the same building. *Id*.

Mr. Winter's characterization of Rev. Hartkemeyer's risk of exposure in the days leading up to and the day of the execution as "very limited interactions with the vast majority" of individuals expected to be present at Mr. Purkey's execution is also misleading. [Filing No. 33-1 at 2.] The uncontested evidence from Rev. Hartkemeyer's submissions and the facts contained in Mr. Winter's own declaration make it plain that Rev. Hartkemeyer will confront repeated exposure to numerous BOP staff, including those exposed to a multitude of other prisoners and those who will be exposed to others from disparate locations from around the country. In the days leading

---

[4] *See* Federal Bureau of Prisons, Coronavirus, https://www.bop.gov/coronavirus/ (last visited July 8, 2020) (10 positive cases among prisoners at USP; 3 positive cases among prisoners at FCI); [Filing No. 33-1 at 2] (one positive case among staff).

[5] Heather Good, *Union Reps Raise Concern About Safety Inside Federal Prison Amid Outbreak*, WTHI-TV 10 (updated Mar. 27, 2020), https://www.wthitv.com/content/news/Union-reps-raise-concerns-about-safety-inside-federal-prison-amid-outbreak-569141811.html.

up to the execution, Rev. Hartkemeyer must come into close contact with BOP staff each time he is screened at the entrance to Terre Haute USP, as he is escorted within the Terre Haute USP to the SCU, where he would meet with Mr. Purkey in the days leading up to the execution, and as he departs. *See id.* at 3; [Filing No. 6-2 at 7-8].  To reach Mr. Purkey in the SCU, his route will require walking through a number of units and hallways through USP Terre Haute, and confinement in small spaces like an elevator, where it is not possible to socially distance from BOP staff escorts.  [Filing No. 6-2 at 7-8.]  This exposure repeats at the end of each visit to Mr. Purkey as BOP staff escorts him out of the facility.  *Id*. at 8.

Rev. Hartkemeyer will be exposed to still others if he visits Mr. Purkey at the Death House or attends the execution.  *See* [Filing No. 6-24 at 3]; Goldenson Suppl. Dec. ¶¶ 18, 19.  He must park his car and travel on a van with an unknown number of BOP staff and other witnesses to the main entrance at USP Terre Haute, where he and others will be screened and processed through security.  [Filing No. 6-24 at 3-4.]  BOP staff will then transport him on yet another van.  [Filing No. 33-1 at 4.]  If he meets with Mr. Purkey before the execution, BOP escorts will be accompany him and members of Mr. Purkey's legal team may also be present.  All of these individuals will share space in a small room where social distancing will not be possible and proper ventilation not an option.  *Id.* at 3-4; [Filing No. 6-24 at 3].  The members of Mr. Purkey's legal team whom he designated as witnesses will only be "provided PPE if they desire."  [Filing No. 33-1 at 3-4.]  During the actual execution, Rev. Hartkemeyer and other individuals will be in the small execution chamber with Mr. Purkey where there will be no ability to socially distance.   [*Id.* at 5; Filing No. 57 at 6.]  And, again, the poorly ventilated areas in which each of these interactions are required to take place increases the risk of airborne transmission of the virus.  [Filing No. 57 at 2-3.]

But, perhaps most importantly, even if Rev. Hartkemeyer interacts with only ten or fifteen individuals in close contact, many of those individuals themselves are likely to have each been exposed to others in the days leading up to the execution, significantly increasing his risk. *See* [Filing No. 33-1 at 3-5; Filing No. 58 at 7-9.]

The Personal Protective Equipment ("PPE") that Defendants would provide Rev. Hartkemeyer during his time at the prison—a surgical face mask, gloves, gown, and a plastic face shield—is insufficient to fully mitigate his risk of exposure to the deadly virus. [Filing No. 58 at 8-9; Filing No. 57 at 4.] A surgical mask does not protect Rev. Hartkemeyer from the individuals around him. [Filing No. 57 at 4.]

The handful of deficient and belated measures that the Government contends will mitigate the risk of spread during the execution will not prevent Mr. Purkey's execution from turning into the kind of super-spreader event that countless health experts have forewarned. [*See* Filing No. 1 at 13 n.38-40.] Rev. Hartkemeyer still faces an intolerable, life-threatening risk should he visit the facility in the days leading up to the execution, and especially to fulfill his religious duty on the day of the execution. [Filing No. 57 at 6-7; Filing No. 58 at 9.] Expert Dr. Goldenson—who, like Rev. Hartkemeyer, is medically vulnerable by virtue of his age alone—"would not personally enter any of the buildings at issue, even with the mitigation efforts described by Mr. Winter." [Filing No. 57 at 3.]

## II. REV. HARTKEMEYER IS LIKELY TO SUCCEED ON THE MERITS OF BOTH HIS RFRA AND APA CLAIMS

### A. Rev. Hartkemeyer's Religious Exercise Is Substantially Burdened By Defendants' Decision To Execute Mr. Purkey During a Pandemic

Defendants' argument that Rev. Hartkemeyer suffers no substantial burden on his religious exercise ignores the special role played by clergy in ministering to the faithful, the particular import

of this role in the prison—and especially, execution—contexts, and the mutual nature of the specific spiritual relationship forged between Rev. Hartkemeyer and Mr. Purkey. Rev. Hartkemeyer is not some stranger off the street who "independently has a sincere religious belief that he should visit FCC Terre Haute to pray for the condemned inmates outside the walls of the facility." [Filing No. 33 at 14.]  On the contrary, he is an ordained Buddhist priest, who has served as Mr. Purkey's spiritual advisor for more than a decade and whose relationship with Mr. Purkey has been recognized and affirmed by the BOP.  The BOP identifies him as Mr. Purkey's official "Minister of Record," and has confirmed his designation, per BOP regulations, as the spiritual advisor who "shall be present" at Mr. Purkey's execution.  Nor is Rev. Hartkemeyer objecting to the execution date merely because he has "a scheduling conflict unrelated to COVID-19[.]"  *Id.* at 4.  He objects because attending the execution is a religious duty at a spiritually pivotal moment in his ministry to Mr. Purkey, yet doing so in the midst of a pandemic would pose a grave risk to Rev. Hartkemeyer's health and life.  He thus faces significant pressure to abandon his religious beliefs and practices pertaining to his longstanding spiritual relationship with Mr. Purkey.  The combination of the unique facts here demonstrates that the imposition on Rev. Hartkemeyer's religious exercise is more than adequate to invoke RFRA's protections.

### 1. As The BOP's Own Policies And Regulations Affirm, Clergy Play A Unique And Important Role In Executions

Clergy play a distinctive and important role in matters of faith, implicating core rights under the First Amendment.  As the Supreme Court has made clear, "the right to the free exercise of religion unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions, or, in other words, to be a minister . . . ." *McDaniel v. Paty*, 435 U.S. 618, 626 (1978).  Accordingly, the law gives special solicitude to clergy and their ministry in myriad contexts, including, for example, the ministerial exception to employment discrimination law, *see*,

*e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.,* 565 U.S. 171, 189 (2012); the priest-penitent privilege, *see, e.g.*, *Trammel v. United States*, 445 U.S. 40, 51 (1980) (privilege is rooted in "the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return."); the parsonage tax exemption, *see* 26 U.S.C. § 107[6]; and a statutory service exemption for ministers and ministerial students in the event of a draft, *see* 50 U.S.C. § 3806. *Cf. Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018) (noting that "a member of the clergy who objects to gay marriage on moral and religious grounds could not be compelled to perform the ceremony without denial of his or her right to the free exercise of religion" notwithstanding nondiscrimination provisions pertaining to wedding-related services).

The special role clergy play is all the more essential in the prison context, or in similar contexts where the government's extensive control over persons' lives severely circumscribes their ability to practice their faith. It is thus particularly critical that BOP facilitate the ability of prisoners and clergy to form spiritual relationships. *See, e.g.*, *Katcoff v. Marsh*, 755 F.2d 223, 234 n.4 (2d Cir. 1985) (explaining that the "provision by state and federal governments for chaplains in penal institutions" is a necessity "[s]ince government has deprived such persons of the opportunity to practice their faith at places of their choice"); *see also, e.g.*, *Carter v. Broadlawns Med. Ctr*., 857 F.2d 448, 457 (8th Cir. 1988) (public hospital's employment of chaplains recognized that "a large percentage of Broadlawns' patients were subject to restrictions on their movement attributable to the state by virtue of the fact that the patients were prisoners or had been involuntarily committed or by virtue of hospital rules in the psychiatric ward" and these

---

[6] *But see Freedom from Religion Found., Inc. v. Lew*, 983 F. Supp. 2d 1051, 1073 (W.D. Wis. 2013) (holding that parsonage exemption violated the Establishment Clause), *vacated and remanded on standing grounds*, 773 F.3d 815 (7th Cir. 2014).

"restrictions constitute[d] a state-imposed burden on the patients' religious practices that the state may appropriately adjust for"). BOP's own policies reflect this concern: BOP employs chaplains of various faiths to provide religious services to prisoners, for instance, and BOP allows prisoners to designate a "Minister of Record" whose visits "will not count against the total number of authorized social visitors an inmate is allowed to have on his or her visiting list" and will "not be counted against the total number of visits allowed." [7]

When it comes to state-sponsored executions, the special role played by clergy reaches its apex. *See, e.g.*, [Filing No. 6-5 at 3-4; Filing No. 6-2 at 5-6]. Indeed, the presence of clergy is so essential that the DOJ has mandated—via the Federal Code of Regulations—that a prisoner's selected spiritual advisor be one of the witnesses who "*shall* be present at the execution," 28 C.F.R. § 26.4(c) (emphasis added), and has provided that the "Warden should notify those individuals described in paragraph (c) of this section as soon as practicable before the designated time of execution[,]" *id.* § 26.4(e). *See also id.* § 26.4(b) ("Beginning seven days before the designated date of execution, the prisoner shall have access only to his spiritual advisers . . . his defense attorneys, members of his family, and the officers and employees of the institution.").

### 2. The Government's Decision To Execute Mr. Purkey During A Pandemic Intrudes On Rev. Hartkemeyer's Religious Exercise

Defendants incorrectly believe that Rev. Hartkemeyer's religious relationship with Mr. Purkey over the years is a one-way street—one that provides spiritual benefit only to Mr. Purkey. But the relationship between a priest and those to whom he ministers is of a mutual nature, and the spiritual bond runs both ways. *See, e.g.*, [Filing No. 6-5 at 3-4; Filing No. 6-2 at 5-6].

---

[7] Bureau of Prisons, Program Statement P5360.09 at 16 (Dec. 31, 2004), https://www.bop.gov/policy/progstat/5360_009.pdf.

To be sure, Mr. Purkey's religious exercise is substantially burdened by the Government's decision to schedule his execution during a pandemic, making it "effectively impracticable" for Rev. Hartkemeyer to safely attend. *See* [Filing No. 7 at 25]. But it substantially burdens Rev. Hartkemeyer's religious exercise, too. As discussed in his opening brief, Rev. Hartkemeyer has a sincere religious calling to minister to incarcerated individuals. *Id.* at 21. In exercising that religious belief through his ministerial relationship with Mr. Purkey for more than a decade, a religious obligation arose for Rev. Hartkemeyer, dictating that, as Mr. Purkey's priest, he must attend the execution to perform certain religious rituals as Mr. Purkey dies. The government's decision to proceed with the execution this month, despite a pandemic and the grave risk to Rev. Hartkemeyer's (and many others') health and life, imposes substantial pressure on him to abandon his sacred religious duties.

The nature of the spiritual relationship between Rev. Hartkemeyer and Mr. Purkey is one in which the religious exercise "interests of both parties are inextricably meshed." *See Procunier v. Martinez*, 416 U.S. 396, 409 (1974). The religious exercise at issue in this case depends on the participation of both Mr. Purkey and Rev. Hartkemeyer, so an intrusion into their spiritual relationship at Mr. Purkey's moment of death "necessarily impinges on the interest of each." *See id.* Rev. Hartkemeyer's assertion that his religious exercise is substantially burdened is, therefore, based on the burden *he* will suffer as a result of Defendants' conduct, not the burden suffered by Mr. Purkey. *See id.* ("The wife of a prison inmate who is not permitted to read all that her husband wanted to say to her has suffered an abridgment of her interest in communicating with him as plain as that which results from censorship of her letter to him. In either event, censorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendments rights of those who are not prisoners."); *see also Turner v. Safley*, 482 U.S. 78, 97 (1987) (noting that state rule

prohibiting prisoners from marrying implicated the interests of nonprisoners because it "may entail a consequential restriction on the [constitutional] rights of those" not incarcerated who wished to marry a prisoner).

Neither *Lyng* nor *Bowen*, relied on by Defendants in their Opposition, requires this Court to hold otherwise. In *Lyng,* the government sought merely to make use of its own land; the plaintiffs, who had no ownership interest in the land and, in fact, had no legal right to be present on the land, had no protected interest to assert. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 453 (1988). In *Bowen*, the government used a Social Security Number in its internal administration of benefits; the plaintiff had no right or obligation to be a part of that internal process. *Bowen v. Roy*, 476 U.S. 693, 699-700 (1986).

Here, by contrast, the law recognizes Rev. Hartkemeyer's religious relationship to Mr. Purkey, and his right—because of that religious relationship—to be on the premises for the execution. Specifically, Defendants have expressly affirmed and actively facilitated the spiritual relationship between Rev. Hartkemeyer and Mr. Purkey for years. In fact, it is precisely because Defendants exercise total control over Mr. Purkey, including the environment for executions, that they have a special obligation to facilitate the spiritual relationship between him and his priest. *See, e.g.*, *Katcoff*, 755 F.2d at 234-35. Indeed, in recognition of that obligation, Defendants have explicitly mandated—via federal regulation—that a spiritual advisor designated by Mr. Purkey shall be present at the execution. In this context, Defendants are not merely regulating their own "internal affairs," as was the case in *Lyng* and *Bowen.* Rather, they are regulating the affairs of the very individuals over whom they exercise considerable control and over those on whom (through their own policies and regulations) they have conferred a right to attend the execution. Unlike in *Lyng* and *Bowen*, Defendants' conduct directly affects and regulates Rev. Hartkemeyer, imposing

11

a substantial burden on his religious exercise.  For the reasons discussed above, the safety protocols proposed by Defendants are simply insufficient to alleviate that burden.  Rev. Hartkemeyer's health and life will still be at grave risk if he attends the execution.

### B. The Government Has Failed To Show A Compelling Interest In Carrying Out Mr. Purkey's Execution During A Pandemic

The Government contends it has a compelling interest in the "timely" enforcement of Mr. Purkey's execution [Filing No. 33 at 16-18], but this asserted interest is contradicted by the length of time the Government took to schedule Mr. Purkey's execution.  As Defendants acknowledge, six years lapsed between the conclusion of Mr. Purkey's post-conviction remedies and July 25, 2019, when the Government first set the date for Mr. Purkey's execution.  [Filing No. 33 at 15.] The Government partially attributes this delay to a shortage of lethal injection drugs, resulting in the need to adopt a protocol that permits single-drug injections.  *Id.*  Yet the Government ignores the fact that it had access to the information and research necessary to adopt a single-drug protocol well before 2019.  Since 2012, two years after Mr. Purkey exhausted his appeals, three states have adopted the same single-drug protocol the Government now maintains was necessary to proceed with Mr. Purkey's execution.[8]  These states have carried out over 100 executions in the same period,[9] belying the Government's contention now that protocol development prevented it from acting on its purportedly compelling interest in swiftly administering the death penalty against Mr. Purkey.

The four executions Mr. Barr scheduled in 2020 do not mark a swift administration of justice.  For nearly two decades, the Government did not carry out any federal executions, but now

---

[8] *See* https://deathpenaltyinfo.org/executions/lethal-injection/state-by-state-lethal-injection-protocols, (State of Texas carried out 88 executions since 2012 with pentobarbital; Georgia carried out 24 executions since 2012; Missouri carried out  22 in 2012).
[9] *Id.*

12

Attorney General Barr has rapidly, and without justification, scheduled four executions in the midst of a pandemic. *See Purkey v. United States*, No. 19-3318, 2020 WL 3603779, at *4 (7th Cir. July 2, 2020) ("For many years—to be exact, since March 18, 2003, when Louis Jones, Jr. was executed—the federal government has not carried out any executions. But policy changed in the current Administration, which is moving quickly to resume executions"). Administering justice "swiftly" should not be done at the expense of other legal rights and interests, particularly the rights and interests of other parties, and especially in cases involving the imposition of the death penalty. *See id.* at *11 (7th Cir. July 2, 2020) ("[T]he public interest is surely served by treating [Mr. Purkey's] case with the same time for consideration and deliberation that we would give any case. Just because the death penalty is involved is no reason to take shortcuts—indeed, it is a reason not to do so"). As Rev. Hartkemeyer explains in his declaration, in the Buddhist religious tradition, a believer's death is a moment of supreme religious significance, marking the transition from one world to the other, with consequence far beyond any act or event during life on earth. [Filing 6-2 at 5-6.] The Government's suggestion that a priest claiming a right to be present at the death of the individual to whom he has ministered for more than a decade is in any way comparable to someone demanding to dictate the color of the government's filing cabinets, *see* [Filing No. 33 at 13], underscores the extent to which the Government still fails to appreciate, and indeed is contemptuous of, the sacred and vital nature of Rev. Hartkemeyer's religious duties as a priest.

The Government argues that DOJ regulations *require* the BOP Director to "'promptly designate'" a new date after a "'stay of execution is . . . is lifted'" *Id.* at 17 (citing 28 C.F.R. § 26.3(a)). However, the regulations do not require that the designated date occur within any prescribed timeframe. Indeed, at the same time that the Government maintains it has little

13

discretion due to federal regulations requiring "promptness," it simultaneously asserts that "[o]nce the inmate has exhausted the procedures for appeal of the judgment of conviction and for review of the sentence and the minimum timing requirements are met, the statute and regulation provide no standard to review the Attorney General's setting of the execution date." *Id.* at 22. And the Government highlighted and relied on the Attorney General's discretion is rescheduling the execution in *Purkey v. Barr*, where Defendant—seeking to dismiss challenges to the constitutionality of Mr. Purkey's execution on the ground that they were not ripe, No. 1:19-cv-3570-TSC, ECF No. 18 at 12 (D.D.C.)—refused to say when they would designate an execution date, did not say they would do so at the earliest point, and instead said it would be entirely up to Attorney General Barr. *Id.*, ECF No. 23-1 at 2.

The Defendants' Opposition selectively includes language from three Supreme Court decisions that discuss the timely conduct of executions, failing to provide crucial context that is central to those rulings. [Filing No. 33 at 16-17.] In *Calderon v. Thompson*, 523 U.S. 538 (1998), the Supreme Court's discussion of "finality" in post-conviction proceedings stressed that the federal courts must respect "the State's interest in the finality of convictions that have survived direct review within the state court system." *Id.* at 554. Similarly, *Baze v. Rees*, 553 U.S. 35, 41 (2008) and *Bucklew v. Precythe*, 139 S. Ct. 1112, 1121 (2019), involve state prisoner challenges to execution protocols under the Eighth Amendment. The Court concluded that Baze's claim could not succeed on the merits, 553 U.S. at 61, and in *Bucklew,* it cautioned lower courts to be wary of last-minute challenges that "could have been brought earlier." *Bucklew*, 139 S. Ct. at 1133-34 (internal quotation and citation omitted). Rev. Hartkemeyer's claims are not of the kind that troubled the Court in *Bucklew*. Rev. Hartkemeyer could not have brought his claim sooner; it was the Government's decision to set the execution date in the midst of a pandemic that first

14

endangered his religious liberties. And, as Congress's passage of the stringent protections in RFRA makes clear, a temporary delay to protect Rev. Hartkemeyer's fundamental rights is surely justified.

### C.  The Government Has Failed To Show It Will Use The Least Restrictive Means To Carry Out Its Interests

Where a less restrictive means "is available for the Government to achieve its goals, the Government *must* use it." *Burwell v. Hobby Lobby*, 573 U.S. 682, 728 (2014) (emphasis added)). Outlining the precautions that BOP will take in an attempt to mitigate the spread of COVID-19 during the scheduled executions, the Government argues that, through these protocol, it is employing the least restrictive means. [Filing No. 33 at 18.]  But as discussed above, the government is not even proposing to use all of the precautionary measures that are available (e.g., testing of all involved in the execution proceedings, the provision of N-95 masks to them, and improving ventilation). The safety measures proposed by are minimal at best and are inadequate to eliminate the substantial danger that Rev. Hartkemeyer would face by participating in an event that involves hundreds of individuals, many of whom have traveled from many different locations (including other prisons where COVID-19 is rampant), and will be confined within a small, enclosed location for a considerable length of time.[10]  *See* [Filing No. 58 at 8-9; Filing No. 57 at 3-7.]

The Government fails to provide a satisfactory answer for why it cannot simply delay Mr. Purkey's execution until the dangers of COVID-19 subside. As Defendants acknowledge, RFRA's

---

[10] The Government argues that the PPE it provides will be more than Rev. Hartkemeyer would wear to the grocery store. [Filing No. 33 at 18.]  But Rev. Hartkemeyer's necessary trips to a local grocery store—during which he observes social distancing and is in control of his own movement throughout the building—are not comparable to attending a potential super-spreader event, where he will be escorted through a prison with a known COVID-19 outbreak, forced to interact with scores of individuals who themselves have been exposed to hundreds of other individuals from disparate locations, and remain for hours in poorly ventilated rooms where social distancing will be impossible.

least-restrictive-means requirement is "exceptionally demanding." [ECF Filing No. 33 at 18.] It imposes a "heavy burden" on the Government, which "must provide actual evidence, not just conjecture, demonstrating that the . . . [official conduct] in question is, in fact, the least restrictive means." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 475–76 (5th Cir. 2014). Defendants argue that they cannot indefinitely suspend the Government's ability to execute Mr. Purkey, but that is not what Rev. Hartkemeyer asks this Court to do: He seeks a postponement to a time at which he could avail himself of a vaccine or treatment so that he may safely attend and carry out his religious obligations. Though it is not clear exactly when this will occur, Dr. Anthony Fauci, the Government's leading expert on the pandemic, testified before Congress last month that a vaccine was a "matter of when and not if" and that one could be available by the end of this year.[11]

Where postponement of a government proceeding would avoid an infringement of a fundamental right, the Supreme Court has held that the government must provide evidence that this less restrictive alternative is not adequate. *See Nebraska Press Ass'n v. Stuar*t, 427 U.S. 539, 563–64 (1976) (holding that, before issuing a gag order on media publication of certain details relating to an upcoming trial in a high-profile case, the Nebraska Supreme Court had improperly failed to demonstrate the inadequacy various less restrictive alternatives, including a "(a) change of trial venue . . . (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors . . . ; (d) the use of emphatic and clear instructions on the sworn duty of each juror"). Defendants, with their general, unsupported assertions that they cannot delay

---

[11] *COVID-19 vaccine a matter of 'when not if,' but must be produced safely: Fauci*, CBC (updated June 23, 2020) https://www.cbc.ca/news/world/dc-house-coronavirus-briefing-1.5623382. *See also Trump Administration's Operation Warp Speed Accelerates AstraZeneca COVID-19 Vaccine to be Available Beginning in October*, U.S. Dep't of Health and Human Servs. (May 21, 2020), https://www.hhs.gov/about/news/2020/05/21/trump-administration-accelerates-astrazeneca-covid-19-vaccine-to-be-available-beginning-in-october.html*; See also Fact Sheet: Explaining Operation Warp Speed*, U.S. Dep't of Health and Human Servs. (June 16, 2020), https://www.hhs.gov/about/news/2020/06/16/fact-sheet-explaining-operation-warp-speed.html.

Mr. Purkey's execution, have not met this heavy burden here. *See Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1045 (9th Cir. 2018) ("It is the government's burden to prove that these specific restrictions are the least restrictive means available to further its compelling interest. They cannot do so through general assertions of national security, particularly where plaintiffs have alleged that CBP is restricting First Amendment activities in traditional public fora such as streets and sidewalks."); *see also Burwell*, 573 U.S. at 728 ("HHS has not shown that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases").[12]

### D. The Government's Scheduling Decision Is Reviewable Under The Administrative Procedure Act And Must Be Set Aside

Defendants attempt to dispose of Rev. Hartkemeyer's APA claim by suggesting that the Government's discretion to set execution dates is essentially unlimited under the applicable statute and regulations—an argument that is at odds with Defendants' contention elsewhere that federal law cabins the Government's discretion in setting execution dates. [*See, e.g.*, Filing No. 33 at 17 (citing requirement that BOP promptly set a new execution date after a stay is lifted to demonstrate compelling interest for RFRA purposes).] But the very regulations to which Defendants point to support their argument show just the opposite, as those regulations outline clear requirements to which the Government must adhere in scheduling and carrying out executions. Defendants have failed to do so here and, as a result, have exceeded the scope of their discretion.

Similarly unavailing are Defendants' contentions that Rev. Hartkemeyer falls outside the relevant "zone of interests" to assert an APA claim—an argument that is belied by the

---

[12] The Government's reliance on *United States v. Anderson*, 854 F.3d 1033, 1037 (8th Cir. 2017) and *United States v. Christie*, 825 F.3d 1048, 1054 (9th Cir. 2016) is misplaced. The religious interests at issue involved criminal defendants asserting RFRA claims to justify distributing heroin (*Anderson*) and marijuana (*Christie*). The courts of appeals held that there was no less restrictive means available to satisfy the government's interest in stopping distribution of these drugs than to proceed with the prosecutions at issue (as opposed to exempting each defendant from federal laws prohibiting such distribution).

17

Government's own regulations—and the suggestion that the Government considered the necessary interests in making its decision—which it plainly did not do. No amount of *post hoc* rationalization can cure the defects inherent in the Government's decision. Accordingly, the Government's action was arbitrary and capricious and should be set aside.

### 1. The Government Exceeded Its Discretion In Scheduling Mr. Purkey's Execution During The Pandemic

Rev. Hartkemeyer does not dispute that the decision to schedule an execution falls within the Government's discretion. [*See* Filing No. 7 at 34 (acknowledging that "the authority to schedule executions is delegated to the Attorney General by statute").] He does contend, however, that the Government acted outside the bounds of that discretion by scheduling Mr. Purkey's execution during the middle of an unprecedented pandemic and public health crisis—at a time when Rev. Hartkemeyer, as Mr. Purkey's designated spiritual advisor, is unable to attend without putting his own health and life at substantial risk.

Even when a statute is broadly worded, agency discretion is not limitless. "'[W]hether a case is governed by *Overton Park* ('no law to apply' so the presumption of reviewability is lost) or *Chaney* (agency action [where a] presumption of non-reviewability has not been overcome),' judicial review is available where there are 'meaningful standards to cabin the agency's otherwise plenary discretion.'" *Physicians for Soc. Responsibility v. Wheeler*, 956 F.3d 634, 643 (D.C. Cir. 2020) (quoting *Drake v. FAA*, 291 F.3d 59, 71 (D.C. Cir. 2002)). In addition, "judicially manageable standards may be found in formal and informal policy statements and regulations as well as in statutes." *Id.* (quoting *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (internal quotation marks and citation omitted)).

Beyond the limitations on their discretion that Defendants concede in their Opposition [*see* Filing No. 33 at 21-22], the applicable DOJ regulation unequivocally prescribes that several

18

specified individuals "*shall* be present at the execution."  28 C.F.R. § 26.4(c) (emphasis added).

Among those listed is a "spiritual adviser" who is "selected by the prisoner."  *Id.*  As explained

above, Rev. Hartkemeyer is the spiritual advisor Mr. Purkey has designated.  [Filing No. 6-2 at 6;

Filing No. 7 at 20.]   Accordingly, pursuant to the Government's own regulations, Rev.

Hartkemeyer "shall" be present for Mr. Purkey's execution.   Defendants' scheduling of the

execution during a pandemic is inconsistent with this mandate because it effectively precludes

anyone who "shall" be present from fulfilling their obligations under the regulation, particularly

Rev. Hartkemeyer, given his heightened risk for becoming infected and developing severe

COVID-19 complications.   Defendants may not simply parrot a regulatory provision reflecting

inherent discretion—that the designation of an execution date be made "promptly" following

termination of a stay[13]—while wholly ignoring another mandatory regulation.  By doing so here,

they have exceeded the scope of their discretionary authority, and their action is thus subject to the

Court's review.[14]

### 2.   Rev. Hartkemeyer Falls Within The Relevant "Zone Of Interests"

The "zone of interests" requirement is one "of general application" for "all statutorily

created causes of action."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118,

129 (2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 163) (1997)).  The test "denies a right of

review if the plaintiff's interests are so marginally related to or inconsistent with the purposes

---

[13] *See* 28 C.F.R. § 26.3(a)(1).  Notably, while Defendants repeatedly emphasize the requirement that executions be scheduled "promptly" following the lifting of a stay, [*see* Filing No. 33 at 17, 22 25], they fail to grapple with the logical fallacy behind their argument.  It simply does not follow from a command that an execution be *scheduled* "promptly" that the chosen date must fall within any specified timeframe.  The Government could have promptly scheduled Mr. Purkey's execution to occur at a later date, when the existence of an effective treatment or vaccine for COVID-19 would be much more likely.  [*See* Filing No. 7 at 38 n.38 (listing examples of executions that have been rescheduled for later dates in light of the pandemic).]

[14] Defendants do not contest, and thus concede, that the scheduling decision amounted to final agency action. [Filing No. 33 at 22].

implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 399 (1987). "[T]here need be no indication of congressional purpose to benefit the would-be plaintiff" for that plaintiff to fall within a statute's zone of interests. *Id.* at 399-400. This standard "is particularly generous as applied to plaintiffs who bring suit under the APA, in light of the need to 'preserv[e] the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review.'" *Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*, 144 F. Supp. 3d. 35, 58 (D.D.C. 2015) (quoting *Lexmark Int'l*, 572 U.S. at 130). *See also Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014) (applying "zone of interests" test "in a manner consistent with 'Congress's evident intent when enacting the APA to make agency action presumptively reviewable'" (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012))).

As Defendants acknowledge, [*see* Filing No. 33 at 23-24], RFRA is one statute the Court may evaluate to determine whether he falls within its zone of interests. For the reasons explained above, *see supra* 6-17, and those advanced in his opening brief, [*see* Filing No. 7 at 23-33], Rev. Hartkemeyer presents a valid cause of action under RFRA. Defendants' contention that Rev. Hartkemeyer—an ordained Buddhist priest who alleges Government infringement of his religious exercise—"does not even arguably fall within" the class of plaintiffs Congress authorized to sue under RFRA, [*see* Filing No. 33 at 23], is wholly unavailing. Indeed, as Rev. Hartkemeyer explained in his opening memorandum, RFRA applies whenever the religious exercise of any "person" is substantially burdened, and the Supreme Court has adopted a broad interpretation of that term. [Filing No. 7 at 24 (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 719 (2014))].

In addition to falling within RFRA's zone of interests, Rev. Hartkemeyer falls squarely within the zone of interests of the Federal Death Penalty Act ("FDPA"), under which Defendants derive their authority to set the schedule and conditions for executions. *See* 18 U.S.C. § 3596; [Filing No. 33 at 24.] Defendants assert that, because the FDPA "makes no provision for spiritual advisors attending an execution" and provides them no cause of action, they cannot fall within the statute's zone of interests. [Filing No. 33 at 24.] But this argument entirely misses the point. The underlying premise of the "zone of interests" inquiry in APA cases is that the statute in question "do[es] not [itself] include causes of action for judicial review." *Lexmark Int'l*, 572 U.S. at 130. And, Defendants' position is critically undermined by the fact that the Government's regulations implementing the FDPA *do* call for the presence of a spiritual advisor—and the presence of many other individuals apart from the condemned prisoner—at an execution. *See* 28 C.F.R. § 26.4(c). In other words, the Government's own interpretation of the statute, as expressed through its duly promulgated regulations, acknowledges the necessity of a spiritual advisor's presence.

Moreover, although the FDPA does not specifically call for the presence of a spiritual advisor, it commands that the Government "implement[] . . . the sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a); *see In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 108 (D.C. Cir. 2020) (per curiam) ("It is common ground that this provision requires the federal government to adhere *at least* to a State's choice among execution methods such as hanging, electrocution, or lethal injection." (emphasis added)). In turn, the operative state statute in this case requires the director of the state's Department of Corrections, "at the request of the defendant," to "permit such clergy or religious leaders, not exceeding two, as the defendant may name . . . to be present at the execution." Mo. Rev. Stat. § 546.740 (2013). Thus, while the FDPA facially "makes no provision for spiritual

21

advisors attending an execution," the state statute to which the FDPA orders the Government to look in implementing the execution *does* make such a provision.

Rev. Hartkemeyer is bound to fulfill his solemn religious duty and his obligation under the regulation to be present for Mr. Purkey's execution. The Government's actions prevent him from doing so. Whether viewed under RFRA or the FDPA, Rev. Hartkemeyer falls within the zone of interests Congress sought to protect.

### 3.   The Government's Decision Is Arbitrary And Capricious

In defending the soundness of their actions, Defendants point to the Government's interest in ensuring that executions are carried out in a timely manner. [Filing No. 33 at 25.] But Defendants fail seriously to dispute the fact that they did not give due consideration to the unique risks posed by COVID-19, the only reasonable response to which would be to delay Mr. Purkey's execution until it can be carried out safely. Instead of citing evidence of sufficiently developed plans, they offer mere conjecture, stating that it is "inconceivable that BOP would not have considered" the effects of COVID-19 when it scheduled Mr. Purkey's execution date. *Id.* at 26. On the contrary, it is evident that BOP did just that.

The declaration of Mr. Winter does not absolve Defendants' argument of its deficiencies. As a threshold matter, Defendants do not even attempt to address the facts in Ms. Woodman's declaration clearly illustrating that they did not have any plans in place to address the challenges posed by the COVID-19 pandemic at the time the Government made its scheduling decision, which, of course, is the only relevant time period for purposes of the Court's review. *Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*, 2020 WL 3271746 at \*9 (U.S. June 18, 2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked *when it took the action*.'" (quoting *Michigan v. EPA*, 576

U.S. 743, 758 (2015) (emphasis added))).  Nor could they, as the evidence is clear that no such plan existed.[15]

Even if the measures belatedly recited in Mr. Winter's declaration could be considered at this late date, they are clearly insufficient.  To take just one example, Mr. Winter asserts that FCC Terre Haute staff are required to undergo daily temperature checks and symptom screenings. [Filing No. 33-1 at 2.]  However, he specifies no similar measures that will be taken with regard to the many others who will be present for Mr. Purkey's execution.  More astonishingly, he actually admits pointedly that "BOP *has no plans* to conduct COVID testing on individuals involved in the execution in advance of the execution."  *Id.* at 3 (emphasis added).  Without comprehensive testing, screenings on a mere subset of individuals who will be present will be wholly ineffective in identifying any participants who are infected with COVID-19 but are asymptomatic, which the CDC estimates to amount to 35 percent of all infections.[16]

Further, Defendants have not even attempted to reconcile the fact that BOP continues to suspend all visitation, including legal visits, at the entire FCC Terre Haute complex due to the dangers of COVID-19, but is now attempting to proceed with an event requiring an influx of people all at one time traveling from all over the country.  Since March 2020, when BOP first suspended visitation bureau-wide, the death toll from COVID-19 has significantly increased across the country; FCC Terre Haute is now home to a known outbreak of the virus; and the country is now in the midst of another surge in infections that has caused numerous states to backtrack on or pause their reopenings due to the grave risk of virus spread.

---

[15] *See supra* 1 n.1.  Even now, such a plan, if it exists, remains incomplete.  At the Court's urging, following the July 6, 2020 status conference, Rev. Hartkemeyer's counsel submitted a list of questions to Defendants' counsel seeking to confirm outstanding facts regarding COVID-19 safety measures in place at USP Terre Haute.  As of the time of filing of this reply, Defendants have yet to respond to several of those questions.  *See* [Filing No. 59 at 2.]

[16] *See* Centers for Disease Control & Prevention, "COVID-19 Pandemic Planning Scenarios," https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html (updated May 20, 2020).

COVID-19 is an insidious virus that is not easily detectable. It is also highly communicable and deadly—especially so for individuals like Rev. Hartkemeyer, whose age and pre-existing conditions make him particularly susceptible to this dangerous contagion. The Government's lack of due consideration for these challenges renders its decision to schedule Mr. Purkey's execution in the midst of the pandemic arbitrary and capricious.

### III.    DEFENDANTS' BALANCE OF HARMS ANALYSIS IS UNSOUND

The Defendant's balance-of-harms analysis grossly understates the risk of COVID-19 transmission. The United States is the epicenter of the pandemic, with confirmed cases accelerating in June and early July 2020 at an alarming rate. [Filing No. 57 at 2.] As of July 8, 2020, 3 million COVID-19 cases had been identified in the United States and over 130,000 individuals had died from the disease.[17] Rev. Hartkemeyer's risk of exposure is not a "mere possibility" as the Defendants contend, but a terrifying reality. [Filing No. 33 at 27] (quotations omitted). The BOP has not taken sufficient steps to mitigate against this risk and has instead created a perfect storm of conditions to create a high risk of significant transmission.

Moreover, the Government not only improperly diminishes the threat of irreparable injury from potential COVID-19 transmission, but it also fails to consider entirely the irreparable injury Rev. Hartkemeyer will suffer if is unable to attend Mr. Purkey's execution. If Rev. Hartkemeyer is unable to attend the execution because of the grave danger it poses to his health and life, he will be prohibited from carrying out his sacred religious duties during Mr. Purkey's death. There is no remedy for this harm. *See Korte v. Sebelius*, 528 F. App'x 583, 588 (7th Cir. 2012) ("Without an injunction pending appeal, the Kortes will be forced to choose between violating their religious beliefs by maintaining insurance coverage for contraception and sterilization services contrary to

---

[17] *See* Johns Hopkins University Coronavirus Resource Center (July 8 2020), https://coronavirus.jhu.edu/map.html.

24

the teachings of their faith and subjecting their company to substantial financial penalties.  RFRA protects the same religious liberty protected by the First Amendment, and it does so under a more rigorous standard of judicial scrutiny; the loss of First Amendment rights "'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

After an eleven-year spiritual relationship, Rev. Hartkemeyer has only one opportunity to guide Mr. Purkey to the afterlife.  The Government, on the other hand, must simply postpone the execution to another date. Such a delay "will not substantially harm the government, which has waited at least seven years to move forward on Purkey's case."  *Purkey v. United States*, No. 19-3318, 2020 WL 3603779, at *11 (7th Cir. July 2, 2020).

The Government also fails to consider the potential broader community harm that is likely to result from moving forward with an execution during a pandemic.  Holding a super-spreader event threatens Rev. Hartkemeyer's health and religious liberties, and also places at risk for infection and illness a broad population, including BOP staff, other witnesses of the execution, prisoners, and community members.  Among the individuals at risk should the Government proceed with the back to back executions in July are members of the victims' families, some of whom actively oppose the Government's rush to carry out death sentences during a pandemic*, See Proposed Complaint For Declaratory and Injunctive Relief*, ECF 35-1.  The balance of harms unquestionably tips in Rev. Hartkemeyer's favor.

## CONCLUSION

For the foregoing reasons, Plaintiff Hartkemeyer respectfully requests that the Motion for Preliminary Injunction be granted.

25

Dated:  July 8, 2020

Respectfully submitted,

/s/      *David C. Fathi*

Douglas Hallward-Driemeier          David C. Fathi**
Maria G. Calvet                            Daniel Mach
Michelle H. Behrens                      Heather L. Weaver
John T. Dey                                 Jennifer Wedekind
ROPES & GRAY LLP                   AMERICAN CIVIL LIBERTIES UNION
2099 Pennsylvania Avenue NW         FOUNDATION
Washington D.C. 20006                  915 15th Street NW
Tel:  (202) 508-4600                      Washington, DC 20005
Douglas.Hallward-Driemeier@ropesgray.com   (202) 548-6603
Maria.Calvet@ropesgray.com            dfathi@aclu.org
Michelle.Behrens@ropesgray.com       dmach@aclu.org
John.Dey@ropesgray.com                 hweaver@aclu.org
                                              jwedekind@aclu.org

                                              Cassandra Stubbs
                                              Amy Fly
                                              AMERICAN CIVIL LIBERTIES UNION
                                                FOUNDATION
                                              201 W. Main St., Suite 402
                                              Durham, NC 27701
                                              (919) 688-4605
                                              cstubbs@aclu.org
                                              afly@aclu.org

                                              **Not admitted in D.C.; practice limited
                                               to federal courts

                                              *Attorneys for Plaintiff*

26

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on the 8th day of July, 2020, I caused the foregoing to be filed electronically with the Clerk of the Court via CM/ECF, with all authorized parties being served electronically via CM/ECF.

/s/ *David C. Fathi*
David C. Fathi
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 548-6603
dfathi@aclu.org

1