**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| DALE HARTKEMEYER (AKA SEIGEN) | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-00336-JMS-DLP |
| | ) | |
| WILLIAM P. BARR, in his official capacity as the Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons; and T.J. WATSON, in his official capacity as Complex Warden for Terre Haute Federal Correctional Complex, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE TO NOTICE OF SUPPLEMENTAL AUTHORITY AND
RESPONSE TO SURREPLY**

Plaintiff respectfully submits the following response to Defendants' July 12, 2020 Notice of Supplemental Authority, which attaches the opinion issued the same day by the U.S. Court of Appeals for the Seventh Circuit in *Peterson v. Barr*, Case No. 20-2252 (7th Cir. July 12, 2020). [*See* Filing No. 78.] This response also briefly addresses Defendants' Sur-Reply, filed on July 13, 2020 in response to an order of this Court. [*See* Filing No. 81.]

**I.      *Peterson* Does Not Negate The Viability Of Rev. Hartkemeyer's Claims**

In *Peterson*, the Seventh Circuit vacated the preliminary injunction this Court granted in *Peterson v. Barr*, Cause No. 2:20-cv-00350-JMS-DLP, ECF No. 20 (S.D. Ind. July 10, 2020). The Seventh Circuit held that the plaintiffs in that case failed to demonstrate that 28 C.F.R. § 26.4(c)(4)(i) "gives them a legally enforceable right to attend the execution" of prisoner Daniel

Lewis Lee, scheduled for July 13, 2020, because the "regulation specifies who may be permitted by the Warden to attend an execution." [Filing No. 78-1 at 8.] That decision does not affect this case, for several reasons.

First, the zones of interests invoked by Rev. Hartkemeyer to support his Administrative Procedure Act ("APA") claim are distinct from that of the *Peterson* plaintiffs. [*See* Filing No. 62 at 24-27.] While Rev. Hartkemeyer relies, in part, on 28 C.F.R. § 26.4(c) for his APA claim, the relevant provision of that regulation specifies that the "spiritual adviser" is "selected *by the prisoner*," not by the Warden. 28 C.F.R. § 26.4(c)(3) (emphasis added). And, as previously noted, the regulation unambiguously states that the spiritual advisor selected by the prisoner "*shall* be present at the execution." *Id.* (emphasis added). This formulation provides a clear standard for review and creates a mandatory basis for Rev. Hartkemeyer to fall within the Federal Death Penalty Act's ("FDPA") zone of interests because he has a right—indeed a regulatory mandate—that specifically designates him to attend Mr. Purkey's execution as the spiritual advisor mentioned in the provision at issue. BOP's decision to carry out the execution in the midst of a pandemic adversely affects Rev. Hartkemeyer's ability to satisfy that mandate when doing so places him in grave medical danger.

Rev. Hartkemeyer's Religious Freedom Restoration Act ("RFRA") claim provides yet another, separate legal basis for his APA claim, one not raised by the *Peterson* plaintiffs. As previously explained, [Filing No. 62 at 25], Rev. Hartkemeyer clearly falls within RFRA's zone of interests for purposes of his APA claim.

Second, even if the *Peterson* decision somehow affected Rev. Hartkemeyer's APA claim, it has no bearing whatsoever on his independent RFRA claim.

**II.   The New BOP COVID-19 Staff Exposure And Lapses In Protocol Highlight The Need For Urgent Relief**

The Government's alarming disclosure about the recent COVID-19 infection by a BOP staff member only underscores the need for urgent relief in this case.  [Filing No. 77-1 at 1.]  As Dr. Joe Goldenson explains, the disclosure "confirms the worst case scenario:  a known exposure from an infected staff person who has been in contact with other staff involved in carrying out the executions and who has been in housing unit with the individuals scheduled for execution." [Filing No. 80-1 at 2].  With the Government's preparations for the executions already underway, the heightened risk of COVID-19 has already materialized and there is no possible way to reduce the known exposure created by this outbreak without a quarantine period.  *Id.* at 2-3.

The Government's new filing reported that, over the weekend of July 4, 2020, a BOP staff member at FCI Terre Haute was exposed to COVID-19.  [Filing No. 77-1 at 1.]  Though he learned of his exposure on the late morning of July 8, 2020 while onsite at FCI Terre Haute and thereafter entered self-quarantine, in the days between his exposure and disclosure of the same, he had already participated in multiple execution preparation meetings at which he potentially exposed others who will be present at the executions, including but not limited to:  (a) a meeting with "outside law enforcement in preparation for the scheduled executions" and (b) "a meeting regarding the handling of demonstrators at the scheduled executions."  He also "attended to an issue at the SCU," (*id.* at 2), where Mr. Purkey is currently held and where Rev. Hartkemeyer would be required to be in order to visit Mr. Purkey in the days leading up to the execution.  [*See* Filing No. 6-2 at 8.]  The BOP staff member does not recall whether he came into contact with individuals who will be present at the execution or in designated locations where Rev. Hartkemeyer would necessarily be.  [Filing No. 77-1 at 2.]  He received positive test results for COVID-19 on July 11, 2020.  *Id.*  In the full week between his exposure and diagnosis, the BOP

staff member could have infected untold numbers of other BOP staff, prisoners, and members of the surrounding community. [*See* Filing No. 6-25 at 10 (declaration of Dr. Goldenson, explaining that "COVID-19 has a typical incubation period of 2 to 14 days . . . and transmission often occurs before the presentation of symptoms"); Filing No. 80-1 at 2 (second supplemental Dr. Goldenson declaration explaining the need for BOP to identify all persons exposed through meetings or indoor settings to the infected staff person).] In turn, those individuals may likewise remain pre-symptomatic for a number of days, or even remain entirely asymptomatic, and unknowingly spread the virus and thus must be placed in a full quarantine for 14 days from the last contact with the infected staff person. [*See* Filing No. 80-1 at 2.] BOP will need to conduct testing of those quarantined individuals, and if any test positive during the quarantine period, BOP will "need to trace the contact of those infected individuals and place them on quarantine, with the 14-day clock running from the last date of contact." *Id.* at 3. This process may take several weeks to determine and isolate everyone carrying the virus as a result of this exposure from the infected BOP staff member. *Id.*

The Government's failures to ensure compliance with its only limited COVID-19 protocols are an equal cause for concern. The recent filing concedes that the infected BOP staff individual "did not wear a mask at all times," contrary to the very mandate the Government touts as the one upon which Rev. Hartkemeyer should rely for his safety—that all BOP staff are required to wear masks. [Filing No. 33-1 at 3.] This lapse increases the risk that others will now be infected, and points to the need for BOP to "conduct an assessment of its policies to determine how and why such a basic requirement was not followed and address this breakdown." [Filing No. 80-1 at 3].

The Government's response to these events, which unfolded subsequent to the filing of Rev. Hartkemeyer's Complaint, falls radically short. First, the BOP filing makes general reference

4

to steps BOP plans to take to identify individuals with whom the BOP staff member was in contact and only commits itself to ensuring that those directly exposed staff will not have contact "[f]or the duration of the execution or until a negative test is obtained" with "inmates scheduled for execution, ministers of record, witnesses of the execution, attorneys, or press". [Filing No. 77-1 at 2.] This response is fully inadequate. All of the exposed individuals—including exposed prisoners in the SCU unit—must be placed on a full 14-day quarantine from the date of exposure. [Filing No. 80-1 at 2-3.] A negative test this week is premature and insufficient to ensure that any of the exposed individuals are not carrying the disease. *Id.* at 3. The Government offers no assurance that it is capable of evaluating all BOP staff who have been exposed to the infected person in order to ensure that they have not been in contact with staff who *will*, in turn, interact with Rev. Hartkemeyer and others present at the execution.

Even with this new information about a documented infection, the Government has failed to disclose other critical information, including whether other BOP staff members have displayed symptoms or undergone testing for which results may still be pending. [*See* Filing No. 80-2 at 1-2.] The Government's disclosure lacks crucial details needed to evaluate the risk posed by the BOP staff member's contact with any of the death row prisoners or SCU staff during the incident in the very same poorly ventilated indoor space where the Government intends to execute Mr. Purkey.

This late-breaking development underscores the unreliability of BOP's plan to make witnesses affirm in writing that they will don a BOP-provided mask, particularly when its own staff elect not to wear one. [Filing No. 80-3 at 2]; [*see* Filing No. 80-1 at 3 ("The fact that [a BOP staff member] was permitted to engage with others without a mask suggests the lack of adequate compliance and enforcement of even the limited COVID-19 policies the Government described

5

adopting in advance of the execution.")]. So, too, BOP intends to make personal protective equipment available to witnesses, but not mandatory. [Filing No. 80-3 at 2.] Finally, its continued reliance on temperature checks and symptom screenings is of little value when we now know that at least one BOP staff member, who presumably passed these screenings over the course of the last week, subsequently tested positive after exposing an unknown number of individuals in the prison complex. [*See* Filing No. 80-1 at 3.] Moreover, they are certainly of no comfort to medically vulnerable individuals, such as Rev. Hartkemeyer, who are bound to attend the execution. [*See, e.g.*, Filing No. 80-3 at 3 (supplemental declaration of Elizabeth Vartkessian stating that "Mr. Winter's declaration has heightened my concerns about the risk to my own and my family's safety if I attend Mr. Purkey's execution").]

For these reasons, the Court should grant Rev. Hartkemeyer's requested preliminary injunctive relief.

Dated: July 13, 2020

Respectfully submitted,

/s/  *David C. Fathi*

| | |
|---|---|
| Douglas Hallward-Driemeier | David C. Fathi* |
| Maria G. Calvet | Daniel Mach |
| Michelle H. Behrens | Heather L. Weaver |
| John T. Dey | Jennifer Wedekind |
| ROPES & GRAY LLP | AMERICAN CIVIL LIBERTIES UNION |
| 2099 Pennsylvania Avenue NW | FOUNDATION |
| Washington D.C. 20006 | 915 15th Street NW |
| Tel:  (202) 508-4600 | Washington, DC 20005 |
| Douglas.Hallward-Driemeier@ropesgray.com | (202) 548-6603 |
| Maria.Calvet@ropesgray.com | dfathi@aclu.org |
| Michelle.Behrens@ropesgray.com | dmach@aclu.org |
| John.Dey@ropesgray.com | hweaver@aclu.org |
| | jwedekind@aclu.org |

Cassandra Stubbs
Amy Fly
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
201 W. Main St., Suite 402
Durham, NC 27701
(919) 688-4605
cstubbs@aclu.org
afly@aclu.org

*Not admitted in D.C.; practice limited to
federal courts

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on the 13th day of July, 2020, I caused the foregoing to be filed electronically with the Clerk of the Court via CM/ECF, with all authorized parties being served electronically via CM/ECF.

/s/ *David C. Fathi*_____
David C. Fathi
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 548-6603